UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
DOUGLAS JENDRAS,

                Plaintiff,

-against-

ABOVENET, INC.,

                Defendant.
---------------------------------------------------------X

Case No.11 Civ. 5409 (KMK)

**AFFIDAVIT IN OPPOSITION**

STATE OF CONNECTICUT )
                          )ss.:
COUNTY OF FAIRFIELD )

DOUGLAS JENDRAS, being duly sworn, deposes and says:

1. I am the Plaintiff in the above-captioned action and am fully familiar with all the prior facts and circumstances herein. I make this Affidavit in opposition to the Defendant's motion for summary judgment dismissing my complaint in its entirety.

2. I was an employee of AboveNet, Inc. and its predecessor in interest, Metromedia Fiber Network, Inc., for more than 10 years. After Metromedia Fiber Network, Inc. emerged from reorganization in Bankruptcy Court in September 2003, the Company was renamed AboveNet, Inc. I served as the Senior Vice President in charge of Operations at AboveNet ("AboveNet" or "the Company") from May 2004 until July 11, 2011, when my employment was terminated.

3. My employment agreement with AboveNet for the initial Term beginning September 12, 2003 is annexed hereto as Exhibit A.

4. My subsequent employment agreement with AboveNet for the initial Term beginning September 2, 2008 is annexed hereto as Exhibit B.

5. The First Amendment to the September 2, 2008 employment agreement which extended the initial Term of that agreement to December 31, 2011 is annexed hereto as Exhibit C.

6. My performance as an employee of AboveNet was reviewed on an annual basis by my direct superior. From September 2003 to the end of 2010, my direct superior was William LaPerch, the Chief Executive Officer of the Company. In or about January 2011, Rajiv Datta was appointed to the newly created position of Chief Operating Officer and he became my direct superior but my employment was terminated by Mr. Datta on July 11, 2011, before Mr. Datta ever conducted a review of my performance.

7. The written reviews of my performance by Mr. LaPerch for the years 2004 through 2010 are collectively annexed hereto as Exhibit D.

8. For each of the years that I was a Senior Vice President of AboveNet, with the exception of 2009, I received merit increases in my salary. Copies of the confirmations of the approved annual merit increases in my salary are collectively annexed hereto as Exhibit E.

9. In 2008, 2009, 2010 and 2011, I also received performance bonuses. Additionally, during my tenure, I received Stock Awards including 3 Stock Awards pursuant to AboveNet's 2008 Equity Incentive Plan ("2008 Plan"). A copy of the 2008 Equity Incentive Plan is annexed hereto as Exhibit F.

10. The first stock award I received pursuant to the 2008 Plan was approved by the Board of Directors on September 8, 2008 ("September 2008 Award"). A copy of

the September 8, 2008 Stock Award Agreement delivered to me by the Company is annexed hereto as Exhibit G.

11. On December 20, 2010, I received a second stock award approved by the Board of Directors ("December 2010 Award") pursuant to the 2008 Plan. A copy of the December 2010 Award Agreement delivered to me by the Company is annexed hereto as Exhibit H.

12. On January 25, 2011, I received a third stock award approved by the Board of Directors pursuant to the 2008 Plan. A copy of the January 25, 2011 Award Agreement executed by me and the Company is annexed hereto as Exhibit I.

13. The terms of the January 25, 2011 Stock Award were also summarized in a Form 8K filed by the Company. A copy of the Form 8K is annexed hereto as Exhibit J.

14. In the fall of 2010, Mr. LaPerch and I had lunch together and he asked me about an investment I had made in a hamburger franchise owned by my brother in law and whether I planned on leaving AboveNet. I informed Mr. LaPerch that I had no plans to leave the Company.

15. Shortly before the Board approved the January 2011 Stock Award, Mr. LaPerch asked me a second time whether I planned to leave the Company and I again informed him that I had no such plans.

16. In January 2011, Mr. LaPerch informed me during a conversation in his office that he would be appointing Rajiv Datta, who was then Senior Vice President in charge of technology, to the newly created position of Chief Operating Officer. Mr. LaPerch asked me again at that time if I had plans to leave the Company and I again informed Mr. LaPerch that I had no plans to leave.

17. At the end of January 2011, subsequent to his appointment to the position of Chief Operating Officer, Mr. Datta, who had been working in the Company's Mahwah, New Jersey office, advised me that he planned to work primarily out of the Company's headquarters in White Plains. Since there was no existing office in White Plains that was available for Mr. Datta, he indicated that he would be working out of the Human Resources conference room. Since most of the employees engaged in Operations for the Company worked outside of White Plains, I suggested to Mr. Datta that he take my office. I also proposed that I would telecommute from home, a practice which was followed by a number of other executives of the company.

18. Mr. Datta, who indicated to me that he would be travelling extensively to meet with AboveNet personnel at offices located throughout the country, decided to accept my offer to relinquish my office and proposed that I would work out of the White Plains office when he was not travelling and as long as there was no conflict with my own existing schedule. Although Mr. Datta did not advise me then or at any subsequent time how he would be sharing his travel schedule with me, he did indicate that he would be doing so. This understanding was confirmed in an e-mail Mr. Datta apparently sent to Mr. LaPerch at the time of our agreed arrangement on February 2, 2011. While I did not see the e-mail until after the commencement of this lawsuit, the e-mail accurately described the understanding that Mr. Datta would be sharing his travel schedule with me. Mr. Datta never instructed me to have my administrative assistant obtain his travel schedule from his administrative assistant. A copy of Mr. Datta's e-mail is annexed hereto as Exhibit K.

19. On or about March 1, 2011, the Company filed its Form 10K. I subsequently read in the filed annual report that the Compensation Committee, based on Mr. LaPerch's recommendation, had approved an increase in my base salary effective March 1, 2011. A copy of the relevant portion of the Form 10K is annexed hereto as Exhibit L.

20. On March 2, 2011, after I had already moved out of my White Plains office and begun telecommuting, I met with Mr. LaPerch for my annual performance review. In the course of my review, Mr. LaPerch expressed his reservations about the telecommuting arrangement and professed not to know much about the understanding I had reached with Mr. Datta. He also suggested that the success of operations during 2010 was attributable more to the strength of the organization than my management efforts. Mr. LaPerch also informed me that a number of salespeople had expressed the view that I was difficult to approach and identified those individuals as Doug Turtz, Eric Nickla and Chris Machen. I subsequently spoke to all three salespeople and all three indicated they could not recall ever expressing such a point of view. Copies of my e-mail exchanges with Mr. Machen and Mr. Turtz are annexed hereto as Exhibit M.

21. On March 3rd, the day following my review, I emailed Mr. Datta to express my objection to the review. A copy of my e-mail is annexed as Exhibit N.

22. Mr. Datta responded to my e-mail that same day (Exhibit N) and indicated that he was in Virginia but would call me to discuss. I subsequently met with Mr. Datta in White Plains and had some follow up telephone conferences with Mr. Datta in the days following my performance review. In the course of those discussions, Mr. Datta expressed some doubt that he and I would be able to work effectively together. I

indicated that if the Company no longer valued my contribution, I would voluntarily separate as long as the Company fulfilled it obligations to me under the relevant contracts consisting of my employment agreement and the Stock Award agreements. Mr. Datta, in general terms, expressed the willingness of the Company to agree to work toward an agreement on a voluntary separation that would involve payment of my salary through the balance of 2011 but expressed reservation about agreeing to honor any stock grants which were scheduled to vest after 2011. Since the only stock grants scheduled to vest after 2011 were contained in the January 2011 Stock Award, I understood that Mr. Datta was referring to the January 2011 Stock Award.

23. On March 16th, after I did not receive the salary increase that had been reported in the Company's Form 10K, I e-mailed Sheila Chang, the Director of Human Resources, to inquire if it was an oversight. Subsequent to my inquiry, I received the salary increase retroactive to March 1st. A copy of my e-mail to Ms. Chang and her response the following day thanking me for catching the "error" is annexed hereto as Exhibit O.

24. On March 21st, in a follow up to an initial conversation I had with Mr. Datta when he was first appointed Chief Operating Officer, I sent a memo containing my thoughts on how to improve the service delivery process and network service organization. A copy of my e-mail and Mr. Datta's response is annexed hereto as Exhibit P.

25. In response to my e-mail, Mr. Datta acknowledged there was "lots to discuss here" but he wanted first to understand where I was "relative to the process we discussed the last time we met". I replied that I assumed he was referring to our

discussion relating to separation and noted that "[o]ur views on a reasonable separation package aren't the same so I've decided to continue in my role." Nevertheless, I also noted that I was available to talk further with him.

26. A day or so later, Mr. Datta indicated to me in a follow up conversation that I did not have any legal right to enforce the January 25 Stock award since I did not have a Stock Award agreement countersigned by the Company. After the commencement of this litigation, I learned for the first time that the Company actually had already countersigned the January 25 Stock Award Agreement when Mr. Datta made this statement to me.

27. On March 24, after Mr. Datta advised me of his position, I received an e-mail from Gina Grimmer in which she wrote: "As previously discussed by Rajiv with you, I am forwarding you a replacement draft stock unit agreement related to the January 25, 2011 grant. Please review, and if acceptable sign and return to me." A copy of the e-mail from Ms. Grimmer and the replacement draft stock unit agreement are collectively annexed hereto as Exhibit Q.

28. In contrast to the earlier version delivered to me, the replacement draft stock unit agreement provided for forfeiture of all the unvested stock units if my employment ended for any reason.

29. After receiving the proposed replacement stock unit agreement, I consulted with and retained the attorneys who are representing me in this litigation. My attorneys responded to the proposed modification by sending a letter to AboveNet and simultaneously provided a copy to me. The letter requested a response from the Company within 7 days to attempt to resolve the dispute arising from the "attempted

revocation" of the "Board approved Stock Unit Award, dated January 25, 2011." A copy of the letter from my attorneys is annexed hereto as Exhibit R.

30. Subsequent to the sending of the letter by my attorneys, I was advised that some additional negotiations ensued between my counsel and Robert Sokota, general counsel for AboveNet, regarding the terms of an agreed voluntary separation. During that same period, I continued to oversee and manage operations of the Company.

31. I continued to conduct regular staff conference call meetings with my direct reports every Monday.

32. I also continually oversaw new fiber optic network installations for the Company and provided monthly and quarterly reports to Mr. Datta relating to the Company's progress in meeting monthly and quarterly targets established for 2011. Copies of my monthly and quarterly reports are collectively annexed hereto as Exhibit S.

33. As reflected in my e-mail of July 5, 2011, by the end of June 2011, the Company was $260,000 ahead of the target established for new installations in the first half of 2011.

34. I also continued to address service issues that arose with respect to any customer problems. Thus, for example, on May 19. 2011, when a number of customers experienced difficulties accessing its fiber optic network, I oversaw the restoration of services and reported back to Mr. LaPerch on our progress. Likewise, I fielded and responded to a series of other requests for information made by Mr. LaPerch regarding operations. Copies of e-mail exchanges relating to these issues are annexed hereto as Exhibit T.

35. During this same period, I never received any instructions from Mr. Datta regarding how he would be sharing his travel schedule with me and I can recall only one occasion when Mr. Datta provided me with any information relating to his travel plans. In an e-mail sent to me on April 7, 2011, Mr. Datta informed me at the end of an e-mail relating to a personnel matter that he had cancelled travel plans for the following week and requested my travel schedule. I immediately responded and detailed my own travel plans for the following week. Mr. Datta did not share his travel plans with me on any other occasion. A copy of the April 7th e-mail exchange is annexed hereto as Exhibit U.

36. I thought Mr. Datta would be providing the information as to when he was travelling at our weekly staff call meetings. However, subsequent to his appointment, Mr. Datta scheduled and then cancelled 16 of 19 weekly staff call meetings prior to the termination of my employment on July 11, 2011. Most of the meetings were cancelled the day of the scheduled meeting or only 1 or 2 days beforehand. Copies of the e-mailed cancellation notices are collectively annexed hereto as Exhibit V.

36. On June 17, 2011, Rob Sokota forwarded what turned out to be the Company's final proposal for an agreed voluntary separation by e-mail to my attorneys. A copy of Mr. Sokota's e-mail is annexed hereto as Exhibit W.

37. My attorneys, with my approval, wrote in response that the offer was unacceptable and further communicated that legal action would be initiated on my behalf. A copy of my counsel's letter is annexed hereto as Exhibit X.

38. On July 11, 2011, I received a phone call from Mr. Datta at home in which he informed me that I was being terminated for cause for not being at the White Plains

9

office. The phone call was shortly followed by a letter delivered to me and annexed hereto as Exhibit Y.

39. Prior to my termination, neither Mr. Datta nor anyone else at the Company had ever communicated to me the view that I was in breach of the employment agreement or facing discipline of any kind as a consequence of that breach. Mr. Datta also never suggested to me that I was not complying with the telecommuting arrangement. After we agreed to the arrangement at the end of the January 2011, we spoke only one more time about the telecommuting understanding and that was in March after my review with Mr. LaPerch. In that conversation, Mr. Datta did not say that I was not in compliance but only reiterated our understanding in response to questions raised by Mr. LaPerch about the arrangement. Subsequent to this conversation, I can only recall one more time when Mr. Datta spoke to me before calling me on July 11 to terminate my employment. That only other conversation took place in or about May 2011 when he asked me to have my attorneys to get in touch with Robert Sokota for the purpose of having a follow up discussion relating to the terms of a possible voluntary separation.

40. The Company has not delivered any of the shares of stock that were scheduled to vest at the time of my termination and has not made any of the payments or extended any of the benefits that are identified in my employment agreement.

_____
DOUGLAS JENDRAS

Sworn to before me this
18th day of January 2013

_____
Notary Public

FRED WEINSTEIN
Notary Public, State Of New York
No. 4728709
Cert. Filed Westchester Co.
Commission Expires April 30, 20 14

10