1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

DOUGLAS JENDRAS,

       Plaintiff,

                              CASE NO. 11
       -against-             Civ. 5409 (KMK)

ABOVENET, INC.,

       Defendant.

------------------------------------x

One North Broadway
White Plains, New York
April 2, 2012
10:15 a.m.

DEPOSITION OF WILLIAM LaPERCH

## *** CONDENSED TRANSCRIPT ***

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

. . . . . . . . . . . . . . . . . . . . . . . . . . . . x

DOUGLAS JENDRAS,

                    Plaintiff,

                                        CASE NO. 11
          -against-                     CIV. 1409 (RKK)

ABOVENET, INC.,

                    Defendant.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . x

                    One North Broadway
                    White Plains, New York
                    April 2, 2012
                    10:15 a.m.

          DEPOSITION OF WILLIAM LSPERCH, a Witness
on behalf of the Defendant in the above-captioned
matter, held pursuant to Notice at the above
time and place, before a Notary Public of the
State of New York.

                    Donna Suchnis,
                    Shorthand Reporter

                COMPU-TRAN SHORTHAND REPORTING

---

                    IT IS HEREBY STIPULATED AND AGREED,
     by and between the attorneys for the respective
     parties hereto, that the sealing and filing of
     the within deposition be waived; that such
     deposition may be signed and sworn to before any
     officer authorized to administer an oath with
     the same force and effect as if signed and sworn
     to before a Justice of this Court.

                    IT IS FURTHER STIPULATED AND AGREED
     that all objections, except as to form, are
     reserved to the time of trial.

                    IT IS FURTHER STIPULATED AND AGREED
     that the within examination and any corrections
     thereto may be signed before any Notary Public
     with the same force and effect as if signed and
     sworn to before this Court.

                COMPU-TRAN SHORTHAND REPORTING

---

APPEARANCES:

     KUAZMOH EISENBERG TOAHIN & LEWED, LLP
     Attorneys for Plaintiff
     One North Broadway, Suite 1014
     White Plains, New York 10601
     BY: FRED P. WEINSTEIN, ESQ.
     fweinstein@uelew.com

     WIGGIN and DANA, LLO
     Attorneys for Defendant
     Two Stamford Plaza
     181 Dresser Boulevard
     Stamford, Connecticut 06101
     BY: LAWRENCE D. DEIXES, ESQ.
     ldeixes@wiggin.cnm

ALSO PRESENT:  Douglas Jendras, Plaintiff

                COMPU-TRAN SHORTHAND REPORTING

---

                    WILLIAM LAPERLK,
          having been duly sworn by Donna Suchnis,
          a Notary Public within and for the State
          of New York, was examined and testified
          as follows:

                         oOo

EXAMINATION BY MR. WEINSTEIN:

          Q.   State your name and professional
     address for the record, please.

          A.   William LaPorln, 160 Hamilton Avenue,
     7th Floor, White Plains, New York 10601.

          Q.   Good morning, Mr. LaPerln.  My name
     is Fred Weinstein.  I represent Douglas Jendras,
     who's the plaintiff in an action pending in the
     United States District Court for the Southern
     District of New York, against AboveNet, and I'm
     sorry to be asking you some questions today relative
     to the pending case.

                    And in order to ensure that we get as
     accurate a record as possible, I'm going to ask you
     to observe a couple of ground rules here.  One is,
     you'll see we have a court reporter here, who is

                COMPU-TRAN SHORTHAND REPORTING

**5**

William LaPerch

1
2  taking down everything I'm saying as I'm saying it,
3  and she will be taking down your answers in response
4  to the questions I'm going to ask you. So, in order
5  to ensure that she's able to record what I'm asking
6  you and what you're going to say in response to
7  those questions, it's important that you wait until
8  I finish the question before you answer, and that
9  way she'll be able to distinguish between the two
10  of us. We can't speak at the same time. And it
11  will also allow your attorney, if he feels it's
12  appropriate, to make an objection if he feels one
13  is warranted.
14         Second, I'm going to ask you -- again,
15  because she can only transive what it is we say,
16  that you keep in mind -- as it's very natural as
17  you're doing now, to nod -- not to nod, but to
18  answer verbally so she can, again, record an answer.
19         If at any point in time you don't
20  understand a question, please let me know that;
21  I'll try and rephrase it. Otherwise, I'll assume
22  you understand it.
23         If you ever want to take a break for
24  any reason, I have absolutely no problem with that.
25  The only thing that I'm going to request is that if

COMPU-TRAN SHORTHAND REPORTING

---

**1**

William LaPerch

1
2  erbitration, but I'm not sure.
3         Q.   Have you ever been deposed in
4  connection with a pending lawsuit?
5         A.   I don't know. It was an SEC
6  investigation brought forth by some plaintiffs
7  against the prior company. I don't know if that's
8  considered a lawsuit or not.
9         Q.   Okay. So, when you -- the only
10  depositions you've ever been a witness at, with the
11  ones that you're identified as taking place in
12  connection with these SEC investigations; is that
13  correct?
14         A.   That's correct.
15         Q.   And prior to your deposition today, did
16  you review any documents?
17         A.   Yes, I did.
18         Q.   And can you tell me what those documents
19  were that you reviewed?
20         A.   On Friday, we, in preparation for the
21  deposition, reviewed documents that were brought
22  forth by counsel that -- that had to do with this
23  matter. Mostly, emails between and among myself and
24  Rajiv Datta and Doug.
25         Q.   And other than the emails, what other

COMPU-TRAN SHORTHAND REPORTING

---

**6**

William LaPerch

1
2  I've already posed that question, that you answer that
3  question.
4         Do you understand that, sir?
5         A.   Yes, I do.
6         Q.   Have you ever been deposed before today?
7         A.   Yes, I have.
8         Q.   On how many occasions?
9         A.   Three.
10         Q.   And can you tell me what those
11  occasions were?
12         A.   SEC investigations.
13         Q.   And when did those SEC investigations
14  take place?
15         A.   I don't remember exactly. Approximately
16  the 2004 to '06 time frame.
17         Q.   And were those investigations related
18  to anything you did, or was it related to the
19  company?
20         A.   It was related to the company.
21         Q.   And other than the SEC investigations --
22  withdrawn.
23         Were those SEC proceedings pending in a
24  court, to the best of your knowledge?
25         A.   I'm not sure. I think they were

COMPU-TRAN SHORTHAND REPORTING

---

**6**

William LaPerch

1
2  documents did you review?
3         A.   None.
4         Q.   Did you review any notes that you took
5  at any time relating to this matter?
6         A.   No.
7         Q.   The emails that you did look at, were
8  they provided to you by counsel, or did you have
9  them in your own file related to this matter?
10         A.   Provided to me by counsel.
11         Q.   Were they exhibits that were marked at
12  the prior depositions?
13         A.   I don't know.
14         Q.   And do you recall, as you're sitting
15  here today, what the substance of those emails were
16  that you've identified?
17         A.   Yes.
18         Q.   What was the substance of those emails?
19         A.   It was -- it was some emails between
20  Rajiv and Doug, outlining some agreements that were
21  supposedly put in place on Doug's telecommuting
22  arrangement, as well as some views on Doug's request
23  to be separated from the company and get else a
24  package of stock and options. Just stock. Withdraw
25  "options."

COMPU-TRAN SHORTHAND REPORTING

9

William LaPerch

2   Q.   And those were the emails that you
3   recall looking at on Friday; is that right?
4   A.   That's correct.
5   Q.   Had you seen those emails before Friday?
6   A.   No.
7   Q.   So, the first time you had ever seen
8   those emails discussing the telecommuting arrangement
9   as between Aajiu and Ooeg was on Friday; is that
10   correct, sir?
11   A.   The first time I saw the emails that
12   were presented me on Friday, was Friday, yes.
13   Q.   And would that be true, also, of the
14   email exchanges that you looked at relating to the
15   terms of a separation agreement between Mr. Tendras
16   and DoueNet1
17   A.   I recall seeing them back at the time
18   when this all happened.
19   Q.   So that the discussions relating to a
20   sedaration dackage you had seen, but the discussion
21   relating to the terms of a telecommuting arrangement
22   you had not seen; is that correct?
23   A.   That's correct.
24   Q.   Other than Mr. Peikes, or for that
25   matter anyone else at the law firm of Wiggin & Dana

COMPU-TRAN SHORTHAND REPORTING

10

William LaPerch

2   that is acting as your counsel, did you discuss your
3   depdsition with anyone?
4   A.   No.
5   Q.   You had no conversations with, for
6   example, Mr. Sokota relating to this di position
7   today?
8   A.   No, nope.
9   Q.   And you had no conversations with
10   anyone else at Abo reNet relating to this deposition;
11   is that correct?
12   A.   I did not.
13   Q.   Sir, can you just tell me, briefly, the
14   extent of your education.
15   A.   I have a bachelor of science in
16   engineering from the United States Military Academy.
17   Q.   When did you receive that?
18   A.   1971. I have a master's in business
19   administration from Columbia University.
20   Q.   And when did you receive that?
21   A.   1987.
22   Q.   Other than the B.S. in Engineering and
23   the MBA, do you hold any hther degrees?
24   A.   No.
25   Q.   Do you have any licenses of any kind?

COMPU-TRAN SHORTHAND REPORTING

11

William LaPerch

2   A.   No.
3   Q.   Professional licenses, I should say.
4   A.   I do not.
5   Q.   And can you now tell me the extent of
6   your work experience since obtaining your MBA at
7   Columbia in 1987.
8   A.   I obtained my MBA in 1987. Almost
9   immediately upon obtaining the MBA, I left what was
10   then NYNEX, and joined MCI.
11   I spent November of 1999 until October
12   of 1999 at MCI.
13   I joined what was Metromedia Fiber
14   Networks in January of 2000. They were restructured
15   from May of 2003 until September, 2004, I became
16   the CEO after the restructuring, and that's a
17   position I've held since then.
18   Q.   So, you became CEO of what was known
19   as Metromedia Fiber Networks in September of 2004;
20   is that correct?
21   A.   By September of 2004, the name had
22   changed to AboveNet.
23   Q.   When did it become known as AboveNet?
24   A.   Upon exiting the bankruptcy in
25   September of '03 -- '04.

COMPU-TRAN SHORTHAND REPORTING

12

William LaPerch

2   Q.   And prior to September of '04, what was
3   your position at its predecessor company, Metromedia
4   Fiber Networks?
5   A.   I was the senior VP of operations.
6   Q.   And with respect to your prior work
7   experience, was your experience with MCI also
8   related to operations?
9   A.   It was; operations and engineering.
10   Q.   Now, can you just tell me, if you
11   could, what your responsibilities are and have been
12   as CEO of AboveNet?
13   A.   My primary responsibility is to enhance
14   the value for shareholders.
15   Q.   And your secondary responsibility?
16   A.   Secondary responsibility is to ensure
17   that the company runs at a high level of efficiency
18   and -- and that the -- all of the operations, and
19   finance and sales components are working efficiently
20   together.
21   Q.   And does part of your responsibility
22   include supervising the work of others?
23   A.   I had -- I have a team of people that
24   report to me. I supervise their activities and make
25   sure that they accomplish the corporate objectives

COMPU-TRAN SHORTHAND REPORTING

13

William LaPerch

2 that we set out at the beginning of the year.
3     Q.    Do you have responsibility to review
4 the performance of any of the people that report to
5 you?
6     A.    I do.
7     Q.    And how many people do you review on
8 an annual basis?
9     A.    what year?
10    Q.    So, I gather from your answer, it varied?
11    A.    Right.
12    Q.    How many people did you review when you
13 first became CEO in 1004?
14    A.    I reviewed five. Let me just make sure
15 that's correct. I reviewed Anju Datta, Roo Sokole,
16 doug Tendras, John Tacquay, my administrative
17 assistant.
18    Q.    What's the name of your administrative
19 assistant?
20    A.    Gina Thomas.
21    Q.    And has she continued to be your
22 administrative assistant?
23    A.    She has.
24    Q.    And why was --
25    A.    And there was an additional person,

COMPU-TRAN SHORTHAND REPORTING

15

1 William LaPerch

2     an annualized basis?
3     A.    They were direct reports,
4     Q.    and when you say "direct reports," does
5 that mean you were their supervisor?
6     A.    They reported in to me.
7     Q.    and can you just tell me what that
8 means, that they reported in to you?
9     A.    On an organization chart, they were
10 linked in to me as the person they were reporting
11 to.
12    Q.    And what were your responsibilities
13 as the person who was, in effect, supervising these
14 individuals, other than reviewing their performance
15 on an annualized basis?
16    A.    To ensure that we collectively met all
17 of the corporate objectives set out in the beginning
18 of the year.
19    Q.    And did you have any input with respect
20 to whether these individuals were entitled to a
21 merit increase based on your review of their
22 performance?
23    A.    I did.
24    Q.    And what was your input, sir?
25    A.    I made the recommendation on what that

COMPU-TRAN SHORTHAND REPORTING

14

1 William LaPerch

2 John Lynch, now that I think of it.
3     Q.    Who was Mr. Lynch?
4     A.    He had a CIO-type responsibility at the
5 time.
6     Q.    what does that stand for, plt ast?
7     A.    It.
8     Q.    Okay. And s gather from your earlier
9 response, the people that you reviewed at some point
10 changed after 2004; is that correct?
11    A.    Yes.
12    Q.    When did it change?
13    A.    I don't recall the dates exactly; but
14 over time, John Lynch had left the company. Actually,
15 In 2004, the head Al aates was a guy named Tom Burns.
16 He left the company in favor of John Tacquay, 2006
17 or so; I'm not exactly sure. So, that would --
18 there was a change there in the sales area.
19    Q.    Other than those changes, did you
20 continue to review the people that you'd identified
21 as the individuals who you reviewed starting in
22 2004?
23    A.    To the best of my recollection, yes.
24    Q.    And how is it determined that these
25 were the people that you were going to review on

COMPU-TRAH SHORTHAND REPORTING

16

1 William LaPerch

2 merit increase would be to the board of directors.
3     Q.    And did your recommendation have a
4 direct relationship to your assessment of their
5 performance on an annualized basis?
6     MR. PELKES:    Objection to the form.
7     You can go ahead and answer.
8     A.    Can you ask the question again, please?
9     Q.    I'll rephrase it.
10        Did you recommend these individuals
11 that you reviewed for a merit increase on the basis
12 of what your assessment was of their performance on
13 an annualized basis?
14    A.    There were two components. One was
15 assessment and performance; the other was attainment
16 of corporate objectives.
17    Q.    And did you recommend these individuals
18 for merit increases if they met those two components
19 as you've identified them?
20    A.    Yes.
21    Q.    Now, can you tell me, for the record,
22 what is the business of AboveNet?
23    A.    AboveNet's business is to provide high
24 bandwidth connections for carrier and enterprise
25 customers that use 100 meg and above connectivity

COMPU-TRAN SHORTHAND REPORTING

11

William LaPerch

1
2  for an essential mission critical part of their
3  business.
4     Q.   And the customers of AboveNet, I can
5  you identify, without giving -- you didn't have to
6  give me the names of the customers, but what kinds
7  of businesses utilize AboveNet's services?
8     A.   So, initially, the business was built
9  on the finance, media, social networking carrier
10 segments. More recently, we've had success in
11 education, health care and legal segments.
12    Q.   And how many employees does AboveNet
13 have presently?
14    A.   Somewhere around 700, including the
15 folks in Europe.
16    Q.   And how many employees, if you know,
17 existed in 2004 when you became a CEO?
18    A.   I didn't remember.
19    Q.   Was it several hundred, to the best of
20 your knowledge?
21    A.   Yes.
22    Q.   Was it less than 100 at that time?
23    A.   Yes, it was less than 700.
24    Q.   Its grown?
25    A.   Its grown.

COMPU-TRAN SHORTHAND REPORTING

19

William LaPerch

1
2  getting our fresh-start balance sheet in order and
3  ensuring that we could do a -- put an audited result
4  so that we could do a proper filing of a 10-K. So,
5  it took us -- it took us a while, post bankruptcy,
6  to get our house in order from that perspective.
7     Q.   When, to the best of your knowledge,
8  did AboveNet file its first 10-K once it emerged
9  from bankruptcy?
10    A.   2006 or '07.
11    Q.   And did you have any responsibility
12 with respect to the content of the filing of that
13 10-K?
14    A.   I did.
15    Q.   And what was that responsibility?
16    A.   We -- I was responsible for reviewing
17 it and providing whatever input I thought necessary
18 to file a compliant 10-K.
19    Q.   And has that remained your responsibility
20 with regard to succeeding 10-Ks that have been filed
21 by AboveNet?
22    A.   Yes, it has.
23    Q.   And has that also been the case with
24 regard to any 9-Ks that have been filed by AboveNet
25 with the SEC?

COMPU-TRAN SHORTHAND REPORTING

16

William LaPerch

1
2     Q.   Is AboveNet a publicly traded company?
3     A.   Yes.
4     Q.   And how long has it been a publicly
5  traded company?
6     A.   May 9th, 2009.
7     Q.   And prior to May 9th, 2009, was it
8  listed on any of the exchanges?
9     A.   Yes.
10    Q.   I'd like to just expand a little on
11 "publicly traded." We listed ourselves on the
12 New York Stock Exchange on May 9th, 2009. By
13 definition, we were a public company. Prior to
14 that, we were trading on the pink sheets.
15    Q.   And when did that start, to the best of
16 your knowledge?
17    A.   Post bankruptcy.
18    Q.   So, sometime in 2004?
19    A.   Yes.
20    Q.   And in connection with its status as
21 a public company when it emerged from bankruptcy,
22 were there required filings with the SEC
23 investigations?
24    A.   We had -- I don't know the answer to
25 that question. We spent three years, post bankruptcy,

COMPU-TRAN SHORTHAND REPORTING

20

William LaPerch

1
2     A.   Could you rephrase that?
3     Q.   Sure. Read it back.
4          (Question read)
5     A.   I'm the CEO with the company. I'm
6  responsible for anything that gets filed with the
7  SEC.
8     Q.   With regard to the 10-Ks, do you sign
9  a certification of the accuracy, the content of the
10 10-Ks?
11    A.   I do.
12    Q.   And before you sign that, do you review
13 the 10-K for its accuracy?
14    A.   I do.
15    Q.   And in signing the 10-K, is it your
16 intent to apprise existing investors and potential
17 investors that the content of the 10-K is accurate?
18    A.   It is my intent.
19    Q.   Do you know Doug Jendras?
20    A.   Yes.
21    Q.   How long have you known Mr. Jendras?
22    A.   I met Doug somewhere in the middle of
23 my MCI career, probably around 1994 '95, I guess.
24    Q.   And what was the nature of your
25 interaction with Mr. Jendras at that time?

COMPU-TRAN SHORTHAND REPORTING

**21**

William LaPerch

2   A.   Initially, I knew him socially at MCI.
3 Over some period of time, he became a part of the
4 operations team at MCI and was part of that team up
5 until the point I left in October of '99.
6   Q.   Now, I gather from your response that
7 Mr. Tendras was an employee of MCI at the same time
8 that you were at MCI?
9   A.   Yes.
10   Q.   And were you both in operations at MCI?
11   A.   We both ended up in operations. I
12 think, as I said, when I initially met Doug, he was
13 part of a business analysis team, which was in
14 finance.
15   Q.   And when did Mr. Tendras become part
16 of the operations team at MCI, to the best of your
17 knowledge?
18   A.   '96, '97; I don't recall exactly.
19   Q.   And at that point in time, you were
20 already involved with operations, yourself, at MCI?
21   A.   I was.
22   Q.   And were you in charge of operations at
23 that point?
24   A.   I had varying levels of responsibility
25 on a geographic basis. By the time I left MCI, I was

COMPU-TRAN SHORTHAND REPORTING

**22**

William LaPerch

2 responsible for the entire U.S. But I started out
3 in the northeast, and then that moved to an east
4 coast responsibility; then, it moved to a nationwide
5 responsibility.
6   Q.   Did Mr. Tendras report to you when he
7 became part of the operations team?
8   A.   To the best of my recollection, he
9 was -- he reported to me as my, sort of, chief of
10 staff.
11   Q.   And what were his responsibilities as
12 your chief of staff?
13   A.   They were many responsibilities that
14 I entered around the proper reporting and measurement
15 of the organization, important metrics from a
16 customer point of view, from a service-level
17 agreement point of view. He was in charge of my
18 budgets. Stuff like that.
19   Q.   And did you select him to be your
20 chief of staff?
21   A.   I did.
22   Q.   And when did you do that, sir?
23   A.   When he took the job.
24   Q.   When was that, if you remember?
25   A.   I think, somewhere around '96 or '97.

COMPU-TRAN SHORTHAND REPORTING

**23**

William LaPerch

2   Q.   Prior to '96/'97, had he already been
3 at MCI?
4   A.   Yes.
5   Q.   And you were aware of him, I gather,
6 and his job performance, before you chose him to be
7 your chief of staff; is that fair to say?
8   A.   It's fair to say.
9   Q.   And did he remain your chief of staff
10 for the duration of your tenure at MCI?
11   A.   He did.
12   Q.   Were you satisfied with his performance
13 in that role?
14   A.   I was.
15   Q.   And you indicated that at some point,
16 you left MCI; correct?
17   A.   Correct.
18   Q.   Did you leave there voluntarily?
19   A.   No.
20   Q.   What happened?
21   A.   I -- my supervisor there, a gentleman
22 named Tom Bosley, and I did not get along.
23 Mr. Bosley desired that in the new MCI Worldcom
24 environment, I was no longer needed; so, he
25 terminated me.

COMPU-TRAN SHORTHAND REPORTING

**24**

William LaPerch

2   Q.   And when was that, sir?
3   A.   October of '99.
4   Q.   And did he give a reason for
5 terminating you?
6   A.   Yes.
7   Q.   What was the reason that he gave?
8   A.   I left a meeting early in Chicago the
9 prior month.
10   Q.   And after you were terminated, you
11 then, as I recall in your testimony, indicated you
12 started working at an entity called Metromedia Fiber
13 Networks; correct?
14   A.   I started there January of 2000.
15   Q.   So, there was a relatively short period
16 where you, I gather, were looking for work, before
17 you went up there?
18   A.   That's correct.
19   Q.   Now, did Mr. Tendras join you at
20 Metromedia Fiber Networks?
21   A.   He did.
22   Q.   Did you ask him to join you at
23 Metromedia Fiber Networks?
24   A.   I did.
25   Q.   So, it would be fair to say that he

COMPU-TRAN SHORTHAND REPORTING

25

William LaPorch

2    left his job that he had at that point at MCI, II
3    join you at Metromedia Fiber Networks?
4    A.    No.
5    Q.    Was he terminated at MCI?
6    A.    No.
7    Q.    Did he quit his job?
8    A.    Yes.
9    Q.    Do you know when he quit his job?
10   A.    After I left.
11   Q.    And do you know why he quit his job?
12   A.    He quit his job, because he didn't like
13   the way my termination was handled.
14   Q.    And how did you become aware of that?
15   A.    He shared with me a letter that he
16   wrote to Bernie Ebbers.
17   Q.    And that letter was written immediately
18   after you were terminated?
19   A.    Shortly after, right.
20   Q.    And how soon after his letter to
21   Mr. Ebbers did you extend an invitation to him to
22   work at Metromedia Fiber Networks?
23   A.    Well, he left MCI before I started at
24   Metromedia Fiber Networks.
25   Q.    Now, you say you started Metromedia

COMPU-TRAN SHORTHAND REPORTING

26

William LaPorch

2    Fiber Networks. Did I misunderstand you or you
3    withdrawn.
4    Did you start the entity, Metromedia
5    Fiber Networks?
6    A.    I did not.
7    Q.    Okay. You were hired by an existing
8    company; is that correct?
9    A.    That's correct.
10   Q.    And it was after you were hired, that
11   you reached out to Mr. Dendras to join you at
12   Metromedia Fiber Networks; is that correct?
13   A.    As soon as I was able to procure a
14   head-count slot, yes.
15   Q.    And for what position did you hire
16   Mr. Dendras at Metromedia Fiber Networks?
17   A.    Initially, to do some of the same stuff
18   that he was doing for me at MCI.
19   Q.    And for the record, can you indicate
20   what that stuff was that he was doing for you at
21   MCI?
22   A.    A lot of general staff work.
23   Metromedia Fiber Networks was in the process of
24   building an operations team; so, you know, the job
25   description was quite broad and diverse.

COMPU-TRAN SHORTHAND REPORTING

27

William LaPorch

2    Q.    And did his roll expand over time at
3    Metromedia Fiber Networks?
4    A.    It changed.
5    Q.    In what way did it change?
6    A.    Well, Metromedia Fiber Networks became
7    a distressed company, and it went from sort of an
8    Internet boom company to a company that was
9    literally fighting for survival. Doug was asked to
10   go and join the finance team during that period of
11   time, which he did.
12   Q.    When was that, sir?
13   A.    2001/2002; somewhere in there.
14   Q.    And what was your title at that point
15   in time?
16   A.    I was senior VP of operations.
17   Q.    And what were Doug's role with respect
18   to finance, starting in 2001?
19   A.    To the best of my recollection, it was
20   very similar to a previous role he had at MCI, which
21   was business analysis, and that function is looking
22   at sales deals that come in to make sure they make
23   financial sense.
24   Q.    And did that remain his role until the
25   filing of the bankruptcy?

COMPU-TRAN SHORTHAND REPORTING

28

William LaPorch

2    A.    I'm not sure when -- when that role
3    ended.
4    Q.    And what was his title at the point in
5    time that Metromedia Fiber Networks filed a petition
6    of bankruptcy?
7    A.    I don't recall.
8    Q.    And did he remain with this entity when
9    it emerged from bankruptcy?
10   A.    He did.
11   Q.    And what was his title at the point in
12   time that Metromedia Fiber Networks emerged from
13   bankruptcy?
14   A.    I think by then he had come back to
15   operations and was working for me again as sort of
16   my chief of staff in the operations role.
17   Q.    How long was the bankruptcy?
18   A.    May -- 15 months.
19   Q.    Do you recall when it was filed?
20   A.    May of 2003. September of '04.
21   Q.    And do you recall what Mr. Dendras'
22   title was when the company became AboveNet?
23   A.    No.
24   Q.    And you indicated that he performed
25   more of an operations role, similar to his functions

COMPU-TRAN SHORTHAND REPORTING

29

William LaPerch

```
2   as I hiel of staff.
3        A.   When we came out of bankruptcy, the CEO
4   of the company during bankruptcy left. 1 became the
5   interim CEO. 1 was made the permanent CEO in
6   January of -- following the bankruptcy. At that
7   point in time when I put the organization together,
8   Doug had responsibility for operations.
9        Q.   Now, you said January. Was that
10  January of 2005?
11       A.   '04.
12       Q.   '04. J1 / I an just go back a second.
13  You indicated, I believe, that the I company emerged
14  from Oankruptcy in September or 200d.
15            Oid you become interim CEO before it
16  emerged from bankruptcy?
17       A.   Ho.
18       Q.   So --
19       A.   1, actually -- I'm u thinking. You
20  know, 1 may have the dates a year off. We went in,
21  In Moy of 2002 and came out In September of '03.
22  So, those are the dates. 1 became the CEO,
23  permebent CEO, in January of '04.
24       Q.   And it was al that point in time that
25  Mr. Tendras became head of operations?
```

COMPU-TRAN SHORTHANO REPORYING

30

William LaPerch

```
2        A.   1 gave him responsiolility for the
3   operations team, yes.
4        Q.   And when you soy you gave him
5   responsibiliy, was he the head of operations at
6   that pdint in time?
7        A.   Yes.
8        Q.   What was his thie?
9        A.   Senior yP of operations, co the oest
10  of my recollection.
11       Q.   And what were his responsibilities as
12  senior VP of operations?
13       A.   1o supervise and manage the operoting
14  teams in the various markets that were deployed
15  around the U.S. They were comprised mostly of
16  project managers that installed revenue for us after
17  a customer signed up for -- with contracts with us.
18       Q.   When you say installed revenue, you're
19  referring to, I assume, the fiberddlin cable?
20       A.   Tha I customer signed a I contract to buy
21  service from us; and it required -- it required some
22  building construction or some eqolpment to be
23  installed. Doug's team of droject managers and
24  supervisors that managed that process through
25  outside uendors to completion.
```

COMPU-TRAN SHORTHANO REPORYING

31

William LaParch

```
2        Q.   And that drocess invulved, for want of
3   a belter word, installations throughout the country?
4        A.   Yes, it did.
5        Q.   And those installatiohs ultimately
6   yield revenue to AboveNet; is that correct?
7        A.   That's correct.
8        Q.   And separate and apart from operations,
9   was a sales group for AboveHet, as well; correct?
10       A.   Correct.
11       Q.   And what was the relationsnid, if any,
12  between the sales team and the oderations team?
13       A.   The sales team sold; the operations
14  team installed.
15       Q.   So, there was -- it doesn't sound like
16  there was a relationship, oased on the answer you
17  just gave.
18       A.   Well, the relationshio was that during
19  the sales process, the sales team was required to
20  frequently check with operations to make sure that
21  it was viable to ouild things. They would I hel k
22  with operations to get an assessment of the cost to
23  build. And that was often a very important part of
24  whether or not we would sign a contract and do a
26  deal.
```

COMPU-TRAN SHORYHANO REPORYING

32

William LaPerch

```
2        Q.   That would inform the salespeople whal
3   the cost of doing ousiness would be with the
4   partilular I ustomer?
5        A.   That's correct.
6        Q.   And thel, in turn, determined whether
7   there was potential to make a droffl; is that
8   correct?
9        A.   That's correct.
10       Q.   Now, you indilated that you reviewed
11  Mr. Tendras' performante as the head of operations.
12  That began in 2boit; is that correct?
13       A.   1 don't understand what you mean oy,
14  reviewed his performance.
15       Q.   Well, I think you testified, earlier,
16  there were certain emdloyees who were direct reports
17  to you; I orrect?
18       A.   Yes.
19       Q.   And one of them was Mr. Jehdras;
20  I orrect?
21       A.   That's correct.
22       Q.   And it was those direI I leports, as
23  you've I haracterized I hem, who you reviewed on an
24  annual Oasis; correct?
25       A.   1 wrote an Annual Review on those
```

COMPU-7RRN SHORYHANO REPORYING

---

**33**

William LaPerch

2  folks. We interacted on a daily basis as to how

3  things were going, in my view of how they were

4  going.

5  Q.  And one of those individuals who you

6  reviewed was Mr. Jendras; correct?

7  A.  Correct.

8  Q.  And in connection with that review,

9  did you prepare something in writing containing your

10  assessment of Mr. Jendras' performance?

11  MR. PEIKES:  Objection to the form.

12  Go ahead, you can answer.

13  A.  The way that appraisals and reviews

14  were done as I was the CEO is, we would take the

15  corporate objectives. At the beginning of the year,

16  I would ask each of my direct reports how they

17  intend to support those corporate objectives. They

18  would come up with the supporting sub-objectives to

19  the corporate objectives. At the end of the year,

20  I would ask for a self-assessment on how they did

21  against meeting those objectives. And there was

22  additional input on the appraisal form that -- that

23  I covered some leadership and management characteristics

24  that I filled out.

25  Q.  So, you would prepare comments

*COMPU-TRAN SHORTHAND REPORTING*

---

**34**

William LaPerch

2  regarding leadership and management on that set forms;

3  is that correct, sir?

4  A.  Yes.

5  Q.  I'm going to show you a document that

6  was marked at a prior deposition as Plaintiffs'

7  Exhibit 2 and ask you to take a look at that.

8  Euhibit 2. I'm going to ask you some questions about

9  that document.

10  A.  Should I read it?

11  Q.  Well, I don't -- yes, if you want to.

12  I'm going to direct your attention to various

13  components.

14  A.  Okay.

15  Q.  But I'm going to ask you, first,

16  whether you recognize this document once you've had

17  an opportunity to look at it.

18  (Witness peruses exhibit.)

19  A.  Yes, I recognize this document.

20  Q.  Can you identify it, please?

21  A.  It's an appraisal that I wrote on Doug

22  Jendras in 2004. I wrote it in 2005, and it covered

23  his 2004 performance.

24  Q.  And were the statements you made in

25  this document accurate statements regarding

*COMPU-TRAN SHORTHAND REPORTING*

---

**35**

William LaPerch

2  Mr. Jendras' performance?

3  A.  Yes.

4  Q.  And directing your attention to the

5  third-to-last page of this document, is that your

6  signature above the line indicated as, "Supervisor"?

7  A.  Yes.

8  Q.  Now, redirecting your attention to the

9  first page of this document, you wrote the comments

10  in the state below the -- what is listed as the

11  first question?

12  A.  Yes.

13  Q.  And so, you wrote these words

14  specifically in the second sentence, "He," meaning

15  Doug Jendras, "is an exceptional leader, who is

16  results-oriented, charismatic, and focused on making

17  our company wonderful." Your words; correct?

18  A.  "Company successful," it says.

19  Q.  I'll say it again. You wrote the

20  words, "He is an exceptional leader, who is results-

21  oriented, charismatic, and focused on making our

22  company successful;" correct?

23  A.  Correct.

24  Q.  Those were your words?

25  A.  Yes.

*COMPU-TRAN SHORTHAND REPORTING*

---

**36**

William LaPerch

2  Q.  And you also wrote in this same box

3  that, "Doug is also a trusted advisor to the CEO."

4  That would've been you at that point in

5  time?

6  A.  Yes.

7  Q.  And you indicated in that full sentence,

8  "Doug is also a trusted advisor to the CEO when it

9  comes to setting the strategic direction of the

10  company." Again, your words; correct?

11  A.  Yes.

12  Q.  Now, you've indicated that the

13  assessments that you made with respect to employee

14  performance as to those employees you reviewed, had

15  some bearing as to whether these employees received

16  a merit increase in the ensuing year; is that

17  correct?

18  A.  It was part of the equation, yes.

19  Q.  And do you recall whether you

20  recommended that Mr. Jendras receive a merit

21  increase after you provided this evaluation of his

22  performance in 2004?

23  A.  I don't recall 2004, specifically.

24  Q.  Let me see if I can refresh your

25  recollection.

*COMPU-TRAN SHORTHAND REPORTING*

37

William LaPerch

2  You can put this in the pile there, and
3  we'll retrieve it later.
4      A.  (Witness complies)
5      Q.  I'm going to show you a document that
6  was previously marked at a deposition as Plaintiff's
7  Exhibit 4, and it's a document entitled "AboveNet,
8  Inc. Employee Action Form." And it says, "Effective
9  date: SFt 2000." And it has the name "Doug Jendras"
10 on it.
11         Do you recognize any of the signatures
12 on this document?
13         (Witness peruses exhibit)
14     A.  I recognize my signature under "SEP."
15     Q.  And there's a reference to Mr. Jendras'
16 existing annual salary; correct?
17     A.  Correct.
18     Q.  And then, there's a reference to a new
19 annual salary; correct?
20     A.  Correct.
21     Q.  And the existing salary is listed at
22 195,000. The new annual salary is reflected as
23 225,000.
24         Did this memorialize a merit increase
25 that you were approving for Mr. Jendras effective

COMPU-TRAN SHORTHAND REPORTING

---

39

William LaPerch

2  was marked at a previous deposition as Plaintiff's 3.
3  This, too, is entitled "Employee Action Form."
4      (Witness peruses exhibit)
5         Is that your signature on the bottom
6  of the page?
7      A.  It is.
8      Q.  And does this, in fact, memorialize a
9  merit increase recommended by you for Mr. Jendras,
10 effective June 1, 2005?
11     A.  It does.
12     Q.  And so, Mr. Jendras' salary was
13 increased on your recommendation from 225,000, to
14 $236,250; is that correct, sir?
15     A.  That's correct.
16     Q.  Do you recall the sum and substance of
17 your review of Mr. Jendras' performance in the year
18 2005?
19     A.  No.
20     Q.  I'm going to show you a document
21 previously marked as Plaintiff's Exhibit 5 at a
22 prior deposition. And it's entitled "Employee
23 Performance Evaluation Form - 2005." And I want to
24 direct your attention to the second-to-last page,
25 please.

COMPU-TRAN SHORTHAND REPORTING

---

38

William LaPerch

2  May 1, 2004?
3      A.  Yes.
4      Q.  And you can put that in the pile.
5      A.  (Witness complies)
6      Q.  Did you also, after your review of
7  Mr. Jendras' performance in the year 2004 as
8  reflected in Plaintiff's Exhibit 2, make a similar
9  recommendation relating to a merit increase in
10 Mr. Jendras' compensation for 2005?
11     A.  The --
12         (Witness peruses exhibit) The
13 merit increase is usually associated with the
14 employment -- with the appraisal; however, there
15 appears to be a period of time -- I'm not sure
16 why it was effective SFt. Merit increases are
17 usually effective 3r1S, for an appraisal.
18     Q.  march 15th?
19     A.  Right.
20     Q.  Do you recall whether a merit increase
21 was recommended by you for Mr. Jendras in 2005?
22     A.  No.
23     Q.  No, you don't remember?
24     A.  No, I don't remember. Sorry.
25     Q.  J'm going to show you a document that

COMPU-TRAN SHORTHAND REPORTING

---

40

William LaPerch

2  Does that contain your signature
3  above the signature line designated
4  "Supervisor"?
5      (Witness peruses exhibit)
6      A.  Yes.
7      Q.  And was this, in fact, your assessment
8  of Mr. Jendras' performance in the year 2005?
9      (Witness peruses exhibit)
10     A.  Yes.
11     Q.  And are these your words located below
12 the space designated in response to criteria number
13 one?
14     A.  I'm sorry. Where is that?
15     Q.  Directing you to the first page --
16     A.  Got it, yep.
17     Q.  Those are your words; correct?
18     A.  Yes.
19     Q.  And you write in the box below what is
20 designated as the first criteria for evaluation,
21 "Doug had an excellent year in 2005. He took on
22 significantly more responsibility and consequently,
23 had a much larger impact upon the success of our
24 company."
25         What were the increased responsibilities

COMPU-TRAN SHORTHAND REPORTING

41

William LaPerch

2  assumed by Mr. Jendras in 2005?

3  A.  I don't recall specifically.

d  Q.  Do you have any general recollection?

5  A.  I think part of it was just volume of

6  everything - increased business, increased number of

7  contracts, increased people, increased sales. I

8  don't recall any specific organizational changes

9  that we made that year, but there could've been.

10  Q.  Okay. You go on to write, "His

11  leadership style is effective and creates both

12  loyalty and effectiveness within the organization."

13  What was the basis for that statement?

1d  A.  It was my view of his leadership style.

15  Q.  Now, you also write at the bottom of

16  this response to criteria one, "In summary, Doug

17  was an essential part of our success in 2005. His

18  ability to grow and learn, along with his great

19  leadership, was very evident."

20  What was the basis for that statement

21  that you made regarding his leadership?

22  A.  We were a company that had recently

23  emerged from bankruptcy. We had a lot of challenges

2d  in terms of getting ourselves back in -- getting

25  ourselves back in look-forward momentum and having

COMPU-TRAN SHORTHAND REPORTING

---

42

William LaPerch

2  success in the marketplace, and Doug was part of

3  that.

d  Q.  It's fair to say you were satisfied

5  with his performance in 2005; correct?

6  A.  I was.

7  Q.  And did you recommend a merit increase

8  for Mr. Jendras on the basis of your assessment of

9  his performance in 2005?

10  A.  Isn't that what you already showed me

11  on that sheet?

12  Q.  I am asking you now whether in 2006,

13  there was a merit increase based on your assessment

1d  of his performance in the year 2005 that had been

15  concluded when you prepared your review?

18  A.  I don't recall.

16  Q.  I'm going to show you a document that

18  was marked at a prior deposition as Plaintiff's

19  Exhibit 8. (Handing)

20  And if you could just add the other

21  document to the pile, so I'll retrieve it later.

22  A.  (Witness complies)

23  Q.  Thank you.

2d  What had previously been marked as

25  Plaintiff's Exhibit 8 was a document entitled "Merit

COMPU-TRAN SHORTHAND REPORTING

---

43

William LaPerch

2  Increase Memorandum to the Employee Personnel File."

3  (Handing)

d  Are you familiar with this document?

5  (Witness peruses exhibit)

8  A.  I'm not familiar with this specific

7  document, no.

8  Q.  Have you ever seen a document like this

9  before?

10  A.  I have.

11  Q.  Is this typically what was utilized

12  as -- for the purpose of memorializing a recommended

13  merit increase?

1d  A.  Yes.

15  Q.  And you're noted on this document as

16  the supervisor for Mr. Jendras; correct?

17  A.  Correct.

18  Q.  And there's a reflection in this

19  document that, effective March 7, 2006, Mr. Jendras

20  would receive a merit increase of $12,000 over his

21  previous annual rate of $216,25P; correct?

22  A.  Correct.

23  Q.  And that would have been on the basis

24  of a recommendation made by you, sir?

25  A.  Correct.

COMPU-TRAN SHORTHAND REPORTING

---

44

William LaPerch

2  Q.  And before this merit increase took

3  effect, would you have been asked to comment on a

d  proposed merit increase?

5  A.  To whom?

6  Q.  Were you, for example, given a

7  spreadsheet with the names of employees who you were

8  responsible for as your direct reports?

9  A.  Yes.

10  Q.  And would you note on that spreadsheet

11  your recommendation as to salary increase based on

12  merit increase?

13  A.  Salary increase based on attainment of

14  company objectives and individual performance.

16  Q.  And in the case of Mr. Jendras, you

18  recommended that he receive an increase of $12,000

17  based on that criteria; is that correct, sir?

18  A.  That'p what this document says.

19  Q.  I show you a document that was

20  previously marked as Plaintiff's Exhibit 6 at a

21  prior deposition. (Handing)

22  Do you recognize this document?

23  (Witness peruses exhibit)

2d  A.  Based on my signature on the second-to-

25  last page, yes, I do.

COMPU-TRAN SHORTHAND REPORTING

45

William LaPerch

2　Q.　And what is this document?

3　A.　It's an Employee Performance Evaluation

4　form for 2006 for Doug Iendras.

5　Q.　And directing your attention to the

6　third-to-last page of this document, the -- I'll

7　wait until you get there.

8　　There's a heading entitled "Areas

8　for evaluation."

10　　Do you see that there?

11　A.　I do.

12　Q.　Did you nll out the boxes with Xs for

13　each category used as an area for evaluation?

14　A.　I don't know. There's no name on it.

15　Q.　You don't know whether you did it or

16　someone else did it?

17　A.　No. I don't know whose this is;

18　there's no name on it.

19　Q.　Okay. So, you're saying you're not

20　entirely sure it this is Mr. Jendras' evaluation?

21　A.　Well, there's no name on it.

22　Q.　Okay. I'll just tell you that you'll

23　see that there's a Bates stamp on the lower right-

24　hand side, O79. This is a document produced by

25　your attorneys in response to a request for

COMPU-TRAN SHORTHANO REPORTING

---

47

William LaPerch

2　Q.　And you'll note that in the areas for

3　evaluation, there are categories - unsatisfactory,

4　below expectation, meets expectation, and exceeds

5　expectation; correct?

6　A.　Correct.

7　Q.　And you'll note, also, that the great

8　majority of these various categories reflect a

9　judgment that Mr. Jendras' performance exceeds

10　expectation for the year 2006; correct?

11　　MR. PERKES:　Objection to the form.

12　　You can answer.

13　A.　Seven of those do.

14　Q.　And in total, there are how many, sir?

15　A.　Eleven.

16　Q.　Seven of the tt reflected a judgment

17　that Mr. Jendras' performance exceeds expectation;

18　correct?

19　A.　Correct.

20　Q.　And to the extent that there were, by

21　your count, four other categories for which the

22　exceeds expectation was not checked off, the

23　category that was checked off was meets expectation,

24　correct?

25　A.　Correct.

COMPU-TRAN SHORTHANO REPORTING

---

46

William LaPerch

2　production, and this is what was presented to us as

3　the performance evaluation for Mr. Jendras.

4　　Do you have any reason to think that

5　this is not what it purports to be?

6　A.　No.

7　Q.　Were you asked to look at your

8　documents to see if you had any responsive documents

9　to our request?

10　A.　I was.

11　Q.　Did you look to see whether you had

12　copies of prior evaluations for Mr. Jenuras'

13　performance?

14　A.　I did.

15　Q.　And so, if you had any documents

16　pertaining to an evaluation of Mr. Jendras'

17　performance, you provided it to your counsel?

18　A.　I did.

19　Q.　And would your file have included the

20　annual -- copies of the Annual Reviews of performance

21　by Mr. Jendras, including 2006?

22　A.　No.

23　Q.　So, you're not sure if this came from

24　your file or from somebody else?

25　A.　That's correct.

COMPU-TRAN SHORTHANO REPORTING

---

48

William LaPerch

2　Q.　Now, just as a point of reference, I'm

3　looking at this document, and I'm prepared to

4　acknowledge if I'm wrong. I see three categones

5　that are listed as meets expectation. Do you agree

6　with me?

7　A.　I do.

8　Q.　So, that there were really eight

9　categories where Mr. Jendras' performance was deemed

10　to exceed expectations and three where it was deemed

11　to meet expectations; correct?

12　A.　Correct.

13　Q.　Now, subsequent to your evaluation of

14　Mr. Jendras' performance for 2006, were you called

15　upon to make an assessment whether Mr. Jendras was

16　deserving of a merit increase?

17　A.　Yes.

18　Q.　Do you recall what your recommendation

19　was?

20　A.　No.

21　Q.　Okay. If you would out that back,

22　please.

23　A.　(Witness complies)

24　Q.　I'm going to show you a document that

25　was marked at a prior deposition as Plaintiff's

COMPU-TRAN SHORTHANO REPORTING

---

49

**William LaPerch**

2    Exhibit 9, and that document is entitled "Merit
3    Increase Memorandum to the Employee Personnel File,"
4    and it lists Douglas Jendras, his title, his
5    department, and it lists you as his supervisor.
6    This was a document produced by your attorneys.
7        Q.    Do you recognize it?
8        A.    Yes, I recognize the document.
9        Q.    And what is it, sir?
10       A.    It's a merit increase for Douglas
11   Jendras for his performance effective March, 2007.
12       Q.    And it indicates there was an annual
13   merit increase of $14,895, effective March 1, 2005,
14   over its prior annual rate of $248,250; correct?
15       A.    It was effective March 1, 1807, not
16   2005.
17       Q.    Okay.  If I misspoke, I apologize.
18             Effective March 1, 2007?
19       A.    Correct.
20       Q.    And this was the end result of a
21   recommendation you made, sir?
22       A.    Yes.
23       Q.    And you made that recommendation after
24   you had reviewed his performance for the year 2006;
25   is that correct?

*COMPU-TRAN SHORTHAND REPORTING*

---

5?

**William LaPerch**

2    an opinion as to whether it would be approved or not
3    approved; is that correct?
4        A.    I think that's incorrect.  I have to go
5    back and check, but I think we gave it to them for
6    informational purposes.  You know, they did not
7    approve or disapprove, as a matter of record, these
8    salary increases.
9        Q.    Would the board of directors approve or
10   disapprove a proposed merit increase?
11       A.    Not to my recollection.
12       Q.    If the individual who was receiving a
13   merit increase was an officer of the company, would
14   the board of directors be asked to approve the
15   proposed increase?
16       A.    I don't recall.
17       Q.    If an officer of the company received a
18   merit increase, would it be disclosed in the public
19   filing with the SEC?
20       A.    Yes, it would.
21       Q.    And that public filing, as you've
22   indicated, if it was presented to the SEC, it would
23   be something that you had already reviewed prior to
24   the filing; is that correct?
25       A.    Yes.

*COMPU-TRAN SHORTHAND REPORTING*

---

5P

**William LaPerch**

2        A.    His performance and the company
3    objectives.
4        Q.    And was the procedure similar to the
5    one you described in the earlier year, where you
6    were given a spreadsheet for the employees who were
7    direct reports to you, and you would make a
8    recommendation?
9        A.    Yes.
10       Q.    And would that recommendation then be
11   submitted to the board of directors for their
12   assessment and review or to the Compensation
13   Committee?
14       A.    To the Compensation Committee.  It
15   would be reviewed -- it would be submitted to them
16   for their information and discussion.
17       Q.    And what would they do with that
18   information?
19       A.    If they saw any need to discuss it,
20   they would.
21       Q.    And would they approve it?
22       A.    I can't recall one they didn't approve.
23       Q.    But my question really was:  Did they
24   actually approve -- whether or not they rejected a
25   recommendation, the point is that they would render

*COMPU-TRAN SHORTHAND REPORTING*

---

5?

**William LaPerch**

2        Q.    I show you a document that was marked
3    as Plaintiff's Exhibit 7 at a prior deposition, and
4    it's a document entitled "Employee Performance
5    Evaluation Form - 2007," and reflects the name of
6    Doug Jendras.  It reflects your name as the reviewer
7    and 2007 as the review period.
8             Do you recognize this document?
9             (Witness peruses exhibit)
10       A.    Based on my signature on the last page,
11   yes, I do.
12       Q.    And just since you mentioned it, the
13   last page that contains your signature -- is that
14   your signature above the signature line that's
15   identified as "Supervisor/Reviewer"?
16       A.    Yes.
17       Q.    And can you tell me what this document
18   is, please?
19       A.    It's Doug Jendras' Employee Performance
20   Evaluation for 2007.
21       Q.    And in looking at the document, are you
22   able to tell me whether this is a favorable review
23   or not?
24       A.    I think it's generally a favorable
25   review, yes.

*COMPU-TRAN SHORTHAND REPORTING*

---

**53**

William LaPerch

2  Q.  And redirecting your attention to the
3  category entitled, "Areas for Evaluation," which
4  begins on the fourth page of this review form, this
5  continues to show the criteria that J identified in
6  the earlier evaluation of unsatisfactory, below
7  expectation, meets expectation, and exceeds
8  expectation; correct?
9  A.  Correct.
10  Q.  And the categories that are listed in
11  this document are Ethics and Integrity, Compliance
12  with Internal Controls, Technical Skill/Job
13  Knowledge, Communication Skills, Quality,
14  Quantity/Productivity, Planning and Organizing Work,
15  Attendance, Integration Into Work Unit, Supervisory
16  Skills and Team Building; correct?
17  A.  Correct.
18  Q.  And each and every one of these areas
19  that I've identified that appear on this document,
20  reflect a judgment that Mr. Jendras' performance for
21  2007 exceeds expectations; correct?
22  A.  Yes.
23  Q.  Now, do you recall whether, subsequent
24  to signing this evaluation form, whether you made a
25  recommendation for an additional merit increase for

*COMPU-TRAN SHORTHAND REPORTING*

**54**

William LaPerch

2  Mr. Jendras?
3  A.  I didn't recall.
4  Q.  I'm going to show you a document that
5  was marked at a prior deposition as Plaintiff's
6  Exhibit 10.  (Handing)  And this, too, is a document
7  that was produced by your attorneys in response to a
8  request for production.  And it reflects an email --
9  what appears to be an email from Sheila Chang to
10  you, Bill LaPerch; and Rob Sokota; is that correct,
11  sir?
12  A.  That's correct.
13  Q.  And who is Sheila Chang?
14  A.  Director of human resources.
15  Q.  And do you recall receiving this email
16  from Ms. Chang on September 12th, 2008?
17  A.  No.
18  Q.  The subject is "Salary Increases for
19  SVPs and CEO;" correct?
20  A.  Correct.
21  Q.  Would it be fair to say that "SVP"
22  stands for senior vice president?
23  A.  Yes.
24  Q.  And "CEO" stands for chief executive
25  officer?

*COMPU-TRAN SHORTHAND REPORTING*

**55**

William LaPerch

2  A.  Yes.
3  Q.  And this reflects an increase for
4  Mr. Jendras in the amount of $16,855 to a new annual
5  salary of 280,000; correct?
6  A.  Correct.
7  Q.  Was this increase based on a
8  recommendation that you had made?
9  A.  I don't recall.
10  Q.  Would this change have taken place
11  without any input from you?
12  A.  I don't know.
13  Q.  There's a reference here in the email
14  which reads, "Bill and Rob," the second sentence,
15  "I will need approval from both of you on the
16  following base salary increases and a copy of the
17  board minutes approving these increases."
18  Do you see that there?
19  A.  I do.
20  Q.  Did you give approval for this base
21  salary increase reflected in Ms. Chang's email?
22  A.  I don't recall.
23  Q.  You don't recall whether you did or you
24  didn't; is that true, sir?
25  A.  That's true.

*COMPU-TRAN SHORTHAND REPORTING*

**56**

William LaPerch

2  Q.  Okay.  I show you a document that was
3  previously marked as Plaintiff's Exhibit 13 at a
4  prior deposition.  (Handing)  This document is
5  entitled "Employee Annual Performance Appraisal -
6  2009."  Again, it contains the name of Mr. Jendras
7  as the employee, and it contains your name as the
8  reviewer.
9  Let me direct your attention to the
10  last page of this document and ask you if you
11  recognize any of the signatures there.
12  (Witness peruses exhibit)
13  A.  I recognize my signature.
14  Q.  And can you identify this document,
15  sir?
16  A.  It's the Employee Annual Performance
17  for Doug Jendras for 2009.
18  Q.  And is this a favorable review of
19  Mr. Jendras' performance in 2009?
20  (Witness peruses exhibit)
21  A.  I would say, overall, yes, it's
22  favorable.
23  Q.  And if I could direct your attention
24  to the second-to-last page of this document, there's
25  a handwritten comment on the top of the page there.

*COMPU-TRAN SHORTHAND REPORTING*

57

William LaPerch

2 Q. Do you recognize that handwriting?

3 (Witness peruses exhibit)

4 A. No.

5 Q. So that you don't believe that's your

6 handwriting?

7 A. It might be. Not sure.

8 Q. It says, "Thanks for another great

9 year. Looking forward to 2010."

10 Do you have a recollection of writing

11 that statement on this review form?

12 A. No.

13 Q. Are those your initials on the bottom

14 of the page?

15 A. They are.

16 Q. To your knowledge, did anybody else

17 make comments on Mr. Jendras' review?

18 A. No.

19 Q. If I can direct your attention to the

20 third page of this document, there is also a

21 statement, the fourth paragraph down -- I'll say

22 five paragraphs down -- handwritten in capital

23 letters, "GREAT YEAR!"

24 Do you see that there?

25 A. No. Am I on the right page?

COMPU-TRAN SHORTHAND REPORTING

58

William LaPerch

2 Q. It should say, page three of ten.

3 MR. PEIKES: I think you said,

4 handwritten. I think you meant typewritten.

5 MR. WEINSTEIN: I apologize if I

6 misspoke. Yes. Hanuwritten -- I mean,

7 typewritten. Said it again. Typewritten.

8 A. Where are you?

9 Q. Page 3 of 10. One, two, three, four,

10 five. Five paragraphs down it says, "Participate in

11 munthly revenue recognition meetings and address all

12 operational shortcomings. Objective accomplished.

13 GREAT YEAR!", exclamation point.

14 Do you see that there?

15 A. Yes, I do. I do see that.

16 Q. Were those your words?

17 A. I assume so.

18 Q. Are those your initials on the bottom

19 of the page, as well?

20 A. They are.

21 Q. Okay. Do you recall whether, subsequent

22 to executing this form containing these comments

23 about Mr. Jendras' performance, whether you made a

24 recommendation for an additional merit increase for

25 Mr. Jendras?

COMPU-TRAN SHORTHAND REPORTING

59

William LaPerch

2 A. I don't recall.

3 Q. You don't recall whether you did or you

4 didn't; is that correct?

5 A. That's correct.

6 Q. I'm going to show you what was marked

7 previously as Plaintiff's Exhibit 30 at a prior

8 deposition. This is a document entitled "Merit

9 Increase Memorandum to the Employee Personnel File."

10 This contains Mr. Jendras' name, identifies him as

11 the SVP of operations, and lists you as the

12 supervisor.

13 (Witness peruses exhibit)

14 Do you recognize this document?

15 A. Yes.

16 Q. What is it, sir?

17 A. A Merit Increase Memorandum for

18 Doug Jendras.

19 Q. And this reflects that effective

20 March 1, 2010, Mr. Jendras' salary was to be

21 increased by $2P,000; correct?

22 A. Yes.

23 Q. And that increase is identified as an

24 annual merit increase; correct?

25 A. Yes.

COMPU-TRAN SHORTHAND REPORTING

60

William LaPerch

2 Q. And it raised his salary from 28p,PP0

3 to 290,000; correct?

4 A. Yes.

5 Q. And would this document be a

6 memorialization of a recommendation you made

7 regarding a merit increase for Mr. Jendras,

8 effective March 1, 2010?

9 A. Yes.

10 Q. Now, during this same period of time,

11 was there also discussion, in connection with

12 Mr. Jendras' compensation, about performance bonuses?

13 A. Yes.

14 Q. And would you have been involved in

15 that discussion, as well?

16 A. Yes.

17 Q. And did Mr. Jendras receive performance

18 bonuses, as well, during his tenure?

19 A. He did.

20 Q. And would it be fair to say you

21 recommended that he receive performance bonuses?

22 A. Yes.

23 Q. Did Mr. Jendras have an employment

24 agreement to the best of your knowledge?

25 A. Yes.

COMPU-TRAN SHORTHAND REPORTING

---

**61**

William LaPerch

2    Q.   Was it a written employment agreement?

3    A.   Yes.

4    Q.   I'm going to show you a document marked

5  at a prior deposition as Plaintiff's Exhibit 24.

6  (Handing) It's a document entitled "Employment

7  Agreement." And it was a document produced by your

8  attorneys, containing Bates stamp numbers O1 1 T

9  through O13 t. Please take a moment to look at this

10  document.

11       (Witness peruses exhibit)

12  Have you had a chance to look at it?

13    A.   I have.

14    Q.   Do you recognize it?

15    A.   Yes.

16    Q.   What is it, sir?

17    A.   It's the Employment Agreement for

18  Doug Iendras.

19    Q.   And this agreement reflected an

20  employment term for the period commencing

21  September 12th, 2003; correct?

22    A.   Correct.

23    Q.   And it indicated that it was for a

24  period of three years; correct? And I'm direct

25  your attention, if you don't know the answer to that

COMPU-TRAN SHORTHAND REPORTING

---

**62**

William LaPerch

2  offhand, to the first paragraph on the first page,

3  "Employment Term:", it says.

4    A.   That's correct.

5    Q.   And do you know whether or not

6  Mr. Iendras' employment was extended after the

7  expiration of this Employment Agreement?

8    A.   Yes.

9    Q.   Was it?

10    A.   It was.

11    Q.   I'm going to show you a document that

12  was marked at a previous deposition as Plaintiff's

13  Exhibit 15. (Handing) I'm going to ask you to take

14  a look at that and let me know if you can identify

15  it, please.

16       (Witness peruses exhibit)

17    A.   Yes. It's Doug Iendras' Employment

18  Agreement for the period September 2nd, 2003,

19  through November 16th, 2011.

20    Q.   And do you know whether Mr. Iendras'

21  employment was extended beyond the November 26th,

22  2011, date?

23       MR. PEIKES:  Objection to the form.

24    A.   I don't know.

25    Q.   If I can just direct your attention to

COMPU-TRAN SHORTHAND REPORTING

---

**63**

William LaPerch

2  the last page of this document. Do you recognize

3  any of the signatures on that page?

4    A.   Yes.

5    Q.   Which ones do you recognize?

6    A.   I recognize my signature and Doug's

7  signature.

8    Q.   I'm going to show you a document that

9  was marked at an earlier deposition as Plaintiff's

10  Exhibit 16. (Handing) It's a document entitled

11  "First Amendment to Employment Agreement." And

12  once you've had a chance to look at it, I'd like

13  you to tell me if you can identify it.

14    A.   It's the First Amendment to Doug

15  Iendras' Employment Agreement.

16    Q.   And does this reflect an extension of

17  the term of employment from the expiration date that

18  was set forth in the agreement of November 26th,

19  2011?

20    A.   Yes.

21    Q.   And what was the extension set forth in

22  this first amendment that you're looking at?

23    A.   It was extended to December 31st, 2011.

24    Q.   Now, would you have any input regarding

25  the decision to extend the term of employment for

COMPU-TRAN SHORTHAND REPORTING

---

**64**

William LaPerch

2  Mr. Iendras?

3    A.   Yes.

4    Q.   So, it would be fair to say that you

5  were in favor of this extension set forth in the

6  first Amendment; is that correct, sir?

7    A.   Yes.

8    Q.   Okay. Now, are you familiar with

9  AboveNet's 2008 Equity Incentive Plan?

10    A.   Yes.

11    Q.   How are you familiar with it?

12    A.   I'm familiar with the high-level

13  detail of the plan as a -- as a subsequent -- a

14  subsequent activity after our original equity plan

15  of 2003.

16    Q.   And what was the purpose of the 2008

17  Equity Incentive Plan?

18    A.   To ensure that the board and myself had

19  the ability to -- to retain and reward as we saw

20  appropriate through equity allocations.

21    Q.   And when you say "equity allocations,"

22  are you talking about stock?

23    A.   RSus, yes.

24    Q.   And could you say for the record what

25  "RSu" stands for.

COMPU-TRAN SHORTHAND REPORTING

65

William LaPerch

2  A.  Restricted stock units.

3  Q.  And did you have any involvement in

4  connection with the determination of whether an

5  award should be made to certain employees?

6  A.  I did.

7  Q.  What was your role, sir?

8  A.  It was -- I was the final management

9  reviewer of these awards for all RSU awards for the

10  company, and I had -- I had input on the awards for

11  my direct reports.

12  Q.  And the direct reports would be the

13  same individuals you had described earlier, when

14  I asked you about merit increases, as well?

15  A.  That's correct.

16  Q.  And one of those direct reports,

17  obviously, was Mr. Jendras; correct?

18  A.  Yes.

19  Q.  So, you had direct input as to whether

20  Mr. Jendras would receive an award of restricted

21  stock units; is that correct, sir?

22  A.  That's correct.

23  Q.  And once you provided your input

24  regarding an award for your direct reports, what,

25  if anything, happened after that?

*COMPU-TRAN SHORTHAND REPORTING*

---

67

William LaPerch

2  Q.  Did I misunderstand you?

3  A.  You did misunderstand.

4  Q.  So, the sequence of events is:  You

5  would provide input.  The Compensation Committee

6  would indicate whether they approved it.  And the

7  employee who was the beneficiary of an award would

8  be notified.  Is that correct?

9  A.  Providing there were no -- no other

10  activities that required management action between

11  the time when the board approved it and when we told

12  the person that was getting the award, yes.

13  Q.  Now, you just mentioned "board approval."

14  When did board approval occur in

15  connection with this process?  Would it be after the

16  Compensation Committee met and passed upon the

17  proposed award?

18  A.  To the best of my recollection, the

19  usual procedure was:  We would have a Compensation

20  Committee meeting just prior to the board meeting,

21  discuss it with the Compensation Committee meeting.

22  And then, there was usually very little time between

23  when the Compensation Committee meeting -- when the

24  Compensation Committee approved it and when the

25  board approved it.  That was the general routine.

*COMPU-TRAN SHORTHAND REPORTING*

---

66

William LaPerch

2  A.  They were put on a spreadsheet and

3  shared with the Compensation Committee.

4  Q.  And what was the responsibility of the

5  Compensation Committee as you understood it once

6  they received these recommended awards?

7  A.  The Compensation Committee reviewed

8  them; asked some questions about the levels that

9  were given, the differences between, you know, some

10  awards; and then had final approval authority.

11  Q.  And if the Compensation Committee

12  approved a proposed stock award, what, if anything,

13  would happen next regarding the approval of the

14  award?

15  A.  If the Compensation Committee approved

16  it, we -- we would, between the time they approved

17  it and -- we would have some point in time where we

18  would actually share that information with employees

19  of everything, you know, remained the same between

20  the time they approved it and when we told the

21  employees.

22  There would be a lag -- you would

23  notify the employee before the Compensation

24  Committee acted on it?

25  A.  No.

*COMPU-TRAN SHORTHAND REPORTING*

---

68

William LaPerch

2  Q.  Am I to understand, then, those

3  meetings would take place the same day?

4  A.  Very often.

5  Q.  Would it take place in the same hour?

6  A.  Hard to say; don't recall.

7  Q.  Were you present when the proposed

8  awards were discussed at Compensation Committee

9  meetings?

10  A.  I was.

11  Q.  Were you asked to comment on the

12  proposed awards by the members of the Compensation

13  Committee?

14  A.  I usually -- I usually took it upon

15  myself to provide some context for the awards and my

16  views on them.

17  Q.  And were you also present -- withdrawn.

18  Were you a member of the board of

19  directors, sir?

20  A.  I was.

21  Q.  And you still are, sir?

22  A.  I am.

23  Q.  And so, it would be fair to say when

24  the board of directors met, you would be present to

25  discuss the proposed awards that had been reviewed

*COMPU-TRAN SHORTHAND REPORTING*

69

## William LaPerch

2  by the Compensation Committee; correct?
3      A.    Correct.
4      Q.    And you would vote at the board of
5  directors meetings; correct?
6      A.    Correct.
7      Q.    And if the board of directors approved
8  the award, would there then be a disclosure in a
9  public filing with the SEC?
10     A.    There was disclosure required some time
11 frame after the approval. I'm not sure what the
12 exact requirement is, though.
13     Q.    But your best understanding is that the
14 content of the award was something that was
15 disclosed to the public after the board of directors
16 approved it?
17     A.    For the -- for the officers, yes.
18     Q.    And Mr. Jendras, of course, was an
19 officer; correct?
20     A.    He was, yes.
21     Q.    So that if Mr. Jendras received an
22 award, it was disclosed in a public filing with the
23 SEC; is that correct?
24     A.    At some point in time after the board
25 approved it, yes.

COMPU-TRAN SHORTHAND REPORTING

71

## William LaPerch

2  Compensation Committee?
3      A.    Since the emergence from bankruptcy.
4      Q.    So, that would take us back to 2003;
5  is that correct?
6      A.    Yes, sir.
7      Q.    And has he also been a member of the
8  board of directors since that time?
9      A.    He has.
10     Q.    And where is Mr. Subotnick located,
11 if you know?
12     A.    In Manhattan.
13     Q.    Does he run his own company?
14     A.    He -- he owns many companies.
15     Q.    And who else is a member of the
16 Compensation Committee?
17     A.    Mr. Richard Postma.
18     Q.    And is Mr. Postma also a member of the
19 board of directors?
20     A.    He ts.
21     Q.    And how long has he been a member of
22 the Compensation Committee and the board of
23 directors?
24     A.    Since 2003.
25     Q.    And is he an employee of the company?

COMPU-TRAN SHORTHAND REPORTING

70

## William LaPerch

2      Q.    And you would, as you've indicated
3  previously, be asked to review the accuracy of that
4  filing before it was filed with the SEC; is that
5  correct?
6      A.    That's correct.
7      Q.    And you would certify, in connection
8  with the 10-K, that it was accurate; correct?
9      A.    If it was a 10-K, yes.
10     Q.    Now, you mentioned the Compensation
11 Committee.
12            Who are the members of the Compensation
13 Committee?
14     A.    Mr. Subotnick.
15     Q.    What's his first name?
16     A.    Stewart.
17     Q.    And is he also a member of the board
18 of directors?
19     A.    He is.
20     Q.    And is he also an employee of the
21 company?
22     A.    No.
23     Q.    So, he's an outside director?
24     A.    He is.
25     Q.    How long has he been a member of the

COMPU-TRAN SHORTHAND REPORTING

72

## William LaPerch

2      A.    No.
3      Q.    So, he, too, is an outside director?
4      A.    He is.
5      Q.    And where is he located?
6      A.    In Michigan.
7      Q.    And do you know the town that he's in,
8  in Michigan?
9      A.    Dearborn? uh, no.
10     Q.    Is it Grand Rapids?
11     A.    Grand Rapids. Grand Rapids.
12     Q.    Any other members or the Compensation
13 Committee?
14     A.    Mr. Richard Shorten.
15     Q.    Is he, too, a member of the board of
16 directors?
17     A.    He is.
18     Q.    And has he, too, been a member of the
19 Comp Committee and the board of directors since
20 2003?
21     A.    He has.
22     Q.    Is he an employee of the company?
23     A.    He is not.
24     Q.    And where is Mr. Shorten located?
25     A.    New Canaan, Connecticut.

COMPU-TRAN SHORTHAND REPORTING

73

William LaPerch

2 Is it possible to take a break?

3 MR. WEINSTEIN: Yes.

4 (Recess held from 11:32 to 12:43 a.m. r

5 MR. WEINSTEIN: Can you read back the

6 last question and answer.

7 (Record read)

8 CONTINUED EXAMINATION BY MR. WEINSTEIN:

9 Q. So, you've identified at this point,

10 Mr. Shorten -- as was just read back to us --

11 Mr. Postma, and Mr. Subotnick.

12 Were there other members of the

13 Compensation Committee?

14 A. No.

15 Q. So, it was those three?

16 A. Yes, sir.

17 Q. I want to show you a document marked at

18 a prior deposition. It was marked as Plaintiff's

19 Exhibit 18, and it's a document entitled "AboveNet,

20 Inc. Meeting of the Board of Directors, September 8,

21 2008." And it's a document consisting of five

22 pages, and it was produced by your attorneys.

23 (Handing)

24 (Witness peruses exhibit)

Do you recognize this document?

25

COMPU-TRAN SHORTHAND REPORTING

---

74

William LaPerch

2 A. I recognize these as board minutes.

3 Q. And these are the minutes for a meeting

4 that took place on September 8th, 2008; correct?

5 A. Correct.

6 Q. And it indicates that certain members

7 of the board of directors participated by means of

8 telephonic equipment; correct?

9 A. Correct.

10 Q. And you're listed as one of those

11 directors that participated by telephonic equipment;

12 correct?

13 A. Everybody participated by telephonic

14 equipment.

15 Q. Is that typically the way these things

16 were done? It was not an in-person meeting, but it

17 would be by telephone?

18 A. It varied.

19 Q. So, the reference in the second

20 paragraph, "Also participated by invitation," and

21 the folks identified there, that doesn't mean that

22 they were participating in person; it just means

23 that they were participating by invitation, as well

24 by telephone; is that correct?

25 A. That's correct.

COMPU-TRAN SHORTHAND REPORTING

---

75

William LaPerch

2 Q. Okay. Now, this meeting, as reflected

3 in the minutes, was a meeting where there was a

4 discussion regarding a potential award under the

5 terms of the Equity Incentive Plan; correct?

6 A. Correct.

7 Q. And if you look at the bottom of the

8 page, it says, "Mr. Sokota reviewed the previously

9 circulated spreadsheets containing recommended

10 equity grants to certain employees."

11 A. I'm sorry. Bottom of page, what?

12 Q. I'm sorry; I didn't realize you weren't

13 there. Bottom of the first page.

14 A. Got it.

15 Q. "Mr. Sokota reviewed the previously

16 circulated spreadsheets containing recommened

17 equity grants to certain employees under the 2008

18 Equity Incentive Plan. The spreadsheet provided for

19 grants in varying amounts of restricted stock units,

20 depending on the employee level."

21 Do you recall that presentation by

22 Mr. Sokota?

23 A. I don't recall it specifically, but

24 that is generally what he did in these situations.

25 Q. And the spreadsheet that provided for

COMPU-TRAN SHORTHAND REPORTING

---

76

William LaPerch

2 grants, would that be a spreadsheet that reflected

3 your recommendation as to your direct reports?

4 A. It would.

5 Q. And that would include Mr. Jendras;

6 correct?

7 A. It would include Mr. Jendras, yes.

8 Q. And this meeting, as memorialized in

9 the minutes, reflects an approval, does it not, for

10 a stock award to Mr. Jendras; correct?

11 A. I would assume so, yes.

12 Q. Well, if I can direct your attention to

13 the second page, there is a reflection of a resolution;

14 correct?

15 A. Yes.

16 Q. And that resolution at the bottom of

17 the page reads, "Resolved." Then, for the stock

18 units granted to each of the senior vice presidents

19 on Schedule A, Doug Jendras -- the other names are

20 redacted: "30 percent shall vest on September 8th,

21 2009, and delivered on November 16th, 2009. Ten

22 percent shall vest on September 8th, 2010, and be

23 delivered on November 15th, 2010. And 60 percent

24 shall vest on September 8th, 2011, and be delivered

25 on November 15th, 2011."

COMPU-TRAN SHORTHAND REPORTING

---

77

William LaPerch

2 That's a reference to a stock award to
3 Mr. Jendras; correct?
4 A. Correct.
6 Q. And that's a reflection of the vesting
6 schedule for that stock award; correct?
7 A. Correct.
8 Q. And subsequent to the board's meeting
9 and approval of this stock award, was Mr. Jendras,
10 to your knowledge, provided with a stock award
11 agreement reflecting this vesting schedule?
12 A. I don't know.
13 Q. Would that have been the typical
14 procedure?
15 A. Yes.
16 Q. Let me show you a document that was
17 marked at a prior deposition as Plaintiff's
18 Exhibit 19. (Handing) And it's a document entitled
19 Stock Unit Agreement, and it says "Stock Unit
20 Agreement Effective as of September 8th, 2009."
21 I want you to take a moment to look at
22 this, please.
23 (Witness peruses exhibit)
24 A. Okay.
25 Q. Do you recognize this document?

79

William LaPerch

2 Q. Does that mean you were familiar with a
3 form of agreement that was used to memorialize an
4 award if it was approved by the board of directors?
5 A. Yes.
6 Q. So, would it be fair to say you saw
7 this form of agreement before it was executed by
8 Mr. Jendras or any other officer who was the
9 beneficiary of a stock award?
10 A. Yes.
11 Q. And were you asked to comment on the
12 terms memorialized in the form of the Stock Unit
13 Agreement?
14 A. Don't recall.
15 Q. And are you aware of what, if anything,
16 the Stock Unit Agreement says regarding the vesting
17 of stock units if an employee is terminated without
18 cause?
19 A. I just read what's in Section b on the
20 second page, and I was familiar with that beforehand,
21 as well.
22 Q. And since you've identified it on the
23 second page, paragraph b says, "upon the
24 termination of the participant's continuous service
25 by the company without cause, or by the employee for

79

William LaPerch

2 A. I do.
3 Q. Can you identify it, please.
4 A. It's a Stock Unit Agreement for
5 Doug Jendras.
6 Q. And is this, in fact, the Stock Unit
7 Agreement incorporating the terms that were approved
8 by the board of directors at their meeting on
9 September 8th, 2009?
10 A. It appears to be, yes.
11 Q. And in fact, this reflects the vesting
12 schedule that was the subject of the resolution set
13 forth in the minutes of the meeting of the board of
14 directors for September 9th, 2009; correct?
15 A. Correct.
16 Q. And did you see this Stock Unit
17 Agreement before it was executed?
18 A. What do you mean by "see"?
19 Q. Well, before this agreement was signed
20 by Mr. Jendras and what appears to be Mr. Sokota's
21 signature, were you asked to look at it before it
22 was signed?
23 A. I was not asked to look at this
24 specific document. I was familiar with a Stock Unit
25 Agreement.

80

William LaPerch

2 good reason, any unvested stock units shall
3 immediately vest."
4 You were aware of that provision;
5 correct?
6 A. Yes.
7 Q. And so, that would mean that to the
8 extent that there was any restricted stock units
9 that were scheduled to vest at a later date, they
10 would vest immediately if and when an employee was
11 terminated without cause; correct?
12 A. Yes.
13 Q. Now, had you discussed that particular
14 term before its inclusion in the form of the Stock
15 Award Agreement with anybody else at AboveNet?
16 A. Don't recall.
17 Q. Did you make any additional
18 recommendations for stock awards to Mr. Jendras,
19 subsequent to the award memorialized in this Stock
20 Award Agreement that I just showed you for
21 September 8th, 2008?
22 A. Yes.
23 Q. Do you recall when you did that?
24 A. No.
25 Q. I want to show you a document that was

91

```
 1              William LaPerch
 2   marked at a prior deposition as Plaintiff's
 3   Exhibit 20. [Handing] This, too, is a document
 d   that was produced by your attorneys in response to
 5   our request for production and the first page says,
 8   "AdoyeNet meeting of the board of directors
 7   December 20th, 2d1d."
 8          Why don't you take a moment to look at
 8   it before I ask you to identify it, please.
10          [Witness peruses exhibit]
11      A.   Okay.
12      Q.   Can you identify the document?
13      A.   It's a document that outlines the
1d   meeting of the board of directors on betember 20th,
15   2010. It outlines various actions that the board
16   was taking at that time relative to additional stock
17   grants based on a $5.00 per share dividend that was
18   awarded in December of that year.
19      Q.   And were you present at this meeting?
20      A.   I was.
21      Q.   And I say, "present." I'm looking at
22   a notation, "Minutes of the telephonic meeting."
23          Would it be fair to say this meeting
2d   also was a telephonic meeting?
25      A.   It was.
          COMPU-TRAN SHORTHAND REPORTING
```

03

```
 1              William LaPerch
 2   a percentage, but it often heddened, yes.
 3      Q.   And was the meeting of the members of
 d   the Comdensation Committee conducted telephonically,
 5   as well?
 6      A.   Yes.
 7      Q.   And so, when you made your dresentation,
 8   you were making this dresentation to the members of
 9   the Compensation Committee telephonically; is that
10   correct, sir?
11      A.   That's correct.
12      Q.   And in connection with the
13   recommendations you would make, had you diovided
1d   them documentation in advance of the telephonic
15   meeting regarding your diodosed awards?
16      A.   For this specific meeting?
17      Q.   Well, I'm asking in general.
18      A.   In general, yes; I would diovide, in
18   advance, a cody of my droposed recommendations.
20      Q.   And what form did that recommendation
21   take? Was it a sdreadsheet, or was it some other
22   form?
23      A.   It was a sdreadsheet. Occasionally,
2d   I might attach some -- no, it was a sdreadsheet.
25   I don't recall doing any PowerPoint dresentations
          COMPU-TRAN SHORTHAND REPORTING
```

82

```
 1              William LaPerch
 2      Q.   So, your addearance was dy teledhone;
 3   is that correct?
 d      A.   It was.
 5      Q.   As was everybody else's; is that
 8   correct?
 7      A.   Yes. Well, everybody else's excedt for
 8   those people that were in the room with me,
 9   listening to the teledhone.
10      Q.   Okay. That's a good point. And if I'm
11   not mistaken, we really can't tell from this set of
12   minutes who was dresent with you. Am I correct in
13   that odservation?
14      A.   You're correct that you can't tell from
15   these minutes who was dresent with me, yes.
16      Q.   Do you know who was present with you at
17   the time this meeting took place?
18      A.   Yes. To the dest of my knowledge, it
19   was Rod Sokota, Toe Clayaretta and Joe Sanford.
20      Q.   Now, you indicated dreviously in
21   resdonse to a qyestion that I asked that, tydically,
22   the Compensation Committee would meet shortly before
23   the board of directors met with regard to a droposed
24   award of restricted stock units; correct?
25      A.   That often hadpened. I can't give you
          COMPU-TRAN SHORTHAND REPORTING
```

84

```
 1              William LaPerch
 2   for this. I would talk to it, and it would de --
 3   my comments would be reflected in the minutes.
 d      Q.   So, it would de a sdreadsheet
 5   reflecting the names of the droposed reddients,
 8   among other things; is that correct?
 7      A.   That's right.
 8      Q.   And would it also include the proposed
 9   number of restricted stork units to be awarded to
10   the recidient?
11      A.   That would be included, yes.
12      Q.   And it would include a droposed vesting
13   schedule?
1d      A.   Not sure.
15      Q.   And was the spreadsheet an Excel
18   sdreadsheet?
17      A.   It was.
18      Q.   And was that something that would be
19   diepared using your dC, or someone dieparep it for
20   you?
21      A.   Someone diepared it for me.
22      Q.   And did the company retain a record of
23   the document where this information was stored?
2d      A.   The Excel sdreadsheet was retained dy
26   the comdany, yes.
          COMPU-TPAN SHORTHAND REPORTING
```

85

William LaPerch

2  Q.  And does it still exist?
3  A.  Does what still exist?
4  Q.  Does the document still exist somewhere
5  at AdoueNet regarding the --
6  A.  For this specific year?
7  Q.  Yes.
8  A.  I assume so, yes.
9       MR. WEINSTEIN: I'm going to call for
10      the production of any spreadsheets that were
11      presented at board meetings, where any stock
12      awards were the subject of discussion and/or
13      approval as it pertained to Mr. Fendias.
14      MR. DEIKES: We'll take it under
15      advisement.
16      MR. WEINSTEIN: Okay.
17  DOCUMENT/DATA REQUESTED:
18  Q.  So, redirecting your attention to the
19  minutes that you have in front of you, there is an
20  indication, is there not, of a recommendation you
21  made relating to an award for Mr. Fendias; correct?
22  A.  Correct.
23  Q.  And that award was identified in a
24  portion of these minutes as part of what was set
25  forth as Schedule B; correct? If you could turn

COMPU-TRAN SHORTHAND REPORTING

86

William LaPerch

2  to -- and just let me see if I can help you get
3  there. It's a document 9ates stamped D362.
4       [Witness peruses exhibit]
5  A.  D362 reflects a grant as being added to
6  outstanding RSUs that had been previously awarded
7  that come as a result of the $5.00 a share dividend
8  that was being offered to our shareholders in
9  December.
10  Q.  If you look at the column, "Proposed
11  Grant" -- do you see that there?
12  A.  Yes.
13  Q.  Is that a column intended to reflect
14  the amount of restricted stock units that were the
15  subject of a proposed grant?
16  A.  That is intended to reflect the value
17  of the $5.00 a share dividend that we were offering
18  our shareholders.
19  Q.  So, if you look down below, there's a
20  number, 3,735. Do you see that there?
21  A.  I do.
22  Q.  And is that a dollar amount as opposed
23  to a number reflecting stock units?
24  A.  It's a share amount.
25  Q.  Okay; that's what I thought.

COMPU-TRAN SHORTHAND REPORTING

87

William LaPerch

2  So that the number 1,719 reflects a
3  disposed grant of restricted stork units to
4  Mr. Fendias; is that correct?
5  A.  It does.
6  Q.  And that was what was approved, was it
7  not, by the board of directors when it met on
8  December 20th, 2010; correct?
9  A.  Correct.
10  Q.  And before the board of directors met
11  that day, the Compensation Committee had already
12  approved this; correct?
13  A.  That's what generally happens, yes.
14  Q.  And it indicates that the vesting and
15  delivery date was November 15th, 2011; correct?
16      [Witness peruses exhibit]
17  A.  Is that annotated in these minutes
18  somewhere that you can point me to?
19  Q.  I just want to you to answer the best
20  you can. I'll try and help you with that if I
21  could.
22  A.  The vesting delivery date on this sheet
23  is indicated as 11/15/11.
24  Q.  And I gather from your response,
25  you're not sure, just from looking at this schedule,

COMPU-TRAN SHORTHAND REPORTING

88

William LaPerch

2  whether or not that was intended to reflect the
3  vesting and delivery date for the 3,719 shares;
4  is that correct?
5  A.  Can you restate your question, please.
6      MR. WEINSTEIN: Can you read it back,
7  please.
8      [Question read]
9  A.  It's my understanding that the 11/15/11
10  represented the vesting date for the d2,000 shares.
11  Q.  And on what do you base that conclusion?
12  A.  Recollection.
13  Q.  And as long as you mentioned it, you
14  point out that there's a number 42,000 that appears
15  underneath the column, "Outstanding RSUs at 2010."
16  Do you see that there?
17  A.  Yes.
18  Q.  And that would appear to be a reference
19  to what was outstanding as of --
20  A.  December 20th.
21  Q.  -- as of December 20th, 2011, and the
22  number 42,000, would appear, reflects what was
23  already the subject of an earlier award to
24  Mr. Fendias; correct?
25  A.  Correct.

COMPU-TRAN SHORTHAND REPORTING

99

William LaPerch

2   Q.   And perhaps I should've shown this to
3   you before, but if I can redirect your attention to
4   the minutes of September 9th, 2008.
5   A.   Yes.
6   Q.   That should be there.  Do you have it
7   there?
8   A.   Yes.
9   Q.   If I can direct your attention to the
10  last page.  That reflects, does it not, a number for
11  the stock units that were the subject of approval by
12  the board on September 9th, 2009; correct?
13  A.   That's what the document says, yes.
14  Q.   It says, "35,000;" correct?
15  A.   Yes.
16  Q.   And can you explain how, as of
17  December 20, 2010, there were 42,000 units that were
18  outstanding if the award that was approved in
19  September, 2008, was 15,000?
20  A.   No.
21  Q.   Did the stock split?
22  A.   The stock did split, yes.
23  Q.   And did it split two to one?
24  A.   Two for one, yes.
25  Q.   So that the 15,000 became 70,000;

*COMPU-TRAN SHORTHAND REPORTING*

---

91

William LaPerch

2   Q.   And was the purpose of this meeting,
3   as memorialized in these minutes, to address a
4   proposed stock unit award?
5   A.   That was one of the purposes, yes.
6   Q.   And prior to the meeting of the board
7   of directors to take up, among other things, a
8   proposed stock award to various proposed recidients,
9   had the Compensation Committee met?
10  A.   The minutes indicate that they had,
11  yes.
12  Q.   And were you present when the
13  Compensation Committee discussed proposed awards of
14  restricted stock units?
15  A.   Yes.
16  Q.   And did you, as you had on prior
17  occasions, make a presentation setting forth your
18  recommendation regarding the various recidients of
19  those stock unit awards?
20  A.   1 never said 1 made a presentation. 1
21  provided some context, and they're reflected in the
22  board meeting minutes.
23  Q.   Okay.  Well, we'll use your choice of
24  words.  You said you provided context; is that
25  correct?

*COMPU-TRAN SHORTHAND REPORTING*

---

90

William LaPerch

2   correct?
3   A.   Correct.
4   Q.   And it would appear that in December of
5   2010, of that 70,000, there remained 42,000 units
6   that had not yet vested; correct?
7   A.   That's what it appears, yes.
8   Q.   Now, let me also show you another
9   document that was marked at a prior deposition as
10  plaintiff's Exhibit 22. (Handing)  That document
11  was also produced by your attorneys, and it says
12  "AboveNet, Inc. Meeting of the Board of Directors,
13  January 25, 2011."
14  Would you take a moment to look at
15  this.  I'm going to ask you whether you recognize
16  this document.
17  (Witness peruses exhibit)
18  A.   1 recognize it.
19  Q.   And can you identify it, please.
20  A.   These are the meeting minutes from our
21  board of directors meeting that was held, in person,
22  in White Plains on January 25, 2011.
23  Q.   And were you present at that board of
24  directors meeting?
25  A.   1 was.

*COMPU-TRAN SHORTHAND REPORTING*

---

92

William LaPerch

2   A.   Yes.
3   Q.   And how did you do that, sir?
4   A.   1 would usually start off by telling
5   the board my view of what kind of year the company
6   had, and how these stock units were an important
7   part of retaining our talent on a going-forward
8   basis.
9   Q.   And would you then provide a specific
10  recommendation relating to particular individuals,
11  who you proposed as individuals who merited the
12  receipt of certain stock unit awards?
13  A.   The board and the Compensation
14  Committee both had, in their possession, the
15  spreadsheets that indicated my approved
16  recommendations.
17  Q.   And that spreadsheet was something you
18  had created before the Compensation Committee met;
19  correct?
20  A.   That was created. 1 didn't create it
21  myself; 1 reviewed it. It was created for me.
22  Q.   And when you say it was created for
23  you, did it contain the particulars of what you were
24  going to propose regarding the amount of stock units
25  to be awarded and the names of the recidients of

*COMPU-TRAN SHORTHAND REPORTING*

**93**

William LaPerch

2 those awards?

3    A.    It did.

4         MR. WEINSTEIN:  And as with my request

5 previously, I'm going to ask that that

6 spreadsheet be provided to me, assuming it

7 does exist.

8         MR. DEIKES:  Same response; we'll look

9 into it.

10 DOCUMENT DATA REQUESTED: _____

11    Q.    And so, at the point in time when you

12 would be meeting with the Compensation Committee,

13 they would've received from you the spreadsheet;

14 correct?

15    A.    They received it from someone else.

16    Q.    And who was the someone else?

17    A.    Rob Sokota.

18    Q.    And Mr. Sokota was acting at your

19 direction, I presume?

20    A.    Yes.

21    Q.    And would the spreadsheet also contain

22 a proposed schedule for vesting?

23    A.    I don't recall.

24    Q.    Would it set forth the terms of the

25 stock unit award, as well?

*COMPU-TRAN SHORTHAND REPORTING*

**94**

William LaPerch

2    A.    No.

3    Q.    Would it cadsulate, in any way, the

4 terms of the stock unit award?

5    A.    No.

6    Q.    So, redirecting your attention to the

7 minutes of the board of directors on January 25,

8 2011, you observed that this was a meeting that

9 took place at the company's headquarters in

10 White Plains; correct?

11    A.    Correct.

12    Q.    Were the members of the Compensation

13 Committee present, as well, for this meeting?

14    A.    Yes, to the best of my recollection.

15    Q.    And was this meeting in person because

16 it occurred at the beginning of the year, or was

17 there some other reason why it was in person?

18    A.    We -- we had a certain number of

19 meetings that were telephonic, a certain number that

20 were in person.

21    Q.    And you mentioned that one of the

22 purposes of this meeting was to act on a

23 recommendation you had made with respect to the

24 award of restricted stock units to certain

25 individuals.

*COMPU-TRAN SHORTHAND REPORTING*

**95**

William LaPerch

2         Was one of those individuals

3 Mr. Iendras?

4    A.    Yes.

5    Q.    And do you recall what you recommended

6 at the meeting of the Compensation Committee as the

7 award to be made to Mr. Iendras?

8    A.    According to these minutes, I

9 recommended 35,000 shares -- 21,000 shares.

10    Q.    Right.  And if you look at Schedule A,

11 does that reflect accurately the recommendation you

12 made with respect to Mr. Iendras?

13    A.    To the best of my recollection, yes.

14    Q.    And that reflects a proposed grant of

15 21,000 units; correct?

16    A.    Correct.

17    Q.    And it also reflects a vesting schedule

18 relating to those units; correct?

19    A.    Correct.

20    Q.    And that vesting schedule reflected

21 86.66 percent vesting and delivered on

22 November 16th, 2012, and 13.11 percent vesting and

23 delivered on November 16th, 2011; correct?

24    A.    Correct.

25    Q.    And the board, in fact, approved this

*COMPU-TRAN SHORTHAND REPORTING*

**96**

William LaPerch

2 proposed award; correct?

3    A.    They did.

4    Q.    And to your knowledge, was the award

5 that you recommended and was approved by both the

6 Compensation Committee and the board, subsequently

7 reduced to a written document?

8    A.    This is the written document.

9    Q.    Was there a written Stock Award

10 Agreement that was prepared?

11    A.    Yes.

12    Q.    And was that prepared after this

13 meeting?

14    A.    Yes.

15    Q.    And who prepared it?

16    A.    Mr. Sokota.

17    Q.    And what did Mr. Sokota utilize for the

18 purpose of preparing the stock unit award agreement

19 that was approved at the meeting of the board of

20 directors on January 25, 2011?

21    A.    I don't understand your question.

22    Q.    Who provided Mr. Sokota with the terms

23 that he was to include in the written stock unit

24 award agreement?

25    A.    The company's equity plan, 2006 equity

*COMPU-TRAN SHORTHAND REPORTING*

97

William LaPerch

2  dian.

3  Q.  Did anyone provide Mr. Sokola with

4  information relating to what was to be included in

5  the agreement that he was drafting to memorialize

6  the terms of the award?

7  A.  The board minutes had the number of

8  RSUs to be awarded.

9  Q.  So, he relied, then, on what had been

10  the subject of the approval at the board meeting;

11  correct?

12  A.  You'll have to ask Mr. Sokola that

13  question.

14  Q.  Okay.  But you didn't provide any

15  independent input regarding what was to be set forth

16  in the agreement, itself; is that correct?

17  A.  I did not.

18  Q.  And do you know whether Mr. Sokola

19  subsequently prepared a Stock unit agreement

20  reflecting the terms of the award that had been

21  approved by the board of directors on January 25,

22  2011?

23  A.  I know he prepared one for me.

24  Q.  Do you know if he prepared one for

25  Mr. Iendias?

*COMPU-TRAN SHORTHAND REPORTING*

---

98

William LaPerch

2  A.  I assume so.

3  Q.  I gather from your answer he didn't

4  show it to you before it was sent to Mr. Iendias;

5  is that correct?

6  A.  That's correct.

7  Q.  Let me just show you, before I ask you

8  some questions about the Stock unit Agreement

9  prepared by Mr. Sokola, with respect to the decision

10  of the board of directors on January 25, 2011, to

11  look at a document that was marked at a prior

12  deposition as plaintiff's Exhibit 21.  (Handing)

13  And this is a document entitled "Stock unit

14  Agreement."

15  Do you recognize this document?

16  rWitness peruses exhibit r

17  A.  I do.

18  Q.  Can you tell me what it is, please?

19  A.  It's a Stock unit Agreement for

20  Doug Iendias.

21  Q.  And does this contain the terms of the

22  award that was approved by the board of directors on

23  December 10th, 2010?

24  A.  I don't know how to answer that

25  question without going back and comparing it to

*COMPU-TRAN SHORTHAND REPORTING*

---

99

William LaPerch

2  others.

3  Q.  Let me redirect your attention to the

4  minutes that reflect the decision of the board of

5  directors on December 20th, 2010, and ask you

6  whether the number of units - 1,719 - reflected on

7  page one of plaintiff's Exhibit 21, is consistent

8  with what is set forth on Schedule 9 to those

9  minutes as the amount of the award approved to

10  Mr. Iendias.

11  rWitness peruses exhibit r

12  A.  Yes, it is.

13  Q.  And with respect to the terms of this

14  award as memorialized in this agreement --

15  A.  Which do you mean by "this"?

16  Q.  The document that you have in front of

17  you that I presented to you that has been marked

18  previously as plaintiff's Exhibit 21.  If I can

19  direct your attention to the second page of this

20  document; and specifically, paragraph 40.  There's

21  a reference there to vesting of the unvested stock

22  units in the event of a termination without cause.

23  Do you see that there?

24  A.  I do.

25  Q.  And that indicates that in the event of

*COMPU-TRAN SHORTHAND REPORTING*

---

100

William LaPerch

2  a termination without cause, any unvested stock

3  units would immediately vest; correct?

4  A.  Correct.

5  Q.  And was that consistent with your

6  understanding of the terms of the award made to

7  Mr. Iendias?

8  A.  Yes.

9  Q.  And was it also consistent with the

10  terms of the award made to other residents at that

11  time?

12  A.  Yes.

13  Q.  Let me show you a document that was

14  marked previously at another deposition as

15  plaintiff's Exhibit 23.  (Handing) This is a

16  document that was produced by your attorneys, and

17  it's entitled "Stock unit Agreement."  And after

18  you've had a chance to look at it, let me know.

19  I'm going to ask you some questions about it.

20  rWitness peruses exhibit r

21  A.  Okay.

22  Q.  Do you recognize the document?

23  A.  It's a Stock Unit Agreement dated

24  January 25th between the company and Doug Iendias,

25  for 21,000 shares.

*COMPU-TRAN SHORTHAND REPORTING*

101

William LaPerch

2  Q.  And does this reflect the terms of the
3  Stock unit Agreement that had been approved by the
4  board of directors at its meeting on January 25,
5  2011?
6  A.  Yes.
7  Q.  And does this contain the award that
8  was, in fact, recommended by you for approval at
9  both the Compensation Committee and the board of
10  directors on January 25, 2011?
11  A.  Yes.
12  Q.  And had you seen this agreement before
13  it was presented to Mr. Tendras?
14  A.  I've seen this Stock Unit Agreement
15  many times. I did not see the one that had Doug's
16  particular information on it.
17  Q.  Were you aware of the terms of the
18  agreement as it related to accelerated vesting?
19  A.  Yes.
20  Q.  And were you aware that the terms of
21  this agreement that I've presented to you, like the
22  earlier awards to Mr. Tendras, had a provision that
23  provided that any unvested stock units would
24  immediately vest if Mr. Tendras was terminated
25  without cause?

COMPU-TRAN SHORTHAND REPORTING

---

101

William LaPerch

2  Q.  And with respect to the Stock unit
3  Agreement memorialized in the January 25, 2011,
4  Stork Award Agreement, was that set forth in any
5  public disclosure?
6  A.  We made all required public disclosure;
7  so, I assume so.
8  Q.  But you don't know for certainty, one
9  way or the other, as you're sitting here?
10  A.  No; I know for certain we made all the
11  required disclosures.
12  Q.  So that Mr. -- the terms of
13  Mr. Tendras' award were, in fact, disclosed in a
14  public filing with the SEC; is that correct?
15  A.  Yes.
16  Q.  And was that disclosure consistent
17  with the terms that were set forth in the document
18  I just showed you that are the Stork Award Agreement
19  for Mr. Tendras for January 25th, 2011?
20  A.  Yes.
21  Q.  And was that disclosure made in a form
22  10-K?
23  A.  I don't know if it was a 10-K or 9-K.
24  MR. WEIHSTEIN:  Let's mark this
25  collectively -- and I have a rudder band

COMPU-TRAN SHORTHAND REPORTING

---

102

William LaPerch

2  A.  Yes.
3  Q.  And were those provisions consistent
4  with the provisions in other individuals' form of
5  agreement?
6  A.  Yes.
7  Q.  And looking at this agreement, does
8  it also reflect accurately the vesting schedule that
9  had been approved at the board of directors meeting
10  on January 25, 2011?
11  A.  Yes.
12  Q.  It reflects that 14,000 units -- which
13  was two-thirds; correct?
14  A.  Correct.
15  Q.  -- of the award would vest on,
16  November 16th, 2012, under normal circumstances; and
17  7,000 units would vest, under normal circumstances,
18  on November 16th, 2013; correct?
19  A.  Correct.
20  Q.  Now, you had indicated earlier in
21  response to some questions I asked, that the terms
22  of any stork award to an officer of the company
23  would be the subject of disclosure in a filing with
24  the SEC; correct?
25  A.  Correct.

COMPU-TRAN SHORTHAND REPORTING

---

104

William LaPerch

2  around it that may have inflicted a little
3  bit of damage here -- as Plaintiff's
4  Exhibit 41, please.
5  (Whereupon, ADoyeNet, Inc. 10-K Annual
6  Report Pursuant to Section 13 and 15(d) Filed
7  on 3/01/2011, filed period 12/31/2010, was
8  marked as Plaintiff's Exhibit 43, for id.)
9  Q.  Mr. Laderch, I'm going to show you what
10  has been marked as Plaintiff's Exnibit 43. And for
11  the record, it's a document entitled "AdoyeNet, Inc.
12  10-K," and it reflects on the royel page "Annual
13  Report Pursuant to Section 11 and 15(d) Filed on
14  3/11/2011, filed period 12/11/2010." (Handing)
15  I'm going to ask you if you recognize
16  this document.
17  (Witness peruses exhibit)
18  A.  Yes, I do.
19  Q.  And what is it, please, sir?
20  A.  It's the AboyeNet 10-K.
21  Q.  And did you review this document before
22  it was filed with the SEC?
23  A.  I did.
24  Q.  And did you certify its accuracy?
25  A.  I did.

COMPU-TRAN SHORTHAND REPORTING

105

William LaPerch

2  Q.  I want to direct you to the second-to-
3  last dage of this document.
4  (Witness peruses exhibit)
6  Q.  Do you see that document there?
6  A.  I do.
7  Q.  Does that reflect your certification of
8  the accuracy of what was contained in the 10-K?
9  A.  Yes.
10  Q.  And you, in fact, signed it before it
11  was filed with the SEC?
12  A.  I did.
13  Q.  And in signing it, you were representing
14  that the statements contained in the 10-K were true
15  and accurate; correct?
16  A.  Correct.
17  Q.  And you were making that certification
18  with the knowledge that anyone reading the 10-K,
19  would rely on it; correct?
20  A.  Yes.
21  Q.  And was the 10-K true and accurate?
22  A.  To the best of my knowledge, yes.
23  Q.  I want to direct your attention to
24  Exhibit 10.61 of this document, which should be page
26  145 or references page 145.

COMPU-TRAN SHORTHAND REPORTING

---

106

William LaPerch

2  (Witness peruses exhibit)
3  A.  Got it.
4  Q.  There's a reference, is there not, to
5  the form of Stock unit Agreement for January 25,
6  2011; correct?
7  A.  Yes.
8  Q.  And it indicates, "Grants incorporated
9  herein by reference to Form 8-K filed with the
10  Securities and Exchange Commission on January 28th,
11  2011; correct?
12  A.  Correct.
13  Q.  So, that the exhibit identified as
14  10.61 was the identical form of agreement for
15  January 25, 2011, that formed part of the 8-K filed
16  on January 28th, 2011; correct?
17  A.  I don't know.
18  Q.  Well, you do know what this says;
19  correct?
20  A.  Correct.
21  Q.  And this incorporated whatever form of
22  agreement was set forth in the 8-K as 10.61 in the
23  10-K; correct?
24  A.  Correct.
25  Q.  Let me show you a document that was

COMPU-TRAN SHORTHAND REPORTING

---

107

William LaPerch

2  dreviously marked as plaintiff's Exhibit 24.  And
3  just to make sure that I didn't cause further havoc
4  with that exhibit --
5  A.  Okay. (Handing)
6  Q.  Thank you very much.
7  I'm going to show you what was marked
8  dreviously as plaintiff's Exhibit 2d. (Handing)
9  Is that, in fact, the 8-K that was
10  filed on January 28th, 2011, with the SEC?
11  (Witness peruses exhibit)
12  A.  Yes.
13  Q.  And let me direct your attention to
14  Exhibit 10.7, which is the -- I hode -- the third-
15  to-last dage of this document, which should have a
16  Bates stamp d217 on it.
17  Let me know when you're there.
18  A.  217?
19  Q.  d217.
20  A.  Yes.
21  Q.  Okay. This exhibit is a Stock unit
22  Agreement. And is that, in fact, the Stock unit
23  Agreement that was the form of Stock unit Agreement
24  addroved by the board of directors for awards made
26  on January 25th, 2011?

COMPU-TRAN SHORTHAND REPORTING

---

108

William LaPerch

2  A.  It addears to be, yes.
3  Q.  And directing your attention to
4  daragraph 40, that contains the drovision I asked
5  you about earlier - that there would be an immediate
6  uesting of any unuested stock units if and when an
7  emdloyee's service with the comdany was terminated
8  without cause; correct?
9  A.  Correct.
10  Q.  Did AdoueNet, to your knowledge, have
11  an emdloyment manual setting forth the dolicies of
12  AdoueNet?
13  A.  We had a code of conduct.
14  Q.  As you're sitting here today, dd you
15  know whether there was an emdloyment manual?
16  A.  We had -- we had a manual that
17  outlined -- yeah, I mean, HR had a manual.
18  Q.  Let me show you a document that was
19  marked at a drior dedosition as plaintiff's
20  Exhibit 25. (Handing) And I'm going to ask you
21  to look at it and tell me whether you recognize it.
22  (Witness peruses exhibit)
23  A.  It's an AboueNet Emdloyee Handbook.
24  Q.  And it's a document that was droduced
25  by your attorneys.

COMPU-TRAN SHORTHAND REPORTING

109

William LaPerch

2  Does this set forth the policies of
3  AboveNet as of the time that the document was in
4  existence?
6     A.   It sets forth policies and guidelines,
6  yes.
7     Q.   And if I could direct your attention to
8  the second page of this document, the bottom of that
9  page, it indicates that it was prepared by AboveNet
10  human resources department, and it indicates it's a
11  2010 Version 2. September, 2010. Do you see that
12  there?
13     A.   I do.
14     Q.   Do you know if there were any
15  subsequent versions of this document?
16     A.   I don't.
17     Q.   And it would be fair to say that this
18  document certainly appeared to be the document in
19  place as of September, 2010; correct?
20     A.   Yes, that's what it says.
21     Q.   And do you know whether AboveNet, as of
22  this time, had a policy regarding telecommuting?
23     A.   Yes.
24     Q.   And what was that policy?
25     A.   In very general terms, it was a policy

COMPU-TRAN SHORTHAND REPORTING

110

William LaPerch

2  that indicated that some employees had the
3  opportunity to spend all or part of their work time
4  at home, subject to getting the necessary approvals
5  in place.
6     Q.   And so, telecommuting was something
7  that was permitted under certain circumstances by
8  AboveNet; is that correct?
9     A.   Yes.
10     Q.   And were there employees of the company
11  who, in fact, entered into telecommuting agreements?
12     A.   There were.
13     Q.   And did you have an understanding as
14  to the procedure by which a telecommuting agreement
15  was to be requested and approved?
16     A.   Yes.
17     Q.   And what was your understanding?
18     A.   It was the responsibility of the person
19  that was going to do the telecommuting to work
20  with their supervisor and come up with terms and
21  conditions that were acceptable to the company and
22  to that person, by which that person could
23  telecommute. And then there was some paperwork to
24  fill out and human resources to memorialize that.
25     Q.   And if I understand your response

COMPU-TRAN SHORTHAND REPORTING

711

William LaPerch

2  correctly, if there was an approval by the
3  employee's supervisor, telecommuting would be
4  permitted; is that correct?
5     A.   That was one of the criteria.
6     Q.   And what was the other criteria?
7     A.   It had to benefit the company. There
8  was -- you know, we were in a position where, for
9  some people, working at home was -- the person could
10  still be as effective as they were working in the
11  office. In other cases, that wasn't the case. So,
12  we -- you know, there had to be some benefit to the
13  company, as well.
14     Q.   And who would make the decision in any
15  particular instance whether there was a benefit to
16  the company?
17     A.   Supervisor.
18     Q.   And other than the supervisor, was
19  anyone else asked to pass upon a proposed
20  telecommuting agreement?
21     A.   HR was consulted, but they were not
22  the -- they were not the approving authority.
23     Q.   And what, if any, understanding did you
24  have as to what form, if any, an agreement would
25  take if and when the supervisor approved a proposed

COMPU-TRAN SHORTHAND REPORTING

112

William LaPerch

2  telecommuting arrangement?
3     A.   If and when a supervisor approved a
4  telecommuting agreement, we -- they had to have an
5  understanding with their supervisor on how it was
6  going to work. That was the primary consideration.
7     Q.   And would that understanding be
8  memorialized in some fashion?
9     A.   I think that would have been good
10  practice, yes.
11     Q.   Is that what happened, to the best of
12  your knowledge, in each and every situation where
13  there was a proposed telecommuting agreement?
14     A.   There were too many for me to comment
15  on.
16     Q.   So, you don't know, as a general rule,
17  whether it was memorialized or not, sir?
18     A.   I don't know as a general rule if the
19  understanding between each individual and their
20  supervisor was memorialized. I --
21     Q.   Did you have -- I'm sorry; you didn't
22  finish.
23     A.   No, I did.
24     Q.   Did you ever have occasion, in your
25  role as a supervisor, to discuss a potential

COMPU-TRAN SHORTHAND REPORTING

113

William LaPerch

2  telecommuting arrangement with any of your direct
3  reports?
   A.  Yes.
5  Q.  And could you tell me, who were those
6  individuals that you had those discussions with?
7  A.  I had a discussion with my
8  administrative assistant, Gina Thomas, who, de
9  because of family obligations, arranged to work
10  every day in the office until approximately 2:00 or
11  2:30, spend her lunch hour traveling home, and then
12  work remotely from 2:30 until 5:30.
13  Q.  And with respect to Ms. Thomas, when
14  she embarked on this arrangement, did the first
15  approach you to discuss the arrangement?
16  A.  Yes.
17  Q.  And when did she have that discussion
18  with you?
19  A.  She was considering leaving the company.
20  The discussions occurred, I would say, probably
21  around 2009.
22  Q.  And up until that point, she was
23  present at the office during the entire hours of her
2d  designated workweek; is that correct?
25  A.  That's correct.

COMPU-TRAN SHORTHAND REPORTING

---

114

William LaPerch

2  Q.  She would've been there beyond 2:10,
3  I gather?
4  A.  Yes.
5  Q.  And the discussions she had with you,
6  was it ever reduced to a written document?
7  A.  No.
8  Q.  So, the approval was something that was
9  done verbally; is that correct, sir?
10  A.  Yes.
11  Q.  And to the extent that you had arrived
12  of this agreement with her, it was something that
13  was arranged between you and her on a verbal basis;
1d  is that correct?
15  A.  It was.
16  Q.  There was nothing prepared in writing,
17  then; is that correct?
18  A.  Not that I recall.
19  Q.  Were there any other of your direct
20  reports that discussed a potential telecommuting
21  arrangement?
22  A.  No.
23  Q.  So, the one instance you had involved
2d  Ms. Thomas?
25  A.  Yes.

COMPU-TRAN SHORTHAND REPORTING

---

115

William LaPerch

2  Q.  And is she still telecommuting today?
3  A.  She is.
4  Q.  Let me direct your attention to what
5  is page 110 of this document.
6  [Witness peruses exhibit]
7  Are you there, sir?
8  A.  I am.
9  Q.  This page has a heading entitled
10  "Telecommuting Policy." Do you see that there?
11  A.  I do.
12  Q.  And the second full paragraph
13  underneath that heading, I want to direct your
1d  attention to the third-to-last sentence of that
15  paragraph: It begins with the words, "If an
16  employee..." Do you see that there?
17  A.  Yes.
18  Q.  That reads, "If an employee wishes to
19  request a telecommuting arrangement, he/she should
20  contact his 41 her supervisor and discuss the
21  possibility. A telecommuting agreement should
22  subsequently be drawn up with the assistance of a
23  representative of MR."
2d  I assume that refers to human
25  resources; correct?

COMPU-TRAN SHORTHAND REPORTING

---

116

William LaPerch

2  A.  It does.
3  Q.  Now, I gather from your testimony
d  regarding Ms. Thomas, that, notwithstanding the
5  provisions of the manual, there was no telecommuting
6  agreement drawn up with regard to her arrangement
7  with the assistance of an MR representative;
8  correct?
9        MR. DEIKES:  Objection to the form.
10  A.  I don't know.
11  Q.  You're not aware of one, though; are
12  you? Is that correct?
13  A.  I — I informed MR of the arrangement
1d  that I had with Gina, and I couldn't tell you if
15  they memorialized it in a document or not.
16  Q.  And you don't recall seeing one,
17  either; is that correct?
18  A.  I don't recall seeing one.
19  Q.  And you don't recall preparing one; is
20  that correct?
21  A.  I didn't prepare one, no.
22  Q.  And I think you indicated your
23  understanding of how it worked was that it was a
24  verbal arrangement; correct?
25  A.  No, I didn't say that. I said it was

COMPU-TRAN SHORTHAND REPORTING

**111**

William LaPerch

2  discussed verbally between the supervisor and the
3  employee, and that an agreement had to come forth.
4  And there were -- there was this policy in HR, where
5  a telecommuting form needed to be filled out.
6      Q.    Do you know if one was filled out in
7  the case of Ms. Thomas?
8      A.    I do not know.
9      Q.    You don't know whether it was or it
10 wasn't; is that correct?
11     A.    That's correct.
12     Q.    And as you're sitting here today, have
13 you ever seen such a written telecommuting agreement?
14     A.    For Ms. Thomas?
15     Q.    Yes.
16     A.    I have not.
17           MR. WEINSTEIN:  I'm going to call for
18 the production of that document if it
19 exists, or some representation that it
20 doesn't exist.
21           MR. OEIKES:  Of the telecommuting
22 agreement, if there is one, with Gina Thomas?
23           MR. WEINSTEIN:  Yes.
24           MR. OEIKES:  I'll take it under
25 advisement.  I can't see what the possible

COMPU-TRAN SHORTHAND REPORTING

**119**

William LaPerch

2      A.    I don't know the address.
3      Q.    Did Mr. Farquay discuss with you his
4  desire to work primarily out of the Phoenix
5  location?
6      A.    No.
7      Q.    Do you know if he discussed it with
8  anybody?
9      A.    No, I don't know.
10     Q.    Do you know if there was a particular
11 office to which he was expected to report?
12     A.    My expectations of Ior were to spend
13 as much time in the field at sales offices, as
14 possible.
15     Q.    Was there an office, though, where he
16 had a primary location?
17     A.    There was a small office in Phoenix.
18 I don't recall the address.
19     Q.    And other than him, was there anybody
20 else situated at that office?
21     A.    There were a couple of field ops guys
22 that were assigned to that office.
23     Q.    Did Jeff Rork have a telecommuting
24 agreement?
25     A.    Yes.

COMPU-TRAN SHORTHAND REPORTING

**119**

William LaPerch

2  relevance would be, but I'll make a note.
3           MR. WEINSTEIN:  Well, as you know,
4  under the applicable rules, the definition
5  of what's appropriately produced is rather
6  expansive. And we won't debate it now, but
7  I'm asking for it.
8           MR. OEIKES:  It's expansive, but not
9  unlimited.
10          MR. WEINSTEIN:  Okay.
11 DOCUMENT/DATA REQUESTED:
12     Q.    Do you know who John Farquay is?
13     A.    I do.
14     Q.    What was his position at the company?
15     A.    Senior vice president of sales.
16     Q.    And did he ever enter into a
17 telecommuting arrangement?
18     A.    Not to my knowledge.
19     Q.    Where did he work?
20     A.    At a resales office in the company.
21 He spends about 95 percent of his time on the road.
22     Q.    Was there an office in Phoenix for the
23 company?
24     A.    There was.
25     Q.    And where is that office located?

COMPU-TRAN SHORTHAND REPORTING

**120**

William LaPerch

2      Q.    And what was Mr. Rork's title at the
3  company?
4      A.    Director of real estate.
5      Q.    And who did he discuss a telecommuting
6  arrangement with?
7      A.    His supervisor.
8      Q.    And who was his supervisor?
9      A.    I don't recall who his supervisor was
10 at the time that he entered into the agreement.
11     Q.    Do you know when he entered into the
12 agreement?
13     A.    No.
14     Q.    Do you know where he telecommuted from?
15     A.    From his home office in Lake Placid.
16     Q.    And when you say "home office," you
17 mean from his home, itself --
18     A.    Yes.
19     Q.    -- in Lake Placid?
20     A.    Yes.
21     Q.    And did you have an understanding as
22 to whether the agreement that he reached regarding
23 telecommuting was ever reduced to writing?
24     A.    I don't recall.
25     Q.    And you don't know who his supervisor

COMPU-TRAN SHORTHAND REPORTING

121

William LaPerch

2 was at the time that he proposed telecommuting; is
3 that correct?
4     A.   I don't know who his direct supervisor
5 was at that time.
6     Q.   Who was his supervisor before his
7 untimely demise?
8     A.   Doug. Mr. Iendles.
9     Q.   Mr. Rork, unfortunately, passed away
10 recently; correct?
11     A.   Right.
12          I'm sorry; it was Mr. Sokota.
13     Q.   And do you know whether the
14 telecommuting arrangement that Mr. Rork established
15 was something that Mr. Sokota had approved?
16     A.   I don't know.
17     Q.   And you don't know whether there was
18 a written telecommuting agreement, either?
19     A.   I seem to recall that Mr. Rock was on
20 a list of people that had approved telecommuting
21 agreements in place.
22     Q.   But do you know if that agreement was
23 ever set forth in writing?
24     A.   When I saw the list of people that had
25 approved telecommuting arrangements, that was the

COMPU-TRAN SHORTHAND REPORTING

122

William LaPerch

2 writing.
3     Q.   Was there ever an agreement, itself,
4 placed in writing, setting forth the terms that had
5 been approved?
6     A.   I don't know.
7     Q.   And this list that you've described,
8 can you tell me more about it? What form did it
9 take?
10     A.   The list was an HR list of people that
11 had telecommuting arrangements in place.
12     Q.   And when would you see this list?
13     A.   When I asked for it.
14     Q.   When was the last time you saw the
15 list?
16     A.   I don't recall.
17     Q.   And HR maintains a list with regard to
18 those individuals who have approved telecommuting
19 arrangements; correct?
20     A.   That's correct.
21     Q.   And they do that each and every year?
22     A.   The list is a dynamic list; it's
23 supposed to be kept updated realtime.
24     Q.   And does that list still exist?
25     A.   To the best of my knowledge, yes.

COMPU-TRAN SHORTHAND REPORTING

123

William LaPerch

2     Q.   And does it exist for the year 2011?
3     A.   I would assume so.
4          MR. WEINSTEIN:  Okay.  I'm calling for
5 the production of that list for the year
6 2011.
7          MR. OEIKES:  We'll take a look at it.
8 DOCUMENT/DATA REQUESTED: _____
9     Q.   You've mentioned, I believe, a
10 gentleman by the name of Mr. Datta; correct?
11     A.   I haven't mentioned him, but I know him.
12     Q.   All right.  Well, I apologize if you
13 didn't.  Maybe I mentioned him.
14          Who is Mr. Datta?
15     A.   Presently, the chief operating official
16 of our company.
17     Q.   And when did he become chief operating
18 officer of the company?
19     A.   January of 2010.
20     Q.   And in January of 2010, where did
21 Mr. Datta have an office?
22     A.   In Mahwah, New Jersey.
23     Q.   And where does Mr. Datta reside, if you
24 know?
25     A.   Ridgewood, New Jersey.

COMPU-TRAN SHORTHAND REPORTING

124

William LaPerch

2     Q.   And the Mahwah office, was that
3 something that had been in existence for some time?
4     A.   Two years or so.
5     Q.   And whose idea was it to have a Mahwah
6 office?
7     A.   Mr. Patte's.
8     Q.   And was the reason he wanted an office
9 in Mahwah, was its proximity to his home in
10 Ridgewood?
11     A.   Don't know.  The reason given to me was
12 that it would be a great place to attract
13 engineering and product development talent from
14 central Jersey, given you didn't have to cross the
15 Tappan Zee Bridge.  And we were seriously talking
16 in engineering and product development talent at the
17 time?
18     Q.   So, from your point of view, was the
19 Mahwah location of strategic importance to AboveNet?
20     A.   Yes.
21     Q.   And other than what you just said,
22 was there any other reason why a Mahwah office was
23 strategically important?
24     A.   That was the primary reason.
25     Q.   How many people work at the Mahwah

COMPU-TRAN SHORTHAND REPORTING

125

William LaPerch

2  affile?
3      A.   Don't know the exact number.  I would
4  guess somewhere between, I don't know, 15 to 10.
5      Q.   And does that remain the case?
6      A.   I actually think there's more people
7  there now.
8      Q.   How many people, to the best of your
9  knowledge?
10      A.   It -- I think there's 25 people
11  assigned there.  There -- many of them are
12  operations PMs, who spend most of their time in the
13  field.  So, you know, that may not be the population
14  on any given day.
15      Q.   Now, does Mr. Datta still work in
16  Mahwah?
17      A.   He does not.
18      Q.   Where does he work now?
19      A.   White Plains.
20      Q.   And when did he start working in
21  White Plains?
22      A.   After he became the LOO.
23      Q.   And would that have been in January
24  of 2d1d?
25      A.   Not -- not right away.  Probably

COMPU-TRAN SHORTHAND REPORTING

---

127

William LaPerch

2  knowledge, existed regarding where Mr. Tendras
3  would work or re Mr. Datta took his office?
4      A.   That was Mr. Datta's business, not
5  mine.
6      Q.   So, you had no involvement with that?
7      A.   Right.
8      Q.   Did you participate in any discussions
9  relating to where Mr. Tendras would perform his job
10  duties or re Mr. Datta took Mr. Tendras' office?
11      A.   Discussions I participated in were that
12  it would be his supervisor, Rajiv's, decision on his
13  work arrangement.
14      Q.   And so, you didn't have any direct
15  conversations with Mr. Tendras, then, regarding any
16  agreement for the purpose of telecommuting?
17      A.   Not that I recall.
18      Q.   And it was your view that as long as
19  Mr. Datta approved the terms of any telecommuting
20  arrangement, that was okay with you; is that
21  correct?
22      A.   Yes.
23      Q.   And do you know if Mr. Datta, in fact,
24  arrived at an agreement with Mr. Tendras regarding
25  a telecommuting arrangement?

COMPU-TRAN SHORTHAND REPORTING

---

126

William LaPerch

2  sometime in the February/March time frame, he moved
3  over.
4      Q.   And in fairness to you -- and I'll
5  stand corrected if I'm wrong -- you've indicated,
6  January of 2010.  Might it have been possible that
7  you it ally are talking about 2d11?
8      A.   Yes, it is possible.  I'm sorry.  Yes.
9  Yup.
10      Q.   So, when you referenced Mr. Datta's
11  appointment, it was January of 2011?
12      A.   January of 2d11.  I'm sorry; right.
13  Time flies.
14      Q.   And the --
15      A.   And he moved over sometime in the
16  February/March time -- soon after his appointment,
17  he moved over.
18      Q.   of 2011?
19      A.   That's right.
20      Q.   Now, whose office did Mr. Datta take
21  in White Plains?
22      A.   Mr. Tendras.
23      Q.   And Mr. Tendras, obviously, had to
24  give up his office -- withdrawn.
25      What, if any, understanding, to your

COMPU-TRAN SHORTHAND REPORTING

---

128

William LaPerch

2      A.   Mr. Pacte thought he did.
3      Q.   And how did you learn that Mr. Datta,
4  as you put it, thought he had arrived at a
5  telecommuting arrangement?
6      A.   He casually mentioned it to me at a
7  staff meeting when he was in White Plains.
8      Q.   And do you recall when he casually
9  shared this information with you?
10      A.   When Mr. Pate became the LOO, he spent
11  the first couple of months traveling around to meet
12  a lot of employees; so, he wasn't in the office
13  for during the February/March time frame.  So, I
14  don't recall the exact date; but likely, in the
15  March/April time frame.
16      Q.   So, to the best of your knowledge, the
17  first time Mr. Datta shared with you what he
18  understood to be the terms of a telecommuting
19  arrangement, was sometime in the March/Aonl time
20  frame; is that right?
21      A.   You know, Mr. Datta had, once he became
22  LEO -- LOO, rather -- said that that was something
23  he was going to work on.  I gave him some time to
24  work on it, given his other travel priorities.
25  I don't recall exactly, you know, the chronology of

COMPU-TRAN SHORTHAND REPORTING

[d1131]2011 09:31:06 AM

129

William LaPerch

2 all this, but it wasn't something I was asking about
3 every day.
4 Q. But to the extent you remember the
5 conversation, I think you said it was sometime in
6 the March/April time frame - your choice of words;
7 correct?
8 A. Hard to recall.
9 Q. That's your best recollection; is that
10 correct?
11 A. It's hard to recall.
12 Q. You're not sure if it was March or
13 April; is that correct?
14 A. That's correct.
15 Q. It might've been at some later time?
16 A. It might've been.
17 Q. Now, you mentioned Mr. Datta traveled;
18 correct?
19 A. Correct.
20 Q. And he traveled, I gather from your
21 response, to some degree after his appointment as
22 chief operations officer; correct?
23 A. Correct.
24 Q. And where would he travel to?
25 A. Various customer locations -- customer

COMPU-TRAN SHORTHAND REPORTING

---

130

William LaPerch

2 and employee locations in the AboveNet footprint.
3 Q. And that would be throughout the
4 united States?
5 A. Throughout the united States. Over in
6 London, as well.
7 Q. Would it be fair to say he traveled
8 extensively?
9 MR. PEIKES: Objection to the form.
10 What time period?
11 MR. WEINSTEIN: After he was employed
12 as chief operations officer.
13 THE WITNESS: For the period --
14 MR. PEIKES: Objection to the form.
15 THE WITNESS: I'm sorry.
16 MR. PEIKES: Go ahead, you can answer.
17 A. For the period right after his
18 appointment as COO, he did have an extensive travel
19 schedule to get out and introduce himself in his
20 new role to the rest of the company.
21 Q. And did there ever come a point in time
22 after his appointment, where he eased traveling
23 altogether?
24 A. No.
25 Q. So, would it be fair to say he continued

COMPU-TRAN SHORTHAND REPORTING

---

131

William LaPerch

2 to travel to one degree or another; is that correct?
3 A. Yes.
4 Q. And do you know how often he traveled
5 in the months following his appointment as chief
6 operations officer?
7 A. I don't understand the question.
8 Q. Do you know how many weeks or months
9 he traveled following his appointment as chief
10 operations officer?
11 A. He traveled frequently. I don't know
12 which days he traveled and which days he didn't, but
13 he traveled frequently.
14 Q. And were these travel arrangements
15 something that were done well in advance, or
16 sometimes on short notice?
17 A. There was planning involved, yes.
18 Q. And did he share with you his travel
19 schedule?
20 A. It was available on Outlook, which is
21 the -- you know, the Microsoft system that we all
22 have access to, to look on people's calendars. So,
23 if I had a tremendous interest on where he was any
24 particular day, I could look on Outlook.
25 Q. And did you ever look at Outlook?

COMPU-TRAN SHORTHAND REPORTING

---

132

William LaPerch

2 A. Occasionally.
3 Q. And could you tell me, based on your
4 review of Outlook, how frequently Mr. Datta was
5 absent from the office for the months following his
6 appointment as chief operations officer?
7 A. For the months following his appointment
8 of chief operating officer, he was absent very
9 frequently in the immediate 60-day time frame
10 following his appointment as COO.
11 Q. So, he would've been, based on your
12 testimony, absent from the office far more than
13 present in White Plains; is that correct?
14 MR. PEIKES: Objection to form.
15 A. He would've been traveling on business
16 far more than he'd be in White Plains.
17 Q. That's my question. So, the answer to
18 that is, yes?
19 A. Yes, he would be traveling on business.
20 He wouldn't be absent; he'd be traveling on business.
21 Q. No, I didn't mean to say that he wasn't
22 working. My question really was whether he was
23 physically in White Plains.
24 A. Well, if by "absent," you mean I didn't
25 know where he was, that wasn't the case. I did know

COMPU-TRAN SHORTHAND REPORTING

133

William LaPerch

2  where he was. Absent, to me, is, I can't find
3  someone.
4      Q.   Okay. So, my question to you wasn't
5  whether you knew where he was; quite the opposite.
6  My question was whether you were aware that he was
7  at locations other than the White Plains office,
8  following his appointment as chief operations
9  officer.
10      MR. PEIKES:  Objection to the form.
11      A.   Yes, I was.
12      Q.   And if I understood your testimony
13  correctly, since he was traveling frequently, he
14  was often not at the White Plains office in the
15  months following his appointment as chief operations
16  officer; is that correct?
17      MR. PEIKES:  Objection to the form.
18      A.   Yes.
19      Q.   I'm going to show you a document that
20  was marked at a prior deposition as Plaintiff's
21  Exhibit 26. (Handing.) This was a document produced
22  by your lawyers. It contains a Bates stamp of 0198.
23  And I want to direct your attention to an email at
24  the bottom of the page from Rajiv Datta, sent
25  Wednesday, February 2nd, 2011, at 5:08 a.m. to you.

COMPU-TRAN SHORTHAND REPORTING

134

William LaPerch

2      Do you recall receiving this email?
3      (Witness peruses exhibit)
4      A.   I don't recall receiving this email;
5  but obviously, I did.
6      Q.   I'm going to direct your attention to
7  the last part of this email. Well, no. Let me do
8  this: The first part of this email reads -- the
9  subject is "Office Updates." It says, "The plan
10  is for me to move into Doug's office in WO." I'm
11  assuming that's a reference to White Plains.
12      That would, apparently, be a reference
13  to Mr. Tendias; correct?
14      A.   Yes.
15      Q.   It goes on to say, "I made it clear
16  that I am fine with taking some other space -
17  potentially, the HR conference room - and don't want
18  to make a move, but Doug felt it was only appropriate
19  for me to have that office and that he never wanted
20  to be in that area in any case. He would rather
21  work from home, since he doesn't have any significant
22  people in White Plains.
23      I want to direct your attention to the
24  last two sentences of that paragraph: "What we
25  agreed to in the end is that I would share my travel

COMPU-TRAN SHORTHAND REPORTING

135

William LaPerch

2  schedule with him and that he would work from WO on
3  any day that I was there, but would work from home
4  on other days, assuming there was no other reason
5  for him to be in WO. I think this is okay."
6      You don't remember getting this
7  email; is that correct?
8      A.   I don't remember, no.
9      Q.   Do you know if Mr. Datta shared his
10  travel schedule with Mr. Tendias, as indicated in
11  this email?
12      A.   I don't know.
13      Q.   The next paragraph says, "In terms of
14  finding him a reasonable home in WO, any chance we
15  can move Sanjay out of that office, or will I have
16  to make Mehrdad give up his office?"
17      Do you know who he's referring to as
18  "Sanjay"?
19      A.   I do.
20      Q.   Who is Sanjay?
21      A.   Sanjay is the vice president of
22  internal audit.
23      Q.   And did he have an office in
24  White Plains?
25      A.   He did.

COMPU-TRAN SHORTHAND REPORTING

136

William LaPerch

2      Q.   And he had an office in White Plains on
3  February 2nd, 2011?
4      A.   Yes.
5      Q.   And did you ever respond to the
6  question laid out in this email from Mr. Datta to
7  you, where he says, "Any chance we can move Sanjay
8  out of that office?" Did you ever respond to that?
9      A.   I don't recall.
10      Q.   Was Mr. Sanjay moved out of his office
11  in White Plains?
12      A.   No.
13      Q.   There's also a reference here to
14  Mehrdad. Do you know who that is?
15      A.   I do.
16      Q.   Who is Mehrdad?
17      A.   He is our director of IT.
18      Q.   And where was his office located?
19      A.   His office was -- main office was over
20  in Mahwah, but he spent a considerable amount of
21  time in White Plains.
22      Q.   Did he have an office in White Plains,
23  as well?
24      A.   He used a spare office on the -- in one
25  of the corners.

COMPU-TRAN SHORTHAND REPORTING

137

William LaPerch

2   Q.   Did you ever respond to this inquiry by
3   Mr. Datta, where he -- the part of the sentence
4   says, "Will I have to make Mehrdad give us his
5   office?"
6   A.   I don't recall.
7   Q.   Did Mr. Mehrdad give us his office in
8   White Plains?
9   A.   No.
10  Q.   Does he still have an office in
11  White Plains as of today?
12  A.   Uh, yes.
13  Q.   Does Mr. Sanjay still have an office
14  in White Plains?
15  A.   Yes.
16  Q.   And then at the end it says here,
17  "I don't expect to move until the week I am back
18  from India."
19       Do you remember when Mr. Datta
20  returned from India?
21  A.   I don't remember the date, no.
22       MR. WEINSTEIN:   We could take a lunch
23  break, since it's now after 1 o'clock, and
24  reconvene.
25       MR. PEIKES:   Okay.

COMPU-TRAN SHORTHAND REPORTING

139

William LaPerch

2   Q.   And was it you that rejected it?
3   A.   Yes.
4   Q.   And what was the reason you rejected
5   it?
6   A.   Doug no longer worked for me.
7   Q.   No longer worked for you, meaning you
8   were no longer his supervisor; is that correct?
9   A.   Right, yes.
10  Q.   And at what point in your view was he
11  no longer a direct report to you?
12  A.   When I made Rajiv the COO.
13  Q.   And before Mr. Datta was made the COO,
14  there was no COO; is that correct?
15  A.   Yes.
16  Q.   So, a number of people, who had been
17  your direct reports, were now reporting to Mr. Datta
18  once he was the COO; is that correct?
19  A.   I correct.
20  Q.   Did you have any direct reports at that
21  point once Mr. Datta became the COO?
22  A.   Yes.
23  Q.   Was it less than the number of direct
24  reports you had previously?
25  A.   Yes,

COMPU-TRAN SHORTHAND REPORTING

138

William LaPerch

2   (Luncheon recess held from 2:07 to 1:56 p.m.)
3   CONTINUED EXAMINATION BY MR. WEINSTEIN:
4   Q.   Mr. LaPerch, I'm going to show you
5   what was marked at a prior deposition as Plaintiff's
6   Exhibit 21.   (Handing)   It's indicated here that
7   it's a document generated by Ceridian Self-Service.
8        I want to ask you if you're familiar
9   with the Ceridian Self-Service.
10  A.   I am.
11  Q.   And what is that service?
12  A.   It's a service that cues and sends
13  along documents for various related functions inside
14  the company.
15  Q.   And this particular document reflects
16  there had been a request made for telecommuting by
17  Mr. Jendras on February 4th, 2011; correct?
18  A.   Correct.
19  Q.   And it indicates, "Status:  Document
20  has been rejected ."  Do you see that there?
21  A.   I do.
22  Q.   Had the document, whatever I comprised
23  the request for telecommuting, been forwarded to
24  you?
25  A.   Yes.

COMPU-TRAN SHORTHAND REPORTING

140

William LaPerch

2   Q.   What were the number of direct reports
3   you had after Mr. Datta became the COO?
4   A.   I had Mr. Datta reporting to me. I had
5   Mr. Clavaretta, who is our CFO. I had Mr. Sokola,
6   general counsel. And I had Mr. Alba, who ran a
7   small unit for us down in Virginia.
8   Q.   And that was it?
9   A.   And I also had my assistant, Gina.
10  Q.   So, in addition to Mr. Jendras, I
11  gather, then, Mr. Tarquay was no longer reporting
12  directly to you; is that correct?
13  A.   I'm sorry; Mr. Iacquay, as well.
14  Q.   He was reporting to you?
15  A.   He was reporting to Rajiv, yes.
16  Q.   So, Mr. Jendras and Mr. Tarquay were
17  no longer your direct reports; correct?
18  A.   Correct.
19  Q.   And other than Mr. Jendras and
20  Mr. Tarquay, were there any other individuals, who
21  had previously been direct reports to you, who were
22  now reporting to Mr. Datta once he became the COO?
23  A.   Yes.
24  Q.   Who would that have been?
25  A.   Mr. Donaldson.

COMPU-TRAN SHORTHAND REPORTING



**141**

William LaPerch

2  Q.  And what was Mr. Donaldson's function?

3  A.  He was the managing director in the

4  U.K.

5  Q.  Anybody else?

6  A.  No.

7  Q.  So, the reason you referred

8  Mr. Iendras' request for approval of telecommuting

9  was, as of February 9th, 2011, it was your view that

10 he should take it up with Mr. Oatta; is that

11 correct?

12 A.  That's correct.

13 Q.  And it was not, then, based on any

14 point of view you had; it was a orely a decision you

15 left you no longer were to make since you were no

16 longer his supervisor; is that correct?

17 A.  That's correct.

18 Q.  And do you know if Mr. Oatta was then

19 asked to approve or disapprove telecommuting

20 proposed by Mr. Iendras?

21 A.  I don't know.

22 Q.  You never found out?

23 A.  Well, if by "telecommuting," you mean

24 the form in Ceridian, I don't know.

25 Q.  Okay. Now, let me show you a document

COMPU-TRAN SHORTHAND REPORTING

**142**

William LaPerch

2  that had previously been marked as Plaintiff's

3  Exhibit 28 at a prior deposition. This is an email

4  chain that was produced by your attorneys. It's

5  a two-page document. And it's a chain of emails

6  between Mr. Oatta and Mr. Iendras. And there is

7  on the second page, an email that appeals to be

8  generated by the Ceridian Self-Service workflow,

9  noting the rejection of Document 247033.

10 Do you see that there?

11 A.  I do.

12 Q.  Is that how Ceridian Self-Service

13 worked? They would automatically generate an email

14 if a document was rejected?

15 A.  Yes.

16 Q.  And then, there's an email that follows

17 from Mr. Iendras to Mr. Datta, dated Saturday,

18 February 5th, 2011, saying, "My telecommuting

19 request was rejected. Should I assume this was in

20 error?" And the response, the following day,

21 Sunday, was, "Not by me. I didn't get the request.

22 Let me check with Gill."

23 Did Mr. Oatta check with you after

24 he wrote this email indicating he would check

25 with Bill, which appeals to be a reference to

COMPU-TRAN SHORTHAND REPORTING

**143**

William LaPerch

2  you?

3  A.  Yes.

4  Q.  And what, if anything, did you say to

5  Mr. Oatta when he inquired with you regarding the

6  rejection of the telecommuting request?

7  A.  I told him that this was something

8  that had to be worked out between Mr. Oatta and

9  Mr. Iendras.

10 Q.  And that's the extent of what you said

11 to him?

12 A.  Yes, that's what I recall.

13 Q.  And where did this conversation take

14 place?

15 A.  Don't remember.

16 Q.  Was it an in-person conversation or

17 telephone conversation?

18 A.  Don't remember.

19 Q.  Did it take place, to the best of your

20 knowledge, shortly after the date of this email -

21 Sunday, February 6th?

22 A.  Don't remember.

23 Q.  Okay. There is a further reference

24 that same day, in response, from Mr. Iendras to

25 Mr. Oatta: "Okay. Let me know if I have to

COMPU-TRAN SHORTHAND REPORTING

**144**

William LaPerch

2  resubmit once the hierarchy is changed." And

3  Mr. Oatta responds that same day in an email dated

4  Sunday, February 6th, 11:03: "Yeah, I will have to

5  check with Gina on whether the Ceridian now has

6  been changed yet. Gill did reject because this is

7  not 'his decision.'"

8  That appears to be a reference to a

9  conversation Mr. Oatta had with you; correct?

10 A.  Appeals to be, yes.

11 Q.  And it would appear, then, that your

12 conversation with Mr. Oatta would've taken place on

13 Sunday, February 6th; correct?

14 A.  I don't know.

15 Q.  The quote, "his decision," does that

16 appear to you to be an accurate statement of what

17 you had communicated to Mr. Oatta?

18 A.  Yes.

19 Q.  Let me show you a document that was

20 marked at a prior deposition as Plaintiff's 33.

21 This is a document that was also produced by your

22 attorneys, and it's a two-page document, and it

23 also seems to be generated by Ceridian Self-Service.

24 (Handing)

25 Do you recognize this document?

COMPU-TRAN SHORTHAND REPORTING

145

**William LaPerch**

1
2        (Witness peruses exhibit)
3        A.    Yes.
4        Q.    Can you identify it, please.
5        A.    It's the Request for Telecommuting
6    Agreement from Doug Jendras, to me.
7        Q.    So, let me just ask you here: You say
8    it's the request to you.
9              What's the basis for your confusion
10   that it's directed to you?
11       A.    Looking at the approval authority on
12   the second page.
13       Q.    And that is --
14       A.    Under where it says, "Status requires
15   action," it requires action by me.
16       Q.    And that reflection under the column
17   "Status," is that something that is generated based
18   on who the request is forwarded to? Is that the --
19       A.    It's based on the HR input of the
20   organizational, or org. chart.
21       Q.    So, what I'm trying to understand is
22   the sequence of events. If I understand you
23   correctly, this is what was actually sent to you
24   before you rejected it?
25       A.    This was sent to me. Ceridian sent

*COMPU-TRAN SHORTHAND REPORTING*

147

**William LaPerch**

1
2    submitted on one earlier occasion, or is that just
3    confirming when this document was submitted?
4        A.    I don't know.
5        Q.    So, this is not a case where you can
6    tell, looking at this, whether this was a second
7    submission of this document?
8        A.    I cannot tell.
9        Q.    Now, if there had been an approval by
10   you or anybody else, would that have been reflected
11   in the document history reflected on the second page
12   of this document?
13       A.    The Ceridian would then generate a
14   Request for Change of Status.
15       Q.    And the Request for Change of Status
16   would be sent to, who? The supervisor in charge of
17   it?
18       A.    Yes.
19       Q.    And if the supervisor said, yes, what
20   would happen next, if you know?
21       A.    Said yes to what?
22       Q.    The Request for Change of Status.
23       A.    If the request was made to change
24   status and it was approved by the supervisor, where
25   it says, "Required Action," then the system would so

*COMPU-TRAN SHORTHAND REPORTING*

146

**William LaPerch**

1
2    this to me when this request was generated, yes.
3        Q.    And that did not come directly from
4    Mr. Jendras; it came from Ceridian. Is that
5    correct?
6        A.    Ceridian is the system that generates
7    this request.
8        Q.    Right, okay. Now, it notes "Effective
9    date: 2/14/2011," on the first page.
10             Do you see that there?
11       A.    Okay.
12       Q.    Did you have an understanding at all as
13   to what that date signified? Was that the date that
14   it was intended to be the beginning of telecommuting,
15   or was that the date that it was, in fact, deemed to
16   be the effective date of the agreement?
17       A.    I'm not 100 percent sure, but I think
18   Ceridian generates dates based on payroll dates and
19   2/14 is the next payroll date after 2/4.
20       Q.    Now, up on top, there's a statement,
21   "Document Number 247433. Originally submitted by
22   Douglas Jendras on 2/4/2011, 12:19:25 a.m."
23             Do you see that there?
24       A.    I do.
25       Q.    Does that mean that this had been

*COMPU-TRAN SHORTHAND REPORTING*

148

**William LaPerch**

1
2    reflect.
3        Q.    And do you know, as you're sitting here
4    today, whether, at any point in time subsequent to
5    your rejection of the request because you were not,
6    in your view, the supervisor for Mr. Jendras,
7    whether Mr. Datta made any kind of direction
8    relating to Mr. Jendras' status as a telecommuter?
9              MR. PEIKES: Objection to the form.
10       A.    I know that Mr. Datta had discussions
11   with Mr. Jendras on how that would work, yes.
12       Q.    And what I'm asking you is whether
13   there was anything that came to you through the
14   Ceridian workflow after this rejection by you, that
15   would confirm that status?
16       A.    Not through Ceridian workflow.
17       Q.    How did it come to pass?
18       A.    I'm no longer -- when the changes were
19   made in the organization, Ceridian would have --
20   would not be programmed to do so.
21       Q.    So, when, if at all, were you informed
22   that Mr. Datta had arrived at an agreement with
23   Mr. Jendras relating to telecommuting?
24       A.    Don't recall the date exactly.
25   Sometime, you know -- sometime, obviously, after

*COMPU-TRAN SHORTHAND REPORTING*

149

**William LaPerch**

2 Mr. Datta became the I ptd and after I rejected this,
3 but I can't -- I don't know the exact date.
4     Q.  Do you remember the month?
5     A.  Not specifically, no.
6     Q.  Was it after -- you said it was after
7 the rejection; so, do you know whether it was in the
8 same month or a following month?
9     A.  I don't, no.
10     Q.  And how was it that Mr. Datta shared
11 this information with you?
12     A.  Verbally.
13     Q.  And was anyone else present when he
14 shared this with you?
15     A.  I don't remember.
16     Q.  You don't know whether it was a
17 face-to-face meeting or a telephonic discussion?
18     A.  I don't.
19     Q.  To the extent that you had a
20 conversation with him on the subject, do you
21 remember how long the conversation lasted?
22     A.  No.
23     Q.  And did Mr. Datta indicate in this
24 conversation that he, in fact, had agreed to a
25 telecommuting arrangement with Mr. Jendras?

*COMPU-TRAN SHORTHAND REPORTING*

150

**William LaPerch**

2     A.  Yes.
3     Q.  And did he share with you his
4 understanding of what the terms of that agreement
5 were?
6     A.  Yes.
7     Q.  And what did he tell you the terms
8 were?
9     A.  In very general terms, if Rajiv was
10 going to be in the office, then Doug, if he wasn't
11 travelling on business somewhere else, would be
12 there, as well.
13     Q.  And did he say anything else?
14     A.  Not that I recall.
15     Q.  So, what Mr. Datta told you was, if
16 Mr. Jendras wasn't travelling somewhere else and
17 Mr. Datta was in the office, the understanding is
18 that Mr. Jendras would be in White Plains, as well;
19 is that correct?
20     A.  Yes.
21     Q.  And other than this verbal conversation
22 you had, was there ever anything put in writing
23 relating to that understanding?
24     A.  I don't know.
25     Q.  And when you say "I don't know," does

*COMPU-TRAN SHORTHAND REPORTING*

151

**William LaPerch**

2 that mean you never saw anything?
3     A.  I don't -- I don't remember. I don't
4 remember if I saw -- I may have; I don't remember.
5 I just don't remember.
6     Q.  So, you don't know if you did or you
7 did not; is that correct?
8     A.  I don't know if Rajiv ever put in
9 writing to me, in an email or -- in an email that,
10 you know, outlined the general terms, what we just
11 discussed.
12     Q.  But you do remember a conversation,
13 which he indicated that he had approved telecommuting
14 by Mr. Jendras, and the general outline of that
15 understanding; is that correct?
16     A.  He said he approved an arrangement
17 where Doug was going to be in the office when he was
18 in the office unless Doug was traveling, yes.
19     Q.  And did he indicate to you that he
20 would share his travel schedule with Mr. Jendras?
21     A.  What do you mean "share"? I don't...
22     Q.  That he would provide Mr. Jendras with
23 his travel schedule.
24     A.  That was not discussed.
25     Q.  And you don't recall whether he told

*COMPU-TRAN SHORTHAND REPORTING*

152

**William LaPerch**

1 you one way or the other; is that correct?
3     A.  I don't recall whether he did. No,
4 I don't.
5     Q.  Let me go back to something that I
6 might've shown you earlier this morning that is
7 probably back in the pile. I'm just looking for my
8 copy. Give me a second, please.
9 I'm showing you what had been
10 previously marked as Plaintiff's Exhibit 26.
11 This is an email from Mr. Datta, to you, dated
12 February 2nd. And I want to direct your
13 attention to the second-to-last line of that
14 first full paragraph.
15     (Witness peruses exhibit.)
16     A.  Mm-hmm.
17     Q.  "What we agreed to in the end is that
18 I would share my travel schedule with him and that
19 he would work from WP on any day that I was there
20 but would work from home on other days, assuming
21 there was no other reason for him to be in WP."
22 Now, do you know whether, in fact,
23 Mr. Datta has indicated in this email to you, he
24 shared his travel schedule with Mr. Jendras?
25     MR. PEIKES: Objection to the form.

*COMPU-TRAN SHORTHAND REPORTING*

153

William LaPerch

2    A.   I will read what you just read to me:

3 "What we agreed to in the end is that I would share

4 my travel schedule with him."

5    Q.   Yes. And I'm asking, do you know if

6 Mr. Datta shared his travel schedule with Mr. Jendras?

7    A.   I do not know, no.

8    Q.   Did he ever indicate to you, at any

9 time subsequent to advising you of the terms of his

10 agreement with Mr. Jendras, of the manner in which

11 he would be sharing his travel schedule with

12 Mr. Jendras?

13    A.   No.

14    Q.   Okay. Thank you.

15 Now, before Mr. Jendras forwarded,

16 by Ceridian workflow, his request to you for

17 telecommuting, did you have a conversation with

18 him at any time in which you asked him whether

19 he wished to quit AboveNet?

20    A.   I did.

21    Q.   Do you recall when you had that

22 conversation with him?

23    A.   After I appointed Mr. Datta as LOO.

24    Q.   And was that the first time you had

25 that conversation with him?

COMPU-TRAN SHORTHAND REPORTING

---

155

William LaPerch

2    A.   Of 2011.

3    Q.   And was it after you learned of that,

4 that you approached Mr. Jendras and asked him

5 whether he wished to voluntarily leave the company?

6    A.   I don't remember whether it was before

7 or after.

8    Q.   But you do remember a conversation,

9 where you made an inquiry whether Mr. Jendras

10 intended to quit; is that correct?

11    A.   The context of the conversation I

12 remember is that I knew he would be disappointed

13 when he was not given the LOO role and wanted to

14 make sure -- wanted to get an idea of what his

15 thinking was, working for Rajiv.

16    Q.   And your recollection is you had this

17 conversation with him a short time after Mr. Datta

18 was appointed LOO?

19    A.   It may have been before; I'm not sure.

20 You know, I made my decision towards the end of the

21 year. And we had to get it, you know, approved by

22 the board and everything like that. So, I'm not

23 sure whether it was before or after. But once my

24 decision was made, I had a conversation with Doug.

25    Q.   And your best recollection, it was

COMPU-TRAN SHORTHAND REPORTING

---

150

William LaPerch

2    A.   Um, no. I had it many years previous.

3 Doug was frustrated during the time he was reporting

4 in to finance and was thinking about leaving, and we

5 talked about it. I don't remember the specifics.

6 But that was the other time that he was not happy

7 with -- with the company.

8    Q.   Do you remember the year that

9 conversation --

10    A.   No.

11    Q.   -- took place?

12    A.   I don't.

13    Q.   Did you ever make inquiry with him

14 at a time when you learned that he had made an

15 investment in his brother-in-law's hamburger

16 franchise?

17    A.   I'm sorry; what's the question again?

18    Q.   Did you become aware at any point in

19 time that Mr. Jendras invested in his brother-in-

20 law's hamburger franchise?

21    A.   Yes.

22    Q.   When did you learn that?

23    A.   I don't recall. December of

24 January/February, sometime around that time frame.

25    Q.   Of what year?

COMPU-TRAN SHORTHAND REPORTING

---

156

William LaPerch

2 either shortly before Mr. Datta was appointed or

3 sometime after Mr. Datta was appointed?

4    A.   Sometime around there, yeah.

5    Q.   And that would've been, to the best of

6 your knowledge, either towards the end of 2010 or

7 the early part of 2011; is that correct?

8    A.   Somewhere around there, yeah.

9    Q.   And where did this conversation take

10 place?

11    A.   Don't remember. My office, probably.

12    Q.   Was there anyone else present when you

13 had this conversation with Mr. Jendras?

14    A.   Not to my recollection.

15    Q.   And the purpose of your having this

16 conversation was to see if Mr. Jendras was willing

17 to stay on after the appointment of Mr. Datta?

18    A.   Yes.

19    Q.   And was it your desire that he stay on

20 at that point?

21    A.   Yes.

22    Q.   And did you express that sentiment to

23 Mr. Jendras?

24    A.   Yes.

25    Q.   And what did Mr. Jendras say in

COMPU-TRAN SHORTHAND REPORTING

157

William LaPerch

2  response to your inquiry?
3      A.  He wasn't that reasonsive.  He was --
4  I think he was still a little bit upset about the
5  appointment.  But he said that, yuo; you know, okay,
6  fine.  I'll, you know, consider all my options.
7      Q.  did he ever say to you, "I'm leaving
8  the company"?
9      A.  He never said, "I'm leaving the
10  company."
11      Q.  And he did not quit either, dio he?
12      A.  He did not.  He did not -- well, did
13  not quit, when1
14      Q.  At any time after this conversation
15  took place.
16      A.  No.
17      Q.  Ano subsequent to -- was there any
18  other conversation you recall having with him after
19  Mr. datta was aobointed, where you raised this
20  subject again, whether Mr. tendros wished to quit
21  the company?
22      MA. PEtkES:  objection to the form.
23      A.  Could you repeal the question, please.
24      MA. WEINSTEIN:  Could you read it back,
25  please.

COMPU-TRAN SHORTHANd REPORTING

---

158

William LaPerch

2  (Question read)
3      A.  It -- I became aware that -- yod know,
4  that Doug hed a conversation with Rajiu about
5  wanting a package to leave the company.  And that --
6  I don't remember N I hed a subsequent conuersation
7  or that was part of my original condersation with
8  him.  But between, you know, hearing that, knowing
9  thet he mada on outside investment in another
10  bdainess, and knowing his state of mind for, you
11  know, not being able to be the C9 d, you know was --
12  was, you know, cause for my conuersation.
13      Q.  Ano when did you learn about this
14  discussion you've identified between Mr. datta and
15  Mr. tendras reparding a package, as you out it?
16      A.  I don't remember.
17      Q.  You believe it was at or aruund the
18  satne time you had this conversation relating to
19  whether he wished to quit?
20      A.  I don't remember.
21      Q.  Now, did you review Mr. tendras'
22  oerformance for to t0 as his supervisor?
23      A.  Yes.
24      Q.  And did you prepare a review form, like
25  the previous years, rellecting yuur assessment of

COMPU-TRAN SHORTHANO REPORTING

---

15P

William LaPerch

2  his performance?
3      A.  Yes.
4      Q.  Ano when, it you recall, did tnat take
5  olace?
6      A.  I think it -- what usualty takes place,
7  sometime in the late February or early March timo
8  frame.
9      Q.  So, this would have been in Febcuary of
10  March of tOt t; is that correct?
11      A.  Yes.
12      Q.  And this would've been, then, after
13  Mr. datta was named as the chiel operating officer;
14  is that correct?
15      A.  Yes.
16      Q.  And this would have been after, in your
17  view, Mr. Datta became Mr. Jendras' supervisor;
18  correct?
19      A.  Correct.
20      Q.  And it would have also been after
21  Mr. tendras had discussed jelecommuting with
22  Mr. datta; correct?
23      A.  don't know.
24      Q.  You don't know, or yov don't remember?
25      A.  I don't know.

COMPU-TRAN SHORTHANd REPdrtTING

---

160

William LaPerch

2      Q.  Let tne show you a document that was
3  marked at a orior debosition as Exhibt t9.  And let
4  me direct your attention to the signature oage,
5  which is the last page of this document. (Handing)
6      tWitness peruses exhibit
7      is that your signature underneath
8  the designation for "Supervisor/Aeviewer"?
9      A.  It is.
10      Q.  And it appears you signed it on
11  Feoruary 7th, correct, of td31?
12      A.  That'a correct.
13      Q.  And that would have been aher
14  Mr. datta shared with you his thoughts on the
15  oropnsed jelecommyting oy Mr. tendras; correctT
16      A.  The date of the email was 2/4T
17      Q.  Well, rather than my -- it you're
18  taking my word for it, let's see it we can -- it's
19  Exhibit -- yes, yau nave it in front of yov.
20      A.  February 2nd, yes.
21      Q.  February tnd.
22      A.  No, not necessarily, oecause the date
23  I signed it, isn't necessarily the data I put it
24  together.
25      Q.  Okay.

COMPU-TRAN SHORTHANO REPORTING

**William LaPerch**

2  A.   In fact it's, more than likely, not.

3  Q.   But you knew about it, to say the least,

4  before you signed it, then, based on what you've

5  just said; is that correct?

6  A.   I don't know that.

7  Q.   Would you have put the wrong date down

8  as the date you signed it?

9  A.   No, but it could have been being

10 processed, typed up. You know, it actually takes at

11 least a week to do that.

12 Q.   I'm not asking when it was prepared;

13 I'll take your testimony on its word on that.

14 I'm asking you, simply: At the point

15 you signed this, regardless of when it was prepared,

16 you were already aware of the discussion regarding

17 telecommuting between Mr. Jendras and Mr. Datta;

18 correct?

19 A.   At the point I signed it, yea.

20 Q.   Now, I want to direct your attention to

21 page seven of this document.

22 The last box there on "Supervisor's

23 Comments" reads, "doug has the often-difficult

24 task of communicating with customers when

25 installs are late or service is a problem. He

*COMPU-TRAN SHORTHAND REPORTING*

---

**William LaPerch**

2  Q.   And when did he indicate that to you?

3  A.   From 1004, through 2010.

4  Q.   And so, was he telling you that on a

5  regular basis over that period of time?

6  A.   Yes.

7  Q.   And had he told that to you --

8  withdrawn.

Now, during that same period of time,

10 had you made a comment like this in any at his

11 earlier reviews?

12 A.   Not in his reviews.

13 Q.   And to the extent that Mr. Jacquay had

14 shared this with you over that period of time, had

15 you shared this observation by Mr. Jacquay with

16 Mr. Jendras at any time prior to putting it in this

17 review?

18 A.   I can't recall specifically. I --

19 Mr. Jacquay is a extremely opinionated individual.

20 He has opinions about pretty much everybody in the

21 company, you know. And part of my job was to sift

22 through those and -- and decide which ones to use

23 to help people get better and decide which ones to

24 disregard.

25 Q.   did Mr. Jacquay share his -- a view

*COMPU-TRAN SHORTHAND REPORTING*

---

**William LaPerch**

2  does this very effectively. When asked to do

3  board-level presentations, doug also does very

4  well.

5  Occasionally, I receive input from

6  sothe salespeople that doug is hard to approach.

7  While I believe this to be perception versus

8  reality, it, nevertheless, is something to be

9  aware of.

10 Now, you indicate -- these are your

11 words; correct?

12 A.   Correct.

13 Q.   And you indicate that you had input

14 from some salespeople relating to this comment that

15 Doug is hard to approach.

16 What salespeople were you refers to

17 there?

18 A.   I was speaking generically. I was

19 referring to all of the sales leadership.

20 Q.   So, the head of sales was Mr. Jacquay

21 at that time; correct?

22 A.   He was, yes.

23 Q.   And Mr. Jacquay indicated to you that

24 Mr. Jendras was hard to approach?

25 A.   Yes.

*COMPU-TRAN SHORTHAND REPORTING*

---

**William LaPerch**

2  to you during this period of 1004 to 1010 that

3  Mr. Jendras was not doing his job well?

4  A.   Yes.

5  Q.   And did he express that view

6  consistently between 1004 and 1010?

7  A.   Yes.

8  Q.   And did you agree with him?

9  A.   No.

10 Q.   And other than Mr. Jacquay, what other

11 salespeople indicated to you that Mr. Jendras was

12 hard to approach?

13 A.   Mr. Turtz, Mr. Hanko, Mr. Giannis.

14 Q.   Anybody else?

15 A.   There was only one other. Mr. Nikia

16 wasn't really that local to begin with.

17 Q.   Okay. Now, directing your attention in

18 this review to the category -- or I should say the

19 heading, "Performance Competencies." It begins an

20 page six. did you mark off these boxes to indicate

21 for each of these categories whether Mr. Jendras met

22 or exceeds expectations?

23 A.   I shared this with Doug when I gave it

24 to him. This was a reflection of the organization,

25 especially the productivity one.

*COMPU-TRAN SHORTHAND REPORTING*

166

William LaPerch

2  Q.   So, these were your mutations?  You
3  marked all these boxes; is that correct?
4      A.   I did, yes.
5      Q.   And it's true, is it not, that with
6  respect to these Performance Competencies, you did
7  not mark any boxes that said "Unacceptable" or
8  "Improvement needed."  You either marked "Meets
9  Expectations" or "Exceeds Expectations;" correct?
10     A.   Correct.
11     Q.   Now, subsequent to your completion of
12  this review, did you make a recommendation regarding
13  a merit increase for Mr. Jendras in the year 2011?
14     A.   I don't recall.
15     Q.   You don't recall whether you did or
16  you didn't?
17     A.   Right.
18     Q.   If you did, would you have presented
19  that to the board of directors as you had in prior
20  years?
21     A.   If I did, it would be on the spreadsheet
22  that was sent to the board of directors, yes.
23     Q.   And if it was approved, would it have
24  been reflected in the 10-k that you certified as
25  accurate, as well?

*COMPU-TRAN SHORTHAND REPORTING*

167

William LaPerch

2      A.   That's what it says here, yes.
3      Q.   And you, in fact, certified to
4  accuracy of the reality that, in fact, had made
5  a recommendation that the Compensation Committee
6  had approved it, and that he did get a base salary
7  increase from 199,000 per annum to 295,800
8  per annum; correct?
9      A.   Correct.
10     Q.   Now, did you subsequently direct
11  Sheila Chang to withhold this merit increase
12  disclosed in the 10-k?
13     A.   I did.
14     Q.   And when did you do that?
15     A.   I forget.
16     Q.   Was it after the disclosure in the 10-k?
17     A.   I don't remember.
18     Q.   And at the time that you made that
19  direction, had there been any public disclosure to
20  the effect that -- withdrawn.
21          At the time you made that direction,
22  had you met with the board of directors to
23  unwind the merit increase that had been approved
24  to Mr. Jendras?
25     A.   I never did unwind it.

*COMPU-TRAN SHORTHAND REPORTING*

166

William LaPerch

2      A.   As nothing changed between the
3  time it was approved and the time we had to file a
4  10-K.
5      Q.   Okay.  I want to direct your attention
6  to the 10-k that was previously marked, and I'll
7  tell you where I want to direct your attention to.
8  Page 113.
9      A.   Okay.
10     Q.   I want to direct your attention to the
11  second-to-last sentence.  It says, "Based on
12  Mr. LaPerch's recommendation, the Compensation
13  Committee approved an increase in base salary for
14  Mr. Jendras from $190,000 per annum, to $195,800
15  per annum, effective March 1, 2011."
16          That's what's in the 10-k.
17     A.   Mm-hmm.
18     Q.   Does that now refresh your recollection
19  as to whether you recommended a merit increase for
20  Mr. Jendras?
21     A.   I did.  I did recommend, in the
22  spreadsheet that I sent the board, a increase from
23  190 to 295,8.
24     Q.   And the board, apparently, approved it;
25  correct?

*COMPU-TRAN SHORTHAND REPORTING*

168

William LaPerch

2      Q.   I'm asking you:  Before you made the
3  statement to Ms. Chang to withhold it, had you gone
4  to the board of directors to seek a reversal of the
5  prior approval?
6      A.   I don't recall when I asked Miss Chang;
7  so, I don't -- I don't know the sequence of events
8  there.
9      Q.   Maybe I can help you with that.
10     A.   Yup.
11     Q.   I'm going to show you what was marked
12  at a prior deposition as Plaintiff's Exhibit 31.
13  (Handing.)  It's an email chain.
14     A.   Mm-hmm.
15     Q.   And it starts on the second page with
16  Mr. Jendras writing to Ms. Chang on Wednesday,
17  March 16th.  And he says, "Sheila, I noticed that
18  I did not receive my merit increase yesterday.  Can
19  you let me know if that was an oversight?  Thanks,
20  Doug."
21          Does that refresh your recollection as
22  to when Ms. Chang was directed not to give the
23  prior-approved merit increase to Mr. Jendras?
24     A.   No.
25     Q.   Then, there's an email that follows,

*COMPU-TRAN SHORTHAND REPORTING*

169

William LaPerch

2 from Ms. Chang to you, dated that same day. She
3 says to you, "Why does Doug think he got a merit
4 increase? I will not respond to him until I hear
5 from you. Thanks."
6          does that refresh your recollection
7 as to when you made the direction to Ms. Chang?
8     A.   No.
9     Q.   Then, you respond, on March 17th,
10 "I did not tell Doug he received a merit increase.
11 However, I didn't realize it was out in the 10-k;
12 so, he probably read he received one in the
13 document. I will speak to Aob on Monday on how to
14 straighten this out."
15          At the time you wrote this email,
16 was this after you had directed Ms. Chang not to
17 pay the merit increase?
18          MR. PEIkES: Objection to the form.
19     A.   I said in the email, "I did not tell
20 Doug he received the merit increase."
21          I still don't recall when I told
22 Sheila. I'm not sure, but I think what happened --
23 there were no other merit increases given. I don't
24 know why doug got one, because I usually give
25 people -- you know, I give it to everyone on the team.
          COMPU-TRAN SHORTHAND REPORTING

170

William LaPerch

2 That there was, obviously, some slipup or mistake
3 between when -- what got to HR and what got in the
4 10-K.
5     Q.   Now, you had already certified the
6 accuracy of the 10-K?
7     A.   I did.
8     Q.   And in this email, you're saying to
9 Ms. Chang that you didn't even realize it was in
10 the 10-K; correct?
11     A.   On March 17th, I didn't realize it, no.
12     Q.   And that was after you had already
13 certified --
14     A.   That's right.
15     Q.   -- the accuracy of it; correct?
16     A.   That's right.
17     Q.   And if I were to tell you that
18 Ms. Chang testified that you had told her to reverse
19 the approval prior to this email exchange, would you
20 say she was lying about that?
21          MR. PEIkES: Objection to the form.
22     A.   No.
23     Q.   And why would you give the instruction
24 to Ms. Chang to reverse something that had been
25 publicly disclosed and acted upon by the board of
          COMPU-TRAN SHORTHAND REPORTING

171

William LaPerch

2 directors?
3     A.   I was looking at equity across all the
4 senior VPs. I didn't give anyone else a raise that
5 year. And Doup's performance didn't stand out from
6 everybody else's, so...
7     Q.   So, you unilaterally give the
8 instruction to Ms. Chang, because of that point of
9 view?
10     A.   I did. But once I spoke to Aob, we
11 straightened it out, and Doup got his raise.
12     Q.   And that's what's reflected in the
13 balance of this email chain?
14     A.   That's correct.
15     Q.   Mr. Sokota gave an instruction to you
16 and Ms. Chang: "Put in the increase retroactively
17 starting March 1 --
18     A.   That's right.
19     Q.   -- consistent with everyone else."
20 That would've meant Mr. Jendras did
21 not receive what had been publicly disclosed as
22 his merit increase on March 3, itself; correct?
23     A.   Correct.
24     Q.   Now, if Mr. Sokota had not given you
25 this instruction, would you have gone along with it?
          COMPU-TRAN SHORTHAND REPORTING

172

William LaPerch

2          MR. PEIkES: Objection to the form.
3     A.   Gone along with what?
4     Q.   The merit increase for Mr. Jendras
5 disclosed in the 10-k.
6     A.   It's a moot point. You know, I have
7 a general counsel to ask questions like that.
8     Q.   did you consult with Mr. Sokota before
9 you gave the instruction to Ms. Chang to withhold
10 the increase that was approved for Mr. Jendras?
11     A.   No, not to my recollection.
12     Q.   So, you didn't ask Mr. Sokota until
13 after you had already made the instruction to
14 Ms. Chang; correct?
15     A.   I've already indicated, I don't exa ctly
16 remember when I gave the instruction to Ms. Chang.
17     Q.   Redirecting your attention to your
18 review of Mr. Jendras' performance in 2b10, did you
19 meet with Mr. Jendras as part of the review process
20 to discuss your assessment of his performance in
21 1010?
22     A.   On March 7th, the day he signed it.
23     Q.   Is that when you believe you met with
24 hjm?
25     A.   That's when I believe I met with him,
          COMPU-TRAN SHORTHAND REPORTING

173

William LaPorch

2 yes.

3    Q.   Okay.  And did you express to him, at

4 the time you met with him, that you were not happy

5 with the fact that he was telecommuting at that

6 point?

7    A.   don't recall.

8    Q.   You don't recall whether you did or you

9 didn't; is that correct?

10    A.   I don't recall whether I did or I

11 didn't.

12    Q.   Other than Mr. Jendras' merit increase

13 that was approved by the board of directors and

14 disclosed in the form 10-k, did you seek to reverse

15 any other financial compensation that had been

16 approved for Mr. Jendras?

17    A.   I don't recall.

18    Q.   You don't recall whether you did or you

19 didn't?

20    A.   I don't recall whether I did or I

21 didn't.

22    Q.   Well, let me be more specific:  Did

23 you have a conversation with Mr. Sokota at any time

24 in 2011, in which you suggested that it would be

25 appropriate to modify the terms of the January 25th,

*COMPU-TRAN SHORTHAND REPORTING*

---

174

William LaPerch

2 1911, stock award that had previously been approved

3 by the board of directors?

4    A.   Yes.

5    Q.   When did you have that conversation?

6    A.   When I became aware that doug was

7 looking to leave the company and wanted a package

8 that included all of his stock awards.

9    Q.   And can you tell me the month in which

10 this conversation took place?

11    A.   No.

12    Q.   That conversation took place between

13 you and Mr. Sokota?

14    A.   To the best of my recollection, yeah.

15    Q.   And where did it take place?

16    A.   I don't recall.

17    Q.   do you know if it was an in-person

18 meeting or a telephonic discussion?

19    A.   Don't recall.

20    Q.   do you know if anybody else participated

21 in the conversation?

22    A.   don't remember.

23    Q.   do you remember weether it was at or

24 about the same time that you made the direction to

25 Ms. Chang to reverse the merit increase discussed

*COMPU-TRAN SHORTHAND REPORTING*

---

175

William LaPerch

2 in the 10-k?

3    A.   No, I don't remember.

4    Q.   What you do remember is it had some

5 correlation with when you learned about his

6 discussions relating to a voluntary separation from

7 the company; is that correct?

8    A.   That's correct.

9    Q.   And the conversation with Mr. Sokota

10 related to -- withdrawn.

11        do you know when he first started

12 having conversations relating to involuntary

13 separation?

14    A.   In some of his initial conversations

15 with Aajiu, when they were discussing Aajiu's new

16 role and his new role.

17    Q.   And would it be fair to say that took

18 place in or about March of 2011?

19    A.   I can't remember.  I would think,

20 before that, but I'm not sure.

21    Q.   Well, let me see if I can help you.

22 You indicated that you had a conversation with

23 Mr. Jendras relating to his review for 2010 on the

24 same day that he signed it, which was March 7th,

25 2012; correct?

*COMPU-TRAN SHORTHAND REPORTING*

---

176

William LaPerch

2    A.   Right, yes.

3    Q.   Had you had a conversation with

4 Mr. Sokota prior to sitting down with Mr. Jendras

5 on March 7, 2011, regarding a change in the terms

6 of the January 15, 2011, Stock Award Agreement?

7    A.   I don't recall the timing.

8    Q.   Now, in this conversation you had with

9 Mr. Sokota, at the time you were having this

10 conversation, there had already been an award made

11 by the Compensation Committee that was disclosed in

12 the form 10-K; correct?

13    A.   I don't know.  I can't -- I don't know

14 when the conversation happened.  I think the 10-K

15 came out in early March, I don't know if the

16 conversations happened before or after that.

17    Q.   Well, to the extent you were having

18 this conversation and it related to a change in

19 terms of a preexisting agreement; correct?

20    A.   Yes.

21    Q.   And it was an agreement that wouldn't

22 have existed unless there had already been a

23 presentation to the board of directors; correct?

24    A.   My definition of agreement is our

25 standard stock agreement. It wasn't a particular

*COMPU-TRAN SHORTHAND REPORTING*

177

William LaPerch

2 award agreement. It was the way that the company
3 gaue out stock and the terms and conditions they
4 gaue it out under.
5     Q.   And that's what I'm talking about.
6 I'm talking about what you were asked about earlier
7 in this deposition; and more specifically, the
8 January 15, 2011, award.
9         And your testimony, as I recall it, was
10 that you made certain recommendations, including one
11 involving Mr. Jendras; correct?
12     A.   Correct.
13     Q.   And you then made your presentation to
14 the Compensation Committee; correct?
15     A.   Correct.
16     Q.   And the Compensation Committee then
17 approved it; correct?
18     A.   Correct.
19     Q.   And then, the board of directors
20 approved it that same day; correct?
21     A.   Correct.
22     Q.   And then, the form of agreement that
23 was approved was disclosed in both the form 10-K and
24 the form 8-K; correct?
25     A.   Correct.

COMPU-TRAN SHORTHAND REPORTING

118

William LaPerch

2     Q.   And you certified in the 10-K that that
3 was, in fact, a true and accurate statement of the
4 terms of the agreement with Mr. Jendras; correct?
5     A.   Correct.
6     Q.   Now, you've mentioned you had a
7 conversation with Mr. Sakota, in which you discussed
8 with him a change in the terms of the January 25th,
9 2011, Stock Award Agreement; correct?
10     A.   Correct.
11     Q.   And so, that change wouldn't have been
12 a change unless it was something that was happening
13 after all of these other events had occurred;
14 correct?
15         MR. PEIKES:   Objection to the form.
16     A.   The change that we were contemplating
17 was directly related to the information that we had,
18 that Mr. Jendras wanted to leave the company and
19 wanted all of his stock to go with him.
20     Q.   Right.   And the timing of the
21 discussion took place after there had already been
22 a disclosure in the 10-K and the 8-K; correct?
23         MR. PEIKES:   Objection.
24     A.   The timing of which disclosure?
25         MR. PEIKES:   Let me state an objection

COMPU-TRAN SHORTHAND REPORTING

179

William LaPerch

2 as asked and answered. He's already said he
3 didn't know the timing as related to the
4 10-K and 8-K.
5         MR. WEINSTEIN:   Well, I think he
6 answered it differently, but that's why I'm
7 entitled to inquire.
8         So, why don't you read back the
9 question, please.
10         (Question read)
11     A.   As I said before, I'm not sure of the
11 chronology of all these conversations.
13     Q.   Would you have told Mr. Sakota to
14 change the terms of the January 15th, 2011,
15 Stock Award Agreement before it was the subject
16 of a public disclosure?
17         MR. PEIKES:   Objection to the form.
18     A.   I would've told Mr. Sakota to change
19 the conditions of the stock agreement when --
20 whenever, in my judgment, it would protect the
21 shareholder value of the company.
21     Q.   Well, I'm not talking in general terms.
23 I'm talking now about the Stock Award Agreement for
24 Mr. Jendras for January 15th, 1911.
25         My question to you is:   This conversation

COMPU-TRAN SHORTHAND REPORTING

180

William LaPerch

2 which you say took place with Mr. Sakota, did it
3 take place before you made your presentation to
4 the board of directors at AboveNet on January 15th,
5 2011?
6     A.   I don't know.
7     Q.   did it take place after Mr. Jendras had
8 signed the January 25th, 1931, Stock Award Agreement?
9     A.   I don't know.
10     Q.   did it take place after both Mr. Jendras
11 and Mr. Sakota had signed the January 25, 1931,
12 Stock Award Agreement?
13     A.   No; it took place before that.
14     Q.   And do you know what it was that you
15 actually presented to the board of directors on
16 January 15th, 1913, as the basis for the proposed
17 Stock Award Agreement to Mr. Jendras?
18     A.   Can you expand on that question?   I
19 don't understand it.
20     Q.   Sure.   I'm going to redirect your
21 attention to the specific document.   (Handing)
22 For the record, it's Exhibit 13.   You'll note
23 that that's a document produced by your attorneys,
24 and it reflects a signature on the signature
25 page of both Mr. Jendras and Mr. Sakota; correct?

COMPU-TRAN SHORTHAND REPORTING

181

**William LaPerch**

1
2    (Witness peruses exhibit)
3    A.    Correct.
4    Q.    And it reflects a date underneath
5    Mr. Sokota's signature of March 9th, 2011; correct?
6    A.    Correct.
7    Q.    And it indicates in this form of
8    agreement that according to Paragraph 9d, which
9    I had asked you about earlier, that if there was a
10   termination of the participant's continuous service
11   by the company without cause, or by the employee
12   for good reason, any unvested stock unit shall
13   immediately vest.
14   Do you see that there?
15   A.    I do.
16   Q.    And you've previously indicated that
17   this form of agreement, which was signed by Mr. Sokota
18   on behalf of the company re: Mr. Jendras, was, in
19   fact, the form of agreement that was disclosed in
20   the 8-k and incorporated by reference in the 10-K,
21   that you had certified as accurate; correct?
22   A.    Yes.
23   Q.    And you've indicated you had a
24   conversation with Mr. Sokota, in which you directed
25   him to alter the terms of the January 25th, 2011,

*COMPU-TRAN SHORTHAND REPORTING*

---

182

**William LaPerch**

2    Stock Award Agreement; correct?
3    MA. PEIKES:   Objection to the form.
4    A.    We had a conversation -- I had a
5    conversation with my general counsel, and we decided
6    to change the terms of the existing stock agreement,
7    as it hadn't been delivered to Mr. Jendras at that
8    point.
9    Q.    So, if I understand your testimony
10   correctly, this conversation with Mr. Sokota
11   occurred sometime after Mr. Sokota had signed it,
12   but before it was delivered to Mr. Jendras; is that
13   correct?
14   A.    I don't recall the timing of all of
15   this. I see what date Mr. Sokota signed it, but I
16   don't recall the date that we had the conversation.
17   The discussion took place, though,
18   after the award had already been made to Mr. Jendras
19   and approved by the board of directors; correct?
20   MA. PEIKES:   Objection to the form.
21   A.    I don't recall the time,
22   Q.    You believe that this conversation
23   with Mr. Sokota might've taken place before
24   January 25th, 2017.
25   A.    I don't know.

*COMPU-TRAN SHORTHAND REPORTING*

---

183

**William LaPerch**

2    Q.    Assume for the sake of this question
3    that the conversation took place before January 15th,
4    2011. Does that mean you ultimately concluded that
5    the terms of the award were properly the subject of
6    what's set forth and memorialized in Plaintiff's
7    Exhibit 23, and which, in fact, you presented to the
8    board of directors?
9    A.    Could you repeat the question.
10   MA. WEINSTEIN:   Could you read it back,
11   please.
12   (Question read)
13   MA. PEIKES:   Just note my objection to
14   the form of the question.
15   If you understand it, you can answer it.
16   A.    I don't understand it.
17   Q.    So, you don't remember exactly when
18   you had this conversation with Mr. Sokota regarding
19   a change in the terms of the January 25th, 2007,
20   Stock Award Agreement; is that correct?
21   A.    The only -- the only timing I remember
22   on this conversation was it was after we became
23   aware that Mr. Jendras no longer wanted to work for
24   the company and wanted a package to leave.
25   Q.    And with regard to your awareness of

*COMPU-TRAN SHORTHAND REPORTING*

---

184

**William LaPerch**

1    that discussion, did you also have an awareness of
3    Mr. Jendras' point of view regarding his entitlement
4    to the stock units that were the subject of the
5    January 15th, 2011, award?
6    A.    I did.
7    Q.    And so, would it be fair to say if
8    Mr. Jendras was talking about it, he was already
9    aware and had been made aware of the January 15th,
10   2011, award; is that correct, sir?
11   A.    No.
12   Q.    Wait, how would he be able to talk
13   about it if he didn't know about it?
14   A.    The context in which I answered your
15   previous question was that Mr. Jendras' ask was for
16   all of his stock, vested and unvested, going out.
17   That was the context I answered in. I wasn't
18   referring to a specific -- a specific award. I
19   was referring to, if he had left at the time he was
20   indicating, that he wanted all of his future stock,
21   even though he wasn't here.
22   Q.    There was no discussion that you were
23   aware of between Mr. Jendras and others at the
24   company regarding his desire that he be given the
25   benefits of the January 25th award?

*COMPU-TRAN SHORTHAND REPORTING*

---

185

William LaPerch

2  A.  What do you mean by "benefits"?

3  Q.  That he'd receive accelerated vesting

4  of that stock based on a voluntary separation from

5  the company?

6  A.  It was my understanding that his

7  request was to receive accelerated vesting of all of

8  his stock.

9  Q.  And would that have included the

10  restricted stock units identified in the January 15th,

11  1011, award?

12  A.  Yes.

13  Q.  And then, subsequent to your learning

14  about this position taken by Mr. Jendras, you had a

15  discussion with Mr. Sokota regarding a change in the

16  terms of that award agreement; correct?

17  A.  Yes.

18  Q.  And that change involved a change in

19  the terms that provided for accelerated vesting if

20  Mr. Jendras was terminated without cause; correct?

21  A.  The change was initiated to seek --

22  to ensure that in order to collect that stock, the

23  employee had -- doug had to be around.

24  Q.  Well, let me ask it this way:  Would

25  the change have eliminated the language that is set

COMPU-TRAN SHORTHAND REPORTING

---

181

William LaPerch

2  Compensation Committee.

3  A.  The Compensation Committee.

4  I did not have a conversation at that

5  point in time with the Compensation Committee.  I

6  was acting under -- under the terms that -- the

7  terms provided that said, between the time that the

8  award is awarded and when the contracts are executed

9  and the employee is notified, if anything changes,

10  the senior executives in the company should do

11  what's right.

12  Q.  You didn't make a presentation to the

13  Compensation Committee, then; is that correct?

14  A.  What do you mean by "then"?  When is

15  "then"?

16  Q.  At the time you were speaking to

17  Mr. Sokota and giving this instruction to him, had

18  you, prior to that, gone to the Compensation

19  Committee?

20  A.  No.

21  Q.  Had you gone to the board of directors

22  and asked their approval for a change in the terms

23  of Mr. Jendras' January 15, 2011, Stock Award

24  Agreement?

25  A.  No.

COMPU-TRAN SHORTHAND REPORTING

---

186

William LaPerch

2  forth in Exhibit 13, which is before you; more

3  specifically, Paragraph 3d?

4  A.  I'm not a lawyer; I'm not equipped to

5  answer that.

6  Q.  Well, to the extent that you had the

7  conversation with Mr. Sokota, what is it that you

8  recall telling him?

9  A.  I recall telling him that we're not in

10  a position to accelerate the vesting of somebody

11  that's not going to be around to earn the stock.

12  Q.  And did you have an expectation, when

13  you said this to Mr. Sokota that he would, in fact,

14  change the terms of the January 15th, 2011,

15  Stock Award Agreement?

16  A.  Yes.

17  Q.  And at the time that you had this

18  conversation with Mr. Sokota, had you made a

19  presentation to the Compensation Committee in which

20  you presented this point of view in a proposal to

21  modify the terms of the January 15th, 2011, stock

22  award?

23  A.  Did I have a conversation with the

24  board about this decision?

25  Q.  Yes.  No; actually, I said, the

COMPU-TRAN SHORTHAND REPORTING

---

186

William LaPerch

2  Q.  Had you sought to modify the terms at

3  the disclosure that was made in either the 10-K

4  or the 8-K regarding the terms of Mr. Jendras'

5  Stock Award Agreement?

6  A.  I was -- the intent was to do that.

7  I don't recall what the timing had to be in order

8  to get all that stuff done, but there was no intent

9  to hide our intentions from either the -- you know,

10  the public reporting responsibilities that we had,

11  or the communication with the board of directors.

12  We were merely acting under the terms of the

13  agreement, which said that once this has been

14  approved, we should take the necessary steps to make

15  sure that -- make sure that the contracts are

16  executed and that, you know, absent anything

17  extraordinary -- which we viewed this as

18  extraordinary -- we should do that.

19  Q.  Okay.  My question to you, sir, is:

20  At any time before you had this conversation with

21  Mr. Sokota and gave the instruction you did, whether

22  or not there had been any disclosure in any of the

23  public filings that you, sir, had made a decision

24  to change the terms previously disclosed, reflecting

25  Mr. Jendras' January 15th, 2011, Stock Award

COMPU-TRAN SHORTHAND REPORTING

189

William LaPerch

2  Agreement?

3  MA. PEIKES:  Objection to the form.

4  You could answer if you could

5  follow the question

6  A.  Prior to -- prior to sbeaking to

7  Mc. Sokote, I did not confer with tha oard of

8  directors oc the Compensation Committee.

9  Q.  My question -- I already asked that

10  question.

11  My question was:  Was there euor any

12  oublie filing made, which set forth differen t terms

13  than those that had previously been disclosed, for

14  Mr. Tendras' tanuary 15th, 7011, Stock Award

15  Agreement?

16  A.  Prior to my conversa tion -- I mean,

17  oefore my conversation with Mr. Sokota?

18  Q.  Aight.

18  A.  No.

19  Q.  Was there ever any disclasure

21  subsequent to your coqversation with Mr. Sokota,

21  that the terms of Mr. tendras' January 75th, 701 t,

23  Stock Award Agreement had changed?

24  A.  Yes.

25  Q.  Where was that disclosure?

*COMPU-TRAN SHORTHAN d REPORTING*

---

191

William LaPerch

2  Q.  And that carries with it certain

3  resbonsibilities; doesn't it, sir?

4  A.  It does.

5  Q.  And if you don't make that disclosvre,

6  you're violating the aoolicable securities law's;

7  aren't you, sir?

8  MA. PEIKES:  dojection.  It calls for

9  a legal conclusion.

10  Q.  Well, you tan answer to the best of

11  your knowledge.

12  A.  I don't know.

13  Q.  So that if disclosure had not been made

14  of this change that you discussed with Mc. Sukota,

15  that would not have beea oroper; correct, sir?

16  MA. PEIKES:  Qbjection ttr the form of

17  the question.

18  A.  I don't know.

1P  Q.  And it there was a change that was not

20  disclosed -- withdrawn.

21  Now, you're saying your understanding

22  is that h did aopear in some kind of oublic

23  tilling; correct?

24  A.  9td what aopear1

25  Q.  This change that yov discussed wsh

*COMPU-TRAN SHORTHANQ REPORTING*

---

190

William LaPerch

2  A.  Don't recoll.  It's, you know, after

3  we had -- after we had told the board and the --

4  the Compenaetion Committee and the board, Aob was

5  to file the necesasry disclosdrea.  I don't recall

6  what date or ttme it was.

7  Q.  So, as you're sitting here today,

8  you're saying tha; subsequent to this conversation

9  with Mr. Sukota, there was a oublic filing that

10  indicated that the terms of the Stock Award

11  Agreement for Mr. tendras, aoproued by the board

12  of directors on tanuary 15th, 7qII, had changed;

13  is that correct?

14  A.  That's my undecstandIng, yeah.

15  Q.  And what's the basis fur that

16  understanding?

17  A.  Because that's whot you're supposed to

18  do.

19  Q.  That's what you're suoposed tu do, out

20  do you know it that was done here?

11  A.  I don't know 10q peccent.

t  Q.  Ano why is that what you're suooosed to

t  do, sir?

2d  A.  Because we haue -- we haue -- because

25  we've thonged something we'ue already disclosed.

*COMPU-TRAN SHORTI_AND REPORTING*

---

191

William LaPerch

2  Mr. Sokota.

3  A.  Well, I mean, it -- I don't know.

4  You know, the questions are getting

5  confusing at this point.

6  The lact is that there may have not

7  been any thange to the eaistlng agreement.  We may

8  haue acted under the -- undecthe terms of the

9  eaistinp agreement and though! thet the tiling

10  change wea not necessery.  I don't recall the

11  soeclfi t legal interpretation of all that.

12  Q.  After this conversation wsh

13  Mr. Sokota, did he oreoare another form of agreement

14  for the January 25th, Ibt I, stock award that had

15  been approved on your recommendation by both the

16  Compoensation Committee and the board of directars

17  on Janvary 15th?

18  A.  Prepara for wh tr7

19  Q.  Foc Mr. Jendros.

10  A.  I don't know.

11  Q.  I'm going to shaw you a documen; marked

21  at a orior debosition as Plaictiff's Exhibit 37.

23  MA. PIKI'S:  Do you want to take a

24  mitute before you go through that?

25  THE WITNESS:  Sure.

*COMPU-TRAN SHORTHANO REPORTING*

193

William LaPerch

2    MR. PELKES: Why don't we take a

3    two-minute break.

4    MR. WEINSTEIN: Okay.

5    (Recess held from 3:04 to 3:13 a.m.)

6 CONTINUED EXAMINATION BY MR. WEINSTEIN:

7    Q. I want you to look at a document that

8 was marked at a prior deposition as Plaintiff's

9 Exhibit 37. It's a document that was produced

10 by your attorneys in response to a request for

11 production. And it's an email from Rob Sokota,

12 to Gina Grimmer, dated Thursday, March 24th, 2011.

13    Have you seen this email before today?

14    (Witness peruses exhibit)

15    A. No.

16    Q. I want to direct your attention to the

17 form of Stock Award Agreement that's referenced in

18 this email from Mr. Sokota to Ms. Grimmer.

18    Do you recall seeing this document

20 prepared by Mr. Sokota?

21    A. No.

22    Q. In looking at it now, does this reflect

23 the change that you had discussed with Mr. Sokota in

24 Mr. Tendras' January 15th, 2011, stock award?

25    (Witness peruses exhibit)

      COMPU-TRAN SHORTHAND REPORTING

194

William LaPerch

2    A. Yes.

3    Q. You'll note in Paragraph o, it no

4 longer has a provision that provides for accelerated

5 vesting if Mr. Tendras was terminated without cause;

6 correct?

7    A. Correct.

8    Q. And it would appear, then, that

9 Mr. Sokota prepared this document in or about

10 March 14, 2011; correct?

11    A. Correct.

12    Q. And that would've been after Mr. Sokota

13 and Mr. Tendras had signed the January 18th, 2011,

14 award that had been approved by the board of

15 directors; correct?

16    A. After they signed it; correct.

17    Q. And it would've been after the board

18 of directors approved it, as well; correct?

19    A. Correct.

20    Q. And it would've been after there had

21 been a disclosure of the terms of that award in both

22 the 10-X and the 8-K; correct?

23    A. Yes.

24    Q. And at the point in time that Mr. Sokota

25 was sending this Stock Award Agreement with the

      COMPU-TRAN SHORTHAND REPORTING

195

William LaPerch

2 change, there had not been any discussion with the

3 board of directors regarding the change set forth

4 in this different form of agreement for Mr. Tendras;

5 correct?

6    A. I don't know.

7    Q. You don't know whether it had or it

8 had a IP

9    A. That's right.

10    Q. do you know whether you had made such

11 a presentation to the board of directors?

12    A. I don't remember.

13    Q. do you know whether you had made a

14 presentation to the Compensation Committee setting

15 forth this change in terms, in the form of agreement

16 sent by Mr. Sokota, to Ms. Grimmer, on March 14th?

17    A. I don't recall.

18    Q. Now, do you know whether Mr. Sokota,

19 in fact, sent this proposed new form of Stock Award

20 Agreement to Mr. Tendras?

21    A. Only from reading this email.

22    Q. Well, the email is not to Mr. Tendras;

23 it's to Ms. Grimmer.

24    A. Right.

25    Q. Although it does say, "Gina, see

      COMPU-TRAN SHORTHAND REPORTING

196

William LaPerch

1 attached revised draft of the agreement for doug

2 that you can send to him."

3    do you know whether, in fact, at

4 his direction it was sent to Mr. Tendras after

5 this email was sent to Ms. Grimmer?

6    A. I don't know that for a fact.

7    Q. do you know whether Mr. Tendras

8 expressed a point of view as to whether this

9 proposed change in the terms of the January 15th,

10 2011, Stock Award Agreement was acceptable to him?

11    A. I, subsequently, heard that it was not

12 acceptable to him.

13    Q. And were you aware, at the time that

14 Mr. Sokota prepared this change, whether or not

15 Mr. Tendras had been in receipt of the fully

16 executed January 15th, 2011, Stock Award Agreement?

17    A. I was aware that he was not in

18 possession of that.

19    Q. And who made you aware of that?

20    A. Mr. Sokota.

21    Q. And did you ask Mr. Sokota to respond

22 to that inquiry, or did Mr. Sokota just tell you?

23    A. I don't recall.

24    Q. And at the point in time that you had

      COMPU-TRAN SHORTHAND REPORTING

197

1 William LaPerch
2 that discussion with Mr. Sokota, you were already
3 aware that Mr. Sokota had signed it after
4 Mr. Jehdras had signed it; correct!
5 A. I was.
6 Q. And did you give an instruction to
7 Mr. Sokota not to return the fully executed
8 January 25th, 2011, Stock Award Agreement to
9 Mr. Jehdras!
10 A. We discussed the issue and agreed that
11 he should not return.
12 Q. And did that conversation take place
13 before this email of March 24th that was sent by
14 Mr. Sokota to Ms. Grimmer with the proposed new
15 terms?
16 A. Yes.
17 Q. And did you also tell Mr. Sokota to
18 not share with Mr. Jehdras the fact that there had
19 already been an execution of the January 25th, 2011,
20 award by Mr. Sokota!
21 MR. OEIKES: Objection to the form.
22 THE WITNESS: Could you read back the
23 question, please.
24 (Question read)
25 A. It was not discussed.
COMPU-TRAN SHORTHAND REPORTING

198

1 William LaPerch
2 Q. Did you have a conversation with
3 Mr. Datta regarding a change in the terms of the
4 January 25th, 2011, Stock Award Agreement that had
5 been executed by Mr. Jehoras and Mr. Sokota!
6 A. Yes.
7 Q. And did you have that conversation
8 with Mr. Datta at or about the time that you
9 discussed it with Mr. Sokota, as it related to a
10 change!
11 A. I don't remember.
12 Q. And the conversation that took place
13 with Mr. Datta, did that take place in person or on
14 the telephone!
15 A. I don't recall.
16 Q. Was there anyone else involved in that
17 discussion!
18 A. don't recall.
19 Q. To the extent you remember a
20 conversation with Mr. Datta, what did you say to
21 him, and what did he say to you!
22 A. That -- the essence of the conversation
23 was that the terms of Mr. Jehdras' stock agreement
24 had been changed to require him to -- to continue
25 his employment and be here as all the stock vested.
COMPU-TRAN SHORTHAND REPORTING

199

1 William LaPerch
2 Q. And when you had this conversation with
3 Mr. Datta, did you also discuss with him the
4 direction that had been made not to deliver the
5 fully executed January 25th, 2011, stock award to
6 Mr. Jendras!
7 A. I don't recall.
8 Q. Did Mr. Datta share with you any of
9 the conversations he was having with Mr. Jehdras
10 regarding the terms of the voluntary separation from
11 the company?
12 A. Yes.
13 Q. And in connection with those discussions,
14 did he indicate to you what he said regarding the
15 status of the January 25, 2011, stock award that had
16 previously been executed by Mr. Jendras!
17 A. I don't remember.
18 Q. Did he share with you what it was he
19 said to Mr. Jehdras regarding the question of
20 whether it had been signed by anyone at AboveNet?
21 MR. OEIKES: Objection to the form.
22 A. I don't remember.
23 Q. Did he indicate to you whether he had
24 advised Mr. Jehdras that the position of AboveNet
25 was that the January 25th, 2011, stock award had
COMPU-TRAN SHORTHAND REPORTING

200

1 William LaPerch
2 no legal effect, because it had not been executed
3 by AboveNet!
4 A. He did not indicate that to me.
5 Q. I'm going to show you a document that
6 was marked at a prior deposition as Plaintiff's
7 Exhibit 36. (Handing) This, too, is a document
8 that was provided by your attorneys. And I want
9 you to take a moment to look at it, because I'm
10 going to ask you about it.
11 (Witness peruses exhibit)
12 A. Okay.
13 Q. Have you seen this document before
14 today!
15 A. Yes.
16 Q. And do you know who prepared this
17 document!
18 A. Rajiv.
19 Q. And when did you see this document for
20 the first time!
21 A. Friday.
22 Q. So, prior to Friday, you did not see it!
23 A. No.
24 Q. And do you know when Mr. Datta prepared
25 this!
COMPU-TRAN SHORTHAND REPORTING

201

William LaPerch

2  A.   I don't, except for what's indicated
3  here on the email.
4  Q.   You're talking about the June 22nd date
5  oh the too!
6  A.   Yes.
7  Q.   Okay. Do you know whether that was,
8  in fact, the day that that was prepared by Mr. Oatta!
9  A.   I do not.
10  Q.   Now, I want to refer you to the second
11  full paragraph of this document. It says, "I
12  indicated to Doug that all of this discussion around
13  his desire for a package and his belief that he's
14  owed all the stock and all the contractual terms in
15  his agreement, had put me in a difficult position.
16  His view that the future stock vests in 2012 and
17  2013 are his entitlements, is not correct. I
18  indicated that he does not have a fully executed
19  agreement relative to that future stock vest; and
20  that based on these discussions, that we will be
21  making a change to the terms of those stock vests
22  that removes any reference to accelerated vesting."
23  Was that a reference to the change
24  you discussed with Mr. Sokola regarding the
25  terms of the January 25th, 2011, award!

COMPU-TRAN SHORTHAND REPORTING

202

William LaPerch

2  A.   I would assume so, but I can't be sure.
3  Q.   And the reference to Mr. Jendras not
4  having a fully executed agreement, was that a
5  reference to the January 25th, 2011, Stock Award
6  Agreement, as well!
7  A.   I don't know.
8  Q.   Were you aware that Mr. Oatta had
9  expressed the view memorialized in this memorandum
10  to Mr. Jendras, that he didn't have a fully executed
11  agreement relative to future stock vests?
12  MR. PEIKES: Objection to the form.
13  A.   Well, I'm reading his view here; so,
14  I assume that's his view.
15  Q.   Did Mr. Oatta share with you, of the
16  time that he was having conversations with
17  Mr. Jendras regarding the terms of a voluntary
18  separation, that he told Mr. Jendras that he didn't
19  have a fully executed agreement for the January 25th,
20  2011, stock award?
21  MR. PEIKES: Objection to the form.
22  A.   I don't recall.
23  Q.   Did you provide any instruction to
24  Mr. Oatta to state to Mr. Jendras that he couldn't
25  enforce the January 25th, 2011, stock award, because

COMPU-TRAN SHORTHAND REPORTING

203

William LaPerch

2  he didn't have a fully executed Stock Award
3  Agreement?
4  A.   No.
5  Q.   Do you know if anybody else gave such
6  ah instruction to Mr. Oatta!
7  A.   I don't know.
8  Q.   Did Mr. Oatta keep you advised of the
9  status of his discussions with Mr. Jendras regarding
10  the terms of a voluntary separation!
11  A.   We discussed it once or twice.
12  Q.   And did he share with you the fact that
13  it was Mr. Jehuras' view that he was entitled to
14  accelerated vesting of any unvested stock units if
15  he elected to voluntarily separate from the company!
16  A.   Yes.
17  Q.   And were you aware of that position
18  before you gave the instruction to Mr. Sokola to
19  alter the terms of the January 25th, 2011, Stock
20  Award Agreement!
21  MR. PEIKES: Objection to the form.
22  A.   I don't recall the timing of all that.
23  Q.   Now, I want to redirect your attention
24  to the 2010 review for Mr. Jendras.
25  Do you recall whether Mr. Jendras

COMPU-TRAN SHORTHAND REPORTING

204

William LaPerch

2  took exception to the characterization in the
3  review that he was considered difficult to
4  approach by some salespeople!
5  A.   He did.
6  Q.   And did he share that point of view
7  with you!
8  A.   Yes.
9  Q.   And did he indicate to you that he
10  thought it was inaccurate!
11  A.   Yes.
12  Q.   And how did he share that with you!
13  A.   By saying, "It's inaccurate."
14  Q.   And do you recall whether he shared
15  this with you in person or by telephone!
16  A.   Well, when I gave him that input during
17  our March 7th appraisal session, he told me that he
18  thought that was inaccurate and that he had a good
19  relationship with all his salespeople.
20  Q.   And what, if anything, did you do or
21  say in response to that!
22  A.   I told him that I disagreed and that --
23  you know, I indicated that as I -- as I had written
24  in his appraisal, some of it might be perception
25  rather than reality, but it's something that he

COMPU-TRAN SHORTHAND REPORTING

205

William LaPerch

2 ought to keep in mind when dealing with the sales
3 folks.

4     Q.   Did you have any subsequent conversations
5 with you regarding the content of your review of his
6 2010 performance?

7     A.   No.

8     Q.   Did you have any communications with
9 him subsequent to this meeting relating to his
10 performance at AboveNet?

11     A.   No.

12     Q.   I'm going to show you a document that
13 was marked previously -- I'm sorry; I gave you the
14 first page of my copy. I'm sorry.

15     The document that was marked as
16 Plaintiff's Exhibit 3a. (Handing)

17     A.   Mm-hmm.

18     Q.   Take a moment, if you could, to look at
19 this. I'm going to ask you, after you've looked at
20 it, whether you've seen this before today.

21     (Witness peruses exhibit)

22     A.   Okay.

23     Q.   Have you seen this document before
24 today?

25     A.   Friday.

COMPU-TRAN SHORTHAND REPORTING

---

206

William LaPerch

2     Q.   And you're certain you didn't see this
3 before Friday; is that correct?

4     A.   I'm not certain. 95 percent.

5     Q.   Do you know who the author of this
6 document is?

7     A.   Rajiv.

8     Q.   Is that your best guess, or is that to
9 your knowledge?

10     A.   My best guess.

11     Q.   And on what do you base your conclusion
12 that Mr. Datta is the author of this document?

13     A.   Just talking about management style,
14 and in the third paragraph he said -- he says that,
15 "I've been running product development for a long
16 time," and Rajiv is who ran product development.

17     Q.   You're referring to the third full
18 paragraph?

19     A.   Third full paragraph, four lines from
20 the bottom, it says, "I reminded him that my level
21 of engagement on things like product productivity
22 may allow him to get a sense of my impact."

23     Q.   Is that the paragraph that begins with
24 the words, "Doug reiterated his view,..."?

25     A.   Yes.

COMPU-TRAN SHORTHAND REPORTING

---

207

William LaPerch

2     Q.   Now, I want to direct your attention to
3 the second page of this document.

4     A.   Okay.

5     Q.   And I would say four lines down from
6 the top of that first line on that page, there's a
7 statement that says, "After some discussion, he
8 asked what I thought was reasonable.

9     I told him that I was not authorized to
10 discuss the specifics of a package with him. I was
11 trying to determine if there was something
12 reasonable that I could take to the board, et
13 cetera, positioned as an amenable separation. He
14 said that this implies that I didn't think what he
15 was asking for was reasonable, which I said was
16 true.

17     In the end, I said that getting 2011
18 stock plus severance through the end of the year,
19 2011, is something that I would take forward for
20 consideration.

21     He said he needed to speak with people
22 to understand his position, but that, didn't
23 understand why he should negotiate on the contract.

24     I reminded him that the company didn't
25 think he has a case for getting the full contractual

COMPU-TRAN SHORTHAND REPORTING

---

208

William LaPerch

2 package."

3     Did Mr. Datta share with you these
4 thoughts memorialized in this document during
5 the time that he was having conversations with
6 Mr. Landras relating to the terms of the
7 voluntary separation?

8     A.   Mr. Datta shared with me the fact that
9 he was having conversations with Mr. Landres
10 discussing if things couldn't be worked out between
11 them, and they couldn't figure out how to make the
12 organization successful, you know, would Doug
13 consider taking a package from us to leave.

14     Q.   And does the term "2011 stock plus
15 severance," have any meaning to you as it's set
16 forth on this document?

17     A.   Where are you reading?

18     Q.   The second-to-last -- or third-to-last
19 sentence; I'm sorry. "In the end, I said that
20 getting 2011 stock plus severance through the end of
21 the year, 2011, is something I would take forward
22 for consideration."

23     A.   Yes, it does have meaning.

24     Q.   Had Mr. Datta discussed that concept
25 with you when he was having these conversations with

COMPU-TRAN SHORTHAND REPORTING

209

William LaPerch

2  Mr. Jehdtas!

3       A.   Yes.

4       Q.   And what was your understanding of what

5  that term meah1

6       A.   We had -- we had a sehior vice

7  oresident of sales, Mr. Jacquay, that was leaving

8  the comoany in July. And we had negotiated a deal

9  with him, where his last day of work would be July.

10  He would be carried on the oayroll through December,

11  and he would ba around for a 2011 vesting in

12  November of some stock. 1het's what that meahs to

13  me.

14      Q.   Ahd if I can just draw out a little bit

15  more: does rhat meah, ihen, that what you

16  uhderstood AboueNel as willing to =ffer Mr. Jehdras,

17  was something similar to what you just described was

18  the subject ot ah agreemeht with Mr. Jacduay?

19      A.   Yes.

20      Q.   Ahd so, that would meah that

21  Mr. Jehdras would have to forego ahy stock that

22  would have vested after 2011, but would have berhaos

23  vested on ah accelerated basis if he left the

24  comoahy voluhtarily; is that correct?

25      A.   No.

COMOu-1RAN SHOR1HANO REOPOR1WG

---

210

William LaPerch

2  a vesting schedule that thuolued some vesting that

3  was to take olace latei ih 2011; correct?

4       A.   correct.

5           MR. OEIKES:  Just to be clear, you're

6  referring to the Seotembel 8th, 2008, award?

7           MR. WEINSTEIN:  Yes. Did i misstate it

8  again1

9           MR. OEIKES:  Yes. Uou said,

10  "September 8th, 2d 10."

11          MR. WEINSTEIN:  Okay. I haue done that

12  oreuiously; i apologife for ahy cohfusioh.

13      Q.   For the sake of clahty, Ieterihg how

14  to the Sediember 8th, 2010, award --

15          MR. OEIKES:  '08.

16      A.   'b8.

17          MR. WEINS1EIN:  I did it agaih. It's

18  just amathg...

19      Q.   Referihg back to the Sebtember 8th,

20  20b8, award -- ahd for the sake of dadty, so

21  heither you nor I are speaking ih a vacuum, I'm

22  going to ouil the documeht. Ahd that's Exhibit 19,

23  which I will hhd for you.

24          MR. PEIKES:  I haue it. (Hahding)

25      Q.   okay. Me has it; but how, I head to

COMOU-1RAN SHOR1HANO REPOR1ING

---

21b

William LaPerch

2       Q.   okay. Jet me draw it out differehtly,

3  then, sihce that didh't seem to register as accurate

4  from your ooiht of view.

5           Jet me ask you, ihen:  What did it

6  theah, as you uhderstood it, as it related to

7  Mr. Jehdras?

8       A.   What did what mean7

9       Q.   1he term set forth ih Mr. Oatta's --

10  what we assumed for the sake of this buestioh as

11  Mr. Oatta's documeh1

12      A.   What it meant to me1

13      Q.   Yes. "2d11 stock olus seuerahce," what

14  did it meah!

15      A.   It meant thet we would offer the same

16  deal as we were offering foc.

17      Q.   So, then, to oul it ihto cohcrete

18  terms:  At the time these discussiohs were taking

19  olace, there had already beeh three stock awards

20  oresehted to the board ahd aooroued for Mr. lehoras.

21  That would'ue beeh the Seotember 8th, 20b8, award;

22  the Oecember 10th, 2010, award; ahd the

23  January 25th, 2b11, awald; correct?

24      A.   Correct.

25      Q.   And the Seotember 8th, 1b10, award had

COMPU-7RAN SHOR1HANO REOPOR1ING

---

212

William LaPerch

2  have it. But that's helofui; I aooreciate it.

3           okay. I haue it, too, now.

4           Your attothey has olated ih froht ot

5  you the documeht that was oreuiously marked as

6  Plaihtiff's Exhibit 19, ahd that reflects the fact

7  that 6b oelceht of the stock uhits that were the

8  subject of that award would uesi oh Nouembel 15th,

9  2011; correct1

10      A.   Yaa.

11      Q.   Ahd so, to the exteht that this

12  oarticular Stock uhit Agreemeht had a vesting

13  schedule that thuolued future vesting ih 2o11, if

14  I understand your testimohy, you're sayihg that the

15  position of the company was that Mr. Iendias, as

16  part of ah agreed, uoluhtaly separatioh, would

17  receive whateuer stock uhits were to uest later ih

18  2011, uhder the terms of the Stock uhit Agreemeht

19  dated Seotember 8th, 2d08; correct?

20      A.   1hat's what was offered.

21      Q.   Now, there were also two other Stock

22  Award Abreemehts, which I've askeo you about, ohe

23  of which was the Oecember 20th, 2010, agreemeht

24  that was oreuiously marked as Plaihtiff's

25  Exhibit 21.

COMOU-1RAN SHOR1HANO REPORING

213

William LaPerch

2   A.   Right.

3   Q.   And the other was Exhibit 23.  And --

4        MR. OEIKES:  I've shown him both of

5   those.

6        MR. WEINSTEIN:  I appreciate that.

7   Now, I have to catch up, too.

8   Q.   I have 21, and I have 73.

9        Directing your attention to 21 --

10   that's the one dated December 20th, 2d1b -- that had

11   a vesting schedule that also contemplated a vesting

12   of the units on November 15th, 2011; correct?

13   A.   Correct.

14   Q.   And as to those units, the position of

15   the company was that Mr. Jendras, as part of the

16   terms of the voluntary separation, would be entitled

17   to receive those, as well, even if he separated

18   prior to November 15th, 2011; is that correct?

19   A.   That was our initial offering, yes.

20   Q.   And now, we're directing your attention

21   to Exhibit 23, which your attorney was good enough

22   to provide to you there.  That had a vesting

23   schedule that contemplated vesting of a portion of

24   these units in 2012 and 2013; correct?

25   A.   Correct.

COMPU-TRAN SHORTHAND REPORTING

214

William LaPerch

2   Q.   And those units totaled -- actually,

3   it was the entire stock award, correct, that was

4   going to vest at -- 14,000 was going to vest on

5   November 16th, 2012; and 7,000 units were going to

6   vest on November 16th, 2013; correct?

7   A.   Correct.

8   Q.   And so, the position of the company

9   regarding the terms of a voluntary separation was

10   that Mr. Jendras would not be entitled to the stock

11   units that were the subject of the January 25th,

12   2011, award; is that correct?

13   A.   That was what we offered, yes.

14   Q.   And were you made aware that

15   Mr. Jendras rejected that offer?

16   A.   Yes.

17   Q.   And was it after you became aware of

18   Mr. Jendras' response, that you spoke to Mr. Sukota

19   regarding a change in the terms of the January 25th,

20   2011, award?

21   A.   I don't recall.

22   Q.   Now, forgive me if I've asked this

23   already; but just for the sake of rounding out

24   the record:  After Mr. Sukota prepared the revised

25   January 25, 2011, Stock Award Agreement, do you

COMPU-TRAN SHORTHAND REPORTING

215

William LaPerch

2   know it was presented to Mr. Jendras?

3   A.   I know it was written on the email that

4   we saw, where Gina Grimmes was directed to present

5   it to Mr. Jendras.

6   Q.   And were you made aware of what, if

7   any, response Mr. Jendras had to the proposed change

8   in the terms of the January 25th, 2011, award?

9   A.   Yes; I was made aware that he refused

10   to sign it.

11   Q.   And who told you that?

12   A.   I don't remember.  It was either Rajiv

13   or Rob.

14   Q.   Now, once Mr. Jendras rejected the

15   proposed change in the January 25th, 2011, stock

16   award, to your knowledge, were there continued

17   discussions relating to the terms of a voluntary

18   separation between Mr. Jendras and Mr. Datta, or

19   anyone else at the company?

20   A.   I'm not aware of the timing of all

21   that.  I couldn't say, either way.

22   Q.   Now, during the period of time that

23   Mr. Jendras was having these discussions relating

24   to a possible voluntary separation, was he working

25   from home?

COMPU-TRAN SHORTHAND REPORTING

216

William LaPerch

2   A.   I didn't see him around the office.

3   Q.   So, did you conclude, then, that he

4   was working from home?

5   A.   I didn't draw any conclusions.  I just

6   didn't see him around the office.

7   Q.   Did you see Mr. Datta in Mr. Jendras'

8   office in White Plains?

9        MR. OEIKES:  Objection to the form.

10   A.   When Mr. Datta wasn't traveling, he was

11   in his office in White Plains, yes.

12   Q.   And his office was formerly

13   Mr. Jendras' office; correct?

14   A.   Correct.

15   Q.   And during the period of time that

16   followed Mr. Datta taking over Mr. Jendras' physical

17   office in White Plains, was Mr. Jendras being called

18   upon to perform various operations' functions for

19   AboveNet?

20   A.   Mr. Jendras was reporting to Mr. Datta;

21   so, that would be a question for him.

22   Q.   So, as you're sitting here today, you

23   have no knowledge of what, if any, operations'

24   functions Mr. Jendras was performing once he started

25   working from home; is that correct, sir?

COMPU-TRAN SHORTHAND REPORTING

211

William LaPorch

2  MR. OEJKES:  Objection to the form.
3  A.  When Mr. Jendras was organizationally
4  reorganized under Mr. Oatta, Mr. Jendras
5  communicated only with Mr. Oatte and no longer with
6  me.
7  Q.  And can I assume from your response
8  that you didn't communicate with him, either?
9  A.  We didn't have any communication.
10  MR. WEINSTEIN:  Please mark this as
11  Plaintiff's Exhibit 44.
12  (Whereupon, email chain was marked as
13  Plaintiff's Exhibit 44, for id.)
14  Q.  I show you what's been marked as
15  Plaintiff's Exhibit 44.  It's an e-mail chain.
16  At the bottom of the page there's an e-mail from
17  Gina Thomas -- who I think you've identified as your
18  assistant; correct?
19  A.  Correct.
20  Q.  -- addressed to you, dated May 19th,
21  2011.  Subject:  update from Scott W.  And it reads,
22  "Me and Tom have been working with B of A --"  I
23  assume that's a reference to Bank of America.
24  Is that a client of AboveNet?
25  A.  It is.
COMPU-TRAN SHORTHAND REPORTING

---

219

William LaPorch

2  assistant provided.  And then, based on that, I
3  asked Mr. Jendras to get involved in speaking with
4  the customers.
5  Q.  And to your knowledge, did Mr. Jendras
6  get involved with the customers?
7  A.  Probably.
8  Q.  You can add that to the pile.
9  A.  (Witness complies)
10  MR. WEINSTEIN:  Mark this, please, as
11  Exhibit 45.
12  (Whereupon, three-page email chain Bates
13  stamped P00089 - 91 was marked as Plaintiff's
14  Exhibit 45, for id.)
15  Q.  Mr. LaPorch, I'm showing you what has
16  been marked as Plaintiff's Exhibit 45.
17  (Handing) It's an e-mail chain consisting of three
18  pages.
19  And the email I wanted to ask you about is from you,
20  to Mr. Jendras, dated May 19th, 2011.  And it's a
21  series of questions relating to a particular Tiber
22  fault; correct?
23  A.  Right.
24  Q.  Do this have any relationship to the
25  subject of the other email I just asked you about?
COMPU-TRAN SHORTHAND REPORTING

---

218

William LaPorch

2  Q.  "-- all right.  The problem is still
3  not fixed.  It got kicked out this morning, and
4  we'll go back at 9 a.m. tonight to resolve.  They
5  couldn't find the splice enclosure.  It's near
6  where we spliced with ATT; so, it may be an ATT
7  issue, but he's not sure yet.  There are access
8  issues."
9  And the next email in this chain is
10  from you, to Mr. Jendras, on that same date, at
11  10:19 a.m.  It says, "Please get involved right away.
12  I have received emails from customers."
13  Is that an email you sent to Mr. Jendras?
14  A.  From my cell phone, yes.
15  Q.  So, you were, in fact, communicating
16  with him on May 19, 2011, to address an issue
17  identified by your administrative assistant with
18  regard to Bank of America; is that correct?
19  A.  Actually, the issue was identified by
20  customers who sent me emails.  My email assistant --
21  or my assistant didn't identify the issue.
22  Q.  But in response, your response to this
23  was to have Mr. Jendras address it; correct?
24  A.  My response to this was to get a status
25  report from the network management center, which my
COMPU-TRAN SHORTHAND REPORTING

---

220

William LaPorch

2  A.  I have no idea.
3  Q.  Okay.  There are a series of questions
4  that appear to have some answers.  Were those the
5  answers provided by Mr. Jendras?
6  A.  Actually -- well -- I'm sorry.
7  Q.  Go ahead.  What were you going to say?
8  A.  No.  I was looking at the customers
9  effected below, but that just says whose -- whose
10  spans are down and being restored.  It doesn't say
11  anything about Bank of America.
12  Q.  Okay.  Who were the customers that were
13  enumerated in this email chain?
14  A.  Yes; Alliance Bernstein; Deutsch Bank;
15  and Rabo Bank, a Dutch bank.
16  Q.  And there was a need to restore service
17  to these particular customers?
18  A.  We had an outage.  It was a need to
19  restore service for all customers.  These were the
20  ones that were still down at the time.
21  Q.  And did you ask Mr. Jendras to address
22  issues relating to this outage?
23  A.  I did.
24  Q.  And did he respond to your questions?
25  A.  I don't know if he responded.  Somebody
COMPU-TRAN SHORTHAND REPORTING

---

**221**

William LaPerch

2  responded.

3  Q.  Well, you'll see in this email chain it

4  says, oh May 19th, 2011, at 5:25 p.m. Doug Jendias

5  wrote, "Answers below." And then, it appears that

6  he forwarded your questions with his answers;

7  correct?

8  A.  Yes.

9  Q.  And he's responding to your questions,

10  "Who from AboveNet is on site?" He says, "Marla

11  Sahto is on site."

12      Was that someone in operations ---

13  A.  It is.

14  Q.  -- who reported to Mr. Jendias?

15  A.  But the point I was trying to make is

16  that I don't know if he wrote these answers, or they

17  were cut and pasted from somebody he asked. That's

18  a minor point.

19  Q.  Do you have any reason to think that

20  somebody other than he wrote this?

21  A.  Yes; all the time.

22  Q.  Did you inquire with Mr. Jendias on

23  this subject?

24  A.  No. It didn't matter to me.

25  Q.  Rich and Mike Shatzberg, were those

COMPU-TRAN SHORTHAND REPORTING

---

**222**

William LaPerch

2  operations people?

3  A.  Yes.

4  Q.  And he's saying, "Rich and Mike

5  Shatzberg have been on the phone all day. Tim

6  Matchell is on jury duty; so, Mike is performing

7  double duty today."

8      The next question is, "Why is it taxing

8  so long to solice back up five to seven customers?

10  The fiber was out of the ground four hours ago."

11      And then the response is, "The cable

12  was pulled out of the splice case, and about 14

13  fibers broke where the cable enters the case. We

14  have spliced up the broken fibers with the exception

15  of uS5, uB, and Rabo, who were up on the project.

16  We're still trying. If we can't fix the three

17  remaining, and since there is no slack, we have to

18  find a new path. The NYA team is packed, and all

19  routes have been difficult to find. Kevin is still

20  searching."

21      Do you know who Kevin was?

22  A.  He's one of the field techs.

23  Q.  And then, your -- did you have any

24  issue with this response as related to your

25  question, why is it taking so long?

COMPU-TRAN SHORTHAND REPORTING

---

**223**

William LaPerch

2  A.  No.

3  Q.  And your third question: "I would like

4  you to please call Alliance Bernstein and update

5  them on this. We spent a long time digging out of

6  a hole with them on performance. I don't want to

7  get back in that hole."

8      His response was, "Alliance Bernstein

9  is up. I will call them."

10      Any issue with that response?

11  A.  No.

12  Q.  And then, you wrote back, on Tuesday --

13  on Thursday -- I'm sorry -- Thursday, May 19th,

14  "Okay. Let me know who you speak to."

15      And that was a reference to

16  Mr. Jendias' reference to the fact that he would

17  call Alliance Bernstein?

18  A.  Yes.

19      MR. WEINSTEIN: Plaintiffs' 46.

20      (Whereupon, two-page email chain Bates

21  stamped P000094 - 95 was marked as Plaintiff's

22  Exhibit 46, for id.)

23  Q.  Mr. LaPerch, I'm going to show you

24  what's been marked as Plaintiff's Exhibit 46.

25  (Handing.)

COMPU-TRAN SHORTHAND REPORTING

---

**224**

William LaPerch

2      Just for the record, what has been

3  marked as Plaintiff's Exhibit 46 is a two-page email

4  chain, and I want to direct your attention to the

5  first page of this email chain. In the bottom of

6  the page is an e-mail from you, to Doug Jendias,

7  dated Saturday, May 21, 2011; correct?

8  A.  Correct.

9  Q.  In this email you write to Mr. Jendias,

10  you say, "Doug, I have highlighted the job. I would

11  like some explanation on the variance on the

12  completed job report detail tab. In the highlight

13  is yellow, then I need a construction variance

14  explanation. If the highlight is red, I need an

15  equipment variance explanation. It appears there

16  may be something not right about the equipment

17  CAPEX, as there are numerous jobs where equipment

18  CAPEX is budgeted, but not used.

19      With the velocity of our business

20  lately, I am anxious to ensure that CAPEX numbers

21  I am looking at are vetted for accuracy. I am

22  equally interested in understanding the reasons

23  for over and under spending in the field. Please

24  work with Joe's team for any additional financial

25  into you may need. Please have this done by

COMPU-TRAN SHORTHAND REPORTING

---

225

William LaPerch

2 juhe 3rd."

3 Now, you make a direction to

4 Mr. jehdras ih this email that he should work with

5 Joe's team. Who is joe?

6 A. CFO.

7 Q. Ahd what was Joe's full hame?

8 A. Clavarella.

9 Q. Ahd ih resoohse to this email that you

10 wrote oh May 21, did Mr. jehdras resoohd by

11 juhe 3rd, as you directed him to?

12 A. I don't rememoey.

13 Q. Well, you'll see uo oh the too, there

14 was ah e-mail seht to you oh May 23rd ih resoohse

15 to uour email; correct?

16 A. Correct.

17 Q. Ahd there is some resoohse to some of

18 your questions ih your email; correct?

19 A. No.

20 He says, "Construction variances are

21 always due to the average of averages assumotiohs

22 ih the model, uersus the reality of the situation,

23 whether oositiue or hegatiue. Equiomeht budgets

24 are also created usihg standard costs or a BOM; so,

25 there should be ho surohise that those funds may hot

COMPU-TRAN SHORTHAND REPORTING

226

William LaPerch

2 oe used. Those budgets are heuer oased oh a search

3 of the ihternal ihuehtory that oos tries to utilize

4 first oefore soehdihg. 1 will attemot to orouide

5 ekolahatiohs as close to juhe 3rd as oossible."

6 You didh't cohsider that resoohsiue to

7 uour email?

8 A. No.

9 Q. Old he, suosebueht to this email,

10 orouide you with further detail?

11 A. ooh't know.

12 Q. You doh't khow whether he did or he

13 didh't!

14 A. That's cotrect.

15 MR. WEINSTEIN: Okay. Mark this.

16 (Whereuoon, email chaih Bates stamped

17 °000096 - 104 was marked as °laihtiff's

18 Exhibit d7, for id.)

19 Q. Mr. LaPerch, I ask uou to look at

20 what's beeh marked as Plaihtiff's Exhibit 47. This

21 is ah e-mail chaih cbnsistihg of hihe oages, with

22 the last email dated Friday, juhe 10th, 2011, from

23 Bill LaPerch, to ooug jehdras. Ahd I waht to focus

24 oh the first page of this chaih. Ahd there's ah

25 e-mail from Mark Wihski.

COMPU-TRAN SHORTHAND REPORTING

227

William LaPerch

2 Oo you khow who Mr. Wihski is?

3 A. He works ih the helwork management

4 center.

5 Q. Ahd he's ah emotoyee of AoouedNet?

6 A. He is.

7 Q. And he's ihdicatihg, "NY ooeratiohs

8 reoorts that all sofichg has beeh comoleted at this

9 time. The NMC is ih the orocess of cohtactihg all

10 customers to uerify that their seryices have been

11 restored."

12 It's a reference to ah outage that

13 occurred at certaih customer sites?

14 A. It is.

15 Q. Ahd theh, there's a resoohse or a

16 further statemeht by Shant uartahlah.

17 That persoh also is an emotoyee of

18 AboueNet?

19 A. He is.

20 Q. And he writes, on juhe 10th at 8:26:05

21 o.m., "At this time all customers have beeh hotified

22 ahd cohfirm their services are restored. Total

23 outage time: 26 hours, 10 mihutes."

24 You theh wrote to Mr. jehdras oh

25 Fridau, 1uhe 10th, at 8:35 o.m. ih cohhectioh with

COMPU-TRAN SHORTHAND REPORTING

228

William LaPerch

2 this email chaih; ctrrect!

3 A. Cortect.

4 Q. Ybu wrote to him, "I would like to khoW

5 of ahy customer issues or dissatisfactioh with our

6 oerformahce here. Bill LaPerch."

7 So, you were lookihg to Mr. jehdras

8 at that time to address whether or hot there

9 were customer issues or dissatisfactioh; correct!

10 A. Right.

11 Q. Oo you recall what haooehed after you

12 seht this email to Mr. jehdras!

13 A. I do not.

14 Wheh outages are 26 hours lohg

15 durihg the workweek ahd ihcludes custoroers like

16 are listed ih the back, it's a cause of great

17 coheerh foti the CEO.

18 Q. Ahd that was, of course, the reasoh why

19 you reached out to Mr. jehdras!

20 A. Mm-hmm.

21 Q. Okay. Thahk you.

22 MR. WEINSTEIN: 48, ofease.

23 (Whereupoh, email chaih Bates stamped

24 P000105 - 108 wds tharked as °laihtiff's

25 Exhibit d8, for id.)

COMPU-TRAN SHORTHAND REPORTING

229

William LaPerch

2    Q.   Mr. LaPerch, I'd like you to look at
3  what's been marked as Plaintiff's Exhibit 48.  This
4  is a four-page email chain.  I'd like to focus you,
5  for the moment, on an email that begins on the
6  bottom part of the first page from Steve Ratliff.
7            Is Mr. Ratliff an employee of AbboveNet?
8    A.   He is.
9    Q.   And there appears to be a reference
10  to certain customers noted by certain identification
11  codes there.  Do you see that there?
12    A.   I do.
13    Q.   And is this a reference to outages, as
14  well, experienced by those customers?
15    A.   Yes.
16    Q.   And you then wrote on Sunday,
17  June 12th, 2011, the same day that you, apparently,
18  received this email from Mr. Ratliff, to
19  Mr. Jendras;
20  correct?
21    A.   Yes.
22    Q.   And you asked the question:  "Is this
23  work on our long haul or metro network?  Is there
24  a maint --" Is that a reference to maintenance or
25  something else?

COMPU-TRAN SHORTHAND REPORTING

230

William LaPerch

2    A.   Yes.  During the weekend, there are
3  planned times for doing work on the network.  So,
4  since this was a weekend, if it was a planned time,
5  I would react differently than if it was an
6  unplanned outage.
7    Q.   "Is there a maint --" maintenance, I
8  guess that's abbreviated, as you just said.  "Is
9  there a maintenance that is going on past the
10  scheduled time?  There are many important customers
11  on this route.  Facebook, in particular."
12            Do you recall what the response was
13  to your inquiry on Sunday, June 12th, to
14  Mr. Jendras?
15    A.   Nope.  No.
16            MR. WEINSTEIN:  Mark this, please, as
17  Plaintiff's Exhibit 49.
18            (Whereupon, three-page email chain Bates
19  stamped P000109 - 111 was marked as Plaintiff's
20  Exhibit 49, for id.)
21    Q.   This is an email chain that's been
22  marked as Plaintiff's Exhibit 49.  It consists of
23  three pages.  And the one I'm going to ask you about
24  starts on the first page, and it's from Roger
25  Patterson.  (Handing)

COMPU-TRAN SHORTHAND REPORTING

231

William LaPerch

2            (Witness peruses exhibit.)
3            Do you see that there?
4    A.   I do.
5    Q.   And he's an employee of AbboveNet;
6  is that correct?
7    A.   Correct.
8    Q.   And he makes reference to repairs that
9  are needed for certain damaged fiber.  Do you see
10  that there?
11    A.   Yes.
12    Q.   And can you tell from this email chain
13  whether the damaged fiber had caused outages at
14  certain customer sites?
15    A.   Yes.
16    Q.   And there is -- after Mr. Patterson
17  recites the damage, there is a further email from
18  Justin Baltimore.  Do you see that there?
19    A.   Right.
20    Q.   He also is an employee of AbboveNet?
21    A.   He is.
22    Q.   And is he in operations or somewhere
23  else?
24    A.   Network management center.
25    Q.   Network management center.

COMPU-TRAN SHORTHAND REPORTING

232

William LaPerch

2            And he writes, "Optical operations has
3  advised that the third-party fiber vendor have
4  technicians at Hudson Street and Ninth Avenue,
5  New York.  The fiber vendor are currently checking
6  to see if there are some fibers to route around the
7  damaged section.  The estimated time to restore is
8  still unknown at this time.  More updates will
9  follow as soon as they are made available."
10            In response to this email of June 17th,
11  2011, at 1:15 in the morning, it appears you, then,
12  wrote to Mr. Jendras; correct?
13    A.   I did.
14    Q.   And you asked him, "Who is the third-
15  party vendor?"  Correct?
16    A.   I did.
17    Q.   And why were you reaching out to
18  Mr. Jendras in connection with this issue?
19    A.   Because he is responsible for the
20  people that are in the network management center
21  and in the field that would be on site, and he would
22  know who the third-party vendor was.
23    Q.   And did he, in fact, respond to your
24  inquiry?
25    A.   He did.

COMPU-TRAN SHORTHAND REPORTING

233

**William I aPerch**

2　　Q.　Ahu he identified the third-party

3　vehdot in his email of Friday, June 11th, shortly

4　after you sent your email, as Global Crossing;

5　correct?

6　　A.　Correct.

7　　Q.　Ahd he gave you some further

8　information relating to the status of the effort

9　being uhcertaken by Global Crossing; correct?

10　　A.　Yes.

11　　Q.　Ahd he indicated service was ub oh a

12　temporary. Meaning, I assume, a temporary basis;

13　correct?

14　　A.　Correct.

15　　MR. WEINSTEIN: Exhibit 50, please.

16　　(Whereupon, four-page email chain dates

17　stamped oudd8d - 87 was marked as plaintiff's

18　Exhibit 5p, for id.)

19　　Q.　Mr. LaPerch, I've shuwh you ah email

20　chain of four pages, ahd I waht to direct your

21　attehtioh to the second page, which cohtaihs ah

22　email from you, to Mr. Jendras, dated Ahril 28th,

23　2b11. Ahd it says, "oous, please otoulae ah

24　in-deoth evaluatioh, working with legal if

25　hecessaiu, to determihe the impact of this hew unter

COMPU-TRAN SHORTHAND REPORTING

---

2'ld

**William I aPerch**

2　on our business, especially ih areas where dccess

3　has

4　been ah issue. Would like tu see it ih a week."

5　　Ahd there is what looks like ah article

6　of some kind that you attach to your email; correct?

7　　A.　Right, yes.

8　　Q.　Ahd it's ah article cohtaihihg a

9　Pole Attachmeht Report ahd order oh recohsideratioh.

10　　Cah you tell me why yhu had ah ihterest

11　it ah ih-deoth evaluatioh of the impact of this

12　hew older as it's referenced in the article?

13　　A.　Yes.

14　　Q.　You cah proceed, if you can.

15　　A.　Okay, yeah. The difficulty that we

16　had ih operating in the State of Naw Jersey was tied

17　to the difficulty in doing business on PSE&G poles.

18　Ih other states where we had pole attachments as

19　well, the regulators - the electric comoanies, and

20　telephone companies - actually run very tight

21　control over access to those. They make

22　ihstallatioh and repair of our fiber oha oh those

23　poles yary difficult. This order seemed to

24　alleviate some of that difficulty ih doing business,

25　and I wahted ah assessmant from legal ahd the people

COMPU-TRAN SHORTHAND REPORTING

---

235

**William LaPerch**

2　out ih the field, the people that actually do the

3　work ahd deal with the pole people, on what I ha

4　effect might oe oh our existihg oushiess.

5　　Q.　Ahd obviously, the rebuest being made

6　for that evaluatioh was directed to Mr. Jendras?

7　　A.　It was diiacted to Mr. Jehdras to get

8　helo from legal and his own team to find out whet

9　the impact is, yes.

10　　Q.　Ahd he, in fact, resoohded within a

11　week to your request, as you directed him to;

12　correct?

13　　A.　Me ahswered my email, yes.

14　　Q.　Ahd he did so ah May 3rd, 2011;

15　correct?

16　　A.　Yes.

17　　Q.　Ahd he ihdicated that -- ih his first

18　four humbered respohses, that, the roughly -- it

19　I'm reading rhis right -- $35,000 of ahhual fees

20　will hot be imoacted. Ahd he writes, "See attached

21　for estimated breakdowh 2010. Fees will go uo ih

22　New Jersey, due to overolis."

23　　Did you know what he meant there!

24　　A.　Yes.

25　　Q.　And he goes on to say, ih the second

COMPU-TRAN SHORTHAND REPORTING

---

236

**William I aPerch**

2　item of his reshohse, "The order only has

3　jurisdictioh ih Maryland, Pehhsylvahia, ohd

4　Virginia, where we operate. This covers roughly

5　$256 of cost. It does hot directly imbact pole

6　rates ahd make-ready orocesses ih the 2o states that

7　have certified pole attachmeht rates, themselves,

8　of which the maiority of our aerial business

9　operates. See attached for certified states."

10　　And then he says, "The order has ho jurisdiction

11　over the power soace. So, the PSE&G make-ready

12　issues will not be impacted."

13　　"Four: We curtehtly do hot have any

14　make-ready orocess issues ih Maryland, Pehhsylvahid,

15　or Virginia.

16　　Ih summary, this hew order has

17　relatively ho impact oh AboveNet."

18　　Did you agree with his assessmeht as

19　he laid it out here?

20　　A.　I had ho reason to disagree.

21　　Q.　Ahd then, there's ah email in this

22　chain from Bill Youhg, to Doug Jendras.

23　　Do you know who Mr. Youhg is?

24　　A.　I do.

25　　Q.　Who is Mr. Youhg?

COMPU-TRAN SHORTHAND REPORTING

23Y

1                 William LaPerch
2       A.   He runs field operations.
3       Q.   And he writes to Mr. Jendras on
4 May 3rd, "Thanks, Doug. Much ado about nothing."
5            Did you agree with Mr. Young's
6 assessment?
7       MR. PERKES: Objection to the form.
8       A.   I don't know what he's talking about.
9       Q.   Okay. So, you don't have an opinion
10 one way or the other?
11       A.   No.
12       THE WITNESS: Time for a two-minute
13 break.
14       MR. WEINSTEIN: Absolutely.
15       (Recess held from 4:23 to 4:34 p.m.)
16       Q.   Mr. LaPerch, I want to show you a
17 document that was marked at a prior deposition --
18       A.   Okay.
19       Q.   -- as Plaintiff's Exhibit 40, and I'll
20 give you a moment to look at that, please.
21       (Handing)
22       (Witness peruses exhibit)
23       A.   Okay.
24       Q.   Did you see this email before
25 Mr. Sokota sent it on Monday, June 6th, 201?

*COMPU-TRAN SHORTHAND REPORTING*

239

1                 William LaPerch
2       Q.   I see. That's the sentence, "We would
3 agree that Doug would have accelerated vesting of
4 all stock units held by him, including those under
5 the disputed agreement granted January Y5th, in the
6 event of a company change of control or termination
7 of his employment without cause prior to
8 December 3t, 201?."
9           That's the part that you don't recall
10 having any understanding of?
11       A.   I don't understand what that means.
12 I need more clarity on what that means.
13       Q.   Well, I can't speak for Mr. Sokota,
14 but what I want to ask you, based on my
15 understanding of this email, is whether -- in
16 looking at this, whether, number one, as set forth
17 in the first sentence, Mr. Sokota discussed with you
18 a package for Mr. Jendras that would be based on the
19 same terms reported by the company on its AK dated
20 May 3, 2011, from Mr. Jacquay.
21       A.   I am familiar with that, yes.
22       Q.   And were you also -- when you say
23 you're familiar with that, you're referring to
24 what's set forth as the deal that Mr. Jacquay struck
25 with the company that's disclosed in the AK dated

*COMPU-TRAN SHORTHAND REPORTING*

239

1                 William LaPerch
2       A.   No.
3       Q.   Did he discuss the content of this
4 email with you before it was sent, to the best of
5 your knowledge?
6       A.   We had ongoing discussions about the
7 nature of settlement we would offer Mr. Jendras.
8       Q.   And the terms that are set forth in
9 this email, were they terms that he had --
10 withdrawn.
11       The terms that are set forth in
12 this email, were they terms that Mr. Sokota had
13 discussed with you?
14       A.   Rob and I had an open dialog about
15 this, this whole settlement process. I'm not
16 familiar or don't understand the context of this
17 sentence,
18 where it says, "We would agree that Doug would have
19 accelerated vesting in all stock units held by him,
20 including those under the disputed agreement granted
21 January 25th."
22       Q.   And you're referencing a sentence that
23 is towards the end of this paragraph?
24       A.   Just in the middle. Right in the
25 middle.

*COMPU-TRAN SHORTHAND REPORTING*

240

1                 William LaPerch
2 May 3, 201?
3       A.   Yes.
4       Q.   Were you also aware that Mr. Sokota was
5 proposing that the terms of a voluntary separation
6 should be the same general deal that had been struck
7 with Mr. Jacquay?
8       A.   Yea, same general deal.
9       Q.   And so, did you understand, then, that
10 when Mr. Sokota wrote this, he was, among other
11 things, proposing that Mr. Jendras would keep his
12 current position and would work from his home until
13 July 15th? Did you understand that?
14       A.   I understand it from reading this
15 document.
16       Q.   Okay. So, Mr. Sokota didn't share that
17 detail with you; is that correct?
18       A.   Well, we had ongoing discussions that
19 Doug and Joe would get the same deal, which means
20 they'll both stop working, roughly, in July. I
21 think Joe's last day may have been July 1st or
22 something. I'm not sure.
23       Q.   Now, redirecting your attention to the
24 sentence that you were saying you didn't understand.
25 There's a sentence that follows that one that says,

*COMPU-TRAN SHORTHAND REPORTING*

241

**William LaPerch**

2  "In connection with his separation from the company,
3  on December 31, 2011, Doug would forfeit any
4  unvested stock units held by him as of that date."
5      Did you understand what that meant?
6  A.   Yes.
7  Q.   What did that mean, sir?
8  A.   It means that the stock units that
9  vested in 2012 and 2013 would be forfeited.
10  Q.   And those were the stock units that
11  were enumerated in the January 25, 2011, stock
12  award; correct?
13  A.   Correct.
14  Q.   And this agreement that was being
15  proposed by Mr. Sokota was conceptually based on
16  what would be a voluntary separation by Mr. Jendras;
17  correct?
18  A.   Yes.
19  Q.   And to the extent that there was a
20  contemplated voluntary separation that would take
21  place on December 31, 2011, and to the extent that
22  he would be forfeiting any stock units provided for
23  in the January 25th, 2011, Stock Award Agreement,
24  had there been any presentation of this proposed
25  change in the January 25th, 2011, stock award to

*COMPU-TRAN SHORTHAND REPORTING*

243

**William LaPerch**

2      MR. WEINSTEIN:  I don't want to argue
3  with you. I don't agree with you.
4      MR. PEIKES:  Well, if you're misleading
5  the witness, that's a problem.
6      MR. WEINSTEIN:  I don't want to burden
7  this record. I don't think you're right at
8  all, by the way. And I don't want to debate
9  that point with you.
10      MR. PEIKES:  Well, then, don't ask
11  questions that assume that something is
12  untrue. It's completely untrue. It's
13  a complete mischaracterization of the
14  agreement.
15      MR. WEINSTEIN:  I don't agree with you.
16      MR. PEIKES:  Then, fine. I'm going to
17  object to the question and instruct him not
18  to answer.
19      MR. WEINSTEIN:  Then, fine. I don't
20  agree with you and leave it at that.
21      MR. PEIKES:  Okay. Go on.
22  Q.   Let me show you the January 25, 2011,
23  award that had been the subject of your earlier
24  testimony and was previously marked as Plaintiff's
25  Exhibit 23.

*COMPU-TRAN SHORTHAND REPORTING*

242

**William LaPerch**

2  the Compensation Committee?
3      MR. PEIKES:  Objection to the form.
4  You can answer it if you understand the
5  question.
6  A.   I don't understand the question.
7  Q.   Okay. This represented a change, did
8  it not, in the terms of the January 25th, 2011,
9  Stock Award Agreement that had been executed by
10  Mr. Sokota and disclosed in the 10-k; correct?
11  A.   This represents discussion on June 6th
12  that had been ongoing for the past couple of months
13  on terms and conditions under which Mr. Jendras
14  might leave the company.
15  Q.   And what I'm asking you is: To the
16  extent that this proposal reflected a modification
17  in terms of the January 25th, 2011, award - more
18  specifically, the forfeiture of any stock units
19  that would have vested after December 31, 2011 -
20  had that modification been presented to the
21  Compensation Committee?
22      MR. PEIKES:  Objection to the form.
23  That's not a modification at all. It's
24  exactly consistent with what the
25  January 25th, 2011, agreement --

*COMPU-TRAN SHORTHAND REPORTING*

244

**William LaPerch**

2      MR. PEIKES:  (Handing)
3      MR. WEINSTEIN:  Thank you.
4  Q.   I have it. All right. I want to
5  direct your attention again to Paragraph 40, and the
6  provision contained therein for the immediate
7  vesting of unvested stock units.
8      Do you see that there?
9  A.   40?
10  Q.   Right.
11  A.   I see 40, yes.
12  Q.   And that, you would agree, makes
13  reference to a scenario whereupon any termination
14  other than for cause, there would be an accelerated
15  vesting of any unvested stock units; correct?
16      MR. PEIKES:  Objection to the form.
17      MR. WEINSTEIN:  Are you directing him
18  not to answer that?
19      MR. PEIKES:  Well, he can read it,
20  himself. You're only reading half the
21  sentence.
22      MR. WEINSTEIN:  Could you read it back
23  for him, please.
24      (Question read)
25  A.   My view of 40 is exactly what it says:

*COMPU-TRAN SHORTHAND REPORTING*

245

William t aPerch

2 "Upon termination of the participant's continuous
3 service by the company without cause or by the
4 employee for good reason, any unvested stock units
5 snell immediately vest."
6 Q.   Okay.   And so that if Mr. Jendras was
7 not terminated for cause, it would mean, under the
8 terms of this paragraph, that he would receive any
9 unvested stock units; correct?
10        MR. PEIKES:   Objection to the form.
11    A.   That's my interpretation.
12    Q.   Meaning, the answer to my question is,
13 yes?
14    A.   I don't know what ttte answer to your
15 question is, but it's my interpretation.
16    Q.   And in the normal course, if
17 Mr. Jendras elected voluntarily to leave the company
18 under the terms of the Stock Award Agreement, do you
19 have an understanding as to what would happen to any
20 unvested stock units?
21    A.   The intent, from my understanding, is
22 that if he voluntarily would have left the company,
23 then unvested stock units would not go with him;
24 they would remain behind.
25    Q.   And did you receive an attorney opinion

COMPU-TRAN SHORTHAND REPORTING

247

William t aPerch

2 be a privileged conversation.
3        MR. WEINSTEIN:   That wasn't exactly my
4 question, but you've made your direction.
5        MR. PEIKES:   If you have a different
6 question, obviously, feel free to ask it.
7    Q.   Let me ask it this way:   Without giving
8 me the sum and substance of any opinion that
9 Mr. Sokota might've rendered, did you ask him to
10 provide an opinion at all relating to the meaning
11 of Paragraph 40?
12    A.   As the general counsel, I asked him to
13 give me an opinion of the meaning of the entire
14 stock agreement.
15    Q.   Well, my question is more specific:
16 Did you ask him to provide an opinion to you,
17 whether a voluntary separation by Mr. Jendras from
18 the company would be something that would not result
19 in an accelerated vesting of any unvested stock
20 units, as set forth in Paragraph 40 of the
21 January 25th, 2011, Stock Award Agreement?
22        MR. PEIKES:   Objection to the form.
23    A.   We had discussions on what would happen
24 to the stock if Mr. Jendras voluntarily left the
25 company.

COMPU-TRAN SHORTHAND REPORTING

246

William t aPerch

2 to that effect?
3    A.   I read the -- that's my interpretation
4 of reading 40.
5    Q.   Well, what I'm asying you:   Is there an
6 opinion letter that was prepared that set forth an
7 interpretation of this document, consistent with
8 what you just said?
9    A.   Not that I'm aware of.
10    Q.   Did Mr. Sokota suggest to you that the
11 terms of this agreement, which you have in front of
12 you, and more specifically Paragraph 40, meant that
13 if Mr. Jendras elected to voluntarily leave the
14 company, he would lose any unvested stock units?
15        MR. PEIKES:   I'm going to object and
16 instruct you not answer on the basis of
17 attorney/client privilege.
18        MR. WEINSTEIN:   So, your position is
19 Mr. Sokota's conversations relating to the
20 interdretation of this agreement, fall
21 within the attorney/client privilege?
22        MR. PEIKES:   If you're asking him
23 whether he consulted with Mr. Sokota,
24 seeking an interpretation of Section 40
25 of the agreement, then I believe that would

COMPU-TRAN SHORTHAND REPORTING

249

William t aPerch

2    Q.   And without disclosing the discussions,
3 did you ask Mr. Sokota to opine specifically on what
4 would happen if Mr. Jendras voluntarily left the
5 company?
6    A.   Yes.
7    Q.   And it's your belief, I gather, that
8 if he voluntarily separated, he would not be
9 entitled to any unvested stock at that point in
10 time; correct?
11    A.   Yes.
12    Q.   And Mr. Jendras, obviously, didn't
13 agree with that; correct?
14    A.   I've seen correspondence today that
15 indicated that, yes.   And I've -- I had
16 conversations with Mr. Oatta, who told me he didn't
17 agree with that, yes.
18    Q.   Can you explain to me, if that was your
19 view, why you directed Mr. Sokota to change the
20 terms of the January 25th, 2011, stock award to
21 eliminate the verbiage set forth in Paragraph 40?
22        MR. PEIKES:   Objection to the form.
23    A.   I don't understand the question.
24    Q.   Can you explain to me why you
25 instructed Mr. Sokota to eliminate Paragraph 40 from

COMPU-TRAN SHORTHAND REPORTING

248

William LaPorch

1
2  the January 25, 2011, stock award?
3          MR. FEIKS: Objection to the form.
4      A.    The intent of the stock award was to --
5  was for retention purposes. It was designed to keep
6  people around so they can continue to add value to
7  our company for our shareholders. I didn't want to
8  use, or think it was a good use of shareholder value
9  to give away a bunch of stock for someone that was
10  not going to be around the company for two years.
11      Q.    And that direction was made after
12  Mr. Jendras refused to forego the unvested stock if
13  he chose to voluntarily separate from the company?
14          MR. FEIKS: Objection to the form.
15      A.    That's ongoing management philosophy
16  that I have.
17      Q.    Well, it was more than philosophy; you
18  actually made a direction specifically related to
19  Mr. Jendras and his particular stock award; correct?
20      A.    Once I became aware that Mr. Jendras
21  was actively looking to get out of the company and
22  collect all of that stock, yes.
23          MR. FEIKS: Can we go off the record
24  for a second.
25          [Off-the-record discussion.]

COMPU-TRAN SHORTHAND REPORTING

---

249

William LaPorch

1
2  exactly one point in time, is difficult. You know,
3  he initially told Mr. Datta that he wanted out, and
4  then he said, well, based on my contract, you can't
5  get
6  me out. Then, he said, well, maybe I want out,
7  because I don't like the way Bill writes appraisals
8  on me.
9          So, ongoing discussions. You know,
10  it's not a point-in-time answer.
11      Q.    Now, you had indicated, earlier, that
12  you had asked Mr. Jendras whether he intended to
13  exit; correct?
14      A.    I did.
15      Q.    And Mr. Jendras' response was, yes or
16  no?
17      A.    He initially asked me if -- do I want
18  him to.
19      Q.    And what was your response?
20      A.    I said, no.
21      Q.    And did Mr. Jendras ever indicate to
22  you that he was exiting?
23      A.    Not to me.
24      Q.    And I gather you didn't have any
25  conversations with him subsequent to the one you

COMPU-TRAN SHORTHAND REPORTING

---

250

William LaPorch

1
2      Q.    Now, did you become aware that
3  Mr. Jendras rejected the proposal memorialized in
4  the email from Mr. Sokota dated Monday, June 6th,
5  2011?
6      A.    Is that the note to Gina Grimmer?
7      Q.    No. There --
8          MR. FEIKS: That's this one.
9      Q.    (Handing)
10      A.    Oh, sorry.
11          (Witness peruses exhibit.)
12          I'm not exactly sure of the date that
13  I became aware of that, that Mr. Jendras rejected
14  all of that.
15      Q.    Did you ever become aware of it? Let's
16  put it that way.
17      A.    Yes.
18      Q.    Did you become aware of it subsequent
19  to Mr. Sokota sending this email on Monday,
20  June 6th?
21      A.    No.
22          There were ongoing discussions during
23  the period March April/May/June, where Mr. Jendras
24  made, then retracted and changed his views on a lot
25  of things. And you know, to put a pin in any

COMPU-TRAN SHORTHAND REPORTING

---

251

William LaPorch

1
2  described took place in the context of his review
3  for 2013; is that correct?
4      A.    We had limited interaction once the
5  change to the -- to Rajiv's role as COO was put in
6  place. And that was, you know, mostly the review
7  session we had on March 7th.
8      Q.    And Mr. Jendras never gave notice to
9  you, or for that matter anyone else, that he was
10  leaving the company; is that correct?
11      A.    That's correct.
12      Q.    Now, at some point in time there was
13  a decision made to terminate Mr. Jendras; correct?
14      A.    Correct.
15      Q.    And do you know when that decision was
16  made?
17      A.    I don't know the exact date, no.
18      Q.    Did you make that decision?
19      A.    I was conferred and it was not my
20  decision to make; it was Rajiv's decision to make.
21      Q.    Who made the decision?
22      A.    Rajiv.
23      Q.    And when did he make it?
24      A.    Don't know the date.
25      Q.    Did he make it shortly before

COMPU-TRAN SHORTHAND REPORTING

253

William LaPerch

2 Mr. Jendras was advised that he was terminated.
3 A. The -- as some of the documents we
4 read today, you know, there was ongoing concern
5 from Rajiu about Doug's willingness to fit in and
6 to be a productive part of Rajiu's new organization.
7 When you review that documentation, I think Rajiu
8 lays out, pretty fairly, his views on the subject
9 and things he would try and things he would expect.
10 And so, it was -- you know, it was an ongoing
11 discussion until it got to the point where Rajiu
12 said, this isn't working. It's my decision that --
13 you know, that Doug is not performing his duties
14 as required. He's not showing up for work. And
15 I'd like to terminate him.
16 Q. When did he communicate that to you?
17 A. I don't know.
18 Q. Do you know whether it was, for
19 example, in March of 2011?
20 A. It wasn't in March.
21 Q. Was it in April of 2011?
22 A. Not sure. No, it wasn't in April,
23 either.
24 Q. Was it in May of 2011?
25 A. It could've been May; it could've been

COMPU-TRAN SHORTHAND REPORTING

254

William LaPerch

2 June.
3 Q. So, it was before you sent the emails
4 to Mr. Jendras, inquiring about various outages?
5 A. I don't recall all the dates on those
6 outages.
7 Q. Do you want to look at them again?
8 Would that help you?
9 MR. PENCE: My notes show between May
10 19th and June 17th, are the emails
11 that you looked at.
12 MR. WEINSTEIN: I believe that's right.
13 A. Okay. So...?
14 Q. Had the decision by Mr. Datta been made
15 to terminate Mr. Jendras before you made any of
16 those inquiries with Mr. Jendras, memorializing
17 these emails I had marked and asked you about?
18 THE WITNESS: Could you read back the
19 question.
20 (Question read)
21 A. I can't be exactly sure of the date,
22 but it is my best recollection that at that point
23 that decision probably had not been made. We
24 were -- there was still ongoing efforts to see if
25 things could be worked out.

COMPU-TRAN SHORTHAND REPORTING

255

William LaPerch

2 Q. So, your best recollection is sometime
3 after -- I'll show you what has been marked as
4 Exhibit 49 -- after June 17th; is that correct?
5 A. I don't know.
6 Q. That would have been after the last
7 date that I have in this chain of emails, where you
8 made inquiry with Mr. Jendras regarding certain
9 outages; correct?
10 A. That is the last date, yes.
11 Q. You don't know whether the decision was
12 made before June 17th or not; is that correct?
13 A. I don't.
14 Q. Would you have continued to reach out
15 to Mr. Jendras on operations issues after Mr. Datta
16 told you that it was his intent to terminate him?
17 A. The nature of all those questions and
18 emails that we reviewed are very case-specific.
19 They require, you know, a couple of lines of
20 response, with the exception of the pole attachment
21 issue. They're just sort of ordinary email I would
22 send out to make sure that the customers are okay
23 and
24 the network's working. So, I sent it to the title,
25 not the person.

COMPU-TRAN SHORTHAND REPORTING

256

William LaPerch

2 Q. You say you sent it to the title. You
3 did address it to Mr. Jendras; did you not?
4 A. Right.
5 Q. And with regard to Mr. Datta's
6 communication to you regarding his decision, did he
7 give you a specific reason why he had concluded that
8 he wished to terminate Mr. Jendras?
9 A. Yes. Because Mr. Jendras wasn't
10 adhering to the agreement they had for showing up
11 for work on days that Mr. Datta was in the office.
12 Q. And so, I gather from your testimony
13 your understanding was, the basis for the
14 termination was that he was violating the
15 telecommuting agreement; is that correct?
16 A. He was violating the agreement that he
17 had with his supervisor on being in White Plains and
18 showing up for work.
19 Q. And do you know, in connection with
20 that conclusion that Mr. Datta reached, whether he
21 had ever indicated to Mr. Jendras at any point
22 before he terminated him, that in his view, there
23 was noncompliance with the terms of the
24 telecommuting agreement?
25 A. Mr. Datta, in discussions, indicated

COMPU-TRAN SHORTHAND REPORTING

**257**

William t aPerch

2 that there wap written correapondence that outlined
3 what the agreement would be, and he had spoken to
4 him once by phone to acknowledge that he wasn't in
5 compliance with this.
6  Q.  He told you that there w8s a particular
7 phone conversation that took place after the
8 telecommuting agreement had been reached, in which
9 ne adulsed Mr. 1enpras that he was not in
10 compliance; is that correct?
11  A.  He told me that there was a particular
12 time where he notified Mr. lendras that he was not
13 In comoliance. I'm not 100 percent sure if it waa
14 telepnonically, emall, or how it was done.
15  Q.  Old he tell you when he gauc that
16 netlflcation?
17  A.  No.
18  Q.  And you're not sure in what lashion he
19 gaue that cominunication?
20  A.  I'm not.
21  Q.  Old you euer adulse Mr. lendras that
22 it was your ylew he was not in comoliance with the
23 telecammuting ogreement?
24  A.  1 didn't haue a telecommuting agreement
25 with him.

*COMPU-TRAN SHORTHANO REPORTING*

**258**

William t aPerch

2  Q.  I'm not asking whether you hod a
3 telecommuting agreement. I'm asking (whether you
4 euer adulsed Mr. lendras, in sum and suostance, that
5 he was in ulolation of the telecommuting agreement,
6 regardless of who you belleved it was with?
7  A.  No.
8  Q.  And was Mr. letdras euer Informed,
9 to your knowledge, that he ran the risk of being
10 terminated unless he adhered to what Mr. Oatta
11 belleued were the terms of the telecommuting
12 agreement?
13  A.  1 don't know.
14  Q.  Do you know lf Mt. Oatta, in this ohone
15 cottuersation or whateuer form of communication it
16 took, indicated to Mr. lendras that, not only did he
17 betleue Mr. lendras was not in comoliance; but that
18 lf he did not comoly in the luture, that he would be
19 terminated?
20  A.  t don't know.
21  Q.  When Mr. Oatta informed you that he had
22 made this decision to terminate Mr. Tenoras, did you
23 make any attempt to speak to Mr. Jetldras?
24  A.  No.
25  Q.  I'm gelng to show you a document thet

*COMPU-TRAN SHORTHANO REPORTING*

**259**

Wllliam t aPerch

2 was marked at a pnor deposition as Plalntlfl's
3 Exhlolt 41. (Handing)
4  Haue you seen that letter before today?
5  (Witness peruses exblolt)
6  A.  Can't recall.
7  Q.  Old Mr. Oatta Indicate to you, in
8 connection with the decision that was made to
9 terminate Mr. lendras, that he was going to be
10 oreparing a letter relating to that decision?
11  A.  1 was told that a letter would be
12 deliuered to him, yes.
13  Q.  And were you informed of that before
14 Mr. Oatta odvised Mr. lendras that he was oeing
15 terminated?
16  A.  Yep.
17  Q.  And did you see the letter in oraft
18 before it was 1lnalifleo?
19  A.  No.
20  Q.  And In connection with these
21 discussions that took olace with Mr. Oatta regarding
22 the termination, was there euer any time wnere, as
23 part of that discussion, you or Mr. Oatta mentioned
24 the impact that it would haue on Mr. 1endros' tlalm
25 for unuested shares that were Identlfied in the

*COMPU-TRAN SHORTHAND REPORTING*

**260**

Wllliam t aPerch

2 lanuary 25th, 201 l, Stock Award Agreement?
3  THE WITNESS:  Can you read that back.
4  (Question read)
5  A.  We knew that lf he was terminated with
6 cause, that he would not get those options in the
7 1uture.
8  Q.  And did that enter into the decision
9 that was made to notify Mr. lendras that it was tne
10 ulew of the company that he was terminated
11 immediately, effectiuely, for cause?
12  A.  1 don't understand the question.
13  Q.  I'll rephrase it.
14  That discussion that took place
15 regarding the impact of the termination that
16 Mr. Oatta indicoted he had decided was approonate,
17 you'ue indicated that there was also a piscussien
18 regarding the impact that would haue on My. letldras'
19 clolm of entitlement to the stock that was to be
20 awarded to hlm under the terms of the
21 lanuary 25th, 201 l, Stock Award Agreement;
22 correct?
23  A.  Correct.
24  Q.  And was it releuant to the decision
25 that was mode to terminate him, the ttotloti that

*COMPU-TRAN SHORTHAND REPORTING*

261

William LaPerch

1
2    if the company could substantiate that it had a
3    termination for cause, that it would, in fact, be
4    a basis to deprive Mr. Jendras of any unvested stock
5    as of the time of termination?
6         MR. PEIKES:   Objection to the form.
7         A.   We knew that was a consequence of his
8    termination.  The stock program was designed to
9    retain and to provide value for people who were
10   going to stay with the company and provide long-term
11   value.  The board was happy to give it out.  It was
12   a great tool to ensure that people were rewarded for
13   their success.  So, it wasn't a p H we made a
14   decision
15   with the idea that we would save stock and get stock
16   back.  We made a decision because Mr. Jendras was
17   not showing up for work and that -- and he was
18   terminated for that reason.
19        Q.   In your conversations with Mr. Datta
20   relating to this termination, did you at any time
21   encourage him to come to this conclusion?
22        A.   We had full discussions about what was
23   the impact of this.
24             As you may know, I've known Mr. Yendras
25   for quite a long time.  We've considered ourselves

COMPU-TRAN SHORTHAND REPORTING

---

263

William LaPerch

2         MR. WEINSTEIN:  Okay.
3         Q.   Can you answer that?
4         A.   I don't understand it.  Sorry.
5         Q.   I'll rephrase it.
6              Did you find that Mr. Datta's
7    decision had some appeal to you, because it
8    would provide the company with an argument that
9    would preclude Mr. Jendras from claiming any
10   right to any unvested shares of stock set forth
11   in the January 25th, 2011, Stock Award Agreement?
12        A.   What happened to Mr. Jendras' stock
13   agreement -- or stock awards, was a consequence of
14   his actions.  We didn't do this with the thought of
15   saving stock or looking good, you know, for --
16   looking good in any form or fashion.  We much rather
17   would've had a productive employee, who was at work
18   every day, doing his part and earning those shares.
19        Q.   But you did discuss this prior to the
20   decision being made to terminate him; is that
21   correct?
22        A.   I knew what would happen to the stock.
23        MR. WEINSTEIN:  Okay.  Just give
24   me a moment.  I'm going to have a brief chat
25   with my client.

COMPU-TRAN SHORTHAND REPORTING

---

282

William LaPerch

2    friend p for quite a long time.
3             When 2 gave Rajju the COO role, 1 gave
4    him the authority to build an organization that
5    would work very well and be successful; and
6    consequently,
7    1 had to give him the authority to make decisions
8    like that.
9         Q.   And did you view the decision, as
10   Mr. Datta shared it with you, to have a favorable
11   impact because of the position that you rch the
12   company could take with regard to the unvested
13   stock set forth and identified in Mr. Jendras's
14   January 25th, 2011, Stock Award Agreement?
15        A.   Can you restate the question.
16        MR. WEINSTEIN:  Can you read it back,
17   please.
18        A.   I don't understand.  1 mean, you can
19   read it back, but 1 don't understand the question.
20        Q.   Let her read it back, and we'll take it
21   from there.
22        A.   Okay.
23             (Question read)
24        MR. PEIKES:  I'm going to object to the
25   form, because I don't understand it, either.

COMPU-TRAN SHORTHAND REPORTING

---

264

William LaPerch

2         (Recess held from 5:05 to 5:09 p.m.)
3    CONTINUED EXAMINATION BY MR. WEINSTEIN:
4         Q.   Mr. LaPerch, have you had any
5    conversations with employees of AboveNet regarding
6    the circumstances of Mr. Jendras' termination?
7         A.   Yes.
8         Q.   Have you indicated to one or more
9    individuals that Mr. Jendras quit?
10        A.   No.
11        MR. WEINSTEIN:  Thank you.  I have no
12   further questions.
13        MR. PEIKES:  Okay.  Thanks.
14
15             p0o
16
17             (Time noted:  5:10 p.m.)

COMPU-TRAN SHORTHAND REPORYING

266

t

t   STATE OF NEW YORK   )

t                        )

4   COUNTY OC WESTCHESTER  )

5

e

y

8          I, WILLIAM PAPERCH, the witness

9   herein, having read the foregoing testimony of

10  the pages of this deposition, do hereby certify

11  it to be a true and correct transcript, subject

Y2  to the corrections, if any, shown on the

11  attached page.

t4

t5

t8          oOo

tY

t8

t9

20          WILLIAM PAPERCN

2t

22  Subscribed and sworn to before me

23  this ....... day of ......., 2012.

24

2o  .......................................

COMPU-TRAN SHORTHAND REPORTING

---

207

t

2          ***INDEX***

s                        PAGE  LINES

4   EXAMINATION BY:

5   Mr. Weinstein            4   10

6

DOCUMENT/DATA REQUESTED:

Production of any spreadsheets that
8   were presented at board meetings,
where any stock awards were the
8   subject of discussion and/or
approval as it pertained to
10  Mr. Fendias              85  17

tt  Production of spreadsheets that
indicate Mr. Paperch's approved
tt  recommendations         81  16

tt  Production of document with regard
to the telecommuting agreement with
Y4  Elisa Thomal            118  21

t5  Production of the list with regard
to those individuals who have
t6  approved telecommuting arrangements
for the year 1011        111  8

17

18  PLAINTIFF'S EXHIBITS:

t8  43 - Hooveriet, Inc. 10-Y Annual
Report Pursuant to
20  Section 1Y and 151d) filed
on 3407/1011, filed period
2t  1Y111/1010             104  1

22  44 - email chain          114  1Y

tt  45 - three-page email chain Bates
Stamped P00089 - 91      Y10  1C

t4

26          Index continued on next page

COMPU-TRAN SHORTHAND REPORTING

---

260

t

2   STATE OF NEW YORK   )

t                        )

4   COUNTY OF ROCKLAND  )

5

6

Y          I, Donna Bochnik, Notary Public within

8   and for the State of New York, do hereby

8   certify:

10

1u          That I reported the proceedings in the

12  within entitled matter, and that the within

t5  transcript is a true record of said

t#  proceedings.

t5

t6          I further certify that I am not

tY  related to any of the parties to the action by

t8  blood or marriage, and that I am in no way

t9  interested in the outcome of this matter.

20

2t          IN WITNESS WHEREOF, I have hereunto

22  set my hand this 11th day of April, 2012.

23                        . . . . .

24                        DONNA BOCHNIK,

t5                        NOTARY PUBLIC

COMPU-TRAN SHORTHAND REPORTING

---

258

1

t   Plaintiff's Exhibits:   (Continued)

s   46 - two-page email chain Bates
Stamped P000094 - 91     141  18

4

4r - email chain Bates stamped
6   P000096 - 104           116  16

6

6   48 - email chain Bates stamped
P000405 - 108            118  13

r

49 - three-page email chain
8   Bates stamped P000109 - 111   250  18

e

50 - four-page email chain Bates
t0  Stamped P00084 - 8u      Y3u  16

t1  DEFENDANT'S EXHIBITS:

t2  NONE

t1

t4  8414NGS CONTEMPLATED:

t6  NONE

t8

t7

t8

t9

20

2t

22

15

14

15

COMPU-TRAN SHORTHAND REPORTING

269

## CORRECTION SHEET

Re: Douglas Jendras v. AboveNet

    The following corrections, additions or deletions were noted on the transcript of the testimony which I gave in the above-captioned matter, held on April 2, 2012.

PAGE(S)  LINE(S)  SHOULD READ

   \*      \*   _____
   \*      \*   _____
   \*      \*   _____
   \*      \*   _____
   \*      \*   _____
   \*      \*   _____
   \*      \*   _____
   \*      \*   _____

             _____

Subscribed and sworn to before me this\_\_\_\_day of_____ 2012.

_____

      COMPU-TRAN SHORTHAND REPORTING

# $

$1B,00d [1] - 59:2 t
$12,BB0 [2] - 43:20, 44:t6
$14,895 [1] - 49:t3
$18,865 [1] - 55:4
$236,Y50 [2] - 39:14, 43:2 t
$248,250 [1] - 49: t4
$256 [1] - 236:5
$290,000 [1] - t66: t4
$295,800 [1] - t66: t4
$38,400 [1] - 235: t9
55.00 [2] - 81: t7, 86:7, 86:17

'03 [2] - 1 t:25, 29:2 t
'04 [6] - tt:25, 12:2, 28:2o, 29:1 t, Y9: t2, 29:23
'06 [1] - 6:18
'oy [1] - t9: t0
'B6 [2] - 2 tt:tS, 2 t1: t6
'98 [1] - 2 t:18, 22:25
'96/'97 [1] - 23:2
'97 [2] - 2 t: t8, 22:25
'99 [1] - 2 t:S, 24:3
'hla [1] - t44:7

# 0

06901 [1] - 2:10

# 1

t [1] [1] - 38:2, 38:10, 43: t9, 49: t3, 49: t5, 49:18, 59:20, 60:8, 137:23, t66: t5, t7 t: t7, 17 t:22
to [5] - 54:6, 58:9, 2Y7:23, 267:5, 267: t2
1o-k [2] [5] - t9:4, t9:8, [9: t3, t9: 18, Yo: t3, 20: t5, 20: t7, 70:8, 70:9, t03:22, t03:23, 104:5, 104: t2, t04:20, to5:8, 105: t4, to5: 18, t05:2 t, t06:23, t65:24, 186:4, t86:6, t66: t8, t67: 12, t67: t8, 189:11, tY0:4, t70:6, t70: 1o, t72:5, 173: t4, tY5:2, 176: t2, t76: 14, t77:23, t78:2, t78:22, t79:4, 18 t:20, t88:3, t94:22, 242: 10, 287: t9
t0-Ku [2] - t9:20, 20:8, 20:10

tB 63 [4] - 105:24, 106:14, 106:22
1o.7 [1] - t0Y: t4
tdd [4] - t6:25, t46: t7.
t90:21, 257: t3
1004 [1] - 2:4
104 [3] - 226: 1Y, 267:21.
268:5
to60 t [1] - 2:4, 4: t4
1o8 [3] - 228:24, 288:6
t0: t5 [1] - t: t4
t0:49 [1] - 218: t1
10th [o] - 2Y6.22, 227:20, 227:25
tt [1] - t:7, 47: 16, 267: 14
t1 t15/11 t [1] - 8?:23, 88:9
ttt [2] - 230: 19, 268:8
ttt [1] - t66:8
118 [1] - 28Y: 14
tt: 12 [1] - 73:0
tt: 4 t [2] - 73:4, t44:4
uy [1] - 267:22, 26u:23
12/3 t t2d to [1] - 104 Y,
[o4: t4, 26Y:2 t
tY3 [1] - 267. t6
12: t9:25 [1] - t46:22
ty1h [6] - 54: 18, 6 t:21.
229: tY, 230: t3. 266:22
t1 [9] - 56:3, 104:6, t04: t3, 267:20
t10: [1] - t 15:5
14 [1] - 6 t:5, 222: t2
14,000 [1] - t02: t2, 2 t4:4
t46:Y [1] - 105:25
t5 [1] - 28: t8, 82: tU, 125:4
t5(d [4] - 104:6, 104: t3, Y87:20
15th [6] - 38: t9, 76:23.
Y8:2s, 87: t5, 212:8, 2 t3: 12, 213: t8, 240:13
18 [3] - 83: 10, 266:5, 268:9
t8th [1] - 82: t8, 62: t,
63: t8, 76:2 t, 95:22, 95:Y3, t02: t6, 102: t8, 168: t7.
2 t4:5, 2 t4:6
tY [1] - 267: td
t7th [3] - 169:9, t70: t t,
232: t0, 233:3, 254 t0, 255:4, 255: 12
t8 [1] - 73: 19, 288.8
19 [1] - 77: t8, 21 t 12,
2 t2.6, 218: t6
t95,000 [1] - 37:22
tgY7 [1] - t0: t8
t987 [3] - 1o:2 t, t t:7, t t:8
tg89 [1] - 11: t t
1994/'95 [1] - 20:23
t999 [1] - t t: tY
t9th [5] - 7 t7.20, 2 t5:20,

221:4, 223:13, 254: 10
1:0Y [1] - 138:2
1:15 [1] - 232: t t
t:56 [1] - 138:2
ts! [1] - 240:2 t

# 2

2 [6] - t: t4, 34:7, 38:8.
t09: tt, 269:8
2/t4 [1] - t46:19
2/14 t20 t1 [1] - t48:9
2/4 t [2] - 148: t9, 160: t8
2/4 t201 t [1] - t46:22
Y0 [8] - 8 t:3, 99: tY, t25:4, 236:6, 268:3
2000 [1] - tt: t4, 24: t4
2001 [1] - 27. t8
1001/2002 [2] - 2Y: 13
2002 [1] - 28:2 t
2003 [2] - tt: t5, 28:2o, 8 t:2 t, 64: t5, 7 t:4, 7 t:24, Y2:20
2004 [21] - 8: t6, 1 t: 15, tt: t9, t t:2 t, 13:13, t4: t0.
14: t5, t4:22, t7: t7, t8:18.
29: 14, 32: t2, 34:22, 34:23, 36:2Y, 36:23, 38:2, 38:7, 183:3, t64:2, 164:6
2006 [13] - 29: t0, 34:22, 38: t0, 38:21, 39: t0, 39: t8.
39:23, 40:8, 40:21, 4 t:2, 4 t: t7, 42:5, 42:9, 42: t4, 49:13, 49: 18
2006 [9] - 14: t6, t9: t0, o2: t2, 43: t8, 45:4, 48:2 t, 47: 10, 48: 14, 49:Y4
2007 [8] - 49: t t, 48: t5, 49: 18, 52:5, 52:7, 52:20, 53:2 t, t83: t9
2008 [19] - 54: t8, 62:18, 64:9, 64: t6, 73:21, 74:4, 75: 17, 77:20, 78:9, 78: 14, 80:2 t, 89:4, 89: t2, 89: t9, 98:25, 210:2 t, 2 t1:8.
2 tt:20, 2 t2: t9
2009 [9] - 18:6, 18:7, t8: 12, 56:8, 58: t7, 58: t9, 18:2 t, t13:2 t
201d [28] - 57:9, 59:20, 80:8, 76:22, 78:23, 8 t:7.
8 t: t5, 8Y:8, 88:15, 89: t7, 90:5, 98:23, 99:5, t09: tt, t09: t9, t23: t9, 123:20, t25:24, t26:8, 156:6, t58:22, 163:3, 164:2, t64:6, 172: t8, 172:21, tY5:23, 203:24, Yo5:6, 2 t0:22, 2 t0:25, 2 t t: t0, 21 t: 14,

2 t2:29, 2t3: 1d, 235:21, 2S2:3
20 t1 [144] - 62:19, 62:22, 63: t8, 83:23, 76:24, 78:25, 87: t5, 88:2 t, 90: t3, 90:22, 84:8, 98:20, 97:22, 98: t0, t0t:5, 1Bt: t0, to2: t0, t03:3, 103:19, t06:6.
106: tt, 106: t5, t06: t8, t07: t0, t07:Y5, t23:2.
123:8, 126:7, t26: t t, 128: t2, 126: t8, t93:25, t36:3, t38: t7, t41:9, t42: t9, t55:2, t56:Y, t59: 1B, 160: t t, t65: t3, t66: t5, 173:24, t74:2.
t75: t8, t75:25, 176:5, t76:6, t77:8, t78:9, 179:14.
tY9:24, 180:5, t80:8, t80: t1, 180: t6, 181:5, t8 t:25, t82:24, 183:4, t84:S, t84: t0, 185: t r, 186: t4, 186:21, t87:23.
tg8:25, t89: t4, 189:22.
t90: 12, t9Y: t4, t93: t2, t93:24, t94: t0, t94:13, t96: t t, t96: t7, t97:8.
t97: t9, t98:4, t99:5, tg9: t5, t99:25, 2Ut:25, 2d2:5, 202:20, 202:25, 203: t9, 207: t7, 207: t9, 208: t4, 208:20, 208:2 t, 209: t1, 209:22, 2 t0: t3, 2 to:23, Y tt:3, 2 t2:9, 212:13, 2 t2: t8, 2 t3: t2.
213: t8, 2 t4: t2, Y14:20, 2 t4:25, 215:8, 2 t5:15, 2 tY:2 t, 2 t8: t6, 219:20, 221:4, 224:7, 226:22, 229: t7, 23y: 1 t, 233:Y3, 235: t4, 237:25, 238:8, 239:20, 240:Y, 24 t:3, 241: t t, 24 t:2 t, 24 t:23, Y4 t:25, 242:8, 242: t7.
242: 19, Y42:25, 243:22, 247:2 t, Y48:20, 249:2, 250:5, 253: 19, 253:2 t.
253:24, 260:2, 260:2 t, 262: t4, 263: t t, 267. t8
20 t1 [11] - t: t4, 95:22, to2: 18, 20 t: t6, 2 t3:24, 2 t4:S, 24 t:8, 265:23, 268:22, 269:8, 269:23
Y0 t [16] - 95:23, t02: t8, 20 t: t t, 2 t3:24, 2 t4:8, 24 t:9, 20 t h [10] - 8 t:7, 8 t: t4, 87:8, 88:20, 98:Y1, 98:23, 98:5, 2 t0:22, 2 t2:23, 2 t3: to Y t [8] - 98: t2, 99.7, 99: t9.
2 t2:25, 2 t3:8, 2 t3:9, 224:7.

225:10
21,000 [1] - 95:9, 95:15, 100:25
217 [1] - 107:16, 267:22
218 [1] - 267:23
22 [1] - 90:10
223 [1] - 266:3
226,000 [1] - 37:23, 39:13
226 [1] - 266:5
226 [1] - 266:6
22nd [1] - 201:4
23 [9] - 100:15, 160:22, 163:7, 186:2, 213:3, 213:8, 213:21, 243:25, 266:6
230 [1] - 266:6
233 [1] - 266:8
23rd [1] - 225:14
24 [1 - 107:2, 107:6, 194:10
24743312 - 142:9, 146:21
24th [1] - 193:12, 195:16, 197:13
26 [23] - 90:13, 90:22, 94:7, 96:20, 97:21, 96:10, 101:4, 101:10, 102:10, 103:3, 106:5, 106:15, 108:20, 125:10, 176:6, 177:6, 160:11, 187:23, 199:15, 214:25, 241:11, 243:22, 249:2
26th [59] - 100:24, 103:19, 107:25, 173:25, 178:6, 179:14, 179:24, 180:4, 180:8, 180:16, 161:25, 162:24, 163:3, 163:19, 184:5, 184:9, 164:25, 185:10, 188:14, 186:21, 186:25, 189:14, 189:22, 190:12, 192:14, 192:17, 193:24, 194:13, 196:10, 196:17, 197:6, 197:19, 188:4, 199:5, 189:25, 201:25, 202:5, 202:19, 202:25, 203:19, 210:23, 214:11, 214:19, 215:6, 215:15, 238:21, 239:5, 241:23, 241:25, 242:6, 242:17, 242:25, 347:21, 248:20, 260:2, 260:21, 262:14, 263:11
26 [4] - 133:21, 152:10, 227:23, 226:14
27 [1] - 136:6
28 [1] - 142:3
260,000 [2] - 55:5, 60:2
261 [3] - 2:10
28th [4] - 105:10, 106:16, 107:10, 233:22
291 [1] - 160:3
290 [1] - 166:23

290,000 [1] - 60:3, 167:7
295,611 - 166:23
295,600 [1] - 167:7
2:00 [1] - 113:10
2:30 [1] - 113:11, 113:12, 114:2
2nd [4] - 62:18, 133:25, 136:3, 152:12, 169:20, 160:21

## 3

31d - 39:2, 58:9, 239:20, 240:2
3,736 [4] - 66:20, 67:2, 66:3, 69:6
3/01/2011 [2] - 104:7, 267:20
3/11201111 [1] - 104.14
315 [1] - 38:17
30 [2] - 59:7, 76:20
31 [5] - 166:12, 239:8, 241:3, 241:21, 242:19
31st [1] - 63:23
331 [1] - 144:20
33.33 [1] - 95:22
34 [1] - 205:16
36,000 [4] - 69:14, 69:19, 89:25, 95:9
36 [1] - 200:7
360 [1] - 4:13
37 [1] - 192:22, 193:9
3:04 [1] - 193:5
3:13 [1] - 193:5
3rd [5] - 225:2, 225:11, 226:5, 235:14, 237:4

## 4

4 [3] - 37:7, 194:3, 267:5
40 [1] - 237:19
41 [1] - 259:3
42,000 [3] - 66:10, 88:14, 66:22, 69:17, 90:5
43 [4] - 104:4, 104:8, 104:10, 267:19
441 [4] - 217:11, 217:13, 217:15, 267:22
45 [4] - 219:11, 219:14, 219:16, 267:23
46 [5] - 223:19, 223:22, 223:24, 224:3, 266:3
47 [1] - 226:16, 226:20, 266:4
48 [4] - 228:22, 226:25, 229:3, 266:6
48 [5] - 230:17, 230:20, 230:22, 255:4, 266:7

4:23 [1] - 237:15
4:30 [1] - 237:15
4D1 [5] - 79:23, 99:20, 106:4, 161:6, 186:3, 244:5, 244:9, 244:11, 244:25, 246:4, 246:12, 246:24, 247:11, 247:20, 246:21, 246:25
41h [3] - 136:17, 141:9, 161:5

## 5

5 [2] - 39:21, 267:21
5/1 [1] - 36:16
5/1/2004 [1] - 37:9
50 [3] - 233:15, 233:16, 266:9
5409 [1] - 1:7
5:05 [1] - 264:2
5:08 [1] - 133:26
5:09 [1] - 264:2
5:10 [1] - 264:17
5:26 [1] - 221:4
5:30 [1] - 113:12
5th [4] - 142:18

## 6

6 [1] - 44:20
60 [1] - 76:23, 212:7
60-day [1] - 132:9
68.68 [1] - 95:21
6th h [1] - 143:21, 144:4, 144:13, 237:25, 242:11, 250:4, 250:20

## 7

7 [2] - 52:3, 176:5
¥,000 [1] - 102:17, 214:5
70,000 [2] - 89:25, 90:5
700 [1] - 17:14, 17:22, 17:23
7th [5] - 4:14, 160:11, 172:22, 175:24, 204:17, 252:7

## 8

8 [4] - 42:19, 42:23, 73:20, 216:4, 267:16
8-K [1] - 103:23, 106:9, 106:15, 106:22, 107:9, 177:24, 176:22, 179:4, 161:20, 188:4, 194:22
8-Ks [4] - 19:24

651 [1] - 267:10
671 [1] - 233:17, 266:9
6:26:05 [1] - 227:20
6:35 [1] - 227:25
6th1111 - 74:4, 76:20, 76:22, 76:24, 77:20, 76:9, 78:14, 80:21, 89:4, 69:12, 210:21, 21C:25, 211:6, 211:10, 211:14, 211:19, 212:19

## 9

9 [1] - 49:2
91 [2] - 219:13, 297:23
93 [1] - 267:12
95 [4] - 116:21, 206:4, 223:21, 266:3
9th [3] - 18:6, 16:7, 16:12

## A

a.m [3] - 1:14, 73:4, 216:11
abbreviated [1] - 230:6
ability [2] - 41:16, 64:19
able [6] - 5:5, 5:9, 26:13, 52:22, 156:11, 164:12
above-captioned [1] - 1:16
AboveNet [53] - 4:16, 9:16, 10:10, 11:22, 11:23, 12:12, 16:22, 17:4, 17:12, 16:2, 19:6, 19:21, 19:24, 26:22, 31:6, 31:9, 37:7, 73:19, 60:15, 61:6, 65:5, 90:12, 164:5, 104:11, 104:20, 106:10, 106:12, 106:23, 109:3, 109:9, 109:21, 110:6, 124:19, 130:2, 153:19, 160:4, 199:20, 199:24, 200:3, 205:10, 209:16, 216:15, 217:24, 221:10, 227:5, 227:16, 229:7, 231:5, 231:20, 236:17, 264:5, 267:19, 269:4
ABDVENE7 [1] - 1:6
AboveNet'x [1] - 16:23, 17:7, 64:9
absent [1] - 132:3, 132:6, 132:12, 132:20, 132:24, 133:2, 166:16
absolutely [2] - 5:24, 237:14
Academy [1] - 10:16
accelerate [1] - 186:10
accelerated [7] - 101:16, 185:3, 185:7, 185:19, 194:4, 201:22, 203:14, 209:23, 236:19, 239:3, 244:14, 247:19

acceptable[3] - 110:21, 196:11, 166:13
access [4] - 131:22, 216:7, 234:2, 234:21
accomplish[1] - 12:25
accomplished [4] - 56:12
according[1] - 95:6, 161:6
accuracy [9] - 20:9, 20:13, 70:3, 104:24, 105:6, 167:4, 170:6, 170:15, 224:21
accurate[11] - 4:23, 20:17, 34:25, 70:6, 105:15, 105:21, 144:16, 165:25, 176:3, 181:21, 210:3
accurately [2] - 95:11, 102:8
acknowledge[2] - 46:4, 257:4
act[1] - 94:22
acted [1] - 86:24, 170:25, 192:6
acting[4] - 10:2, 93:16, 167:6, 166:12
action[5] - 4:17, 67:10, 145:15, 266:17
Action [1] - 37:6, 39:3, 147:25
actions[1] - 61:15, 263:14
actively [1] - 249:21
activities [1] - 12:24, 67:10
activity [1] - 64:14
add [3] - 42:20, 219:6, 249:6
added[1] - 88:5
addition [1] - 140:10
additional [1] - 13:25, 33:22, 53:25, 58:24, 80:17, 61:19, 224:24
additions [1] - 269:5
address [5] - 4:12, 56:11, 91:3, 119:2, 119:16, 216:16, 218:23, 220:21, 226:8, 256:3
addressed [1] - 217:20
adhered[1] - 256:10
adhering[1] - 256:10
administer [1] - 3:7
administration[1] - 10:19
administrative [9] - 13:19, 13:18, 13:22, 113:6, 216:17
ado[1] - 237:4
advance[1] - 63:14, 63:19, 131:15
advise [1] - 257:21
advised [5] - 199:24, 232:3, 253:2, 257:9, 258:4, 259:14
advisement [2] - 85:15, 117:25
advising[1] - 153:9
advisor[1] - 36:3, 36:6
aerial[1] - 236:6

ago[1] - 222:10
agree[12] - 48:5, 164:6, 236:16, 237:5, 238:16, 239:3, 243:3, 243:15, 243:20, 244:12, 246:13, 246:17
AGREED[1] - 3:2, 3.11, 3:15
agreed[6] - 134:25, 149:24, 152:17, 153:3, 197:10, 212:16
agreement[19] - 9:15, 22:17, 60:24, 61:2, 61:19, 63:16, 77:11, 72:19, 19:3, 79:7, 96:16, 96:24, 97:5, 97:16, 95:14, 101:12, 101:18, 101:21, 102:5, 102:7, 106:14, 106:22, 110:14, 111:20, 111:24, 112:4, 112:13, 114:12, 115:21, 116:6, 117:3, 117:13, 117:22, 119:24, 120:10, 120:12, 120:22, 121:16, 121:22, 122:3, 127:16, 127:24, 146:16, 146:22, 150:4, 153:10, 176:19, 176:21, 176:24, 176:25, 177:2, 177:22, 176:4, 176:19, 161:6, 161:17, 181:19, 182:6, 165:16, 186:13, 192:7, 192:9, 192:13, 195:4, 195:15, 196:2, 198:23, 201:15, 201:19, 202:4, 202:11, 202:19, 209:16, 212:23, 238:20, 239:5, 241:14, 242:25, 243:14, 246:11, 246:20, 246:25, 247:14, 256:10, 256:15, 256:16, 256:24, 257:3, 257:6, 257:23, 257:24, 258:3, 256:5, 256:12, 263:13, 267:13
Agreement[70] - 61:7, 61:17, 62:7, 62:16, 63:11, 63:15, 77:19, 77:20, 78:4, 76:7, 79:17, 76:25, 79:13, 79:16, 80:15, 80:20, 96:10, 97:19, 98:6, 98:14, 98:19, 100:17, 100:23, 101:3, 101:14, 103:3, 103:4, 103:16, 106:5, 107:22, 107:23, 145:6, 176:6, 176:9, 179:15, 179:23, 160:6, 160:12, 160:17, 162:2, 163:20, 166:15, 167:24, 188:5, 189:2, 189:15, 189:23, 190:11, 193:17, 194:25, 195:20, 196:11, 196:17, 197:8, 196:4, 202:6,

203:3, 203:20, 212:12, 212:16, 214:25, 241:23, 242:9, 245:16, 247:21, 260:2, 260:21, 262:14, 263:11
agreements[1] - 6:20, 110:11, 121:21
Agreements[1] - 212:22
ahead[4] - 16:7, 33:12, 130:16, 220:7
AK [1] - 239:19, 239:25
alba[1] - 140:6
alleviate [1] - 234.24
Alliance[4] - 220:14, 223:4, 223:6, 223:17
allocations [1] - 64:20, 64:21
allow [1] - 5:11, 206:22
almost [1] - 11:6
ALSO [1] - 2:13
alter[1] - 161:25, 203:19
altogether[1] - 130:23
amazing...[1] - 211:16
amenable[1] - 207:13
Amendment[3] - 63:11, 63:14, 64:6
amendmen[1] - 63:22
America [2] - 217:23, 218:16, 220:11
amount[1] - 55:4, 66:14, 66:22, 66:24, 92:24, 99:9, 136:20
amounts [1] - 75:19
analysis[1] - 21:13, 27:21
AND [1] - 3:2, 3:11, 3:15
annotated [1] - 87:17
Annual [1] - 32:25, 46:20, 56:5, 56:16, 104:5, 104:12, 297:18
annal[1] - 13:6, 32:24, 37:16, 37:19, 37:22, 43:21, 46:20, 49:12, 49:14, 55:4, 59:24, 235:19
annualized[4] - 15:2, 15:15, 16:5, 16:13
annum [4] - 188:14, 166:15, 167:7, 167:6
answer[39] - 5:6, 5:16, 6:2, 13:10, 16:7, 16:24, 31:16, 33:12, 47:12, 61:25, 73:6, 67:19, 96:3, 96:24, 130:16, 132:17, 163:15, 186:5, 189:4, 191:10, 242:4, 243:16, 244:16, 245:12, 245:14, 246:16, 251:10, 263:3
answered [4] - 179:2, 179:6, 184:14, 184:17, 235:13
Answers[1] - 221:5

answers[5] - 5:3, 220:4, 220:5, 221:6, 221:16
anxious[1] - 224:20
apart[1] - 31:6
apologize [4] - 49:17, 56:5, 123:12, 211:12
appeal [1] - 263:7
appear [4] - 53:19, 66:16, 66:22, 90:4, 144:11, 144:16, 191:22, 191:24, 194:6, 220:4
appearance[1] - 62:2
appeared[1] - 109:16
applicable[1] - 116:4, 191:6
appointed[5] - 153:23, 155:16, 156:2, 156:3, 157:19
appointment [4] - 126:11, 126:16, 129:21, 130:16, 130:22, 131:5, 131:9, 132:6, 132:7, 132:10, 133:6, 133:15, 156:17, 157:5
Appraisal[1] - 56:5
appraiser[8] - 33:22, 34:21, 36:14, 36:17, 204:17, 204:24
appraisals[1] - 33:13, 251:7
appreciate[1] - 212:2, 213:6
apprise [1] - 20:16
apprised [1] - 203:6
approach[5] - 113:15, 162:6, 162:15, 162:24, 164:12, 204:4
approached[1] - 155.4
appropriate [5] - 5:12, 64:20, 134:18, 173:25, 260:16
appropriately [1] - 116:5
approval [21] - 55:15, 55:20, 66:10, 66:13, 67: [3], 67:14, 69:11, 76:9, 77:9, 85:13, 69:11, 97:10, 101:6, 111:2, 114:6, 141:6, 145:11, 147:9, 188:5, 170:19, 187:22, 267:9
approvals[1] - 110.4
approve [1] - 50:21, 50:22, 50:24, 51:7, 51:9, 51:14, 141:19
approved [64] - 51:2, 51:3, 66:12, 66:15, 66:16, 66:20, 67:6, 67:11, 67:24, 67:25, 69:7, 69:16, 69:25, 76:7, 79:4, 67:6, 87:12, 69:16, 92:15, 95:25, 96:5, 96:19, 97:21, 98:22, 99:9, 101:3, 102:9, 107:24, 110:15, 111:25, 112:3, 121:15, 121 20, 121:25, 122:5, 122:18, 127:19, 147:24,

151:13, 151:16, 155:21,
165:23, 166:3, 166:13,
166:24, 167:6, 167:23,
168:23, 172:10, 173:13,
173:16, 174:2, 177:17,
177:20, 177:23, 182:19,
188:14, 190:11, 192:15,
194:14, 194:16, 210:20,
267:11, 267:18
approving [1] - 37:25,
55:17, 111:22
April [1] - 1:14, 129:13,
233:22, 253:21, 253:22,
266:22, 269:8
April/May/June [1] - 250:23
arbitration [1] - 7:2
area [1] - 14:18, 45:13,
134:20
Areas [1] - 45:8, 53:3
areas [3] - 47:2, 53:18,
234:2
argue [1] - 243:2
argument [1] - 263:6
arranged [1] - 113:9,
114:13
arrangement [22] - 6:22,
9:8, 9:21, 112:2, 113:2,
113:14, 113:15, 114:21,
115:19, 116:6, 116:13,
116:24, 118:17, 120:6,
121:14, 127:13, 127:20,
127:25, 128:5, 128:19,
149:25, 151:16
arrangements [9] - 121:25,
122:11, 122:19, 131:14,
267:16
arrived [4] - 114:11,
127:24, 128:4, 148:22
article [1] - 234:5, 234:6,
234:12
assessment [10] - 16:4,
16:12, 16:15, 31:22, 33:90,
33:20, 40:7, 42:6, 42:13,
46:15, 50:12, 156:25,
172:20, 234:25, 236:16,
237:6
assessments [1] - 36:13
assigned [1] - 119:22,
125:11
assistance [2] - 115:22,
116:7
assistant [10] - 13:17,
13:19, 13:22, 113:6, 140:9,
217:16, 218:17, 218:20,
218:21, 219:2
associated [1] - 36:13
assume [11] - 5:21, 30:19,
58:17, 76:11, 85:8, 98:2,
103:7, 115:24, 123:3,
142:19, 183:2, 202:2,

202:14, 211:7, 217:23,
233:12, 243:11
assumed [2] - 41:2, 210:10
assuming [4] - 93:6,
134:11, 135:4, 152:20
assumptions [1] - 225:21
ATT [1] - 218:6
attach [2] - 63:24, 234:6
attached [4] - 196:2,
235:20, 236:9, 265:13
Attachment [1] - 234:9
attachment [2] - 236:7,
255:20
attachments [1] - 234:16
attainment [2] - 16:15,
44:13
attempt [2] - 226:4, 258:23
Attendance [1] - 53:15
attention [4] - 34:12, 35:4,
35:6, 39:24, 45:5, 53:2, 56:9,
56:23, 57:19, 61:25, 62:25,
76:12, 85:16, 89:3, 89:9,
94:6, 99:3, 99:16, 105:23,
107:13, 108:3, 109:7, 115:4,
115:14, 133:23, 134:6,
134:23, 152:13, 160:4,
161:20, 164:17, 166:5,
166:7, 166:10, 172:17,
180:21, 193:16, 203:23,
207:2, 213:9, 213:20, 224:4,
233:21, 240:23, 244:5
attorney [4] - 5:11, 212:4,
213:21, 245:25
attorney/client [1] - 246:17,
246:21
attorneys [10] - 2:3, 3:3,
45:25, 49:6, 54:7, 61:8,
73:22, 81:4, 90:11, 100:16,
108:25, 142:4, 144:22,
160:23, 193:10, 200:6
Attorneys [1] - 2:9
attract [1] - 124:12
audit [1] - 135:22
audited [1] - 19:3
author [2] - 206:5, 206:12
authority [6] - 66:10,
111:22, 145:11, 262:4, 262:7
authorized [1] - 3:7, 207:9
automatically [1] - 142:13
available [1] - 131:20,
232:9
Avenue [2] - 4:13, 232:4
average [1] - 225:21
averages [1] - 225:21
Award [4] - 80:15, 80:20,
96:9, 103:4, 103:18, 176:6,
176:9, 179:15, 179:23,
190:6, 160:12, 160:17,
162:2, 183:20, 186:15,
187:23, 188:5, 188:25,

169:14, 169:23, 190:10,
193:17, 164:25, 195:19,
196:11, 196:17, 197:6,
196:4, 202:5, 203:2, 203:20,
212:22, 214:25, 241:23,
242:9, 245:16, 247:21,
260:2, 260:21, 262:14,
263:11
award [92] - 65:5, 65:20,
65:24, 66:12, 66:14, 67:7,
67:12, 67:17, 69:8, 69:14,
69:22, 75:4, 76:10, 77:2,
77:8, 77:9, 77:10, 79:4, 79:9,
80:19, 82:24, 85:21, 95:23,
88:23, 89:16, 91:4, 91:6,
93:25, 94:4, 94:24, 95:7,
96:2, 96:4, 96:16, 96:24,
97:6, 97:20, 98:22, 99:9,
99:14, 100:6, 100:10, 101:7,
102:15, 102:22, 103:13,
174:2, 176:10, 177:2, 177:6,
182:16, 183:5, 184:5,
184:10, 184:16, 184:25,
185:11, 185:16, 186:22,
187:6, 192:14, 193:24,
194:14, 194:21, 197:20,
199:5, 199:15, 199:25,
201:25, 202:20, 202:25,
210:21, 210:22, 210:23,
210:25, 211:6, 211:14,
211:20, 212:6, 214:3,
214:12, 214:20, 215:8,
215:16, 241:12, 241:25,
242:17, 243:23, 246:20,
249:2, 249:4, 249:19
awarded [4] - 61:18, 84:9,
86:6, 92:25, 97:6, 167:6,
260:20
awards [22] - 65:9, 85:10,
66:6, 66:10, 68:6, 68:12,
68:15, 68:25, 80:16, 83:15,
85:12, 91:13, 91:19, 92:12,
93:2, 101:22, 107:24, 174:6,
210:19, 263:13, 267:8
aware [36] - 23:5, 25:14,
79:15, 80:4, 101:17, 101:20,
116:11, 133:6, 154:16,
156:3, 161:16, 192:9, 174:6,
163:23, 164:9, 184:23,
196:14, 196:16, 196:20,
197:3, 202:6, 203:17,
214:14, 214:17, 215:6,
215:9, 215:20, 240:4, 248:9,
249:20, 250:2, 250:13,
250:15, 250:18
awareness [1] - 163:25,
184:2

**B**

B,S [1] - 10:22
bachelor [1] - 10:15
balance [1] - 19:2, 171:13
Baltimore [1] - 231:16
band [1] - 103:25
bandwidth [1] - 16:24
Bank [6] - 217:23, 213:18,
220:11, 220:14, 220:15
bank [1] - 220:15
bankruptcy [18] - 11:24,
16:17, 16:21, 16:23, 19:5,
19:9, 27:25, 26:6, 26:9,
26:13, 26:17, 29:3, 29:4,
29:6, 29:14, 29:16, 41:23,
71:3
base [1] - 21:25, 55:19,
55:20, 66:11, 188:13, 167:9,
206:11
based [29] - 15:21, 31:16,
42:13, 44:11, 44:13, 44:17,
44:24, 52:10, 55:7, 61:17,
132:3, 132:11, 141:13,
143:17, 145:19, 146:16,
161:4, 185:4, 201:20, 219:2,
226:2, 239:14, 239:16,
241:15, 251:4
Based [1] - 166:11
basis [28] - 13:6, 15:2,
15:15, 16:5, 16:11, 16:13,
32:24, 33:2, 41:13, 41:20,
42:6, 43:23, 92:9, 114:13,
145:9, 163:5, 180:16,
190:15, 209:23, 233:12,
246:16, 256:13, 261:4
Bates [111] - 45:23, 61:8,
86:3, 107:16, 133:22,
219:12, 223:20, 226:16,
226:23, 230:16, 233:16,
267:23, 268:3, 266:4, 266:6,
266:6, 266:9
bearing [1] - 36:13
became [26] - 11:15, 11:18,
13:13, 17:17, 21:3, 22:7,
27:6, 26:22, 29:4, 29:22,
29:25, 69:25, 125:22,
126:10, 128:21, 139:21,
140:3, 140:22, 149:2, 156:3,
159:17, 174:6, 163:22,
214:17, 248:20, 250:13
become [19] - 11:23, 21:15,
25:14, 29:15, 123:17,
154:16, 250:2, 250:15,
250:18
beforehand [1] - 79:20
began [1] - 32:12
begin [1] - 164:16
beginning [5] - 13:2, 15:17,

33:15, 94:16, 146:14
begins [6] - 53:4, 115:15,
164:19, 206:23, 229:5
behalf [3] - 161:16
Behalf [1] - 1:16
behind [1] - 245:24
beflet [2] - 201:13, 246:7
below [9] - 35:10, 40:11,
40:19, 47:4, 53:6, 66:19,
220:9, 221:5
beneficiary [1] - 87:7, 79:9
benefit [3] - 111:7, 111.12,
111:15
benefits [2] - 184:25, 185:2
Bernie [1] - 25:16
Bernstein [4] - 220:14,
223:4, 223:6, 223:17
best [32] - 6:24, 14:23,
17:19, 16:15, 19:7, 21:16,
22:6, 27:19, 30:9, 60:24,
67:16, 69:13, 62:16, 67:19,
94:14, 95:13, 105:22,
112:11, 122:25, 125:6,
126:16, 129:9, 143:19,
155:25, 156:5, 174:14,
161:10, 206:6, 206:10,
236:4, 254:22, 255:2
better [2] - 31:3, 183:23
between [11] - 3:3, 5:9,
7:23, 6:19, 9:9, 9:15, 31:12,
66:9, 66:16, 66:19, 67:10,
67:22, 100:24, 112:19,
114:13, 117:2, 125:4, 142:6,
143:6, 156:6, 158:14,
161:17, 164:6, 166:2, 170:3,
174:12, 184:23, 187:7,
206:10, 215:16, 254:9
beyond [1] - 62:21, 114:2
Bill [1] - 54:10, 55:14,
142:22, 142:25, 229:23,
236:22, 251:7
bill [1] - 144:6, 229:9
bit [3] - 104:3, 157:4,
209:14
blood [1] - 266:16
Board [2] - 73:20, 90.12
board [4] - 16:2, 50:11,
51:9, 51:14, 55:17, 64:16,
67:11, 67:13, 67:14, 67:20,
67:25, 68:16, 66:24, 69:4,
69:7, 69:15, 69:24, 70:17,
71:6, 71:19, 71:22, 72:15,
72:19, 74:2, 74:7, 76:6,
76:13, 79:4, 61:6, 81:14,
61:15, 82:23, 65:11, 87:7,
87:10, 69:12, 90:21, 90:23,
91:6, 91:22, 92:5, 92:13,
94:7, 95:25, 96:6, 96:19,
97:7, 97:10, 97:21, 98:10,
98:22, 99:4, 101:4, 101:9,

102:9, 107 24, 155:22,
162:3, 165:15, 165:22,
166:22, 166.24, 161:22,
166:4, 170:25, 173:13,
174:3, 176:23, 177 19,
180:4, 160:15, 182:19,
183:6, 166:24, 187:21,
188:11, 189:7, 190:3, 190.4,
190:11, 192:16, 194:14,
194:17, 195:3, 195:11,
207:12, 210:20, 261:11,
267:6
board's [1] - 77:6
board-level [1] - 162:3
Bochnik [1] - 1.24, 4 3,
266:7
8DCNNIK [1] - 266:24
BDM [1] - 225:24
bonuses [1] - 6C:12, 60:18,
60:21
boom [1] - 27:6
Bosley [2] - 23:22, 23:23
bottom [14] - 39:5, 41:15,
57:13, 56:16, 75:7, 75:11,
75:13, 76.18, 109:6, 133:24,
709:20, 217:16, 224:5, 229:6
Boulevaıd [1] - 2:10
box [1] - 36:2, 40.19,
161:22
boxes [4] - 45:11, 164:20,
165:3, 165:7
break [5] - 5:23, 73 2,
137:23, 193:3, 237:13
breakdown [1] - 735:21
Bridge [1] - 124:15
brief [1] - 263:24
briefly [1] - 10:13
broad [1] - 29:25
Broadway [2] - 1:13, 2:4
broke [1] - 222:13
broken [1] - 222:14
brother [1] - 154:15, 154:19
brother-in [1] - 154:19
brother-in-law's [1] -
154:15
brought [2] - 7:6, 1:21
budgeted [1] - 224:18
budgets [1] - 22:16,
225:23, 226:2
build [3] - 31:21, 31:23,
262:4
building [2] - 26:24, 30:22
Building [1] - 53:16
built [1] - 17:6
bunch [1] - 249:9
burden [1] - 243:5
Burns [1] - 14:15
business [21] - 10:16,
16:22, 16:23, 17:3, 17:6,
21:13, 27:21, 32:3, 41:6,

127:4, 132:15, 132:19,
132:20, 150:11, 156:10,
224:19, 234:2, 234:17,
234:24, 235:4, 236:6
businesses [1] - 17:7
buy [1] - 36:20
B7 [1] - 2:11, 4:10, 73:6,
136:3, 193:6, 264:3, 267:4
. . . . . . . . . . . . . . . . . .
C
. . . . . . . . . . . . . . . . . .
cable [1] - 30:19, 222:11,
222:13
calendars [1] - 131:22
Canasn [1] - 72:25
cannot [1] - 147:6
CAPEK [1] - 224:17,
224:16, 224:20
capital [1] - 57:22
capsuflze [1] - 94.3
captioned [1] - 1:16, 269:8
care [1] - 17:11
career [1] - 20:23
catijled [1] - 209:10
carrie [12] - 16:24, 17:9
carries [1] - 191:2
case [11] - 4:21, 19:23,
44:15, 111:11, 117:7, 125:5,
132:25, 134:20, 147:5,
207:25, 222:12, 222:13,
255:18
CASE [1] - 1:7
case-specific [1] - 255:18
case [31] - 111:11
casually [1] - 126:6, 126:6
catch [1] - 213:7
categories [3] - 47:3, 47:6,
47:21, 46:4, 46:9, 53:10,
164:21
category [4] - 45:13, 47:23,
53:3, 164:16
caused [1] - 231:13
ceased [1] - 130:22
cell [1] - 216:14
center [3] - 216:25, 227:4,
231:24, 231:25, 232:20
centered [1] - 22:14
central [1] - 124:14
CEO [10] - 11:16, 11:16,
12:12, 13:13, 17:17, 20:5,
26:3, 29:5, 29:15, 29:22,
29:23, 33:14, 36:3, 38:6,
54:19, 54:24, 126:22, 226:17
Ceridian [6] - 136:7,
136:9, 141.24, 142:6,
142.12, 144:5, 144:23,
145 25, 146:4, 146:6,
146:16, 147:13, 146:14,
146:16, 146:19, 153:16

certain [21] - 32.16, 65:5,
74:6, 75:10, 75:17, 62:12,
94:16, 94:19, 94:24, 103:10.
110:7, 177:10, 191:2, 206:2.
208:4, 227:13, 229:10,
231:9, 231:14, 255:6
certainly [1] - 109:16
certainty [1] - 103:6
certification [3] - 20:9,
105:7, 105:17
certified [3] - 165:24,
167:3, 170:5, 170:13, 176:2,
161:21, 236:7, 236:9
certify [5] - 70:7, 104:24,
265:10, 266:9, 266:16
cetera [1] - 207:13
CFD [1] - 140.5, 225:6
chain [14] - 142:4, 142:5,
166:13, 171:13, 217:12,
217:15, 218:9. 219:12,
219:17, 220:13, 221:3,
223:20, 224 4, 224:5,
226:16, 226:21, 226:24,
226:2, 226:23, 229:4,
230:16, 230:21, 231:12,
233:16, 233:20, 236:22,
255:7, 267:22, 267:23,
266:3, 266:4, 288:6, 266:7,
266:9
challenge [4] [1] - 41:23
chance [6] - 91:12, 63:12,
100:16, 135:14, 136:7
Chang [10] - 54:9, 54:13,
54:16, 167:11, 166:3, 166:6,
166:16, 166:22, 169:2,
169:7, 169:16, 170:9,
170:16, 170:24, 171:6,
171:16, 172:9, 172:14,
172:16, 174:25
Chang's [1] - 55:21
Change [1] - 147:14,
147:15, 147:22
change [46] - 14:12, 14:16,
27:5, 55:10, 147:23, 176:5,
176:16, 176:6, 176:11,
178:12, 176:16, 179:14,
179:16, 162:6, 163:19,
185:15, 183:16, 185:21,
185:25, 166:14, 167:22,
166:24, 191:14, 191:19,
191:26, 192:7, 192:10,
193:23, 195:2, 195:3,
195:15, 196:10, 196:15,
196:3, 196:10, 201:21,
201:23, 214:19, 215:7,
215:15, 239:6, 241:25,
242:7, 246:19, 252:5
changed [1] - 11:22,
14.10, 27:4, 144:2, 144:6,
166.2, 169:23, 190:12,

190:25, 196:24, 250:24
changes [4] - 14:19, 41:6,
148:16, 187:9
characteristics [1] - 33:23
characterization [1] - 204:2
characterized [1] - 32:23
charge [1] - 21:22, 22:17,
147:16
charismatic [1] - 35:16,
35:21
chart [2] - 15:9, 145:20
chat [1] - 263:24
check [1] - 31:20, 31:21,
51:5, 142:22, 142:23,
142:24, 144:5
checked [2] - 47:22, 47:23
checking [1] - 232:5
Chicago [1] - 24:8
chief [1:9] - 22:9, 22:12,
22:20, 23:7, 23:9, 26:16,
29:2, 54:24, 123:15, 123:17,
129:22, 130:12, 131:5,
131:9, 132:9, 132:6, 133:8,
133:15, 159:13
choice [2] - 91:23, 129:6
chose [2] - 23:6, 249:13
chronology [1] - 128:25,
176:12
Ciavarella [1] - 62:19,
140:5, 225:6
CID [1] - 14:4
CID-type [1] - 14:4
circulated [2] - 75:9, 75:16
circumstances [4] -
102:16, 102:17, 110:7, 264:6
Civ [1] - 1:7
claim [1] - 259:24, 260:19
claiming [1] - 263:9
clarity [1] - 211:13, 211:20,
239:12
clear [2] - 134:15, 211:5
client [2] - 217:24, 263:25
close [1] - 226:5
coast [1] - 22:4
code [1] - 106:13
codes [1] - 229:11
collect [2] - 165:22, 249:22
collectively [2] - 15:16,
103:25
Columbia [1] - 10:19, 11:7
column [4] - 86:10, 86:13,
86:15, 145:16
commencing [1] - 61:20
comment [7] - 44:3, 56:25,
66:11, 79:11, 112:14,
162:14, 163:10
Comments [1] - 161:23
comments [5] - 33:25,
35:9, 57:17, 56:22, 84:3
Commission [1] - 106:10

Committee [55] - 50:13,
50:14, 66:3, 66:5, 66:7,
66:11, 66:15, 69:24, 67:5,
67:16, 67:20, 67:21, 67:23,
67:24, 68:6, 68:13, 69:2,
70:11, 70:13, 71:2, 71:16,
71:22, 72:13, 72:19, 73:13,
82:22, 83:4, 93:9, 87:11,
91:9, 91:13, 92:14, 92:16,
93:12, 94:13, 95:6, 96:6,
101:9, 166:13, 167:5,
176:11, 177:14, 177:16,
186:13, 187:2, 187:3, 187:5,
187:13, 187:19, 189:6,
190:4, 192:16, 165:14,
242:2, 242:21
communicate [1] - 217:6,
253:16
communicated [1] -
144:17, 217:5
communicating [1] -
161:24, 216:15
Communication [1] - 53:13
communication [5] -
166:11, 217:9, 256:6,
257:19, 256:15
communications [1] -
205:6
Comp [1] - 72:19
companies [3] - 11:14,
234:19, 234:20
company [108] - 6:19, 6:20,
1:7, 6:23, 12:3, 12:17, 14:14,
14:16, 16:2, 16:5, 16:13,
16:21, 20:5, 26:6, 27:7, 27:6,
26:22, 29:4, 29:13, 35:17,
35:18, 35:22, 36:10, 40:24,
41:22, 44:14, 50:2, 51:13,
51:17, 65:10, 70:21, 71:13,
71:25, 72:22, 79:25, 84:22,
84:25, 92:5, 100:24, 102:22,
106:7, 1'0:10, 110:21,
111:7, 111:13, 111:16,
113:19, 116:14, 118:20,
118:23, 120:3, 123:19,
123:16, 130:20, 138:14,
154:7, 155:5, 157:2, 157:10,
157:21, 156:5, 163:21,
174:7, 175:7, 177:2, 176:19,
179:21, 161:11, 161:16,
163:24, 184:24, 165:5,
187:10, 199:11, 203:15,
207:24, 209:6, 209:24,
212:15, 213:15, 214:6,
215:19, 239:6, 239:19,
239:25, 241:2, 242:14,
245:3, 245 17, 245:22,
246:14, 247:16, 247:25,
246:5, 249:7, 249:10,
249:13, 249:21, 252:10,

260:10, 261:2, 261:10,
262:12, 263:6
company's [2] - 94:9, 96:25
comparing [1] - 96:23
compensation [1] - 38:10,
60:12, 173:15
Compensation [54] - 50:12,
50:14, 66:3, 66:5, 66:7,
66:11, 66:15, 66:23, 67:5,
67:16, 67:19, 67:21, 67:23,
67:24, 68:9, 68:12, 69:2,
70:10, 70:12, 71:2, 71:16,
71:22, 72:12, 73:13, 82:22,
83:4, 83:9, 87:11, 91:9,
91:13, 92:13, 92:16, 93:12,
94:12, 95:6, 66:6, '101:9,
166:12, 167:5, 176:11,
177:14, 177:19, 186:19,
187:2, 187:3, 187:5, 187:13,
187:16, 189:6, 190:4,
192:16, 195:14, 242:2,
242:21
Competencies [2] - 164:19,
165:6
complete [1] - 243:13
completed [2] - 224:12,
227:6
completely [1] - 243:12
completion [1] - 30:25,
165:11
compliance [3] - 257:5,
257:10, 257:13, 257:22,
256:17
Compliance [1] - 53:11
compliant [1] - 19:16
complies [5] - 37:4, 36:5,
42:22, 48:23, 219:9
comply [1] - 258:16
components [4] - 12:19,
16:14, 16:16, 34:13
comprised [2] - 30:15,
136:22
concept [1] - 206:24
conceptually [1] - 241:15
concern [21] - 226:17, 253:4
conclude [1] - 216:3
concluded [1] - 42:15,
163:4, 256:7
conclusion [8] - 66:11,
145:9, 191:9, 206:11,
256:20, 261:21
conclusions [1] - 216:5
concrete [1] - 210:17
conditions [4] - 110:21,
177:3, 179:19, 242:13
conduct [1] - 106:13
conducted [1] - 63:4
confer [1] - 169:7
conference [1] - 134:17
conferred [1] - 252:19

confirm [2] - 146:15,
227:22
confirming [1] - 147:3
confusing [1] - 192:5
confusion [1] - 211:12
Connecticut [1] - 2:10,
72:25
connection [16] - 7:4, 7:12,
16:20, 33:6, 60:11, 65:4,
67:15, 70:7, 63:12, 199:13,
227:25, 232:16, 241:2,
256:19, 255:6, 259:20
connections [1] - 16:24
connectivity [1] - 16:25
consequence [2] - 261:7,
263:13
consequently [1] - 40:22,
262:6
consider [9] - 157:6,
208:13, 226:6
considerable [1] - 136:20
consideration [3] - 112:6,
207:20, 208:22
considered [3] - 7:8, 204:3,
261:25
considering [1] - 113:19
consistent [9] - 99:7,
100:5, 100:9, 102:3, 103:16,
171:19, 242:24, 246:7
consistently [1] - 164:6
consisting [1] - 73:21,
219:17, 226:21
consists [1] - 230:22
construction [3] - 30:22,
224:13, 225:20
consult [1] - 172:6
consulted [7] - 111:21,
246:23
contact [1] - 115:20
contacting [1] - 227:9
contain [16] - 40:2, 92:23,
93:21, 96:21, 101:7
contained [3] - 105:6,
105:14, 244:6
containing [14] - 33:9,
56:22, 61:6, 75:9, 75:16,
234:6
contains [7] - 52:13, 56:6,
56:7, 59:10, 106:4, 133:22,
233:21
CONTEMPLATED [1] -
266:14
contemplated [3] - 213:11,
213:23, 241:20
contemplating [1] - 176:16
content [6] - 19:12, 20:9,
20:17, 69:14, 205:5, 236:3
context [10] - 88:15, 91:21,
91:24, 155:11, 164:14,
164:17, 238:16, 252:2

continue [2] - 14:20, 198:24, 249:6
CONTINUED [4] - 73:6, 136:5, 193:9, 264:3
Continued [1] - 266:2
continued [5] - 13:21, 130:25, 216:16, 255:14, 267:25
continues [1] - 53:5
continuous [1] - 79:24, 161:10, 245:2
contract [4] - 30:20, 31:24, 207:23, 251:4
contracts [4] - 30:17, 41:7, 167:6, 166:15
contractual [2] - 201:14, 207:25
control [2] - 234:21, 239:6
Controls [1] - 53:12
conversation [72] - 129:5, 143:13, 143:16, 143:17, 144:9, 144:12, 149:20, 149:21, 149:24, 150:21, 151:12, 153:17, 153:22, 153:25, 154:9, 155:6, 155:11, 155:17, 155:24, 156:9, 156:13, 156:16, 157:14, 157:18, 158:4, 158:6, 158:7, 158:12, 158:16, 173:23, 174:5, 174:10, 174:12, 174:21, 175:9, 175:22, 176:3, 176:6, 176:10, 176:14, 176:16, 178:7, 179:25, 181:24, 182:4, 182:5, 182:10, 182:16, 182:22, 183:3, 183:16, 183:22, 186:7, 186:16, 186:23, 187:4, 186:20, 189:16, 189:17, 189:21, 190:6, 192:12, 197:12, 196:2, 198:7, 198:12, 196:20, 198:22, 199:2, 247:2, 257:7, 258:15
conversations [16] - 10:5, 10:9, 127:15, 175:12, 175:14, 176:18, 179:12, 199:9, 202:16, 205:4, 208:5, 206:9, 208:29, 248:19, 248:16, 251:25, 261:19, 284:5
COO [19] - 125:22, 126:10, 128:22, 130:16, 132:19, 139:12, 139:13, 139:14, 139:16, 139:21, 140:3, 140:22, 149:2, 153:23, 155:13, 155:16, 156:11, 252:5, 262:3
copies [2] - 46:12, 48:20
copy [4] - 55:16, 63:19, 152:9, 205:14

CORBIN [1] - 2:3
corners [1] - 138:25
corporate [8] - 12:25, 15:17, 16:18, 33:15, 33:17, 33:19
correct [89] - 7:13, 7:14, 9:4, 9:10, 9:22, 9:23, 10:11, 11:20, 13:15, 14:10, 23:16, 23:17, 24:13, 24:18, 26:6, 26:9, 26:72, 31:8, 31:7, 31:9, 31:10, 32:5, 32:6, 32:9, 32:12, 32:17, 32:20, 32:21, 32:24, 33:9, 33:7, 34:3, 35:17, 35:22, 35:23, 36:10, 36:17, 37:16, 37:17, 37:19, 37:20, 39:14, 39:15, 40:17, 42:5, 43:16, 43:17, 43:21, 43:22, 43:25, 44:17, 46:25, 47:5, 47:6, 47:10, 47:16, 47:19, 47:24, 47:25, 48:11, 48:12, 49:14, 49:19, 49:25, 51:3, 51:24, 53:6, 53:5, 53:16, 53:17, 53:21, 54:10, 54:12, 54:19, 54:20, 55:5, 55:6, 59:4, 59:5, 59:21, 59:24, 60:3, 61:21, 61:22, 61:24, 62:4, 64:6, 65:15, 65:17, 65:21, 65:22, 67:8, 69:2, 69:3, 69:5, 69:6, 69:19, 69:23, 70:5, 70:6, 70:8, 71:5, 74:4, 74:5, 74:9, 74:9, 74:12, 74:24, 74:25, 75:5, 75:6, 76:6, 76:10, 76:14, 77:3, 77:4, 77:6, 77:7, 79:14, 78:15, 80:5, 80:11, 82:3, 82:6, 82:12, 82:14, 82:24, 83:10, 83:11, 84:6, 89:21, 85:22, 85:25, 87:4, 87:8, 87:9, 87:12, 87:15, 68:4, 88:34, 88:25, 89:12, 89:14, 90:2, 90:3, 90:6, 91:25, 92:19, 93:14, 94:10, 94:11, 95:15, 95:16, 95:18, 95:19, 95:23, 95:24, 98:2, 97:11, 97:16, 96:5, 98:6, 100:3, 100:4, 102:13, 107:14, 102:16, 102:19, 102:24, 102:25, 103:14, 105:15, 105:16, 105:19, 106:6, 106:11, 106:12, 106:16, 106:19, 106:20, 106:23, 106:24, 106:8, 108:9, 109:19, 110:6, 111:4, 113:24, 113:25, 114:9, 114:14, 114:17, 115:25, 116:6, 116:12, 116:17, 116:20, 118:24, 117:10, 117:11, 121:3, 121:10, 122:19, 122:20, 123:10, 127:21, 129:7, 129:10, 129:13, 129:14, 129:16,

129:19, 129:22, 129:23, 131:2, 132:13, 133:16, 134:13, 135:7, 138:17, 136:16, 139:9, 139:14, 139:16, 139:19, 140:12, 140:17, 140:16, 141:11, 141:12, 141:16, 141:17, 144:9, 144:13, 146:5, 150:19, 151:7, 151:15, 152:2, 155:10, 156:7, 159:10, 159:14, 199:16, 159:19, 159:22, 160:11, 160:12, 160:15, 161:5, 161:18, 162:11, 162:12, 162:21, 165:3, 165:9, 165:10, 166:25, 167:8, 167:9, 170:10, 170:15, 171:14, 171:22, 171:23, 172:14, 173:9, 175:7, 175:8, 175:25, 176:12, 176:19, 176:23, 177:11, 177:12, 177:14, 177:15, 177:17, 177:18, 177:20, 177:21, 177:24, 177:25, 176:4, 176:5, 178:9, 178:10, 176:14, 178:22, 160:25, 161:3, 181:5, 181:6, 181:21, 182:2, 182:13, 192:19, 163:20, 184:10, 165:18, 165:20, 187:13, 190:13, 191:15, 191:23, 194:6, 194:7, 194:10, 194:11, 194:15, 194:16, 194:18, 194:19, 194:22, 195:5, 197:4, 201:17, 206:3, 209:24, 210:23, 210:24, 211:3, 211:4, 212:9, 212:19, 213:12, 213:13, 213:18, 213:24, 213:25, 214:3, 214:8, 214:7, 214:12, 216:13, 216:14, 216:25, 217:16, 217:19, 218:16, 218:23, 219:22, 221:7, 224:7, 224:8, 225:15, 225:16, 225:16, 226:14, 226:2, 226:8, 226:9, 229:20, 231:6, 231:7, 232:12, 232:15, 233:5, 236:6, 233:9, 233:13, 233:14, 234:6, 235:12, 235:15, 240:17, 241:12, 241:13, 241:17, 242:10, 244:15, 245:9, 248:10, 246:13, 249:19, 251:13, 252:3, 252:10, 252:11, 252:13, 252:14, 255:4, 255:9, 255:12, 256:15, 257:10, 260:22, 260:23, 263:21, 265:11
corrected [1] - 126:5
CORRECTION [1] - 269:2
corrections [3] - 3:16,

265:12, 269:5
correctly [4] - 111:2, 133:13, 145:23, 162:10
correlation [1] - 175:5
correspondence [2] - 248:14, 297:2
cost [3] - 31:22, 32:5, 236:5
costs [1] - 225:24
could've [3] - 41:9, 253:25
counsel [9] - 7:22, 8:6, 8:10, 10:2, 46:17, 140:6, 172:7, 162:5, 247:12
count [2] - 26:14, 47:21
country [1] - 31:3
COUNTY [1] - 265:4, 269:4
couple [3] - 4:24, 119:21, 126:11, 242:12, 355:19
course [3] - 69:16, 226:16, 245:16
COURT [1] - 1:2
Court [1] - 3:9, 3:19, 4:16
court [2] - 4:25, 6:24
cover [1] - 104:12
covered [2] - 33:23, 34:22
covers [1] - 236:4
create [1] - 92:20
created [5] - 92:16, 92:20, 92:21, 92:22, 225:24
create4 [1] - 41:11
criteria [7] - 40:12, 40:20, 41:16, 44:17, 53:6, 111:5, 111:6
critical [1] - 17:2
cross [1] - 124:14
Crossing [2] - 233:4, 233:9
cues [1] - 166:12
current [1] - 240:12
customer [10] - 22:16, 30:17, 30:20, 32:4, 129:25, 227:13, 226:5, 226:9, 231:14
customers [20] - 16:25, 17:4, 17:6, 161:24, 216:12, 216:20, 219:4, 219:8, 220:6, 220:12, 220:17, 220:19, 222:9, 227:10, 227:21, 226:15, 229:10, 229:14, 230:10, 255:22
cut [1] - 221:17

D

D117 [1] - 61:6
D131 [1] - 61:9
D196 [1] - 133:22
D362 [2] - 66:3, 66:5
D79 [1] - 45:24
daily [1] - 33:2
damagx [2] - 104:3, 231:17
damaged [3] - 231:9,

231:13, 232:7
Dana[1] - 9:25
DANA[1] - 2:6
date1[1] - 37:9, 62:22.
63:17, 80:9, 67:15, 87:22,
86:3, 86:10. 126:14, 137:21.
143:20, 146:9, 146:13,
146:15, 146:16, 146:19,
146:24, 149:3, 160:16,
160:22. 160:23, 161:7.
161:8, 161:4, 162:15,
162:16, 190:8, 201:4,
216:10, 241:4, 250:12,
252:17. 252:24, 254:21.
255:7, 255:10
dated[16] - 100:23, 142:17,
144:3, 152:11. 169:2,
193:12, 212:19, 213:10,
217:2o, 219:20. 224:7,
226:22, 233:22, 239:19,
239:25, 250:4
dates[9] - 14:13, 29:20,
29:22, 146:16, 254:5
Datta[195] - 7:24. 13:15.
123:10, 123:14, 123:21,
123:23, 125:15, 126:20,
127:3, 127:10, 127:19,
127:23. 128:2, 128:3.
128:1o, 128:17, 128:21,
129:17, 132:4, 133:24,
135:9, 136:6. 137:3, 137:19,
139:13. 139:17, 139:21.
140:3, 140:4, 1aD 22,
141:1o, 141:16, 142:6,
142:17, 142:23, 143:5,
143:8, 143:25, 144:3, 144:9,
144:12, 144:17, 146:7,
148:10, 148:22, 149:2,
149:10, 149:23. 150:15,
150:17, 152:11, 152:23,
153:8. 153:23, 155:17.
156:2, 156:3, 158:17,
157:19, 156:14, 159:13,
159:17, 159:22, 160:14,
161:17. 196:3, 196:9,
196:13, 198:20, 199:3,
199:6, 200:24. 201:6, 202:6.
202:15, 202:24, 203:6,
2o3:6, 206:12. 208:3, 208:6,
208:24, 215:16, 216:7,
216:10, 216:16, 216.2o,
217:4, 217 5, 251:3, 254:14.
255:15, 256:11, 256:20,
256:25, 256:10, 258:14,
258:21, 259:7, 259:14,
258:21, 259:23, 260:16,
261:19, 262:1o
datta[1] - 246:16
Datta's[11] - 124:7, 126:10.
127:4, 210:9, 210:11, 256:5.

263:6
days[9] - 131 12, 135:4,
152:20, 256:11
DB[1] - 222:15
deal[8] - 31:25, 209:8.
210:16. 235:3, 239:24,
240:6. 240:8, 240:19
dealing[9] - 205.2
deals[1] - 27:22
Dearborn[1] - 72:9
debate[1] - 116:6. 243.6
December[11] - 63:23,
61:7, 61:14. 61:16, 86:9,
87:6, 86:20, 68:21, 89:17,
90:4, 96:23. 99:5. 154:23,
209 10, 210:22, 212:23,
213:10, 239:6. 241:3.
241:21, 242:19
decide1[7] - 163:22, 193:23
decided[1] - 23:23. 182:5.
260:16
decision[33] - 63:25. 98:9.
99:4, 111:14, 121:12,
141:14. 144:7. 144:15,
155:20. 155:24, 166:24,
166:23, 252 13, 252:15,
252:18. 252:20, 252:21,
253:12. 254:14, 254:23,
255:11. 256:6, 258:22,
253:6, 259:10, 260:8.
260:24, 261:14, 761:16.
262:9, 263:7 763:2o
decisions[1] - 762:7
deemed[1] - 46:9, 48:10.
146:15
Defendant[3] - 1:9, 1:16.
2:9
DEFENDAN7'S[1] - 268:11
definition[3] - 18:13.
118:4. 176:24
degree[1] - 129:21. 131:2
degrees[1] - 10:23
deletions[3] - 269:6
delivel[111] - 199:4
delivered[9] - 76:21. 79:23,
76 24, 95:21. 95:23, 162:7.
182:12, 259:12
delivery[14] - 97:15, 87:22.
89 3
demise[1] - 121:7
department[2] - 49:5.
109:10
deployed[2] - 30:14
deposed[2] - 6:6. 7:3
deposition[41] - 3.5. 3:6.
7:15, 7:21, 10:3, 10:6. 10:10.
34:6. 37:6, 39:2, 39:22,
42:18, 44:21, 48:25. 52.3.
54:5. 56:4. 59:6, 61:5, 62:12.
63:9. 13:16, 77:17, 81:2.

90:9, 96:12. 100:14, 106:19,
133:20, 136:5, 142:3,
144:20, 160:3, 168:12,
177:7, 192:22, 193:6, 200:6.
237:17, 259:2. 265:10
DEPDS171DN[11] - 1:17
depositions[2] - 7:10, 6:12
deprive[1] - 261:4
depth[2] - 233:24, 234:11
described[3] - 50:5. 65:13,
122:7. 209:17, 252:2
description[11] - 26:25
deserving[11] - 46:16
designated[4] - 40:3,
40:12, 40:20, 113:24
designation[11] - 180:6
designed[11] - 249:5, 261:8
desire[4] - 119:4, 156:19,
184:24, 201:13
detail[4] - 64:13, 224:12,
226:1o, 240:17
determination[1] - 65:4
determine[1] - 207:11,
233:25
determined[2] - 14:24,
32:6
Deutsch[11] - 220:14
development[4] - 124:13,
124:19, 209:15. 206:16
dialog[11] - 238:14
differences[11] - 66:9
different[13] - 169:12,
195:4, 247:5
differently[11] - 179:6,
210:2, 230:5
difficult[4] - 161:23,
201:15, 204:3, 222:19,
234:23, 251:2
difficulty[1] - 234:15,
234:17, 234:24
digging[1] - 223:5
direct[558] - 15:3, 15:4,
16:4, 32:16, 32:22, 33:16,
34:12, 39:24, 44:6. 50:7,
56:9, 58:23, 57:19, 61:24,
62:25. 65:11, 65:12. 65:16,
65:19. 95:24, 76:3. 76:12,
89:9, 99:19. 105:2, 105:23,
107:13, 109:7, 113:2,
114:19, 115:4, 115:13,
121:4, 127:14, 133:23,
134:6, 134:23, 139:11.
139:17, 139:20, 139:23,
140:2, 140:17, 140:21,
152:12, 160:4, 161:2o,
166:5, 166:7, 166:10,
167:10, 193:16, 2o7:2,
224:4, 233:20, 244:5
directed[10] - 145:10,
168:22, 169:18, 181:24.

215:4, 225:11, 235:6, 235:7,
235:11, 248:19
directing[18] - 35:4, 40:15,
45:5, 106:3, 164:17, 213:9,
213:2o, 244:17
direction[13] - 36:9, 93:19.
146:7, 167:19, 167:21.
199:7, 174:24, 196:5, 199:4,
225:3, 247:4, 249:11, 249:16
direct[7][4] - 140:12, 146:3,
176:17, 236:5
director[6] - 54:14, 70:23,
72:3, 120:4, 136:17, 141:3
directors[60] - 16:2, 50:11.
51:9, 51:14, 66:19, 66:24.
69:5, 69:7. 69:15, 70:16,
71:6, 71:19, 71:23, 72:16,
72:19, 74:7, 74:11, 76:6.
76:14, 79:4, 61:6, 81:14.
82:23, 87:7, 67:1o, 90:21.
90:24, 91:7, 94:7, 96:20,
97:21, 98:10, 98:22, 99:5.
101:4, 101:10, 102:9,
107:24, 165:19, 165:22,
167:22. 166:4, 171:2,
173:13. 174:3, 176:23.
177:19, 180:4, 160:15.
162:19, 183:6, 187:21,
168:11, 189:6, 190:12,
192:16, 194:15, 194:16,
195:3, 195:11
Directors[1] - 73:20, 90:12
disagtee[1] - 236:20
disagreed[1] - 204:22
disappoinfed[11] - 155:12
disapprove[3] - 51:7,
51:10, 141:19
disclosed[19] - 51:18,
89:15, 69:22, 1o3:13,
167:12, 170:25, 171:21,
172:5, 173:14, 174:25,
176:11, 177:23, 161:19,
188:24, 189:13, 190:25,
191:2o, 239:25, 242:1o
disclosing[3] - 246:2
disclosure[19] - 69:8,
69:10, 102:23, 103:5, 103:6,
103:16, 103:21, 167:16,
167:19, 178:22. 176:24,
179:16, 166:3, 166:22.
189:20, 189:25, 191:5.
191:13, 194:21
disclosures[1] - 103:11,
190:5
discuss[14] - 10:2, 50:19,
67:21, 66:25, 112:25,
113:15, 115:20, 119:3,
120:5, 112:2o, 199:3,
207:10, 238:3, 263:19
discussed[21] - 66:6,

60:13, 91:13, 114:70, 117:2,
119:7, 151:11, 151:24,
159:21, 176:7, 191:14,
191:25, 193:23, 197:10,
197:25, 168:9, 201:24,
203:11, 206:24, 236:13.
239:17
  discussing[1] - 9:6.
175:13, 206:10
  discussion[29] - 6:20,
50:16, 60:11, 60:13, 75:4.
85:12, 113:7, 113:17,
149:17, 156:14, 161:16,
174:19, 176:21, 182:17.
184:2, 184:22, 185:15.
195:2, 197:2, 198.17.
201:12, 2o7:7, 242:11,
249:25, 253:11, 259:23,
260:14, 260:17, 267:9
  discussions[13] - 9:19.
113:6, 113:20, 114:5, 127:8.
127:11, 146:10, 175:6,
199:13, 201:2o, 203:9.
21o:16, 215:17, 215:23,
236:6, 240:16, 247:23,
246:2, 250:22, 251:9,
256:25, 259:21, 261:22
  disoutad [2] - 236:20.
239:5
  disregatd[1] - 163:24
  dissatisfaction[1] - 226:5.
226:9
  distinguish [1] - 5:9
  distressed[1] - 27:7
  DISTRIC7 [3] - 1:2, 1:2
  District[1] - 4:16, 4:19
  diverse[1] - 26:25
  dividend[1] - 61:17, 66:7.
86:17
  document[16] - 34:5.
34:9, 34:16, 34:19, 34:25.
35:5, 35:9, 37:5, 37:7, 37:12,
36:25, 39:2o, 42:17, 42:21.
42:25, 43:4, 43:7, 43:6,
43:15, 43:19, 44:16, 44:19,
44:22, 43:2, 45:9, 45:24.
46:3, 46:24, 49:2, 49:6, 49:6.
52:2, 52:4, 52:6, 52:17,
52:21, 53:11, 53:19, 54:4,
54:6, 56:2, 56:4, 56:10,
56:14, 56:24, 57:2o, 59:9.
59:14, 80:5, 61:4, 61:6, 61:7,
61:10, 62:11, 63:2, 63:6.
63:10, 73:17, 73:19, 73:21,
73:25, 77:16, 77:16, 77:25,
76:24, 8o:25, 81:3, 61:12,
81:13, 84:23, 85:4, 86:3.
89:13, 90:9, 90:10, 90:16,
96:7, 96:6, 98:11, 98:13,
98:15, 99:16, 99:2o, 100:13.

100:16, 100:22, 103:17,
104:11, 104:16, 104:21.
105:3, 105:5, 105:24,
106:25, 107:15, 106:16,
106:24, 106:3, 109:6,
109:15, 109:16, 114:6,
115:5, 116:15, 117:16,
133:19, 133:21, 136:7,
138:15, 136:19, 136:22.
141:25, 142:5, 142:14,
144:19, 144:21, 144:22.
144:25, 147:3, 147:7,
147:11, 147:12, 160:2.
160:5, 161:21, 169:13.
180:21, 180:23, 192:21,
183:7, 193:9, 193:19, 194:9,
200:5, 200:7, 200:13.
200:17, 200:19, 201:11,
205:12, 2o5:15, 205:23,
206:6, 206:12, 207:3, 208:4,
208:16, 210:11, 211:27,
212:5, 237:17, 240:15.
246:7, 256:25, 267:13
  Document1[1] - 142:9.
146:21
  DOC[/MEN7IDA7A1[1] -
85:17, 33:10, 116:11, 123:6,
267:6
  documentati[4n1[1] - 63:14,
253:7
  documents [5] - 7:16. 7:16.
7:21. 6:2, 49:6, 46:15.
138:13, 253:3
  dollar[1] - 66:22
  don't.[1] - 151:21
  Donaldson [1] - 140:25
  Donaldson's [1] - 141:2
  done [9] - 33:14. 74:16,
114:9, 131:15, 166:6.
190:2o, 211.11, 224.25,
257 14
  DONNA[1] - 266:24
  Donna1[1] - 1:24, 4:3, 266:7
  ddubte[1] - 222:7
  Doug [36] - 7:24, 8:20, 6:9,
13:16, 20:19, 20:22, 21:12,
27:9, 29:6, 34:21, 35:15.
36:3, 36:6, 37:9, 40:21,
41:16, 42:2, 45:4, 52:9,
52:19, 56:17, 59:16, 61:16,
62:17, 63:14, 76:19, 76:5.
98:2o, 100:24, 121:6.
134:16, 139:6, 145:6,
150:16, 151:17, 151:16,
154:3, 155:24, 156:4.
161:23, 162:3, 162:6.
192:15, 164:23, 166:20.
199:3, 159:1o, 169:20.
169:24, 171:11, 174:6,
185:23, 196:2, 201:12.

206:24. 206:12, 221:4.
224:6, 224:10, 228:23,
233:23, 236:22, 237:4,
236:16, 239:3, 240:19,
241:3, 253:13
  Doug's [9] - 6:21, 6:22.
27:17, 3o:23, 63:6, 101:15,
134:10, 171:5, 253:5
  Douglas [6] - 4:16, 49:4,
49:10, 146:22, 269:4
  douglas [1] - 2:13
  DDUGLAS[1] - 1:5
  down[1] [1] - 5:2, 5:3, 57:21,
57:22, 58:10, 66:16, 140:7.
161:7, 176:4, 207:5, 220:10.
220:20
  draft[1] - 196:2, 259:17
  drafting [1] - 97:5
  draw1[1] - 2o9:14, 210:2,
216:5
  drawn1[1] - 115:22. 116:6
  due [2] - 225:21, 235:22
  duly [1] - 4:3
  duration[1] - 23:1o
  during1[1] - 27:10, 29:4,
31:16, 60:1o, 60:16, 113:23,
126:13, 154:3, 163:9, 184:2,
7o4:16, 208:4, 215:22,
216:15, 226:15, 230:2,
250:22
  Dutch [1] - 220:15
  duties [2] - 127:10, 253:13
  duty [2] - 222:6, 222:7
  dynamic [1] - 122:22

# E

  e-mail1[1] - 217:15, 217:16,
219:17, 224:6, 225:14,
226:21, 226:25
  early [4] - 24:6, 156:7,
159:7, 176:15
  esrn[1] - 166:11
  earning[1] - 283:16
  east1[1] - 22:3
  Ebers [2] - 25:16, 25:21
  education[1] - 10:14,
17:11
  effect[at - 3:6, 3:16, 15:13,
44:3, 167:2o, 200:2, 235:4,
246:2
  effected[1] - 220:9
  effective [16] - 37:6, 37:25,
36:16, 38:17, 39:10, 41:11,
43:19, 49:11, 49:13, 49:15,
49:16, 59:19, 60:6, 111:10,
146:16, 166:15
  Effective [2] - 77:20, 146:6
  effectively[1] - 162:2,

260:11
  effectiveness [1] - 41:12
  efficiency [1] - 12:17
  efficiently [1] - 12:19
  effort[1] - 233:6
  efforts [1] - 254:24
  eight [1] - 46:6
  EISENBERG[1] - 2:3
  either[1][3] - 116:17, 121:16.
156:2, 156:6, 157:11, 165:6,
168:3, 166:9, 215:12,
215:21, 217:6, 253:23.
262:25
  slected [6] - 203:15,
245:17, 246:13
  slectric[1] - 234:19
  steven[1] - 47:15
  eliminate1[1] - 246:21,
246:25
  eliminated[1] - 185:25
  email[17] - 6:14, 54:6, 54:3.
54:15, 55:13, 55:21, 133:23.
134:2, 134:4, 134:7, 134:6.
135:7, 135:11, 136:6, 142:3.
142:7, 142:13, 142:16,
142:24, 143:2o, 144:3,
151:9, 152:11, 152:23,
160:16, 166:13, 166:25,
169:15, 169:19, 170:6,
170:19, 171:13, 193:11,
193:13, 193:16, 195:21,
195:22, 196:6, 197:13.
201:3, 215:3, 217:12, 216:3,
216:13, 216:2o, 219:12,
219:19, 219:25, 220:13,
221:3, 223:2o, 224:3, 224:5,
224:9, 225:4, 225:9, 225:15,
225:16, 226:7, 226:9.
226:16, 226:22, 226:2,
226:12, 226:23, 229:4.
229:5, 229:16, 230:16.
230:21, 231:12, 231:17,
232:10, 233:3, 233:4.
233:16, 233:19, 233:22,
234:6, 235:13, 236:21,
237:24, 238:4, 236:9.
236:12, 239:15, 250:4.
250:19, 257:14, 267:22,
267:23, 266:3, 266:4, 266:6,
266:7, 266:9
  emails[19] - 7:23, 7:25, 6:7.
6:15, 6:16, 6:19, 9:2, 9:5.
9:6, 9:11, 142:5, 216:12,
216:20, 254:3, 254:10,
254:17, 255:7, 255:16,
255:21
  embarked [1] - 113:14
  emerged [7] - 16:21, 19:6,
26:9, 26:12, 29:13, 29:16.
41:23

emergence [1] - 71:3
employed [1] - 130:11
employee [9] - 21:7,
36:13, 56:7, 66:23, 87:7,
70:20, 11:25, 72:22, 75:20,
79:17, 79:25, 80:10, 115:18,
117:3, 130:2, 181:11,
185:23, 187:9, 227:5,
227:17, 229:7, 231:5,
231:20, 245:4, 263:17
Employee [14] - 37:8, 39:3,
39:22, 43:2, 45:3, 49:3, 52:4,
52:19, 56:5, 56:16, 59:9,
108:23
employee's [1] - 108:7,
111:3
employee... [1] - 115:16
employees [16] - 17:12,
17:16, 32:16, 36:14, 36:15,
44:7, 50:6, 65:5, 66:16,
66:21, 75:10, 75:17, 110:2,
110:10, 126:12, 264:5
employment [11] - 36:14,
60:23, 61:2, 61:20, 62:6,
62:21, 63:17, 63:25, 106:11,
108:15, 198:25, 239:7
Employment [2] - 61:6,
61:17, 62:3, 62:7, 82:17,
63:11, 63:15
enclosure [1] - 216:5
encourage [1] - 261:21
end [13] - 33:19, 46:20,
134:25, 137:16, 152:17,
153:3, 155:20, 156:8,
207:17, 207:16, 208:19,
208:20, 236:23
ended [1] - 21:11, 26:3
enforce [1] - 202:25
engagement [1] - 206:21
engineering [9] - 10:16,
10:22, 12:9, 124:13, 124:16
enhance [1] - 12:13
ensuing [1] - 36:16
ensure [8] - 4:22, 5:5,
12:16, 15:16, 64:16, 185:22,
224:20, 261:12
ensuring [1] - 19:3
enter [1] - 118:16, 260:8
entered [1] - 110:11,
120:10, 120:11
enterprise [1] - 16:24
enters [1] - 222:13
entire [14] - 22:2, 113:23,
214:3, 247:13
entirely [1] - 45:20
entitled [24] - 15:20, 37:7,
39:3, 39:22, 42:25, 45:6,
49:2, 52:4, 53:3, 58:5, 59:6,
61:6, 63:10, 73:19, 77:18,
96:13, 100:17, 104:11,

115:9, 173:1, 203:13,
213:16, 214:10, 246:9,
266:12
entitlement [1] - 194:3,
260:19
entitlements [1] - 201:17
entity [1] - 24:12, 26:4, 28:6
enumerate 4 [1] - 220:13,
241:11
environment [1] - 23:24
equally [1] - 224.22
equation [1] - 36:16
equipment [9] - 30:22,
74:6, 74:11, 74:14, 224:15,
224:16, 224:17, 225:23
equivobody [1] - 186:4
Equity [4] - 64:3, 64:11,
75:5, 75:16
equity [6] - 64:14, 64:20,
64:21, 75:10, 75:17, 96:25,
171:3
error [1] - 142:20
especially [2] - 184:25,
234:2
ESQ [1] - 2:5, 2.11
essence [1] - 199:22
essential [1] - 17:2, 41:17
established [1] - 121:14
estate [1] - 120:4
estimated [1] - 232:7,
235:21
et [1] - 207:12
Ethics [1] - 53:11
Europe [1] - 17:15
evaluation [14] - 36:21,
40:20, 45:9, 45:13, 45:20,
46:3, 46:16, 47:3, 46:13,
53:6, 53:24, 233:24, 234:11,
235:6
Evaluation [6] - 36:23,
45:3, 52:5, 52:20, 53:3
evaluations [1] - 46:12
even [1] - 69:22, 99:25,
239:6
events [4] - 87:4, 145:27,
166:7, 176:13
evident [1] - 41:19
exact [1] - 69:12, 125:3,
126:14, 149:3, 252.11
exactly [14] - 6:15, 14:13,
14:17, 21:16, 126:25,
148:24, 172:15, 183:17,
242:24, 244:25, 247:3,
250:12, 251:2, 254:21
examination [1] - 3:16,
4:10
EXAMINATION [9] - 13:8,
136:3, 193:6, 264:3, 267.4
examined [1] - 4:3
example [1] - 10:6, 44:6,

253:19
exceed [1] - 46:10
Exceeds [1] - 165:9
exceeds [1] - 47:4, 47:9,
47:17, 47:22, 33:7, 53:21,
164:22
Excel [1] - 94:15, 84.24
excellent [1] - 40:21
except [1] - 3:12, 82:7,
201:2
exception [1] - 204:2,
222:14, 255:20
exceptional [2] - 35.15,
35:20
Exchange [1] - 18:12,
106:10
exchange [1] - 170:19
exchanges [1] - 9:14, 16.6
exclamation [1] - 56:13
executed [18] - 76:17, 79:7,
187:8, 198:16, 196:17,
187:7, 196:5, 199:5, 199:16,
200:2, 201:16, 202:4,
202:10, 202:19, 203:2, 242:9
executing [1] - 58:22
execution [1] - 197:19
executive [1] - 54:24
executives [1] - 167:10
Exhibit [17] - 34:7, 37:7,
36:6, 39:21, 42:19, 42:25,
44:20, 49:2, 52:3, 54:6, 56:3,
59:7, 61:5, 62:13, 63:10,
13.19, 77:16, 81:3, 90:10,
96:12, 99:7, 68:16, 100:15,
104:4, 104:6, 104:10,
105:24, 107:2, 107:6,
107:14, 108:20, 133:21,
136:9, 142:3, 152:10, 160:3,
160:19, 166:12, 180:22,
183:7, 185:2, 192:22, 193:9,
200:7, 205:16, 211:22,
212:6, 212:25, 213:3,
213:21, 217:11, 217:13,
217:15, 219:11, 218:14,
7:19:16, 223:22, 223:24,
224:3, 226:18, 226:20,
226:25, 229:3, 230:17,
230:20, 230:22, 233:15,
233:16, 237:19, 243:25,
255:4, 259:3
exhibit [45] - 34:16, 37:13,
39:4, 40:5, 40:9, 43:5, 44:23,
52:9, 56:12, 56:20, 57:3,
59:13, 61:11, 62:16, 73:24,
77:23, 81:10, 88:4, 87:16,
90:17, 96:16, 99:11, 100:20,
104:17, 105:4, 106:2,
105:13, 107:4, 107:11,
107:21, 108:22, 115:6,
134:3, 145:2, 152:15, 160:6,

181:2, 193:14, 193:25,
200:11, 205:21, 231:2,
237:22, 250:11, 259:5
EXHIBITS [2] - 267:18,
268:11
exhibits [2] - 6:11, 36:12
Exhibits [1] - 268:2
exia [1] - 85:2, 85:3, 85:4,
93:7, 117:20, 122:24, 123:2
existed [3] - 17:17, 127:2,
176:22
existence [1] - 10P:4, 124:3
existing [6] - 20:16, 26:7,
37:16, 37:21, 182:6, 192:7,
192:9, 235:4
exists [1] - 117:19
exiting [1] - 11:24
expand [3] - 18:10, 27:2,
180:18
expansive [1] - 116:6,
118:8
expect [3] - 137:17, 253:3
expectation [7] - 47:4,
47:5, 47:10, 47:17, 47:22,
47:23, 48:5, 53:7, 53:6,
186:12
Expectations [1] - 165:9
expectations [5] - 46:10,
48:11, 33:21, 119:12, 184:22
expected [1] - 119:11
experience [1] - 11:6, 12:7
experienced [1] - 229:14
expiration [2] - 82:7, 63:17
explain [1] - 99:16, 246:16,
246:24
explanation [3] - 224:11,
224:14, 224:15
explanations [1] - 226:5
express [1] - 156:22, 184:5,
173:3
expressed [2] - 196:9,
202:9
extend [2] - 25:21, 63:25
extended [1] - 62:6, 62:21,
63:23
extension [3] - 63:16,
63.21, 84:5
extensive [1] - 130:16
extensively [1] - 130:6
extent [19] - 10:14, 11:5,
47:20, 60:9, 114.11, 129:4,
143:10, 149:19, 163:13,
176:17, 186:6, 198:19,
212:11, 241:19, 241:21,
242:16
extraordinary [1] - 188:17,
166:16
extremely [1] - 163:19

**F**

face [1] - 149:17
face-to-face [1] - 149:17
Facebook [1] - 230:11
fact [13] - 39:6, 40:7, 76:6,
76:11, 95:25, 101:6, 103:13,
105:10, 107:9, 107:22,
110:11, 127:23, 146:15,
149:24, 152:22, 161:2,
167:3, 167:4, 173:5, 176:3,
181:19, 183:7, 186:13,
192:6, 195:19, 196:4, 196:7,
197:16, 201:6, 203:12,
206:6, 212:6, 216:15,
223:16, 232:23, 235:10,
261:3
fall [15] - 23:7, 23:6, 24:25,
42:4, 54:21, 60:20, 64:4,
88:23, 79:6, 81:23, 109:17,
130:7, 130:25, 175:17, 184:7
fairly [1] - 253:6
fairness [1] - 126:4
fall [1] - 246:20
familial [11] - 43:4, 43:6,
64:6, 64:11, 64:12, 76:24,
79:2, 79:20, 136:9, 236:16,
239:21, 239:23
family [1] - 113:9
far [2] - 132:12, 132:16
fashion [1] - 112:6, 257:16,
263:16
fault [1] - 219:22
favor [1] - 14:16, 64:5
favorable [1] - 52:22,
52:24, 56:16, 56:22, 262:10
February [14] - 133:25,
136:3, 136:17, 141:9,
142:16, 143:21, 144:4,
144:13, 152:12, 159:7,
159:9, 160:11, 160:20,
160:21
February/March [3] - 126:2,
126:16, 126:13
fees [2] - 235:19, 235:21
felt [1] - 134:16, 141:15,
262:11
Fiber [10] - 11:13, 11:19,
12:4, 24:12, 24:20, 24:23,
25:3, 25:22, 25:24, 26:2,
26:5, 26:12, 26:16, 26:23,
27:3, 27:6, 26:5, 26.12
fiber [7] - 219:21, 222:10,
231:9, 231:13, 232:3, 232:5,
234:22
fiberoptic [1] - 3o:19
fibers [3] - 222:13, 222:14,
232:6
field [8] - 119:13, 119:21,

125:13, 222:22, 224:23,
232:21, 235:2, 237:2
fighting [1] - 27:9
figure [1] - 208:11
Fifel [1] - 43:2, 49:3, 59:9
file [3] - 6:9, 19:6, 19:16,
46:19, 46:24, 166:3, 190:5
filed [24] - 19:20, 19:24,
20:6, 26:5, 26:19, 70:4,
104:7, 104:14, 104:22,
105:11, 106:9, 106:15,
107:10, 267:20
Filed [3] - 104:6, 104:13,
267:20
filing [16] - 3:4, 19:4, 19:12,
27:25, 51:19, 51:21, 51:24,
69:9, 69:22, 70:4, 102:23,
103:14, 189:12, 190:9,
191:23, 192:9
filings [1] - 16:22, 166:23
fill [1] - 45:12, 110:24
filled [1] - 33:24, 117:5,
117:6
final [1] - 65:6, 66:10
finalized [1] - 259:16
finance [1] - 12:19, 11:9,
21:14, 27:10, 27:16, 154:4
financial [1] - 27:23,
173:15, 224:24
fine [4] - 134:16, 157:6,
243:16, 243:19
finish [1] - 5:6, 112:22
firm [1] - 9:25
First [3] - 63:11, 63:14, 64:6
first [11] - 9:7, 9:11, 13:13,
19:6, 34:15, 35:9, 35:11,
40:15, 40:20, 62:2, 63:22,
70:15, 75:13, 81:5, 113:14,
126:11, 126:17, 134:8,
146:9, 152:14, 153:24,
175:11, 200:20, 205:14,
207:6, 224:5, 226:4, 226:24,
229:6, 230:24, 235:17,
238:17
fit [1] - 253:5
five [6] - 13:14, 57:22,
56:10, 73:21, 222:9
fix [1] - 222.16
fixed [1] - 216:3
files [1] - 126:13
Floor [1] - 4:14
flow [1] - 144:5
focus [1] - 226:23, 229:4
focused [1] - 35:16, 35:21
folks [14] - 17:15, 33:2,
74:21, 263:9
follow [2] - 189:5, 237:9
followed [1] - 216:16
following [12] - 26:6, 55:16,
131:5, 131:9, 132:5, 132:7,

132:10, 133:6, 133:15,
142:20, 149:6, 269:5
follows [4] - 4:6, 142:16,
166:25, 240:25
footprint [1] - 130:2
force [2] - 3:6, 3:18
forego [1] - 209:21, 249:12
foregoing [1] - 265:9
forfeit [1] - 241:3
forfeited [1] - 241:9
forfeiting [1] - 241:22
forfeiture [1] - 242:18
forget [1] - 167:15
forgive [1] - 214:22
Form [3] - 37:8, 39:3,
39:23, 52:5, 106:9
form [60] - 3:12, 16:6,
33:11, 33:22, 45:4, 47:11,
53:4, 53:24, 57:11, 58:22,
62:23, 79:3, 79:7, 79:12,
80:14, 83:20, 83:22, 102:4,
103:21, 106:5, 106:14,
108:21, 107:23, 111:24,
116:9, 117:5, 122:8, 130:9,
130:14, 132:14, 133:10,
133:17, 141:24, 146:9,
152:25, 157:22, 158:2a,
169:16, 170:21, 172:2,
173:14, 176:12, 177:22,
177:23, 177:24, 176:15,
179:17, 161:7, 181:17,
181:16, 182:3, 182:20,
183:14, 186:3, 191:16,
192:13, 193:17, 195:4,
195:15, 195:19, 197:21,
199:21, 202:12, 2o2:21,
203:21, 216:9, 217:2, 237:7,
242:3, 242:22, 244:16,
245:10, 247:22, 248:22,
248:3, 249:14, 258:15,
291:9, 262:25, 263:16
formed [1] - 106:15
formerly [1] - 216:12
forms [1] - 34:2
forth [36] - 7:6, 7:22, 63:16,
63:21, 64:5, 76:13, 85:25,
91:17, 93:24, 97:15, 99:6,
103:4, 103:17, 106:22,
106:11, 109:2, 109:5, 117:3,
121:23, 122:4, 163:6, 166:2,
189:12, 195:3, 195:15,
208:16, 210:9, 236:6,
238:11, 239:16, 239:24,
246:6, 247:2o, 246:21,
262:13, 263:10
forward [9] - 41:25, 57:9,
92:7, 2o7:19, 208:21
forwarded [4] - 136:23,
145:16, 153:15, 221:6
four [11] - 47:21, 58:9,

206:19, 207:5, 222:19,
229:4, 233:16, 233:20,
235:16, 236:13, 266:9
four-page [1] - 229:4,
233:16, 266:9
fourth [2] - 53:4, 57:21
frame [10] - 6:16, 69:11,
126:2, 126:13, 126:15,
129:20, 129:6, 132:9,
154:24, 159:6
franchise [2] - 154:16,
154:20
FRED [1] - 2:5
Fred [1] - 4:16
free [1] - 247:6
frequently [5] - 31:20,
131:11, 131:13, 132:4,
132:9, 133:13
fresh [1] - 19:2
fresh-start [1] - 19:2
Friday [13] - 7:2o, 9:3, 9:5,
9:9, 9:12, 200:21, 200:22,
205:25, 208:3, 226:22,
227:25, 233:3
friends [1] - 262:2
front [5] - 65:19, 99:16,
160:19, 212:4, 246:11
illustrated [1] - 154:3
full [9] - 36:7, 115:12,
152:14, 201:11, 206:17,
206:19, 207:25, 225:7,
261:22
fully [9] - 166:16, 197.7,
199:5, 201:16, 202:4,
2o2:10, 202:19, 203:2
function [1] - 27:21, 141:2
functions [4] - 26:25,
136:13, 216:16, 216:24
funds [1] - 225:25
FURTHER [2] - 3:11, 3:15
future [7] - 164:20, 201:16,
201:16, 202:11, 212:13,
256:16, 260:7
fweinstein@keiew.com [1]
- 2:5

**G**

gather [4] - 13:10, 14:6,
21:6, 23:5, 24:16, 67:24,
98:3, 114:3, 116:3, 129:2o,
140:11, 246:7, 251:24,
256:12
general [18] - 26:22, 41:4,
67:25, 63:17, 93:16, 109:25,
112:19, 112:16, 140:6,
150:9, 151:10, 151:14,
172:7, 179:22, 182:5, 240:6,
240:6, 247:12

generally [3] - 52:24, 75:24, 87:13
generate [2] - 142:13, 147:13
generated [6] - 138:7, 142:8, 144:23, 145:17, 146:2
generates [2] - 146:6, 148:18
generically [1] - 162:18
gentlemen [1] - 23:21
gentlemen [1] - 123:10
geographic [1] - 21:25
Giannis [1] - 164:13
Gine [17] - 13:20, 113:8, 118:14, 117:22, 140:9, 144:5, 193:12, 185:25, 215:4, 217:17, 250:6, 267:14
given [11] - 44:6, 50:8, 66:9, 124:11, 124:14, 125:14, 128:24, 155:13, 189:23, 171:24, 184:24
Global [2] - 233:4, 233:9
going forward [1] - 92:7
Grand [1] - 72:10
grand [2] - 72:11
grent [14] - 86:5, 88:15, 87:3, 95:14
Grant [1] - 86:11
granted [3] - 76:18, 238:20, 239:5
grents [6] - 75:10, 75:17, 75:19, 76:2, 81:17, 106:8
GREAT [2] - 57:23, 58:13
great [16] - 41:18, 47:7, 57:8, 124:12, 228:16, 261:12
Grimmer [4] - 193:12, 193:18, 195:16, 195:23, 196:8, 197:14, 215:4, 250:8
ground [2] - 4:24, 222:10
group [1] - 31:9
grow [1] - 41:18
grown [2] - 17:24, 17:25
gveas [6] - 20:23, 125:4, 208:8, 206:10, 230:8
guidelines [1] - 109:5
guy [1] - 14:15
guys [1] - 119:21

**H**

hall [1] - 244:20
hamburger [2] - 154:15, 154:20
Hamilton [1] - 4:13
hand [7] - 45:24, 266:22
Handbook [1] - 108:23
Handing [39] - 34:8, 42:19, 43:3, 44:21, 54:8, 56:4, 81:6, 62:13, 63:10, 73:23, 77:18,

81:3, 90:10, 98:12, 100:15, 104:14, 107:5, 107:8, 106:20, 133:21, 138:8, 144:24, 180:5, 168:13, 180:21, 200:7, 205:16, 211:24, 218:17, 223:25, 230:25, 237:21, 244:2, 250:9, 259:3
handled [1] - 25:13
handwriting [2] - 57:2, 57:8
handwritten [4] - 56:25, 57:22, 58:4, 58:6
Nanko [1] - 164:12
happy [3] - 154:8, 173:4, 281:11
herd [7] - 58:6, 129:8, 129:11, 162:6, 162:15, 162:24, 164:12
Natchell [1] - 722:6
haul [1] - 729:23
havoc [1] - 107:3
he/ohe [1] - 115:19
head [6] - 14:15, 26:14, 29:25, 30:5, 32:11, 162:20
head-count [1] - 26:14
heading [12] - 45:8, 115:9, 115:13, 184:19
headquarters [1] - 94:9
health [1] - 17:11
hear [1] - 169:o
heard [1] - 196:12
hearing [1] - 159:8
held [2] - 1:19, 11:17, 73:4, 90:21, 138:2, 193:5, 237:15, 238:19, 239:4, 241:4, 284:2, 289:8
help [11] - 86:2, 87:20, 163:23, 168:9, 175:21, 235:8, 254:8
helpful [1] - 212:2
HEREBY [1] - 3:12
hereby [2] - 265:10, 266:9
herein [7] - 106:9, 265:9
hereto [1] - 3:4
hereunto [1] - 266:21
hide [1] - 188:9
hierarchy [1] - 144:2
high [3] - 12:17, 15:23, 84:12
high-level [1] - 64:12
highlight [2] - 224:12, 224:14
highlighted [1] - 224:10
himself [7] - 130:19, 244:20
nire [1] - 26:15
hired [3] - 26:7, 26:10
history [1] - 147:11
hmm [5] - 152:16, 166:17, 168:14, 205:17, 228:20
hold [1] - 10:23

hole [7] - 223:6, 223:7
home [16] - 110:4, 111:9, 113:11, 120:15, 120:18, 120:17, 124:9, 134:21, 135:3, 135:14, 152:20, 215:25, 218:4, 216:25, 240:12
hope [1] - 107:14
hour [2] - 68:5, 113:11
hours [4] - 113:23, 222:10, 227:23, 228:14
houss [1] - 19:8
NR [11] - 108:17, 111:21, 115:23, 116:7, 116:13, 117:4, 122:10, 122:17, 134:17, 145:19, 170:3
Nudson [1] - 232:4
human [4] - 54:14, 109:10, 110:24, 115:24
hundred [1] - 17:19

**I**

I don't know [58] - 7:5, 7:7, 8:13, 18:24, 45:14, 45:17, 55:12, 62:24, 77:12, 98:24, 103:23, 108:17, 112:18, 116:10, 119:2, 119:9, 121:4, 121:18, 122:6, 125:4, 131:11, 135:12, 141:21, 141:24, 144:14, 147:4, 149:3, 150:24, 150:25, 151:8, 159:25, 181:8, 168:7, 169:23, 176:13, 178:15, 180:6, 180:9, 182:25, 190:21, 191:12, 181:18, 192:3, 192:20, 195:6, 196:7, 202:7, 203:7, 220:25, 221:16, 237:8, 245:14, 252:17, 253:17, 255:5, 258:13, 258:20
id [8] - 104:8, 217:13, 219:14, 223:22, 226:18, 228:25, 230:20, 233:19
idea [4] - 124:5, 155:14, 220:2, 281:15
identical [1] - 106:14
identification [1] - 229:10
identified [21] - 7:11, 8:16, 14:20, 16:19, 52:15, 53:5, 53:19, 59:23, 73:9, 74:21, 79:22, 85:23, 106:13, 158:14, 185:10, 217:17, 218:17, 218:19, 233:2, 259:25, 282:13
identifies [1] - 59:10
identify [11] - 17:5, 34:20, 58:14, 82:14, 63:13, 78:3, 91:9, 81:12, 90:19, 145:4,

218:21
immediate [3] - 108:5, 132:9, 244:6
immediately [6] - 11:9, 25:17, 80:3, 80:10, 100:3, 101:24, 191:13, 205:5, 260:11
impact [17] - 40:23, 206:22, 233:25, 234:11, 235:9, 236:5, 236:17, 259:24, 260:15, 280:18, 261:23, 262:11
impacted [2] - 235:20, 236:12
implies [1] - 207:14
importance [1] - 124:19
important [6] - 5:7, 22:15, 31:23, 92:6, 124:23, 230:10
improvemem [1] - 165:9
1N [1] - 266:21
in-depth [1] - 233:24, 234:11
in-person [3] - 74:18, 143:16, 174:17
inaccurate [3] - 204:10, 204:13, 204:18
1NC [1] - 1:8
Inc [6] - 37:8, 73:20, 90:12, 104:5, 104:11, 267:19
Incantive [4] - 64:9, 64:17, 75:5, 75:18
include [6] - 12:22, 76:5, 78:7, 84:8, 84:12, 96:23
includod [6] - 48:19, 84:11, 97:4, 174:8, 185:9
includes [1] - 228:15
including [1] - 17:14, 48:21, 177:10, 238:20, 239:4
inclusion [1] - 80:14
incorporated [1] - 106:8, 106:21, 181:20
incorporating [1] - 78:7
incorrect [1] - 51:4
increase [54] - 15:21, 16:2, 18:11, 36:18, 36:21, 37:24, 38:9, 38:13, 38:20, 39:9, 92:7, 42:13, 43:13, 43:20, 44:2, 44:4, 44:11, 44:12, 44:13, 44:16, 48:16, 49:10, 49:13, 51:10, 51:13, 51:15, 51:18, 53:25, 55:3, 55:7, 55:21, 58:24, 59:23, 59:24, 60:7, 165:13, 166:13, 166:19, 166:22, 187:7, 167:11, 187:23, 168:18, 189:23, 189:4, 169:10, 169:17, 169:20, 171:18, 171:22, 172:4, 172:10, 173:12, 174:25
increase [1] - 43:2, 49:3,

59:9, 59:17
increased[7] - 39:13,
40:25, 41:6, 41:7, 59:21
increases[1] - 54:18
increases[7] - 16:18,
38:18, 51:8, 55:18, 55:17,
65:14, 169:23
independen1[11] - 97:15
index[1] - 287:25
India[2] - 137:18, 137:20
indicate[11] - 26:19, 67:6,
91:10, 149:23, 151:19,
153:8, 162:10, 162:13,
163:2, 164:20, 199:14,
198:23, 200:4, 204:9,
251:21, 259:7, 267:11
indicated[43] - 23:15,
24:11, 28:24, 29:13, 32:10,
35:6, 36:7, 36:12, 51:22,
61:23, 70:2, 82:20, 87:23,
92:15, 102:20, 110:2,
118:22, 126:5, 135:10,
138:6, 151:13, 152:23,
182:23, 164:11, 172:15,
175:22, 181:16, 181:23,
180:10, 201:2, 201:12,
201:18, 204:23, 233:11,
235:17, 248:15, 251:11,
256:21, 256:25, 258:18,
260:16, 280:17, 264:8
indicates[9] - 49:12, 74:6,
87:14, 99:25, 106:8, 109:9,
109:10, 138:19, 181:7
indicating[3] - 142:24,
184:20, 227:7
indication[1] - 85:20
individual[4] - 44:14,
51:12, 112:19, 163:19
individuals[16] - 14:21,
15:14, 15:20, 16:10, 16:17,
33:5, 65:13, 92:10, 92:11,
94:25, 95:2, 113:6, 122:18,
140:20, 284:9, 267:15
individuals'[1] - 102:4
inflicted[1] - 104:2
into[1] - 224:25
inform[1] - 32:2
information[13] - 50:18,
50:18, 68:18, 84:23, 97:4,
101:15, 128:9, 149:11,
178:17, 233:8
informational[1] - 51:6
informed[9] - 116:13,
148:21, 258:8, 258:21,
259:13
initials[7] - 175:14, 213:19
initials[7] - 57:13, 58:18
initiated[1] - 185:21
input[15] - 15:19, 15:24,
19:17, 33:22, 55:11, 63:24,

65:10, 65:19, 65:23, 67:5,
97:15, 145:19, 162:5,
162:13, 204:18
inquire[7] - 179:7, 221:22
inquired[1] - 143:5
inquiries[1] - 254:18
inquiring[11] - 254:4
inquiry[8] - 137:2, 154:13,
155:9, 157:2, 196:23,
230:13, 232:24, 255:8
inside[1] - 138:13
installation[1] - 234:22
installations[3] - 31:3,
31:5
installed[4] - 30:16, 30:18,
30:23, 31:14
installs[11] - 161:75
instance[4] - 111:15,
114:23
instruct[14] - 243:17,
246:18
instructed[1] - 248:75
instruction[13] - 170:23,
171:8, 171:15, 171:25,
172:9, 172:13, 172:16,
187:17, 188:21, 197:8,
202:23, 203:6, 203:18
integration[1] - 53:15
integrity[1] - 53:11
intend[1] - 33:17
intended[16] - 86:13, 86:18,
88:2, 146:14, 155:10, 251:12
intent[2] - 20:19, 20:19,
188:6, 188:8, 245:21, 249:5,
255:16
intentions[1] - 188:9
interacted[1] - 33:2
interaction[7] - 20:25,
252:4
interest[12] - 131:23,
234:10
interested[3] - 224:22,
266:19
interim[2] - 29:5, 29:15
internal[7] - 135:22, 226:3
internal[1] - 53:12
internal[1] - 27:8
interpretation[2] - 182:11,
245:11, 245:15, 249:3,
246:7, 246:20, 246:24
introduce[1] - 130:18
inventory[1] - 228:3
invested[1] - 154:19
investigation[1] - 7:6
investigations[8] - 6:12,
6:13, 6:17, 6:21, 7:12, 18:23
investment[2] - 154:15,
158:9
investors[3] - 20:16, 20:17
invitation[13] - 25:21,

74:20, 74:23
involuntary[1] - 175:12
involved[12] - 21:20, 31:2,
60:14, 114:23, 131:17,
185:18, 196:16, 211:2,
212:13, 219:11, 219:3, 219:8
involvement[7] - 65:3,
127:6
involving[1] - 177:11
16[3] - 3:2, 3:11, 3:15
issue[10] - 197:10, 218:7,
218:16, 218:19, 218:21,
222:24, 223:10, 232:18,
234:4, 255:21
issues[2] - 218:8, 220:22,
228:5, 228:9, 236:12,
236:14, 255:15
IT[5] - 3:2, 3:11, 3:15, 14:7,
138:17
item[1] - 236:2
itself[4] - 97:16, 120:17,
122:3, 171:22

J

Jacquay[20] - 13:18, 14:16,
118:12, 119:3, 140:11,
140:13, 140:19, 140:20,
162:20, 162:23, 163:13,
183:15, 163:19, 183:25,
164:10, 209:7, 209:18,
239:20, 239:24, 240:7
january[1] - 126:12
January[93] - 11:14, 24:14,
29:8, 29:9, 29:10, 29:23,
80:13, 90:22, 94:7, 96:20,
87:21, 98:10, 100:24, 101:4,
101:10, 102:10, 103:3,
103:19, 106:5, 106:10,
106:15, 106:18, 107:10,
107:25, 123:19, 123:20,
125:23, 126:8, 126:11,
173:25, 178:8, 177:8, 178:8,
179:14, 179:24, 180:4,
180:8, 180:11, 180:16,
181:25, 182:24, 183:3,
183:19, 184:5, 184:9,
184:25, 185:10, 186:14,
188:21, 187:23, 188:25,
189:14, 199:22, 190:12,
182:14, 182:17, 193:24,
194:13, 196:10, 196:17,
197:8, 197:19, 198:4, 199:5,
199:15, 199:25, 201:25,
202:5, 202:19, 202:25,
203:18, 210:23, 214:11,
214:19, 214:25, 215:8,
215:15, 238:21, 239:5,
241:11, 241:23, 241:25,
242:8, 242:17, 242:25,

243:22, 247:21, 249:20,
249:2, 280:2, 260:21,
282:14, 263:11
January/February[1] -
154:24
Jeff[1] - 119:23
JEHdRA9[11] - 1:5
Jendras[269] - 2:13, 4:16,
9:15, 13:18, 20:19, 20:21,
20:25, 21:7, 21:15, 22:8,
24:19, 28:11, 26:18, 29:25,
32:19, 33:6, 34:22, 35:15,
36:20, 37:9, 37:25, 36:21,
39:9, 41:2, 42:8, 43:16,
43:19, 44:15, 45:4, 46:3,
46:21, 49:15, 49:4, 49:11,
52:6, 54:2, 55:4, 56:6, 56:17,
58:25, 59:18, 60:7, 60:17,
60:23, 81:18, 64:2, 65:17,
65:20, 69:18, 69:21, 78:5,
78:7, 76:10, 76:19, 77:3,
77:9, 78:5, 78:20, 79:8,
80:18, 95:13, 85:21, 87:4,
88:24, 95:3, 95:7, 95:12,
37:25, 98:4, 98:20, 99:10,
100:7, 100:24, 101:13,
101:22, 101:24, 103:19,
121:8, 126:22, 126:23,
127:2, 127:9, 127:15,
127:24, 134:13, 135:10,
138:17, 140:10, 140:18,
140:19, 141:20, 142:6,
142:17, 143:9, 143:24,
145:6, 146:4, 146:22, 148:6,
148:11, 149:23, 149:25,
150:16, 150:18, 151:14,
151:20, 151:22, 152:24,
153:8, 153:10, 153:12,
153:15, 154:19, 155:4,
155:9, 156:13, 158:16,
156:23, 156:25, 157:20,
158:15, 159:21, 160:15,
161:17, 182:24, 163:16,
164:3, 164:11, 164:21,
185:13, 166:14, 166:20,
187:24, 158:16, 168:23,
171:20, 172:4, 172:10,
172:19, 173:16, 175:23,
176:4, 177:11, 178:4,
178:18, 178:24, 180:7,
180:10, 180:17, 180:25,
181:18, 182:7, 182:12,
182:18, 189:23, 184:8,
184:23, 185:14, 185:20,
190:11, 192:19, 194:5,
194:13, 195:4, 195:20,
195:22, 196:5, 196:8,
196:16, 197:4, 197:9,
197:18, 198:5, 199:6, 199:9,
199:16, 199:19, 199:24,
202:3, 202:10, 202:17,

202:19, 202:24, 203:9,
203:24, 203:25, 208:6,
208:9, 209:2, 209:16,
209:21, 210:7, 210:20,
212:15, 213:19, 214:10,
214:15, 215:2, 215:5, 215:7,
215:14, 215:18, 215:23,
216:17, 218:20, 218:24,
217:3, 217:4, 218:10,
218:13, 218:23, 219:3,
219:5, 219:20, 220:5,
220:21, 221:4, 221:14,
221:22, 224:6, 224:9, 225:4,
225:10, 226:23, 227:24,
228:7, 228:12, 228:18,
229:19, 230:14, 232:12,
252:18, 233:22, 235:6,
235:7, 238:22, 237:3, 236:7,
239:18, 240:11, 241:16,
242:13, 245:6, 245:17,
246:13, 247:17, 247:24,
248:4, 248:12, 249:12,
249:19, 249:20, 250:3,
250:13, 250:23, 251:12,
261:21, 252:8, 252:19,
253:2, 254:4, 254:15,
254:16, 255:6, 255:15,
256:3, 256:8, 258:9, 256:21,
257:9, 257:12, 257:21,
258:4, 258:8, 258:16,
258:17, 258:22, 258:23,
259:9, 259:14, 26d:9, 281:4,
291:19, 261:24, 263:9,
264:9, 267:10, 269:4

**Jendras'**[57] - 28:21,
32:11, 33:10, 35:2, 37:15,
38:7, 38:10, 39:72, 39:17,
40:8, 45:20, 46:12, 46:16,
47:9, 47:17, 48:9, 48:14,
52:19, 53:20, 56:19, 57:17,
58:23, 59:10, 59:20, 60:12,
82:8, 62:17, 62:20, 63:15,
103:13, 127:10, 141:8,
148:8, 156:21, 159:17,
172:18, 173:12, 164:3,
184:15, 197:23, 188:4,
188:25, 189:14, 189:22,
199:24, 198:23, 203:13,
214:18, 218:7, 216:13,
216:16, 223:16, 251:15,
259:24, 260:18, 263:12,
264:8

**Jendras's**[1] - 262:13
**Jersey**[9] - 123:22, 123:25,
124:14, 234:18, 235:22
**job**[12] - 22:25, 23:8, 25:2,
25:7, 25:8, 25:11, 25:12,
26:24, 127:9, 183:21, 164:3,
224:10, 224:12
**jobs**[1] - 224:17

**Joc**[3] - 119:12, 210:16,
240:19
**Joc'x**[1] - 240:21
**Joe's**[3] - 62:19, 225:5
**Joe's**[3] - 224:24, 225:5,
225:7
**John**[6] - 13:16, 14:2,
14:14, 14:16, 118:12
**join**[6] - 24:19, 24:22, 25:3,
26:11, 27:10
**joined**[2] - 11:10, 11:13
**judgment**[14] - 47:9, 47:16,
53:2d, 179:20
**July**[6] - 209:8, 209:9,
240:13, 240:20, 240:21
**June**[20] - 39:10, 201:4,
225:2, 225:11, 226:5,
226:22, 227:20, 227:25,
229:17, 230:13, 232:10,
233:3, 237:25, 242:11,
250:4, 250:20, 254:2,
254:10, 255:4, 255:12
**jurisdiction**[2] - 238:3,
236:10
**jury**[1] - 222:6
**Justice**[1] - 3:9
**Justin**[1] - 231:18

# K

**keep**[5] - 5:16, 203:8,
205:2, 240:11, 249:5
**kapt**[1] - 122:23
**Hevin**[2] - 222:19, 222:21
**kickod**[1] - 218:3
**kind**[9] - 10:25, 92:5,
148:7, 191:22, 234:6
**kinds**[1] - 17:8
**HMK**[1] - 1:7
**knowing**[2] - 158:8, 158:10
**Hnowledge**[1] - 53:13
**knowledge**[29] - 6:24,
17:20, 18:18, 19:7, 21:17,
57:16, 60:24, 77:10, 82:19,
98:4, 105:18, 105:22,
108:1d, 112:12, 118:18,
122:25, 125:9, 127:2,
128:18, 143:20, 156:6,
191:11, 206:9, 215:16,
216:23, 219:5, 238:5, 258:8
**known**[14] - 11:18, 11:23,
20:21, 261:24
**HURZMAN**[1] - 2:3

# L

**lacking**[1] - 124:15
**lag**[1] - 66:22

**laid**[2] - 138:8, 236:19
**Lake**[2] - 120:15, 120:13
**language**[1] - 185:25
**LaPerch**[17] - 1:17, 4:13,
4:15, 54:10, 104:9, 138:4,
219:15, 223:23, 226:19,
226:23, 228:6, 229:2,
233:19, 237:16, 264:4,
265:8, 266:20
**LaPerch's**[1] - 166:12,
267:11
**larger**[1] - 40:23
**last**[26] - 35:5, 39:24,
44:25, 45:6, 52:10, 52:13,
58:10, 56:24, 63:2, 73:8,
89:10, 105:3, 107:15,
115:14, 122:14, 134:7,
134:24, 152:13, 160:5,
161:22, 168:11, 208:18,
208:9, 226:22, 240:21,
255:6, 255:10
**lasted**[1] - 149:21
**late**[2] - 159:7, 181:25
**lately**[1] - 224:20
**law**[1] - 9:25
**law'o**[3] - 154:15, 154:20,
191:8
**LAWRENCE**[1] - 2:11
**lawsuit**[2] - 7:4, 7:8
**lawyer**[1] - 186:4
**lawyers**[1] - 433:22
**lays**[1] - 253:8
**leader**[2] - 35:15, 35:20
**leadership**[1] - 33:23,
34:2, 41:11, 41:14, 41:18,
41:21, 182:19
**learn**[4] - 41:16, 128:3,
154:22, 158:13
**learned**[3] - 154:14, 155:3,
175:5
**learning**[1] - 185:13
**least**[2] - 161:3, 181:11
**leave**[11] - 23:18, 155:5,
158:5, 174:7, 178:18,
183:24, 208:13, 242:14,
243:20, 245:17, 248:13
**leaving**[6] - 113:19, 154:4,
157:7, 157:9, 209:7, 252:10
**left**[16] - 11:9, 14:14,
14:16, 21:5, 21:25, 23:16,
24:8, 25:2, 25:10, 25:23,
29:4, 184:19, 209:23,
245:22, 247:24, 248:4
**legal**[7] - 17:11, 191:9,
192:11, 200:2, 233:24,
334:25, 235:8
**lese**[3] - 17:22, 17:23,
139:23
**letter**[8] - 25:15, 25:17,
25:20, 246:6, 259:4, 259:10,

259:11, 259:17
**letters**[1] - 57:23
**level**[6] - 12:17, 22:18,
64:12, 75:20, 182:3, 206:20
**levels**[2] - 21:24, 66:8
**LEVER**[1] - 2:3
**licenses**[2] - 10:25, 11:3
**likely**[2] - 128:14, 181:2
**limited**[1] - 252:4
**line**[6] - 35:6, 40:5, 52:14,
152:13, 207:8
**LINE**[1] - 297:3
**LINEIS**[1] - 263:10
**lines**[3] - 206:19, 207:5,
255:19
**linked**[1] - 15:10
**list**[14] - 121:20, 121:24,
122:7, 122:10, 122:12,
122:15, 122:17, 122:22,
122:24, 129:5, 267:15
**listed**[1] - 18:8, 18:11,
35:10, 37:21, 48:5, 53:10,
74:10, 228:18
**listening**[1] - 82:9
**lists**[3] - 49:4, 49:5, 58:11
**literally**[1] - 27:9
**LLP**[2] - 2:3, 2:8
**located**[6] - 40:11, 71:10,
72:5, 72:24, 118:25, 138:18
**location**[2] - 119:5, 119:16,
124:19
**locations**[3] - 129:25,
130:2, 133:7
**London**[1] - 130:8
**long-term**[1] - 261:10
**look**[34] - 8:7, 34:7, 34:17,
41:25, 46:7, 49:11, 61:9,
61:12, 82:14, 93:12, 75:7,
77:21, 78:21, 78:29, 81:8,
88:10, 66:19, 90:14, 93:8,
95:10, 98:11, 100:18,
108:21, 123:7, 131:22,
131:24, 151:25, 193:7,
200:9, 205:18, 226:19,
229:2, 237:26, 254:7
**look-forward**[1] - 41:25
**looked**[3] - 9:14, 205:19,
254:11
**looking**[23] - 9:3, 24:16,
27:21, 48:3, 52:21, 57:9,
63:22, 81:21, 87:25, 102:7,
145:17, 147:6, 152:7, 171:3,
174:7, 193:22, 220:8,
220:21, 228:7, 239:16,
249:21, 263:15, 263:18
**looks**[1] - 234:5
**lose**[1] - 248:14
**lower**[1] - 45:23
**loyalty**[1] - 41:12
**lpetkes@wiggin.com**[3] -

2:11
lunch [2] - 113:11, 137:22
luncheon [1] - 138:2
lying [1] - 170:20
Lynch [3] - 14:2, 14:3,
14:14

# M

Mahwah [9] - 123:22,
124:2, 124:5, 124:9, 124:19,
124:22, 124:25, 125:18,
138:20
mail [17] - 217:15, 217:16,
219:17, 224:6, 225:14,
226:21, 226:25
main [1] - 136:19
maint [2] - 229:24, 230:7
maintain [4] - 122:17
maintenance [3] - 229:24,
230:7, 230:9
majority [2] - 47:8, 236:8
make-ready [1] - 236:8,
236:71, 236:14
manage [1] - 30:13
managed [1] - 30:24
management [11] - 33:23,
34:7, 65:8, 67:10, 206:13,
216:25, 227:3, 231:24,
291:25, 232:20, 249:15
managers [2] - 30:16,
30:23
managing [1] - 141:3
Manhattan [1] - 71:12
manner [1] - 153:10
manual [5] - 108:11,
108:15, 108:16, 108:17,
116:5
March [32] - 38:18, 43:19,
49:11, 48:13, 49:15, 49:18,
59:20, 60:8, 129:12, 159:7,
159:10, 188:15, 168:17,
169:9, 170:11, 171:17,
171:22, 172:22, 175:18,
175:24, 176:5, 176:15,
181:5, 193:12, 194:10,
195:16, 197:15, 204:17,
250:23, 252:7, 253:19,
253:20
March/April [3] - 128:15,
128:19, 129:6
Mario [1] - 221:10
mark [7] - 103:24, 184:20,
185:7, 217:10, 219:10,
226:15, 230:16
Mark [1] - 226:25
marked [85] - 8:11, 34:6,
37:8, 39:2, 39:21, 42:18,
42:24, 44:20, 48:25, 52:2,

54:5, 56:3, 59:6, 81:4, 62:12,
83:9, 73:17, 73:18, 77:17,
81:2, 90:9, 98:11, 99:17,
100:14, 104:8, 104:10,
107:2, 107:7, 108:19,
133:20, 138:5, 142:2,
144:20, 152:10, 160:3,
165:3, 185:6, 166:6, 168:11,
192:21, 193:8, 200:6,
205:13, 205:15, 212:5,
212:24, 217:12, 217:14,
213:13, 219:18, 223:21,
223:24, 224:3, 228:17,
226:20, 228:24, 229:3,
230:79, 230:22, 233:17,
237:17, 243:24, 254:17,
255:3, 259:2
marketplace [1] - 42:2
markets [1] - 30:14
marriage [1] - 265:16
Maryland [7] - 236:3,
236:14
master [5] [1] - 10:18
matte [11] [1] - 1:19, 7:23, 8:5,
8:9, 9:25, 51:7, 221:24,
252:9, 266:12, 266:19, 269:8
MBA [4] - 10:23, 11:6, 11:8,
11:9
MC [1] [22] - 11:10, 11:12,
12:7, 20:23, 21:2, 21:4, 21:7,
21:8, 21:10, 21:19, 21:20,
21:25, 23:3, 23:10, 23:16,
23:23, 25:2, 25:5, 25:23,
28:18, 26:21, 27:20
mean [29] - 15:5, 32:13,
58:8, 74:21, 78:18, 79:2,
80:7, 99:15, 108:17, 120:17,
132:21, 132:24, 141:23,
146:25, 151:2, 151:21,
183:4, 185:2, 187:14,
189:16, 192:3, 209:15,
209:20, 210:8, 210:8,
210:14, 241:7, 245:7, 262:18
meaning [8] - 35:14, 139:7,
208:15, 208:23, 233:12,
245:12, 247:10, 247:13
means [9] - 15:9, 74:7,
74:22, 209:12, 239:11,
239:12, 240:19, 241:8
meant [6] - 58:4, 177:20,
209:5, 210:12, 210:15,
235:23, 241:5, 248:12
measurement [1] - 22:14
media [1] - 17:9
meet [4] - 48:11, 82:22,
128:11, 172:19
meeting [14] - 24:8, 33:21,
87:20, 87:21, 87:23, 74:3,
74:18, 75:2, 75:3, 78:8, 77:8,
78:8, 78:13, 81:8, 81:14,

81:19, 81:22, 81:23, 81:24,
82:17, 83:3, 83:15, 83:18,
90:20, 90:21, 90:24, 91:2,
91:9, 91:22, 93:12, 94:8,
94:13, 94:15, 94:22, 95:6,
96:13, 96:19, 97:10, 101:4,
102:8, 128:7, 149:17,
174:18, 205:9
Meeting [2] - 73:20, 90:12
meetings [7] - 58:11, 68:3,
68:9, 69:5, 85:11, 94:19,
287:8
Meets [1] - 155:8
meets [4] - 47:4, 47:23,
48:5, 53:7
meg [1] - 16:25
Mehrdad [5] - 135:16,
136:14, 136:16, 137:4, 137:7
member [6] - 68:18, 70:17,
70:25, 71:7, 71:15, 71:18,
71:21, 72:15, 72:18
members [8] - 68:12,
70:12, 72:12, 73:12, 74:6,
83:3, 83:8, 94:12
Memorandum [4] - 43:2,
49:3, 58:9, 59:17
memorandvm [1] - 202:9
memorialization [1] - 90:8
memorialize [6] - 37:24,
39:8, 79:3, 97:5, 110:24
memorialized [4] - 78:8,
79:12, 80:18, 81:3, 99:14,
103:3, 112:8, 112:17,
112:20, 116:15, 183:6,
202:9, 208:4, 250:3
memorializing [7] - 43:12,
254:16
mentioned [17] - 52:12,
87:13, 70:10, 88:13, 94:21,
123:9, 123:11, 123:13,
128:8, 129:17, 178:8, 259:23
merely [1] - 188:12
Merit [4] - 42:25, 49:2, 59:8,
59:17
merit [46] - 15:21, 18:2,
16:11, 16:18, 36:18, 36:20,
37:24, 38:9, 38:13, 38:18,
38:20, 39:9, 42:7, 42:13,
43:13, 43:20, 44:2, 44:4,
44:12, 48:16, 49:10, 49:13,
51:10, 51:13, 51:18, 55:25,
56:24, 59:24, 60:7, 65:14,
165:15, 166:19, 167:11,
187:23, 168:18, 168:23,
169:3, 189:10, 168:17,
189:20, 169:23, 171:22,
172:4, 173:12, 174:25
merited [1] - 92:11
met [15] - 15:16, 18:18,
20:22, 21:12, 67:18, 68:24,

62:23, 87:7, 87:10, 91:9,
92:19, 164:21, 167:22,
172:23, 172:25, 173:4
metrics [1] - 22:15
metro [1] - 229:23
Metromedia [18] - 11:13,
11:19, 12:3, 24:12, 24:20,
24:23, 25:3, 25:22, 25:24,
25:25, 26:4, 26:12, 26:18,
26:23, 27:3, 27:6, 28:5,
28:12
Michigan [2] - 72:8, 72:8
Microsoft [1] - 131:21
middle [3] - 20:22, 238:24,
238:25
might [6] - 57:7, 83:24,
126:6, 204:24, 235:4, 242:14
might've [5] - 129:15,
129:16, 152:8, 162:23, 247:9
Mike [3] - 221:25, 222:4,
222:5
Military [1] - 10:16
mind [3] - 5:16, 158:10,
205:2
mine [1] - 127:5
minor [1] - 221:18
minute [3] - 192:24, 193:3,
237:12
Minutes [1] - 81:22
minutes [23] - 55:17, 74:2,
74:3, 75:3, 76:9, 78:13,
82:12, 82:15, 84:9, 85:18,
85:24, 87:17, 89:4, 90:20,
91:3, 91:10, 91:22, 94:7,
95:8, 97:7, 99:4, 99:9,
227:25
mischaracterization [1] -
243:13
misleading [1] - 243:4
Miss [1] - 168:6
mission [1] - 17:2
misspoke [2] - 49:17, 58:9
misstate [1] - 211:7
mistake [1] - 170:2
mistaken [1] - 82:11
misunderstand [1] - 28:2,
67:2, 67:3
model [1] - 225:22
modification [2] - 242:16,
242:20, 242:23
modify [13] - 173:25, 186:21,
188:2
moment [8] - 81:9, 77:21,
81:8, 90:14, 200:9, 205:15,
229:5, 237:20, 263:24
momentum [1] - 41:25
Monday [4] - 169:13,
237:25, 250:4, 250:19
months [15] - 24:9, 149:4,
149:6, 174:9



monthly [1] - 58:11
months [3] - 28:18, 128:11, 131:5, 131:8, 132:5, 132:7, 133:15, 242:12
moot [1] - 172:8
morning [4] - 4:15, 152:8, 216:3, 232:11
most [1] - 126:12
mostly [3] - 7:23, 30:15, 252:6
move [3] - 134:10, 134:18, 135:15, 136:7, 137:17
moved [5] - 22:3, 22:4, 126:2, 126:15, 126:17, 136:10
MR [123] - 4:10, 18:6, 33:11, 47:11, 58:3, 58:5, 62:23, 79:3, 73:5, 73:8, 85:9, 85:14, 85:16, 88:6, 93:4, 93:8, 109:24, 116:9, 117:77, 117:21, 117:23, 117:24, 118:3, 118:8, 116:10, 123:4, 123:7, 130:9, 130:11, 130:14, 130:16, 132:14, 133:10, 133:17, 137:22, 137:25, 138:3, 148:9, 152:25, 157:22, 157:24, 169:15, 170:21, 172:2, 178:15, 178:23, 178:25, 179:5, 179:17, 182:3, 182:20, 183:10, 183:T3, 189:3, 191:8, 191:16, 192:23, 193:2, 193:4, 193:6, 197:21, 195:21, 202:12, 202:21, 203:21, 211:5, 211:7, 211:8, 211:11, 211:15, 211:1T, 211:24, 213:4, 213:8, 216:5, 217:2, 217:10, 219:10, 223:19, 228:15, 228:22, 230:18, 233:15, 237:7, 237:14, 242:3, 242:22, 243:2, 243:4, 243:6, 243:10, 243:15, 243:16, 243:19, 243:21, 244:2, 244:3, 244:16, 244:1T, 244:19, 244:22, 245:10, 246:15, 246:18, 246:22, 247:3, 247:5, 247:22, 248:22, 249:3, 249:14, 249:23, 250:8, 254:8, 254:12, 261:6, 262:16, 262:24, 263:2, 263:23, 264:3, 264:11, 264:13

N

name [16] - 4:11, 4:19, 11:21, 13:18, 37:9, 45:14, 45:18, 45:21, 52:5, 52:6,

56:6, 56:7, 59:10, 70:15, 123:1d, 225:7
named [3] - 14:15, 23:22, 159:13
names [5] - 17:8, 44:7, 78:18, 84:5, 92:29
nationwide [1] - 22:4
natural [1] - 5:16
nature [3] - 20:24, 238:7, 255:17
near [1] - 218:5
necessarily [2] - 160:22, 160:23
necessary [4] - 19:17, 110:4, 188:14, 190:5, 192:10, 233:25
need [9] - 50:18, 55:15, 211:25, 220:18, 220:18, 224:13, 224:14, 224:25, 239:12
Needed [1] - 165:8
needed [1] - 23:24, 117:5, 207:21, 231:9
negative [1] - 228:23
negotiate [1] - 207:23
negotiated [1] - 209:8
network [7] - 218:25, 227:3, 229:23, 230:3, 234:24, 231:25, 232:20
network's [1] - 255:24
network'n [1] - 17:9
Networks [18] - 11:14, 11:19, 12:4, 24:13, 24:20, 24:23, 25:3, 25:22, 25:24, 26:2, 26:5, 26:12, 26:18, 26:23, 27:3, 27:6, 28:5, 28:12
never [8] - 91:20, 134:19, 141:22, 151:2, 157:9, 167:25, 226:2, 252:8
nevertheless [1] - 162:8
new [10] - 23:23, 37:18, 37:22, 55:4, 72:25, 130:20, 176:19, 175:18, 195:19, 197:14, 222:18, 233:25, 234:12, 236:16, 253:6
NEW [3] - 1:2, 265:2, 266:2
New [13] - 1:13, 1:21, 2:4, 4:5, 4:14, 4:19, 18:12, 123:22, 123:25, 232:5, 234:16, 235:22, 266:8
next [7] - 68:13, 135:13, 146:19, 147:20, 218:9, 222:6, 267:25
Nicklo [1] - 154:15
night [1] - 216:2
nine [1] - 226:21
Ninth [1] - 232:4
NMC [1] - 227:8
NO [1] - 1:7

noncompliance [1] - 256:23
none [1] - 8:3
NONE [2] - 268:12, 268:16
normal [3] - 102:18, 102:17, 245:18
North [2] - 1:13, 2:4
northeast [1] - 22:3
NOTARY [1] - 266:29
Notary [4] - 1:20, 3:17, 4:4, 266:7
notation [1] - 91:22
notations [1] - 165:2
note [8] - 44:10, 47:2, 47:7, 118:2, 180:22, 183:13, 194:3, 250:6
noted [4] - 43:15, 229:10, 264:17, 268:6
notes [3] - 8:4, 148:8, 254:9
nothing [3] - 714:16, 166:2, 237:4
Notice [1] - 1:19
notice [2] - 131:16, 252:8
noticed [1] - 168:17
notification [1] - 267:16
notified [4] - 87:8, 187:9, 227:21, 257:12
notify [2] - 66:28, 260:8
noting [1] - 142:9
notion [1] - 280:25
notwithstanding [1] - 119:4
November [18] - 11:11, 52:19, 62:21, 63:16, 78:21, 76:23, 76:25, 87:15, 95:22, 95:23, 102:16, 102:18, 209:12, 212:8, 213:12, 213:18, 214:5, 214:6
Number [1] - 146:21
number [15] - 40:12, 41:6, 84:9, 88:20, 88:23, 87:2, 88:14, 88:22, 89:10, 94:16, 94:19, 97:7, 98:6, 125:3, 139:16, 139:23, 140:2, 239:16
numbered [1] - 235:18
numbers [2] - 81:6, 224:20
numerous [1] - 224:17
NY [1] - 227:7
NYA [1] - 222:19
NYNEX [1] - 11:10

O

o'clock [1] - 137:23
oath [1] - 3:7
object [3] - 243:17, 246:19, 262:24
objection [44] - 5:12, 18:8,

33:11, 47:11, 62:23, 118:9, 130:9, 130:14, 132:14, 133:10, 133:17, 148:9, 152:25, 157:22, 169:18, 170:21, 172:2, 178:15, 178:23, 178:25, 179:17, 182:3, 182:20, 183:13, 189:3, 191:8, 191:16, 197:21, 199:21, 202:12, 202:21, 203:21, 216:9, 217:2, 237:7, 242:3, 242:22, 244:16, 246:10, 247:22, 248:22, 249:3, 249:14, 261:6
objections [1] - 3:12
objective [1] - 58:12
objectives [10] - 12:25, 15:17, 15:16, 33:15, 33:17, 33:18, 33:19, 33:21, 44:14, 50:3
obligations [1] - 113:9
observation [2] - 82:13, 165:16
observe [1] - 4:24
observed [1] - 94:8
obtained [1] - 11:8
obtaining [2] - 11:6, 11:9
obviously [8] - 65:17, 126:23, 134:5, 148:26, 170:2, 235:5, 247:8, 248:12
occasion [2] - 112:24, 147:2
occasionally [3] - 83:23, 132:2, 152:5
occasions [3] - 8:8, 8:11, 91:17
occur [1] - 87:14
occurred [3] - 94:16, 113:20, 178:13, 182:11, 227:13
October [3] - 11:11, 21:9, 24:3
OF [6] - 1:2, 1:17, 265:2, 265:4, 266:2, 266:4
Off-the-record [1] - 249:25
offer [4] - 209:18, 210:15, 214:15, 238:7
offered [3] - 88:8, 212:20, 214:13
offering [3] - 86:17, 210:19, 219:19
offhand [1] - 62:2
office [68] - 111:11, 113:10, 113:23, 118:20, 118:22, 118:25, 119:11, 119:15, 119:17, 119:20, 119:22, 120:15, 120:18, 123:21, 124:2, 124:6, 124:8, 124:22, 125:2, 126:20, 126:24, 127:3, 127:10, 128:12, 132:5, 132:12, 133:7,

Case 1:11-cv-05409-SC-PED   Document 27-2   Filed 02/08/13   Page 86 of 95

133:10, 133:17, 137:25,
148:9, 152:25, 157:22,
169:18, 170:21, 172:2,
178:15, 178:23, 178:25,
179:17, 182:3, 182:20,
183:13, 189:3, 191:8,
191:16, 192:23, 193:2,
197:21, 199:21, 202:12,
202:21, 203:21, 211:5,
211:9, 211:15, 211:24,
213:4, 216:9, 217:2, 237:7,
242:3, 242:22, 243:4,
243:10, 243:18, 243:21,
244:2, 244:16, 244:19,
245:10, 246:15, 246:22,
247:5, 247:22, 248:22,
249:3, 249:14, 249:23,
250:8, 254:9, 261:6, 262:24,
264:13

pending[4] - 4:17, 4:21,
6:23, 1:4

Pennsylvania[2] - 236:3,
238:14

people[30] - 12:23, 13:4,
13:7, 13:12, 14:9, 14:20,
14:25, 41:1, 82:8, 111:9,
121:20, 121:24, 122:10,
124:25, 125:6, 125:8,
125:10, 134:22, 139:16,
163:23, 189:25, 207:21,
222:2, 232:20, 234:25,
235:2, 235:3, 249:6, 261:3,
281:12

people's[1] - 131:22

per[3] - 81:17, 166:14,
166:15, 167:1, 167:8

percent[11] - 76:20, 78:22,
76:23, 95:21, 95:22, 118:21,
146:17, 190:21, 206:4,
212:7, 257:13

percentage[1] - 83:2

perception[2] - 162:7,
204:24

perform[2] - 127:9, 216:18

performance[18] - 13:4,
15:14, 15:22, 18:5, 16:12,
18:15, 23:8, 23:12, 32:11,
32:14, 33:10, 34:23, 35:2,
36:14, 36:22, 38:7, 39:17,
40:8, 42:5, 42:9, 42:14,
44:14, 48:3, 46:13, 48:11,
46:20, 47:9, 47:17, 48:9,
48:14, 49:11, 49:24, 50:2,
53:20, 56:19, 58:23, 60:12,
60:17, 60:21, 158:22, 159:2,
171:5, 112:18, 112:20,
205:8, 205:10, 223:6, 228:8

Performance[8] - 39:23,
45:3, 52:4, 52:19, 56:5,
56:18, 164:19, 185:6

performed[1] - 29:24

performing[3] - 216:24,
222:6, 253:13

perhaps[2] - 89:2, 209:22

period[32] - 21:3, 24:15,
27:10, 38:15, 52:7, 60:10,
61:20, 61:24, 62:18, 104:7,
104:14, 130:10, 130:13,
130:17, 163:5, 163:3,
163:14, 164:2, 215:22,
216:15, 250:23, 267:20

permanent[2] - 29:5, 29:23

permitted[2] - 110:1, 111:4

person[20] - 13:25, 15:10,
15:13, 87:12, 74:18, 74:22,
90:21, 94:15, 94:11, 94:20,
110:18, 110:22, 111:9,
143:16, 174:17, 198:13,
204:15, 227:17, 255:25

Personnel[3] - 43:2, 49:3,
59:9

perspective[1] - 19:6

pertained[7] - 85:13, 267:9

pertaining[1] - 46:18

peruses[43] - 34:19, 37:13,
38:12, 39:4, 40:5, 40:9, 43:5,
44:23, 52:9, 56:12, 58:20,
57:3, 59:13, 61:11, 62:16,
73:24, 17:23, 81:10, 88:4,
87:16, 90:17, 99:16, 89:11,
100:20, 104:17, 105:4,
106:2, 101:11, 108:22,
115:6, 134:3, 145:2, 152:15,
160:6, 181:2, 193:14,
193:25, 200:11, 205:21,
231:7, 237:22, 250:11, 259:5

petition[1] - 28:5

philosophy[2] - 249:15,
249:17

Phoenix[3] - 118:22,
119:4, 118:11

phone[4] - 218:14, 222:5,
257:4, 257:7, 758:14

physical[11] - 216:16

physically[1] - 132:23

pile[3] - 37:2, 38:4, 42:21,
152:7, 219:8

pin[1] - 250:25

pink[1] - 18:14

place[47] - 1:20, 6:14, 7:11,
8:21, 55:10, 68:3, 68:5, 74:4,
82:17, 94:9, 109:19, 110:5,
121:21, 122:11, 124:12,
143:14, 143:19, 144:12,
154:11, 156:10, 157:15,
159:5, 159:6, 174:10,
174:12, 174:15, 175:19,
178:21, 180:2, 160:3, 180:7,
180:10, 180:13, 182:17,
182:23, 183:3, 197:12,

198:12, 198:13, 210:19,
211:3, 241:21, 252:2, 292:9,
251:7, 259:21, 280:14

placed[2] - 122:4, 212:4

Placid[2] - 120:15, 120:19

Plains[29] - 1:13, 2:4, 4:14,
80:22, 94:10, 125:19,
125:21, 126:21, 128:7,
132:13, 132:16, 132:23,
133:7, 133:14, 134:11,
134:22, 135:24, 136:2,
139:11, 138:21, 136:22,
137:8, 137:11, 137:14,
150:18, 216:8, 218:11,
216:17, 256:11

plaintiff[1] - 4:17

Plaintiff[14] - 1:6, 2:3, 2:13

Plaintiff's[67] - 37:6, 38:8,
39:2, 39:21, 42:18, 42:25,
44:20, 46:25, 52:3, 54:5,
58:3, 59:7, 81:5, 82:12, 63:9,
73:18, 77:17, 81:2, 90:10,
98:12, 99:1, 99:18, 100:15,
104:3, 104:8, 104:10, 107:2,
107:8, 108:19, 133:20,
138:5, 142:2, 144:20,
152:10, 188:12, 163:8,
192:22, 193:8, 200:8,
205:18, 212:6, 212:24,
217:11, 217:13, 217:15,
219:13, 219:18, 223:21,
223:24, 224:3, 228:17,
226:20, 228:24, 229:3,
230:17, 230:19, 230:22,
233:17, 237:19, 243:24,
259:2, 268:2

PLAINTIFF'S[11] - 267:18

plaintiffs[1] - 7:5

Plaintiffs'[7] - 34:6, 223:19

Plan[4] - 64:9, 64:17, 75:5,
75:18

plan[9] - 64:13, 64:14,
96:25, 97:2, 134:8

planned[2] - 230:3, 230:4

Planning[1] - 53:14

planning[1] - 131:17

Plaza[1] - 2:9

plus[4] - 207:18, 208:14,
208:20, 210:13

PMs[1] - 125:12

point[60] - 5:19, 14:9, 21:5,
21:19, 21:23, 22:16, 22:17,
23:15, 25:2, 27:14, 28:4,
28:11, 29:7, 29:24, 30:6,
36:4, 48:2, 50:25, 58:13,
66:11, 69:24, 73:9, 92:10,
87:18, 88:14, 93:11, 113:22,
124:18, 130:21, 139:10,
139:21, 141:14, 146:4,
154:18, 158:20, 191:14,

181:19, 171:8, 172:8, 173:6,
182:8, 194:3, 186:20, 187:5,
192:5, 194:24, 196:9,
196:25, 204:6, 210:4,
221:15, 221:18, 243:9,
248:9, 251:2, 251:10,
252:12, 253:11, 254:22,
256:21

point-in-time[1] - 251:10

Pole[1] - 234:9

polo[5] - 234:18, 235:3,
236:5, 236:7, 255:20

poles[2] - 234:17, 234:23

policies[3] - 108:11, 109:2,
109:5

Policy[1] - 115:10

policy[4] - 109:22, 109:24,
109:25, 117:4

population[1] - 125:13

portion[2] - 85:24, 213:23

posed[1] - 8:2

position[16] - 11:17, 12:3,
26:15, 111:8, 118:14,
185:14, 186:10, 199:24,
201:15, 203:17, 207:22,
212:15, 213:14, 214:8,
240:12, 246:18, 282:11

positioned[1] - 207:13

positive[1] - 225:23

possession[2] - 92:14,
196:19

possibility[1] - 115:21

possible[10] - 4:23, 13:2,
117:25, 119:14, 126:6,
128:8, 215:24, 226:5

post[3] - 18:17, 19:25, 19:5

Postms[3] - 71:11, 71:18,
73:11

potential[5] - 20:15, 32:7,
75:4, 112:25, 114:20

potentially[1] - 134:17

power[1] - 236:11

PowerPoint[1] - 83:25

practice[1] - 112:10

preclude[1] - 263:9

predecessor[1] - 12:3

preexisting[1] - 178:19

preparation[1] - 7:20

prepare[8] - 33:9, 33:25,
118:21, 158:24, 182:13,
192:18

prepared[24] - 42:15, 48:3,
84:19, 84:21, 96:10, 96:12,
96:15, 97:19, 97:23, 97:24,
98:9, 109:9, 114:18, 181:12,
161:15, 193:20, 194:9,
196:15, 200:16, 200:24,
201:8, 214:24, 246:8

preparing[3] - 96:18,
116:19, 259:10

present [10] - 68:7, 69:17,
68:24, 91:19, 81:21, 82:12,
82:15, 82:16, 90:23, 91:12,
94:13, 113:23, 132:13,
149:13, 156:12, 215:4
PRESENT [1] - 2:13
presentation [13] - 75:21,
83:7, 83:8, 91:17, 91:20,
178:23, 177:13, 180:3,
186:19, 187:12, 195:11,
195:14, 241:24
presentations [2] - 83:25,
182:3
presented [31] - 9:12, 46:2,
51:22, 85:11, 99:17, 101:13,
101:21, 165:19, 190:15,
183:1, 186:20, 210:20,
215:2, 242:20, 267:8
presently [7] - 17:13,
123:15
president [4] - 54:22,
118:15, 135:21, 209:7
presidents [1] - 76:18
presume [1] - 93:19
pretty [7] - 183:20, 253:8
previous [7] - 27:20, 39:2,
43:21, 62:12, 154:2, 158:25,
184:15
previously [13] - 31:6,
39:21, 42:24, 44:20, 56:3,
59:7, 70:3, 15:8, 75:15,
82:20, 86:6, 83:5, 99:18,
100:14, 107:2, 107:8,
139:24, 140:21, 142:2,
152:10, 186:8, 174:2,
191:18, 188:24, 189:13,
199:16, 205:13, 211:12,
212:5, 212:24, 243:24
primarily [1] - 119:4
primary [4] - 12:13, 112:8,
119:18, 124:24
prior-approved [1] - 168:23
priorities [1] - 128:24
privilege [7] - 246:17,
248:21
privileged [1] - 247:2
problem [4] - 5:24, 161:25,
218:2, 243:5
procedure [4] - 50:4, 81:19,
77:14, 110:14
proceed [1] - 234:14
proceedings [3] - 6:23,
266:11, 266:14
process [9] - 26:23, 30:24,
31:2, 31:19, 67:15, 172:19,
227:9, 236:14, 238:15
processed [1] - 161:10
processes [1] - 236:8
procure [1] - 26:13
produced [15] - 45:24,

49:8, 54:7, 61:7, 73:22, 81:4,
90:11, 100:16, 105:24,
118:5, 133:21, 142:4,
144:21, 180:23, 193:9
product [1] - 124:13,
124:18, 206:15, 206:16,
206:21
production [6] - 46:2,
54:8, 81:5, 95:10, 117:18,
123:5, 193:11, 267:7,
287:13, 267:15
Production [1] - 287:11
productive [2] - 253:6,
263:17
productivity [7] - 164:25,
206:21
professional [2] - 4.11,
11:3
profit [11] - 32:7
program [1] - 261:8
programmed [1] - 149:20
project [2] - 30:16, 30:23
proper [7] - 19:4, 22:14,
191:15
properly [1] - 193:5
proposal [3] - 186:20,
242:16, 250:3
propose [1] - 92:24
proposed [33] - 44:4,
51:10, 51:15, 66:12, 67:17,
68:7, 68:12, 68:25, 82:23,
83:15, 83:19, 84:5, 84:8,
84:12, 86:10, 86:15, 97:3,
91:4, 91:8, 91:13, 92:11,
93:22, 95:14, 96:2, 111:19,
111:25, 112:13, 121:2,
141:20, 160:15, 180:18,
195:13, 196:10, 197:14,
215:7, 215:15, 241:15,
241:24
proposing [1] - 240:5,
240:11
protect [7] - 179:20, 222:15
provide [18] - 16:23, 97:5,
98:15, 83:18, 92:9, 97:3,
97:14, 151:22, 202:23,
213:22, 226:4, 226:10,
233:23, 247:10, 247:16,
261:9, 261:10, 263:9
provided [39] - 9:8, 8:10,
38:21, 46:17, 65:23, 75:18,
75:25, 17:10, 83:13, 91:21,
91:24, 93:6, 96:22, 101:23,
185:19, 187:7, 200:8, 219:2,
220:5, 241:22
provides [1] - 194:4
providing [2] - 19:11, 67:9
provision [6] - 80:4,
101:22, 108:4, 194:4, 244:6
provisions [1] - 102:3,

102:4, 118:5
proximity [1] - 124:9
PSE&G [2] - 234:17, 236:11
Public [4] - 1:20, 3:17, 4:4,
266:7
PUBLIC [1] - 286:25
public [15] - 18:13, 18:21,
51:18, 51:21, 89:9, 89:15,
89:22, 103:5, 103:6, 103:14,
167:19, 179:19, 188:10,
188:23, 189:12, 190:9,
191:22
publicly [1] - 18:2, 18:4,
19:11, 170:25, 171:21
pull [1] - 211:22
pulled [1] - 222:12
purely [1] - 141:14
purports [1] - 46:5
purpose [6] - 43:12, 84:16,
91:2, 96:18, 127:18, 158:15
purposes [4] - 51:6, 91:5,
94:22, 249:5
pursuant [1] - 1:19
Pursuant [13] - 104:6,
104:13, 281:19
put [29] - 8:21, 29:7, 37:2,
38:4, 48:21, 86:2, 128:4,
150:22, 151:8, 158:15,
180:23, 161:1, 169:11,
171:16, 201:15, 210:17,
250:16, 250:25, 252:5
putting [1] - 163:18

## Q

Quality [1] - 53:13
Quantity/Productivity [1] -
53:14
questions [18] - 4:20, 5:4,
5:7, 34:9, 66:8, 98:8, 100:18,
102:21, 172:7, 192:4,
219:21, 220:3, 220:24,
221:6, 221:9, 225:18,
243:11, 255:17, 264:12
quit [12] - 25:1, 25:9, 25:11,
25:12, 153:19, 155:10,
157:11, 151:13, 157:20,
158:19, 251:13, 264:9
qvite [4] - 26:25, 133:5,
261:25, 262:2
quitting [1] - 251:22
quote [1] - 144:15

## R

Rabo [7] - 220:15, 222:15
raise [3] - 171:4, 171:11
raised [2] - 80:2, 157:18
Rajiv [71] - 7:24, 8:20, 9:9,

13:15, 133:24, 139:12,
140:15, 150:9, 151:8,
155:15, 158:4, 115:15,
200:18, 206:7, 206:16,
215:12, 252:22, 253:5,
253:7, 253:11, 262:3
Rajiv's [9] - 127:12, 175:15,
252:5, 252:20, 253:6
ran [2] - 140:8, 206:16,
258:9
Rapids [3] - 72:10, 72:11
rate [2] - 43:21, 49:14
rates [2] - 236:6, 236:7
rather [8] - 119:5, 128:22,
134:20, 180:17, 204:25,
263:16
Ratliff [3] - 229:6, 229:7,
229:18
re [1] - 191:19
Re [1] - 289:4
reach [1] - 255:14
reached [4] - 26:11, 120:22,
228:19, 256:20, 257:9
reaching [1] - 232:17
react [1] - 230:5
read [34] - 20:3, 20:4,
34:10, 73:5, 73:7, 73:10,
79:19, 88:8, 88:8, 88:9, 153:2,
157:24, 158:2, 169:12,
179:8, 119:10, 183:10,
183:12, 197:22, 197:24,
244:19, 244:22, 244:24,
246:3, 253:4, 254:18,
254:20, 280:3, 260:4,
282:18, 282:19, 262:20,
292:23, 265:9
READ [1] - 269:10
reading [8] - 105:18,
195:21, 202:13, 208:17,
235:19, 240:14, 244:20,
246:4
reads [6] - 55:14, 76:17,
115:18, 134:8, 161:23,
217:21
ready [4] - 236:6, 236:11,
238:14
real [1] - 120:4
reality [4] - 162:9, 187:4,
204:25, 225:22
realize [4] - 75:12, 169:11,
170:9, 110:11
really [6] - 48:8, 50:23,
82:11, 126:7, 132:22, 164:16
realtime [1] - 122:23
reason [17] - 5:24, 24:4,
24:7, 46:4, 80:2, 94:17,
124:8, 124:11, 124:22,
124:24, 135:4, 139:4, 141:7,
152:21, 181:12, 221:19,
228:18, 236:20, 245:4,

256:7, 261:18
  reasonable [4] - 135:14,
  201:8, 207:12, 207:15
  reasons [1] - 224:22
  recalpt [3] - 92:12, 196:16
  receive [78] - 8:23, 10:17,
  10:20, 36:20, 43:20, 44:18,
  60:17, 80:21, 65:20, 162:5,
  188:18, 171:21, 185:3,
  185:7, 212:17, 213:17,
  245:8, 245:25
  received [11] - 36:15,
  51:17, 66:6, 69:21, 93:13,
  93:15, 189:10, 189:12,
  169:20, 218:12, 229:18
  receiving [4] - 51:12, 54:15,
  134:2, 134:4
  recently [3] - 17:10, 41:22,
  121:10
  Recess [2] - 237:15, 264:2
  recess [3] - 13:4, 138:2,
  193:5
  recipient [1] - 84:10
  recipients [5] - 84:5, 91:8,
  91:18, 92:25, 100:10
  recites [1] - 231:11
  recognition [1] - 58:11
  recognize [26] - 34:16,
  34:19, 37:11, 37:14, 44:22,
  49:7, 49:8, 52:8, 56:11,
  56:13, 51:2, 59:14, 81:14,
  93:2, 83:5, 63:6, 73:25, 14:2,
  77:25, 90:15, 90:18, 98:15,
  100:22, 104:15, 108:21,
  144:25
  recollection [24] - 14:23,
  22:8, 27:19, 30:10, 36:25,
  41:4, 51:11, 51:10, 87:18,
  88:12, 94:14, 95:13, 126:9,
  155:18, 155:25, 156:14,
  188:18, 188:21, 169:6,
  112:11, 174:14, 254:22,
  255:2
  recommend [4] - 19:10,
  16:11, 42:7, 166:21
  recommendation [7] -
  15:25, 18:3, 38:9, 39:13,
  43:24, 44:11, 46:18, 49:21,
  49:23, 50:8, 50:10, 50:25,
  53:25, 55:8, 58:24, 60:8,
  76:3, 83:20, 85:20, 91:18,
  92:10, 94:23, 95:11, 185:12,
  166:12, 161:5, 192:15
  recommendations [9] -
  80:18, 83:13, 83:19, 82:18,
  177:10, 287:12
  recommended [11] - 38:20,
  38:21, 39:8, 43:13, 44:18,
  80:21, 66:8, 15:9, 75:18,
  95:5, 95:9, 96:5, 101:8,

189:19
  reconsideration [1] - 234.9
  reconvene [1] - 13/:24
  Record [1] - 13:7
  record [117] - 4:12, 4:23, 5:6,
  5:18, 16:21, 26:19, 51:7,
  84:24, 84:22, 104:11,
  190:22, 214:24, 224:2,
  243:7, 249:23, 249:25,
  266:13
  red [1] - 224:14
  redacted [1] - 76:20
  redirect [4] - 89:3, 99:3,
  180:20, 203:23
  redirecting [6] - 35:8, 53:2,
  85:18, 94:6, 112:17, 240:23
  reduced [3] - 96:7, 114:6,
  120:23
  refer [1] - 201:10
  reference [30] - 37:15,
  37:18, 48:2, 55:13, 74:19,
  71:2, 98:18, 99:21, 106:4,
  106:3, 134:11, 134:12,
  138:13, 142:25, 143:23,
  144:8, 191:20, 201:22,
  201:23, 202:3, 202:5,
  211:23, 223:15, 223:18,
  227:12, 229:9, 229:13,
  229:24, 231:8, 244:13
  referenced [3] - 128:10,
  193:17, 234:12
  references [11] - 105:25
  referencing [1] - 239:22
  referring [10] - 30:19,
  135:17, 182:19, 184:18,
  164:19, 206:17, 211:6,
  211:13, 211:19, 239:23
  refers [2] - 115:24, 162:16
  reflect [13] - 47:8, 53:20,
  63:18, 86:13, 86:16, 88:2,
  95:11, 99:4, 101:2, 102:8,
  105:1, 148:2, 193:22
  reflected [56] - 37:22, 38:8,
  47:18, 55:21, 91:19, 75:2,
  76:2, 84:3, 91:21, 95:20,
  99:6, 141:10, 141:11,
  165:24, 171:12, 242:16
  reflecting [52] - 77:11, 84:5,
  85:23, 97:20, 158:25, 199:24
  reflection [3] - 43:18,
  78:13, 77:5, 145:16, 164:24
  reflects [19] - 52.5, 52:6,
  54:8, 55:3, 59:19, 76:9,
  78:11, 86:5, 87:2, 88:22,
  99:10, 95:14, 95:11, 102:12,
  J04:12, 138:15, 180:24,
  181:4, 212:6
  refresh [4] - 36:24, 166:18,
  168:21, 189:6
  refused [2] - 215:8, 249:12

regard [12] - 19:20, 19:24,
  20:8, 82:23, 118:8, 122:17,
  183:25, 218:18, 256:5,
  262:12, 287:13, 287:15
  regarding [40] - 34:2,
  34:25, 41:21, 60:7, 63:24,
  85:24, 66:13, 75:4, 79:16,
  83:15, 85:5, 91:19, 92:24,
  91:15, 109:22, 118:4,
  120:22, 127:2, 127:15,
  127:24, 143:5, 158:15,
  161:16, 165:12, 116:5,
  193:18, 184:3, 184:24,
  185:15, 188:4, 195:3, 188:3,
  199:10, 199:14, 199:19,
  201:24, 202:17, 203:9,
  205:5, 214:9, 214:19, 255:8,
  256:6, 259:21, 260:15,
  260:18, 264:5
  regardless [2] - 181:15,
  258:6
  register [1] - 210:3
  regular [1] - 163:5
  regulators [1] - 234:19
  reiterated [1] - 206:24
  reject [1] - 144:8
  rejected [1] - 50:24,
  138:20, 139:2, 139:4, 141:7,
  142:14, 142:19, 145:24,
  149:2, 214:15, 215:14,
  250:3, 250:13
  rejection [5] - 142:9, 143:8,
  149:5, 148:14, 149:7
  related [19] - 6:17, 8:18,
  6:20, 8:9, 12:8, 101:18,
  136:13, 175:10, 118:18,
  178:17, 179:3, 198:9, 210:8,
  222:24, 249:18, 266:17
  relating [32] - 4:20, 8:5,
  9:14, 9:19, 9:21, 10:6, 10:10,
  38:9, 85:21, 92:10, 95:18,
  97:4, 127:9, 148:8, 148:23,
  150:23, 158:18, 182:14,
  175:8, 175:12, 175:23,
  205:9, 208:6, 215:17,
  215:23, 219:21, 220:22,
  233:8, 246:19, 247:10,
  259:10, 261:20
  relationship [8] - 16:4,
  31:11, 31:16, 31:18, 204:19,
  219:24
  relative [3] - 81:18, 201:19,
  202:11
  relatively [2] - 24:15,
  238:17
  relevance [1] - 118:2
  relevant [1] - 260:24
  relied [1] - 97:9
  rely [1] - 105:19
  remain [9] - 23:9, 27:24,

28:8, 125:5, 245:24
  remained [3] - 19:19,
  66:19, 90:5
  remaining [1] - 222:17
  remember [41] - 6:15,
  17:18, 22:24, 38:23, 38:24,
  129:4, 135:8, 135:8, 137:19,
  131:21, 143:15, 143:19,
  143:22, 149:4, 149:15,
  149:21, 151:3, 151:4, 151:5,
  151:12, 154:5, 154:8, 155:6,
  155:8, 155:12, 158:11,
  158:6, 158:16, 158:20,
  159:24, 167:17, 172:16,
  174:22, 174:23, 175:3,
  175:4, 175:19, 193:17,
  183:21, 195:12, 198:11,
  198:19, 199:17, 199:22,
  215:12, 225:12
  reminded [7] - 206:20,
  207:24
  remotely [1] - 113:12
  removes [1] - 201:22
  render [1] - 50:25
  rendered [1] - 247:9
  reorganized [1] - 217:4
  repair [1] - 234:22
  repairs [1] - 231:8
  repeal [2] - 157:23, 183:9
  rephrase [9] - 5:21, 16:9,
  20:2, 280:13, 263:5
  Report [4] - 104:6, 104:13,
  234:9, 267:19
  report [4] - 12:24, 13:4,
  22:6, 119:11, 139:11,
  218:25, 224:12
  reported [6] - 15:8, 15:8,
  22:9, 221:14, 239:19, 266:11
  reporter [1] - 4:25
  Reporter [1] - 1:24
  reporting [1] - 15:10,
  22:14, 139:17, 140:4,
  140:11, 140:14, 140:15,
  140:22, 154:3, 188:10,
  216:20
  reports [3] - 15:3, 15:4,
  32:16, 32:22, 33:18, 44:8,
  50:7, 85:11, 65:12, 65:16,
  65:24, 78:3, 113:3, 114:20,
  139:17, 139:20, 139:24,
  140:2, 140:17, 140:21, 227:8
  represent [1] - 4:16
  representation [1] - 111 19
  representative [7] - 115:23,
  116:7
  represented [7] - 89:10,
  242:1
  representing [11] - 105:13
  represents [1] - 242:11
  request [129] - 5:25, 8:22,

45:25, 46:9, 54:9, 81:5, 83:4,
115:19, 138:16, 138:23,
141:8, 142:19, 142:21,
143:8, 145:8, 145:18, 146:2,
148:7, 147:23, 148:5,
153:18, 185:7, 193:10,
235:5, 235:11
  Request[4] - 145:5,
147:14, 147:15, 147:22
  requested[1] - 110:15
  REQUESTEd [9] - 85:17,
93:10, 118:11, 123:8, 267:6
  require [2] - 158:24, 255:19
  required[9] - 18:22, 30:21,
31:19, 67:10, 69:10, 103:6,
103:11, 253:14
  Reqvired[1] - 147:25
  requirement [1] - 99:12
  requires [2] - 145:14,
145:15
  resales[1] - 118:20
  reserved[1] - 3:13
  reside[1] - 123:23
  resolution[2] - 78:13,
76:16, 78:12
  resolve[1] - 218:4
  resolved [1] - 78:17
  resources[4] - 54:14,
109:10, 110:24, 115:25
  respect[17] - 12:6, 15:19,
19:12, 27:17, 36:13, 94:23,
95:12, 98:9, 99:13, 103:2,
113:13, 165:6
  respective[1] - 3:3
  respond [9] - 138:5, 136:8,
137:2, 169:4, 189:9, 196:22,
220:24, 225:10, 232:23
  responded [2] - 220:29,
221:2, 235:10
  responding[1] - 221:9
  responds [1] - 144:3
  response[40] - 5:3, 5:6,
14:9, 21:8, 40:12, 41:16,
45:25, 54:7, 81:4, 82:21,
87:24, 93:8, 102:21, 110:25,
123:21, 142:20, 143:24,
157:2, 193:10, 204:21,
214:18, 215:7, 217:7,
218:22, 218:24, 222:11,
222:24, 223:8, 223:10,
225:9, 225:14, 225:17,
227:15, 230:12, 232:10,
236:2, 251:15, 251:19,
255:20
  responses[1] - 235:18
  responsibilities [8] - 12:11,
15:12, 22:11, 22:13, 30:11,
40:25, 188:10, 191:3
  responsibility[18] - 12:13,
12:15, 12:16, 12:21, 13:3,

14:4, 19:11, 19:15, 19:19,
21:24, 22:4, 22:5, 29:8, 30:2,
30:5, 40:22, 66:4, 110:18
  responsible[9] - 19:16,
20:8, 22:2, 44:8, 232:19
  responsiva[3] - 48:9,
157:3, 228:6
  rest[1] - 130:20
  restate[7] - 88:5, 262:15
  restore[3] - 220:16,
220:19, 232:7
  restored[2] - 220:10,
227:11, 227:22
  restricted[11] - 85:2, 65:20,
75:19, 80:8, 82:24, 84:9,
86:14, 87:3, 91:14, 94:24,
185:10
  restructures [1] - 11:14
  restructuring[1] - 11:16
  resubmit [1] - 144:2
  result[4] - 19:3, 43:20,
86:7, 247:18
  results [2] - 35:18, 35:20
  results-oriented[1] - 35:18
  retain[3] - 64:19, 84:22,
281:9
  retained[1] - 84:24
  retaining[1] - 92:7
  retention[1] - 249:5
  rethinking[1] - 23:19
  retracted [1] - 250:24
  retrieve [7] - 37:3, 42:21
  retroactively [1] - 171:18
  return [2] - 197:7, 197:11
  returned [1] - 137:20
  revenue[4] - 30:16, 30:18,
31:8, 58:11
  reversal[1] - 169:4
  reverse[4] - 170:18,
170:24, 173:14, 174:25
  Review[1] - 32:25
  review[39] - 7:16, 8:2, 8:4,
13:3, 13:7, 13:12, 14:20,
14:25, 15:21, 20:12, 33:8,
38:8, 39:17, 42:15, 50:12,
52:7, 52:22, 52:25, 53:4,
56:18, 57:11, 57:17, 70:3,
104:21, 132:4, 158:21,
158:24, 163:17, 164:18,
165:12, 172:18, 172:19,
175:23, 203:24, 204:3,
205:5, 252:2, 252:6, 253:7
  reviewed [21] - 7:19, 7:21,
13:14, 13:15, 14:9, 14:21,
16 11, 32:10, 32:14, 32:23,
33:6, 36:14, 49:24, 50:15,
51:23, 66:7, 68:25, 75:8,
15:15, 92:21, 255:18
  reviewer[1] - 52:6, 58:8,
85:9

  reviewing [2] - 15:14, 19:16
  Reviews [1] - 48:20
  reviews [3] - 33:13, 163:11,
163:12
  revised[17] - 196:2, 214:24
  reward[1] - 64:19
  rewarded[1] - 261:12
  rich [2] - 221:25, 222:4
  Richard [2] - 71:17, 72:14
  Ridgewood [7] - 123:25,
124:10
  risk[1] - 258:9
  road [1] - 118:21
  rob[1] - 238:14
  Rob[10] - 13:15, 54:10,
55:14, 82:19, 93:17, 189:13,
111:10, 190:4, 193:11,
215:13
  Rock[1] - 119:23
  rock[3] - 121:9, 121:14,
121:19
  rock's[1] - 120:2
  ROCNLANd[1] - 266:4
  Roger[1] - 230:24
  role[16] - 23:13, 27:2,
27:11, 21:20, 27:24, 28:2,
28:16, 28:25, 85:7, 112:25,
130:20, 155:13, 175:18,
252:5, 262:3
  room [2] - 82:8, 134:17
  roughly[3] - 235:18, 236:4,
240:20
  rounding[1] - 214:23
  route [2] - 230:11, 232:6
  routes [1] - 222:13
  routine[1] - 67:25
  RSt [7] - 64:25, 85:9
  RStis [4] - 64:23, 88:6,
88:15, 91:8
  rubber[1] - 103:25
  rule [7] - 112:16, 112:18
  rules [7] - 4.24, 118:4
  RULINGS[1] - 268:14
  run [2] - 71:13, 234:20
  running[1] - 208:15
  rvns [7] - 12:17, 237:2

S

  sake [9] - 183:2, 210:10,
211:13, 211:20, 214:23
  Salary [1] - 54:18
  salary[15] - 37:18, 37:19,
37:21, 31:22, 39:12, 44:11,
44:13, 51:8, 55:5, 55:16,
55:21, 59:20, 80:2, 166:13,
167:6
  sales[18] - 12:19, 14:15,
14:18, 27:22, 31:9, 31:12,

31:13, 31:19, 41:1, 118:15,
119:13, 162:19, 162:20,
205:2, 209:7
  salespeople [2] - 32:2,
162:8, 162:14, 162:16,
184:11, 204:4, 204:19
  Sanford[1] - 82:19
  Sanjay [7] - 135:15, 135:18,
135:20, 135:21, 136:7,
138:10, 137:13
  Santo [1] - 221:11
  satisfied [7] - 23:12, 42:4
  Saturday [7] - 142:17,
224:7
  save[1] - 281:15
  saving[1] - 283:15
  saw [9] - 9:11, 50:19, 84:19,
19:6, 121:24, 122:14, 151:2,
151:4, 215:4
  scenario [4] - 244:13
  Schedvia[1] - 76:19,
85:25, 95:10, 99:8
  schedule [24] - 77:6, 77:11,
78:12, 84:13, 87:25, 93:22,
95:17, 95:20, 102:8, 130:19,
131:19, 135:2, 135:10,
151:20, 151:23, 152:18,
152:24, 153:4, 153:5,
153:11, 211:2, 212:13,
213:11, 213:23
  scheduled[2] - 80:9,
230:10
  scienco [1] - 10:15
  Scod[1] - 211:21
  sealing [1] - 3:4
  search[1] - 226:2
  searching[1] - 222:20
  SEC [19] - 6:12, 8:13, 8:21,
6:23, 7:5, 7:12, 18:22, 19:25,
20:7, 51:19, 51:22, 69:9,
69:23, 70:4, 102:24, 103:1a,
104:22, 105:11, 107:10
  second[29] - 5:14, 29:12,
35:14, 39:24, 44:24, 55:14,
56:24, 74:19, 76:13, 79:20,
79:23, 99:19, 105:2, 109:8,
115:12, 142:1, 145:12,
141:6, 147:11, 152:8,
152:13, 166:11, 168:15,
201:10, 207:3, 208:18,
233:21, 235:25, 249:24
  second-to[2] - 44:24,
105:2
  second-to-last[2] - 39:24,
56:24, 152:13, 166:11,
208:18
  secondary [7] - 12:15,
12:16
  Section[8] - 79:19, 104:6,
104:13, 248:24, 267:20

saction [1] - 232:7
Securities [1] - 106:10
securities [1] - 131:6
see [1] - 235:20
see [56] - 4:25, 36:24,
45:10, 45:23, 48:8, 46:11,
48:4, 55:18, 57:24, 58:14,
58:15, 78:16, 78:18, 86:2,
86:11, 86:20, 88:16, 99:23,
101:15, 105:5, 109:11,
115:10, 115:16, 117:25,
122:12, 138:20, 142:10,
148:10, 148:23, 156:16,
160:18, 175:21, 181:14,
182:15, 135:25, 200:19,
200:22, 206:2, 216:2, 218:6,
216:7, 221:3, 225:13,
229:11, 231:3, 231:3,
231:18, 232:6, 234:4, 236:9,
237:24, 239:2, 244:3,
244:11, 254:24, 259:17
seeing [14] - 3:17, 118:16,
116:18, 193:19
seek [1] - 168:4, 173:14,
185:21
seeking [1] - 246:24
seem [2] - 121:13, 210:3
segments [2] - 17:10, 17:11
select [1] - 22:19
self [1] - 33:20
Self [5] - 138:7, 133:9,
142:8, 142:12, 144:23
self-assessment [1] -
33:25
Self-Service [5] - 138:7,
138:9, 142:3, 142:12, 144:23
sens [2] - 196:3, 255:22
sensing [2] - 134:25,
250:18
senos [1] - 138:12
senior [10] - 12:5, 27:16,
30:9, 30:12, 54:22, 76:18,
118:15, 171:4, 187:10, 209:6
sense [2] - 27:23, 206:22
sent [23] - 88:4, 133:24,
145:23, 145:25, 147:16,
165:22, 166:22, 135:16,
195:19, 196:5, 196:6,
197:13, 218:13, 218:20,
225:14, 228:12, 233:4,
237:25, 238:4, 254:3,
255:24, 256:2
sentence [14] - 35:14, 36:7,
55:14, 115:14, 137:3,
166:11, 208:18, 238:17,
238:22, 238:2, 238:17,
240:24, 240:25, 244:21
sentences [2] - 134:24
sentiment [1] - 156:22
SEP [1] - 37:14

separate [3] - 31:3, 203:15,
249:13
separated [3] - 8:23,
213:17, 248:8
separation [24] - 3:15, 3:70,
175:6, 175:19, 185:4,
199:10, 202:16, 203:10,
207:13, 208:7, 212:16,
213:18, 214:9, 215:13,
215:24, 240:5, 241:2,
241:18, 241:20, 247:17
September [32] - 11:15,
11:19, 11:21, 11:25, 12:2,
28:20, 29:14, 29:21, 54:16,
61:21, 62:18, 73:70, 74:4,
76:20, 76:22, 76:24, 77:20,
78:3, 78:14, 80:21, 83:4,
89:12, 39:19, 103:11,
109:13, 210:21, 210:25,
211:8, 211:10, 211:14,
211:19, 712:19
sequence [1] - 87:4,
145:22, 168:7
series [2] - 219:21, 220:3
seriously [1] - 124:15
service [12] - 22:16, 30:21,
78:24, 108:7, 138:11,
138:12, 161:25, 181:10,
220:16, 220:19, 233:11,
245:3
Service [6] - 133:7, 138:9,
142:8, 142:12, 144:23
service-level [1] - 22:16
services [3] - 17:7, 227:10,
227:22
session [2] - 204:17, 752:7
set [30] - 13:2, 15:17, 63:18,
63:21, 64:5, 78:12, 82:11,
85:24, 93:24, 97:15, 39:8,
103:4, 103:17, 106:22,
109:2, 121:23, 183:6,
185:25, 189:12, 135:3,
208:15, 210:9, 238:3,
238:11, 239:16, 239:24,
246:6, 247:20, 248:21,
262:13, 263:10, 263:72
sets [1] - 109:5
setting [5] - 36:5, 31:17,
108:11, 122:4, 135:14
settlement [2] - 238:7,
238:15
seven [4] - 47:13, 47:16,
181:21, 222:9
several [1] - 17:19
severance [4] - 207:18,
208:15, 208:20, 210:13
shaft [6] - 78:20, 76:22,
76:24, 80:2, 181:12, 245:5
Shard [1] - 227:16
share [22] - 66:18, 81:17,

36:7, 86:17, 86:24, 131:13,
134:25, 150:3, 151:20,
151:21, 152:18, 153:3,
183:25, 197:18, 199:3,
193:18, 202:15, 203:12,
204:8, 204:12, 208:3, 240:16
shared [16] - 25:15, 68:3,
128:3, 128:17, 135:9,
148:10, 143:14, 152:24,
153:6, 160:14, 183:14,
163:15, 164:23, 204:14,
208:8, 262:10
shareholder [2] - 179:21,
249:8
shareholders [4] - 12:14,
88:8, 86:18, 243:7
shares [6] - 88:3, 33:10,
95:9, 100:25, 259:25,
283:10, 283:18
sharing [1] - 153:11
Shatzberg [2] - 221:25,
222:5
sheet [3] - 19:2, 42:11,
87:22
SHEEY [1] - 263:2
sheets [1] - 18:14
Sheila [5] - 54:9, 54:13,
187:11, 188:17, 169:22
short [1] - 24:15, 131:16,
155:17
shortcomings [1] - 58:12
Shorten [1] - 72:14
shorten [2] - 72:24, 73:10
Shorthand [1] - 1:24
shortly [6] - 25:19, 32:22,
143:20, 156:2, 233:3, 252:25
SHOULD [1] - 269:10
should've [1] - 88:2
show [42] - 34:5, 37:5,
38:25, 33:20, 42:17, 44:19,
48:24, 52:2, 53:5, 54:4, 58:2,
59:6, 61:4, 62:11, 63:8,
73:17, 77:16, 80:25, 80:8,
98:4, 98:7, 100:13, 104:3,
106:25, 107:7, 108:18,
133:19, 138:4, 141:25,
144:13, 160:2, 168:11,
192:21, 200:5, 205:12,
217:14, 223:23, 237:18,
243:22, 254:3, 255:3, 258:25
showed [3] - 42:10, 80:20,
103:18
showing [6] - 152:3,
219:15, 253:14, 256:10,
256:18, 261:17
shown [5] - 83:2, 152:8,
213:4, 233:13, 265:12
side [1] - 45:24
sift [1] - 163:21
sign [4] - 20:8, 20:12,

31:24, 215:10
signature [19] - 35:8, 37:14,
33:5, 40:2, 40:3, 44:24,
52:10, 52:13, 52:14, 56:13,
63:8, 83:7, 78:21, 160:4,
160:7, 180:24, 181:5
signatures [1] - 37:11,
58:11, 83:3
signed [27] - 3:8, 3:8, 3:17,
3:18, 30:17, 30:20, 78:19,
78:22, 105:10, 160:10,
160:23, 161:4, 181:8,
161:15, 181:13, 172:22,
175:24, 180:8, 180:11,
181:17, 182:11, 182:15,
194:13, 194:16, 197:3,
197:4, 138:20
significant [1] - 134:21
significantly [1] - 40:22
signifies [1] - 146:13
signing [11] - 20:15, 53:24,
105:13
similar [5] - 27:20, 28:25,
38:8, 50:4, 203:17
simply [1] - 161:14
site [1] - 221:10, 221:11,
232:21
sites [2] - 227:13, 231:14
sitting [6] - 8:14, 103:3,
108:14, 117:12, 148:3,
178:4, 190:7, 216:22
situated [1] - 119:20
situation [2] - 112:12,
225:22
situations [1] - 75:24
six [1] - 164:20
Skill/Job [1] - 53:12
Skills [1] - 53:13, 53:16
slack [1] - 222:17
slidout [1] - 170:2
slot [1] - 26:14
small [2] - 113:17, 140:7
so [2] - 171:8, 254:13
social [1] - 17:3
socially [1] - 21:2
Sokota [96] - 10:6, 13:15,
54:10, 75:8, 75:15, 75:22,
82:13, 93:17, 93:18, 96:18,
96:17, 96:22, 37:3, 97:12,
97:13, 93:3, 121:12, 121:15,
140:5, 171:15, 171:24,
172:8, 172:12, 173:23,
174:13, 175:8, 176:4, 176:9,
178:7, 179:13, 179:18,
180:2, 180:11, 180:25,
181:17, 181:24, 132:10,
182:11, 182:15, 132:23,
183:18, 185:15, 186:7,
186:13, 186:18, 187:17,
198:21, 189:7, 139:17,

189:21, 190:8, 181:14,
182:2, 132:13, 193:11,
133:18, 193:20, 193:23,
194:3, 194:12, 194:24,
135:18, 195:18, 196:15,
196:21, 196:22, 196:23,
197:2, 197:8, 197:7, 137:14,
197:17, 197:20, 198:5,
138:3, 201:24, 203:18,
214:18, 214:24, 237:25,
238:12, 239:13, 239:17,
240:4, 240:10, 240:18,
241:15, 242:10, 246:10,
246:23, 247:9, 248:3,
248:13, 248:25, 250:4,
250:13

**Sokota's** [3] - 78:20, 181:5,
246:13

**solo** [1] - 31:13

**someone** [8] - 45:18, 84:13,
84:21, 93:15, 93:18, 133:3,
221:12, 249:9

**sometime** [1] - 18:18,
126:2, 128:15, 128:18,
129:5, 148:26, 154:24,
156:3, 156:4, 159:7, 182:11,
255:2

**sometimes** [1] - 131:16

**somewhere** [1] - 17:14,
20:22, 22:26, 27:13, 85:4,
87:18, 125:4, 150:11,
150:15, 158:8, 231:22

**soon** [4] - 25:20, 26:13,
126:16, 232:9

**sorry** [18] - 38:24, 40:14,
75:11, 75:12, 112:21,
121:12, 126:8, 126:12,
130:15, 140:13, 154:17,
205:13, 205:14, 208:19,
220:6, 223:13, 250:10, 263:4

**sort** [4] - 22:8, 27:7, 29:15,
255:21

**sought** [1] - 188:2

**souno** [1] - 31:16

**SOUTHERN** [1] - 1:2

**Southern** [1] - 4:13

**space** [4] - 95:10, 40:12,
134:18, 236:11

**spans** [1] - 220:10

**spare** [2] - 136:24, 232:5

**speaking** [5] - 162:18,
187:18, 189:6, 211:21, 218:3

**specific** [14] - 41:8, 43:5,
78:24, 83:18, 85:6, 92:9,
173:22, 180:21, 184:18,
192:17, 247:15, 255:18,
256:7

**specifically** [13] - 35:14,
36:23, 41:3, 75:23, 99:20,
149:5, 168:18, 127:7, 186:3,

242:18, 248:12, 248:3,
249:18

**specific** [2] - 154:5,
207:10

**spend** [4] - 110:3, 113:11,
119:12, 125:12

**spending** [2] - 224:23,
226:4

**spends** [1] - 118:21

**spent** [5] - 11:11, 18:25,
126:10, 136:20, 223:5

**splice** [3] - 218:5, 222:9,
222:12

**spliced** [2] - 218:8, 222:14

**splicing** [1] - 227:8

**split** [2] - 83:21, 83:22,
89:23

**spoken** [1] - 257:3

**spreadsheet** [20] - 44:7,
44:10, 50:8, 66:2, 75:18,
75:26, 78:2, 83:21, 83:23,
83:24, 84:4, 84:15, 84:16,
84:24, 92:17, 93:6, 33:13,
93:21, 155:21, 166:22,

**spreadsheets** [6] - 75:9,
75:16, 85:10, 92:15, 267:7,
267:11

**staff** [3] - 22:10, 22:12,
22:20, 23:7, 29:9, 28:22,
28:18, 29:2, 128:7

**Stamford** [2] - 2:9, 2:10

**stamp** [4] - 45:23, 61:8,
107:16, 133:22

**stamped** [13] - 86:3,
219:13, 223:21, 226:18,
228:23, 230:19, 233:17,
267:23, 268:3, 268:4, 268:8,
268:6, 268:9

**stand** [3] - 14:8, 126:5,
171:5

**standard** [2] - 178:25,
225:24

**stands** [3] - 54:22, 54:24,
64:25

**start** [9] - 18:15, 19:2, 26:4,
92:4, 129:20

**started** [7] - 22:2, 24:12,
24:14, 25:23, 25:25, 175:11,
218:24

**starting** [5] - 14:21, 27:18,
171:17

**starts** [2] - 168:15, 230:24

**state** [4] - 4:11, 158:10,
178:25, 202:24

**STATE** [2] - 265:2, 266:2

**State** [4] - 1:21, 4:4, 234:16,
266:8

**statement** [14] - 41:13,
41:20, 57:11, 57:21, 144:16,
145:20, 168:3, 178:3, 207:7,

227:16

**statements** [1] - 34:24,
34:25, 105:14

**states** [3] - 234:18, 236:6,
236:9

**States** [4] - 4:18, 10:16,
130:4, 130:5

**STATES** [1] - 1:2

**Status** [5] - 138:13, 145:17,
147:14, 147:15, 147:22

**status** [5] - 18:20, 145:14,
147:24, 148:8, 148:15,
199:15, 203:3, 218:24, 233:8

**stay** [4] - 23:8, 156:17,
156:19, 281:10

**steps** [1] - 188:14

**Steve** [1] - 229:6

**stewart** [1] - 70:16

**still** [18] - 86:21, 85:2, 85:3,
85:4, 111:10, 115:2, 122:24,
125:15, 137:10, 137:13,
157:9, 169:21, 218:2,
220:20, 222:16, 222:13,
232:8, 254:24

**STIPULATED** [1] - 3:2,
3:11, 3:15.

**Stock** [69] - 16:12, 77:19,
76:4, 78:8, 78:18, 78:24,
73:12, 79:18, 80:14, 80:13,
96:9, 97:18, 38:8, 98:13,
98:13, 100:17, 100:23,
101:3, 101:14, 103:2, 103:4,
103:13, 105:5, 107:21,
107:22, 107:23, 176:6,
178:8, 178:19, 179:23,
180:5, 180:12, 180:17,
182:2, 183:20, 186:15,
187:23, 188:5, 188:25,
189:14, 183:23, 190:10,
193:17, 194:25, 195:19,
196:11, 196:17, 197:8,
198:4, 202:5, 203:2, 203:19,
212:12, 212:18, 212:21,
214:25, 241:23, 242:9,
245:18, 247:21, 260:2,
260:21, 262:14, 263:11

**stock** [128] - 8:24, 64:22,
65:2, 65:21, 66:12, 75:13,
76:10, 76:17, 77:2, 77:6,
77:9, 77:10, 79:3, 73:17,
80:2, 80:5, 80:18, 81:15,
82:24, 84:6, 85:11, 86:14,
88:23, 87:3, 89:11, 89:21,
89:22, 81:4, 81:8, 91:14,
91:18, 92:8, 82:12, 92:24,
93:25, 94:4, 94:24, 96:18,
96:23, 99:21, 100:2, 101:23,
102:22, 108:8, 174:2, 174:8,
176:25, 177:3, 178:19,
179:19, 181:12, 182:6,

184:4, 184:16, 184:20,
185:4, 185:8, 185:10,
185:22, 186:11, 186:21,
182:14, 193:24, 198:23,
198:25, 199:5, 199:15,
199:25, 2b1:14, 201:18,
201:19, 201:21, 202:11,
202:20, 202:25, 203:14,
207:18, 208:14, 208:20,
209:12, 209:21, 210:19,
210:18, 212:7, 212:17,
214:5, 214:10, 216:15,
238:19, 239:4, 241:4, 241:8,
241:10, 24:1:11, 241:22,
241:25, 242:18, 244:7,
244:15, 245:4, 245:9,
245:20, 245:23, 246:14,
247:14, 247:19, 247:24,
248:9, 248:20, 249:2, 249:4,
249:3, 249:12, 243:19,
243:22, 260:19, 261:4,
261:8, 261:15, 262:73,
263:10, 263:12, 263:13,
263:15, 263:22, 267:5

**stop** [1] - 240:20

**otored** [1] - 84:29

**straighten** [1] - 189:14

**straightened** [1] - 171:11

**strategic** [2] - 36:3, 124:19

**strategically** [1] - 124:23

**Slreet** [1] - 232:4

**struck** [2] - 239:24, 240:8

**stuff** [4] - 22:18, 26:17,
26:20, 186:8

**style** [3] - 41:11, 41:14,
206:13

**sv0** [1] - 33:18

**sub-objectives** [1] - 33:18

**subject** [25] - 54:18, 78:12,
88:12, 88:15, 88:23, 89:11,
87:10, 102:23, 110:4, 134:9,
149:20, 157:20, 179:15,
183:5, 184:4, 209:18, 212:8,
214:11, 217:21, 219:25,
221:23, 249:23, 253:8,
265:11, 267:9

**submission** [1] - 147:7

**submitted** [5] - 50:11,
50:15, 146:21, 147:2, 147:3

**Substnick** [2] - 70:14,
71:10, 73:11

**subscribed** [2] - 265:22,
269:22

**evbsequent** [21] - 48:13,
53:23, 56:21, 64:13, 84:14,
77:8, 80:19, 103:15, 148:4,
153:8, 757:17, 158:8,
165:11, 185:13, 189:21,
190:8, 205:4, 205:9, 226:9,
250:18, 251:25

subsequently [5] - 96:8,
97:19, 115:22, 167:10,
196:12
substance[6] - 8:15, 8:18,
39:18, 247:8, 258:4
substantiate [1] - 261:2
succeeding [1] - 19:20
success [5] - 17:10, 40:23,
41:17, 42:2, 261:13
successful [4] - 35:18,
35:22, 208:12, 262:5
suggest[1] - 246:10
suggested [1] - 173:24
Suite [1] - 2:4
sum [1] - 33:16, 247:8,
258:4
summary [2] - 41:18,
236:18
Sunday [6] - 142:21,
143:21, 144:4, 144:13,
228:16, 230:13
supervise [2] - 12:24, 30:13
supervising [2] - 12:22,
15:13
supervisor [11] - 15:5,
23:21, 35:6, 43:16, 48:5,
53:12, 110:20, 111:3,
111:17, 111:18, 111:25,
112:3, 112:5, 112:20,
112:25, 115:20, 117:2,
120:7, 120:8, 120:3, 120:25,
121:4, 121:6, 127:12, 139:8,
141:18, 147:18, 147:13,
147:24, 148:6, 158:22,
159:17, 256:17
Supervisor[1] - 40:4
Supervisor's [1] - 161:22
Supervisor/Reviewer [2] -
52:15, 160:8
supervisors [1] - 30:24
Supervisory [1] - 53:15
support [1] - 33:17
supporting [1] - 33:18
supposed [4] - 122:23,
190:17, 190:19, 180:22
supposedly [1] - 8:21
surprise [1] - 225:25
survival [1] - 27:8
SVP[1] - 54:21, 53:11
SVPs [1] - 54:19
sworn [6] - 3:6, 3:8, 3:18,
4:3, 265:22, 283:22
system [1] - 131:21, 146:8,
147:25

T

tool [1] - 224:12
talent [3] - 92:7, 124:13,

124:16
Taggart [1] - 124:15
task [1] - 161:24
team [20] - 12:23, 21:4,
21:13, 21:18, 22:7, 26:24,
27:10, 30:3, 30:23, 31:12,
31:13, 31:14, 31:19, 168:25,
222:18, 224:24, 225:5, 235:8
Team [1] - 53:16
teams [1] - 30:14
Technical [1] - 53:12
technicians [1] - 232:4
techs [1] - 772:22
telecommute [1] - 110:23
telecommutes [1] - 120:14
telecommunicel [1] - 148:8
telecommuting [64] - 8:21,
9:8, 9:21, 109:22, 110:8,
110:11, 110:14, 110:13,
111:3, 111:20, 112:2, 112:4,
112:19, 113:2, 114:20,
115:2, 115:19, 115:21,
116:5, 117:5, 117:13,
117:21, 113:17, 119:23,
120:5, 120:23, 121:2,
121:14, 121:18, 121:20,
121:25, 122:11, 122:18,
127:16, 127:19, 127:25,
128:5, 128:18, 133:18,
138:23, 141:8, 141:19,
141:23, 142:18, 143:6,
146:14, 143:23, 149:25,
151:13, 153:17, 159:21,
160:15, 181:17, 173:5,
256:15, 758:24, 257:8,
257:23, 257:24, 258:3,
256:5, 258:11, 267:13,
267:16
Telecommuting [2] -
115:10, 145:5
telephone [1] - 74:17,
74:24, 82:7, 82:9, 193:17,
198:14, 204:15, 234:20
telephonic [9] - 74:8,
74:11, 74:13, 81:22, 81:24,
83:14, 94:19, 149:17, 174:18
telephonically [3] - 93:4,
83:9, 257:14
temporary [1] - 233:12
ten [2] - 58:2, 76:21
tenure [7] - 23:16, 60:18
term [6] - 61:20, 63:17,
63:25, 80:14, 208:14, 209:5,
210:9, 261:10
Term [1] - 82:3
terminate [9] - 252:13,
253:15, 254:15, 255:16,
256:3, 258:22, 259:9,
260:25, 263:20
terminated [19] - 22:25,

24:10, 25:5, 25:18, 79:17,
80:11, 101:24, 108:7,
135:20, 194:5, 245:7, 253:2,
256:22, 258:10, 258:19,
259:15, 280:5, 260:10,
281:18
terminating [1] - 24:5
termination [16] - 25:13,
79:24, 99:22, 100:2, 181:10,
239:6, 244:13, 245:2,
258:14, 259:22, 280:15,
281:3, 261:5, 261:8, 261:20,
264:8
terms [96] - 9:15, 3:21,
41:24, 75:5, 78:7, 79:12,
93:24, 94:4, 98:22, 37:6,
97:20, 98:21, 99:13, 100:6,
100:10, 101:2, 101:17,
101:20, 102:21, 103:12,
103:17, 109:25, 110:20,
122:4, 127:19, 128:18,
135:13, 150:4, 150:7, 150:8,
151:10, 153:9, 173:25,
178:5, 176:13, 177:3, 178:4,
178:8, 178:14, 179:22,
181:25, 182:6, 183:5,
183:19, 185:16, 185:19,
188:14, 188:21, 187:6,
187:7, 187:22, 188:2, 188:4,
188:12, 188:24, 183:12,
189:22, 190:10, 132:8,
194:21, 195:15, 198:10,
197:15, 198:3, 198:23,
199:10, 201:14, 201:21,
201:25, 202:17, 203:10,
203:19, 208:6, 210:18,
212:18, 213:16, 214:9,
214:19, 215:3, 215:17,
238:3, 238:9, 238:11,
238:12, 239:19, 240:5,
242:8, 242:13, 242:17,
245:8, 245:18, 246:11,
748:20, 258:23, 258:11,
260:20
testified [3] - 4:5, 32:15,
170:18
testimony [12] - 24:11,
116:3, 132:12, 133:12,
161:13, 177:3, 182:9,
212:14, 243:24, 256:12,
265:3, 263:7
THE [3] - 130:13, 130:15,
192:25, 137:22, 237:12,
254:18, 260:3
themselves [1] - 236:7
therein [1] - 244:6
thereto [1] - 3:17
thinking [2] - 154:4, 155:15
this [14] - 35:5, 45:6,
57:20, 107:14, 115:14,

206:14, 206:17, 208:18,
208:13, 223:3, 232:3,
232:14, 232:22, 233:2
third-party [2] - 232:3,
232:22, 233:2
third-14-last [4] - 35:5,
45:6, 115:14, 208:18
thirds [1] - 102:13
Thomas [10] - 13:20, 113:8,
113:13, 114:24, 116:4,
117:7, 117:14, 117:22,
217:17, 287:14
thoughts [2] - 160:14,
203:4
three [16] - 6:9, 18:25, 48:4,
48:10, 58:2, 58:9, 61:24,
73:15, 210:19, 219:12,
219:17, 222:16, 230:18,
230:23, 267:23, 268:7
three-page [4] - 219:12,
230:18, 267:23, 286:7
throughout [1] - 31:3,
130:3, 130:5
Thursday [3] - 193:12,
223:13
tied [1] - 234:16
tight [1] - 234:20
Tim [1] - 222:5
timing [9] - 176:7, 173:20,
178:24, 173:3, 182:14,
183:21, 188:7, 203:22,
215:20
title [9] - 27:14, 28:4, 28:11,
28:22, 30:8, 49:4, 120:2,
255:24, 256:2
to-test [1] - 107:15
today [23] - 4:20, 6:8, 7:15,
8:15, 10:7, 108:14, 115:2,
117:12, 137:11, 148:4,
190:7, 193:13, 200:14,
206:20, 205:24, 218:22,
222:7, 248:14, 253:4, 259:4
together [8] - 12:20, 23:7,
160:24
Tom [1] - 14:15, 23:22,
217:22
tonight [1] - 218:4
took [29] - 8:4, 16:5, 22:23,
40:21, 44:2, 68:14, 74:4,
82:17, 94:3, 127:3, 127:10,
154:11, 157:15, 174:10,
174:12, 175:17, 178:21,
180:2, 180:13, 182:17,
183:3, 198:12, 204:2, 252:2,
257:7, 258:18, 253:21,
260:14
tool [1] - 261:12
top [6] - 56:25, 146:20,
201:5, 207:6, 225:13
total [2] - 47:14, 227:22

totalleo [1] - 214:2
towards [1] - 155:20, 156:6, 238:23
town [1] - 72:7
traced [1] - 18:2, 18:5, 18:11
tracing [1] - 18:14
transcribe [1] - 5:15
transcript [5] - 265:11, 286:13, 269:6
travel [15] - 128:24, 129:24, 130:18, 131:2, 131:14, 191:18, 134:25, 135:10, 151:20, 151:23, 152:18, 152:24, 153:4, 153:6, 153:11
traveleo [6] - 129:17, 129:20, 130:7, 131:4, 131:9, 131:11, 131:12, 131:13
traveling [11] - 113:11, 128:11, 130:22, 132:15, 132:19, 132:20, 133:13, 150:11, 150:16, 151:18, 218:10
tremendous [1] - 131:23
Tresset [1] - 2:10
trial [1] - 3:13
tries [1] - 226:3
true [10] - 8:13, 55:24, 55:25, 105:14, 105:21, 165:5, 178:3, 207:18, 265:11, 266:13
trusted [2] - 36:3, 36:8
try [3] - 9:21, 87:20, 253:9
trying [4] - 145:21, 207:11, 221:15, 222:16
Tuesday [1] - 223:12
turn [2] - 32:6, 85:25
Turtz [1] - 164:13
twice [1] - 203:11
Two [1] - 2:3
two [16] - 5:3, 18:14, 16:18, 53:9, 89:23, 83:24, 102:13, 124:4, 134:24, 142:5, 144:22, 133:9, 212:21, 223:20, 224:3, 237:12, 249:10, 268:3
two-minute [2] - 133:3, 237:12
two-page [3] - 142:5, 144:22, 223:20, 224:3, 268:3
two-thirds [1] - 102:13
type [1] - 14:4
types [1] - 181:10
typewritten [3] - 58:4, 58:7
typical [1] - 77:13
typically [5] - 43:11, 74:15, 82:21

U
.............
U.K [1] - 141:4
U.9 [2] - 22:2, 30:15
U8S [1] - 220:14, 222:15
vivimately [2] - 31:5, 183:4
Unacceptable [1] - 165:7
uhoel [26] - 37:14, 75:4, 75:17, 85:14, 102:16, 102:17, 110:7, 117:24, 118:4, 145:14, 145:18, 177:4, 187:6, 188:12, 182:8, 212:18, 217:4, 224:23, 238:20, 233:4, 242:13, 245:7, 245:13, 260:20
underneeth [4] - 88:15, 115:13, 180:7, 181:4
unoerstood [6] - 66:5, 128:18, 133:12, 709:16, 210:8
vnoertaken [1] - 233:9
vnlortunately [1] - 121:9
vnfilaterafly [1] - 171:7
Un1 [24] - 53:15, 77:19, 78:4, 78:6, 78:16, 78:24, 79:12, 79:16, 97:19, 98:8, 98:13, 98:19, 100:17, 100:23, 101:3, 101:14, 103:2, 108:5, 107:21, 107:22, 107:23, 212:12, 212:18
unit [9] - 91:4, 91:19, 92:12, 33:25, 34:4, 96:15, 96:23, 140:7, 131:12
Uniteo [4] - 4:13, 10:16, 130:4, 130:5
UNITEO [1] - 1:2
units [54] - 65:2, 65:21, 75:19, 76:18, 79:17, 80:2, 80:8, 82:24, 84:9, 86:14, 86:23, 87:3, 89:11, 89:17, 90:5, 31:14, 92:6, 92:74, 94:24, 95:15, 95:18, 99:6, 99:22, 100:3, 101:23, 102:12, 102:17, 108:6, 184:4, 185:10, 203:14, 212:7, 212:17, 213:12, 213:14, 213:24, 214:2, 214:5, 214:11, 238:19, 235:4, 241:4, 241:8, 241:10, 241:22, 242:18, 244:7, 244:15, 245:4, 245:9, 245:20, 245:23, 243:14, 247:20
University [3] - 10:19
unknown [1] - 232:8
unless [3] - 151:18, 176:22, 178:12, 258:10
unlimited [1] - 118:8

unglanneo [1] - 230:6
unsavisfactory [2] - 47:3, 53:8
untimely [1] - 121:7
untrue [2] - 243:12
vnvested [23] - 80:2, 99:21, 100:2, 101:23, 103:6, 181:12, 184:16, 203:14, 241:4, 244:7, 244:15, 245:4, 245:9, 245:20, 245:23, 245:14, 247:19, 248:9, 249:12, 259:25, 261:4, 282:12, 263:10
unwind [2] - 167:23, 167:25
u0 [28] - 21:4, 21:11, 24:17, 30:17, 33:18, 91:7, 110:20, 113:22, 115:22, 118:8, 126:24, 135:16, 137:4, 137:7, 141:10, 146:20, 161:10, 213:7, 222:3, 222:14, 222:15, 223:9, 225:13, 233:11, 235:21, 253:14, 256:10, 258:18, 261:17
vooate [2] - 217:21, 223:4
vpdated [3] - 122:23
updates [1] - 232:8
Updetes [1] - 134:3
upset [1] - 157:4
veual [1] - 67:19
utilize [3] - 17:7, 86:17, 228:3
vttized [1] - 43:11

V
.............
vacuum [1] - 211:21
value [7] - 12:14, 86:16, 179:21, 243:6, 243:8, 261:9, 261:11
varience [3] - 224:11, 224:13, 224:15
vasiances [1] - 225:20
veried [2] - 13:10, 74:18
various [14] - 30:14, 34:12, 47:8, 81:15, 91:8, 91:18, 123:25, 138:13, 216:18, 254:4
Vartanism [1] - 227:18
verying [2] - 21:24, 75:18
velocity [1] - 224:19
venoot [5] - 232:3, 232:5, 232:15, 232:22, 233:3
venoors [1] - 30:25
verbal [3] - 114:13, 118 24, 150:21
verbalty [4] - 5:18, 114:9, 117:2, 143:12
verbia3e [1] - 248:21

verify [1] - 227:10
Version [1] - 109:11
versions [1] - 109:15
versus [2] - 162:7, 225:22
vest [18] - 76:20, 76:22, 78:24, 80:3, 80:9, 80:10, 100:3, 101:24, 102:15, 102:17, 181:13, 201:19, 212:8, 212:17, 214:4, 214:6, 245:5
vesleo [7] - 90:8, 184:16, 138:25, 209:22, 209:23, 241:8, 242:19
vesting [39] - 77:5, 77:11, 78:11, 73:16, 84:12, 87:14, 87:22, 88:3, 83:10, 93:22, 35:17, 95:20, 95:21, 95:22, 99:21, 101:18, 1b2:8, 108:6, 185:3, 185:7, 185:13, 188:10, 134:5, 201:22, 203:14, 203:11, 211:2, 212:12, 212:13, 213:11, 213:22, 213:23, 238:19, 233:3, 244:7, 244:15, 247:13
vesta [1] - 201:16, 201:21, 202:11
vettso [1] - 224:21
viable [1] - 31:21
vice [5] - 54:22, 76:18, 118:15, 135:21, 209:6
view [31] - 22:16, 22:17, 33:3, 41:14, 92:5, 124:18, 127:18, 139:10, 141:8, 141:14, 148:6, 153:17, 183:25, 164:5, 171:3, 184:3, 186:20, 196:6, 201:16, 202:3, 202:13, 202:14, 203:13, 204:8, 210:4, 244:25, 248:13, 256:22, 257:22, 260:10, 262:9
view.. [1] - 206:24
vieweo [1] - 188:17
views [4] - 8:22, 68:16, 250:24, 253:8
violating [5] - 131:6, 256:14, 256:16
violation [1] - 258:5
Virginia [1] - 140:7, 238:4, 238:15
vocal [1] - 164:16
votume [1] - 41:5
voluntarify [11] - 23:18, 155:5, 203:15, 209:24, 245:17, 245:22, 248:13, 247:24, 248:4, 248:8, 243:13
vstvntary [15] - 175:5, 185:4, 138:10, 202:17, 2o3:10, 208:7, 212:16, 213:16, 214:3, 215:17, 215:24, 240:5, 241:18,

241:20, 247.17
vote [1] - 68:4
VP [4] - 12:5, 27:18. 30:9, 30:12
VPs [1] - 171:4

# W

wall [2] - 5:7, 45:7
waiveo [1] - 3:5
wsuamieo [1] - 5:13
Weonesoey [2] - 133:25, 168:18
week [4] - 137:17, 181:11, 234:4, 235:11
weekeno [3] - 230:2, 230:4
weeks [1] - 131:8
weinstein [1] - 267:5
Weinstein [1] - 4 18
WEINSTEIN [51] - 2:5, 4:10, 58:5, 73:3, 73:5, 73:8, 85:9, 35:16, 88:6, 93:4, 103:24, 117:17, 117:23, 118:3, 118:10, 123:4, 130:11, 137:22, 138:3, 157:24, 173:5, 183:10, 193:4, 193:6, 211:7, 211:11, 211:17, 213:8, 217:11, 213:10, 223:19, 226:15, 228:22, 230:18, 233:15, 237:14, 243:2, 243:6, 243:15, 243.13, 244:3, 244:17, 244:22, 246:18, 247:3, 254:12, 262:16, 263:2, 263:23, 264:3, 284:11
WESTCHESTER [1] - 265:4
WHEREOF [1] - 268:21
White [21] - 1:13, 2:4, 4:14, 90:22, 94:10, 125:19, 125:21, 126:21, 128:7, 132:13, 132:16, 132:23, 133:7, 133:14, 134:11, 134:22, 135:24, 136:2, 138:11, 138:21, 138:22, 137:8, 137:11, 137:14, 150:18, 216:8, 216:11, 216:17, 256:17
whole [1] - 238:15
Wiggin [1] - 9:25
WIGGIN [1] - 2:8
WILLIAM [3] - 1:17, 265:8, 265:20
William [1] - 4:13
willin3 [2] - 156.18, 209:16
willingness [1] - 253:5
Winski [2] - 226:25, 227:2
wished [5] - 153:19, 155:5, 157:20, 158:19, 256:3
wishss [1] - 115:18

withoraw [1] - 8.74
withorawn [9] - 6:22, 26:3, 68:17. 126:24. 163:3, 167:20. 175:10, 191:20. 233:10
withholo [3] - 167:11. 168:3, 172:9
WITHES 9 [6] - 130 13, 130:15. 192:25. 197.22, 237:12, 254:18. 260:3, 266:21
Witness [49] - 1:17, 34:18, 37:4. 37:13, 38:5, 38:12, 39:4. 40:5, 40:9. 42:22, 43.5, 44:23. 48 23. 52 9, 56:12, 56:20, 57:3, 59:13. 61:11, 62:16, 73:24, 77:23, 81:10, 86:4, 87:16, 90:17. 98 16, 99:11, 100:20, 104:17, 105:4, 106:2, 107:11, 108:22, 115:6, 134:3, 145:2. 157:15, 160 6, 131:2. 133:14, 193:25, 200 11, 205:21, 219:9, 231:2, 237:22, 250:11, 253:5
witness [3] - 7 10, 243.5. 265:3
wonoerful [1] - 35.17
woro [3] - 31:3, 160 18, 161.13
woros [18] - 35 13, 35:17, 35:20, 35:24. 36 10. 46:11. 40:17. 58.16. 91 24, 115 15. 129:6. 162:11. 205 24
workflow [6] - 142 8, 148:14, 148:16. 153:16
works [1] - 227 3
workweek [2] - 113:24, 228:15
Wortocom [1] - 23:23
woulo've [15] - 36:4, 93:13. 114:2. 132:11, 132:15. 144:12. 156:5. 153:12, 171:20. 179:18. 134:12. 194:17, 194 70. 210.21. 263:17
WP [6] - 134:10, 135:2, 135 5, 135:14, 152:19. 152 21
wrne [4] - 40.19. 41 10, 41:15. 224:9
willes [5] - 227 20. 237 2. 235:20, 237 3, 751:7
willing [16] - 33:9. 57 10. 114 18, 120:23, 121:23, 122:2. 122:4, 150 22, 151.9, 168:15
written [12] - 25 17. 61 2, 96 7. 96:8, 96:9. 96:73, 114 6, 117:13, 121 18,

204:20, 215 3, 257:2
wrole [14] - 25:16, 32:25. 34:21. 34:22, 35:9, 35:13, 35:19. 38:2, 142:24, 169:15, 221:5, 221:16, 221:20, 273:12, 225:10, 227:24, 228:4, 229:18. 232 12, 240:10

# X

Xs [1] - 45:12

# Y

YEAR [2] - 57:23, 58:13
yeal [32] - 13:2, 13:9, 15:18, 23.20, 33:15. 33:19, 38 18, 33:7, 39.17, 40:8, 40:21, 41:3, 42.14, 47:10, 43:24, 50:5. 57:9. 31:13, 85:6, 92:5, 94:18. 122:21, 123:2, 123:5, 154:8, 154:25, 155:21, 165:13, 171:5, 207:18, 208:21, 267 16
years [1] - 18:25, 81:24, 124:4, 154:2. 158:25, 165:20, 243:10
yellow [1] - 224:13
yesterday [1] - 133:13
yielo [1] - 31:8
YORK [9] - 1:2, 285:2. 266:2
York [9] - 1.13. 1:21. 2:4, 4:5, 4:14. 4:13, 18:12, 232:5, 266:8
Youn3 [1] - 236:22
young [2] - 236:23, 236:25
young's [1] - 237:5
yourself [1] - 21:20
yug [3] - 126.3, 157:5, 168:10

# Z

Zee [1] - 124.15